**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JUDAH LEEDER, individually and on Behalf of all others similarly situated, | ) ) | Case No. 1:21-cv-00430 |
| | ) | |
| | ) | District Judge Martha M. Pacold |
| Plaintiff, | ) | Magistrate Judge M. David Weisman |
| | ) | |
| v. | ) | |
| | ) | |
| THE NATIONAL ASSOCIATION OF REALTORS, ET AL., | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' JOINT MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

FACTS .................................................................................................................................... 2

ARGUMENT .......................................................................................................................... 3

I.     Plaintiff Has Standing to Pursue his Antitrust Claims ................................................ 3

       A.    Plaintiff and Members of the Putative Class are Direct Purchasers of Buyer Agent Services ........................................................................................................ 3

       B.    Plaintiff Adequately Pleads his Injunctive Relief Claim ................................. 6

II.    Plaintiff Plausibly Pleads a Section 1 Claim ............................................................... 9

       A.    Defendants Committed a *Per Se* Violation of the Sherman Act .................... 9

       B.    Defendants' Rule of Reason Arguments Fail .................................................. 11

            1.    Plaintiff Satisfies the "Quick Look" Analysis. ........................................ 11

            2.    Plaintiff Plausibly Pleads a Relevant Market and Anticompetitive Effects in the Market. ..................................................................................... 11

            3.    *American Express* Does Not Dispose of Plaintiff's *Per Se* Claim ......... 12

III.   Plaintiff Plausibly Pleads an Unjust Enrichment Claim ............................................ 14

IV.   Plaintiff Should be Given Leave to Amend ............................................................... 15

CONCLUSION ..................................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988)..................................................................................................................10

*Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
    456 U.S. 556 (1982)..................................................................................................................10

*Animal Sci. Prods., Inc., v. China Minmetals Corp.*,
    34 F. Supp. 3d 465 (D.N.J. 2014)...............................................................................................4

*Apple v. Pepper*,
    139 S. Ct. 1514 (2019) .......................................................................................................4, 5, 6

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................................................3

*Bausch v. Stryker Corp.*,
    630 F.3d 546 (7th Cir. 2010) ....................................................................................................15

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................................................3

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ......................................................................................................5

*In re Broiler Chicken Antitrust Litig.*,
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ..........................................................................................8

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986)................................................................................................................6, 7

*Catalano, Inc. v. Target Sales, Inc.*,
    446 U.S. 643 (1980)..................................................................................................................10

*City of Rockford v. Mallinckrodt ARD, Inc.*,
    360 F. Supp. 3d 730 (N.D. Ill. 2019) ........................................................................................15

*In re Clark Oil & Ref. Corp. Antitrust Litig.*,
    422 F. Supp. 503 (E.D. Wis. 1976) .............................................................................................8

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.,*
    767 F. Supp. 2d 880 (N.D. Ill. 2011) ........................................................................14

*In re Dealer Mgmt. Sys. Antitrust Litig.,*
    362 F. Supp. 3d 510 (N.D. Ill. 2019) ............................................................ 6, 7, 11

*In re Delta Dental Antitrust Litig.,*
    484 F. Supp. 3d 627 (N.D. Ill. 2020) ..............................................................*passim*

*Denny's Marina, Inc. v. Renfro Prods., Inc.,*
    8 F.3d 1217 (7th Cir. 1993) .........................................................................................9

*Dolan v. Fairbanks Capital Corp.,*
    No. 03-CV-3285, 2006 WL 8441225 (E.D.N.Y. Dec. 15, 2006) ............................5

*Fashion Originators' Guild of Am., Inc. v. FTC,*
    312 U.S. 457 (1941) ..................................................................................................10

*G & S Holdings LLC v. Cont'l Cas. Co.,*
    697 F.3d 534 (7th Cir. 2012) ............................................................................11, 12

*Gelboim v. Bank of Am. Corp.,*
    823 F.3d 759 (2d Cir. 2016) .....................................................................................10

*Gen. Leaseways, Inc. v. National Truck Leasing Ass'n,*
    744 F.2d 588 (7th Cir. 1984) ...................................................................................10

*Illinois Brick Co. v. Illinois,*
    431 U.S. 720 (1977) ....................................................................................................3

*In re K-Dur Antitrust Litig.,*
    338 F. Supp. 2d 517 (D.N.J. 2004) ..........................................................................14

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
    551 U.S. 877 (2007) ....................................................................................................9

*Marion Healthcare, LLC v. Becton Dickinson & Co.,*
    952 F.3d 832 (7th Cir. 2020) .....................................................................................5

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
    473 U.S. 614 (1985) ....................................................................................................8

*Moehrl v. Nat'l Ass'n of Realtors,*
    492 F. Supp. 3d 768 (N.D. Ill. 2020) ......................................................................12

*Montana v. Crow Tribe of Indians,*
    523 U.S. 696 (1998) ..................................................................................................14

*National Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984) ........................................................................................................10

*National Soc'y of Prof'l Eng'rs v. United States,*
435 U.S. 679 (1978) ......................................................................................................10

*In re NorthShore Univ. HealthSystem Antitrust Litig.,*
No. 07-cv-4446, 2018 WL 2383098 (N.D. Ill. Mar. 31, 2018) ....................................5

*Ohio v. American Express Co.,*
138 S. Ct. 2274 (2018) ..............................................................................................12, 13

*Pillsbury Co. v. Conboy*,
459 U.S. 248 (1983) .........................................................................................................8

*In re Plasma-Derivative Protein Therapies Antitrust Litig.,*
764 F. Supp. 2d 991 (N.D. Ill. 2011) .............................................................................3

*In re Plasma-Derivative Protein Therapies Antitrust Litig.,*
No. MDL 2109, 09 C 7666, 2012 WL 39766, (N.D. Ill. Jan. 9, 2012) ........................7

*Ploss v. Kraft Foods Grp., Inc.,*
197 F. Supp. 3d 1037 (N.D. Ill. 2016) .........................................................................12

*PLS.com, LLC v. Nat'l Ass'n of Realtors,*
No. 220CV04790, 2021 WL 369545 (C.D. Cal. Feb. 3, 2021) ...................................13

*Sitzer v. Nat'l Ass'n of Realtors,*
420 F. Supp. 3d 903 (W.D. Mo. 2019) .........................................................................11

*In re Surescripts Antitrust Litig.,*
No. 1:19-cv-06627, 2020 WL 4905692 (N.D. Ill. Aug. 19, 2020) ..............................15

*Tamayo v. Blagojevich,*
526 F.3d 1074 (7th Cir. 2008) ........................................................................................3

*U.S. Gypsum Co. v. Ind. Gas Co., Inc.,*
350 F.3d 623 (7th Cir. 2003) ..........................................................................................8

*United States v. Concentrated Phosphate Export Ass'n, Inc.*
393 U.S. 199 (1968) .........................................................................................................4

*United States v. Gasoline Retailers Ass'n,*
285 F.2d 688 (7th Cir. 1961) ........................................................................................10

*US Airways, Inc. v. Sabre Holdings Corp.,*
938 F.3d 43 (2d Cir. 2019) ...........................................................................................13

**Statutes**

15 U.S.C. § 26 ................................................................................................................... 6

28 U.S.C. § 1332(d) ......................................................................................................... 15

**Other Authorities**

Restatement (First) of Restitution § 1 (1937) ............................................................... 14

## INTRODUCTION

This case asserts an antitrust claim concerning services offered by real estate agents to home buyers. In November 2020, Defendant National Association of Realtors ("NAR") entered a settlement with the United States Department of Justice ("DOJ") to resolve claims arising from anticompetitive practices in the real estate market. As part of this settlement, DOJ found that NAR and its members, including the "Broker Defendants,"[1] sought to artificially inflate the commissions paid to real estate agents by adopting a series of contractual restraints. Defendants enforced these anticompetitive rules by conditioning agent access to real estate listings ("MLS") on compliance with these terms. The DOJ's investigation found that this conduct harmed home buyers.

Plaintiff Judah Leeder ("Plaintiff") is one of those injured home buyers. In 2020, Plaintiff purchased a home that was listed on a NAR-controlled MLS. As a result of the unlawful agreement among the Defendants, Plaintiff was forced to pay a higher commission to his real estate agent than he otherwise would have, among other harms.

In their bid to dismiss this case, Defendants make a series of counterfactual arguments regarding the structure of the real estate market, the relationship between home buyers and their agents, and the mechanics of a real estate transaction. Defendants ignore that potential home buyers, like Plaintiff and putative class members, are the ones who consume buyer agent services. Potential home buyers select their buyer agents. Potential home buyers enter into contractual relationships with buyer agents. Potential home buyers pay buyer agents directly from the funds used to purchase the home. These facts demonstrate that Plaintiff and putative class members have antitrust standing to assert a claim relating to buyer agent services because they are the direct—indeed, the only—

---

[1] The "Broker Defendants" are Homeservices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., Re/Max LLC, and Keller Williams Realty, Inc.

purchasers of those services. For these and the reasons explained below, this Court should deny Defendants' motion in its entirety.

## FACTS

Most home buyers purchase their homes with the assistance of a real estate agent. ¶¶ 2, 3, 31.[2] Home buyers retain buyer agents to provide unique services at each stage of the transaction, from identifying property options that match the buyers' criteria to coordinating the closing and the actual purchase of the home. ¶¶ 3, 41, 63. Home sellers have a different set of needs and typically engage a separate seller agent to assist with, for example, marketing the property and developing a pricing strategy that maximizes the value of their home. ¶ 42. The buyer selects the buyer agent, enters into a contract with the buyer agent, and pays the buyer agent by placing the home sale price into an escrow account, which the escrow agent distributes directly and simultaneously to the seller, the buyer agent, and the seller agent at closing. *Id.*

In most instances, the homes involved in these transactions are offered for sale through an MLS. ¶¶ 92-98. The MLSs at issue here are the systems maintained by Defendant NAR. ¶¶ 4-5, 44. NAR's MLSs dominate the market. ¶¶ 5, 36. Significantly, access to the homes listed on NAR's MLSs is restricted to member brokers. ¶ 5. To become a member and gain this all-important access to NAR's MLSs, real estate agents must agree to a series of rules. ¶ 5. One such rule requires seller agents listing a property on an MLS to make a "blanket unilateral offer[] of compensation" to the buyer agent that reflects a fixed percentage of the purchase price of the home. ¶ 7. This same rule prohibits agents from disclosing to buyers the total commission. *Id.*

The lack of disclosure about commission prices leads many buyers to incorrectly believe that their buyer agent's services are free. ¶¶ 43, 53, 78-80, 88, 123. But as the DOJ explained, NAR's rules

---

[2] "¶___" refers to paragraphs in Plaintiff's Class Action Complaint, ECF No. 1.

"governing, among other things, the publication and marketing of real estate, real estate broker commissions, as well as real estate broker access to lockboxes… were widely adopted by NAR's members resulting in a lessening of competition among real estate brokers to **the detriment of American home buyers**." ¶ 6 (emphasis added).

The complaint sets forth in detail how Defendants' conspiracy maintained buyer agent commissions at artificially high levels by, among other things, enforcing restrictions against commission disclosure, permitting buyers' agents to misrepresent that their services were "free," and allowing agents to steer home buyers away from lower-commission homes to those that resulted in higher profits for the agents at the buyer's expense. ¶ 7. As a result, home buyers, including Plaintiff Leeder, were forced pay inflated buyer agent commissions and inflated home prices, while receiving fewer and lower quality services from their agents. ¶ 106.

## ARGUMENT

Rule 8(a)'s notice-pleading standard governs antitrust claims. *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 999 (N.D. Ill. 2011). To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), an antitrust plaintiff need only give a defendant fair notice of the claims, *Tamayo v. Blagojevich*, 526 F.3d 1074, 1082 (7th Cir. 2008), and provide enough factual material, accepted as true, "to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This does not require detailed factual allegations. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, plaintiffs must simply "nudge[] their claims across the line from conceivable to plausible." *Id.* at 570.

I.      **Plaintiff Has Standing to Pursue his Antitrust Claims**

A.      **Plaintiff and Members of the Putative Class are Direct Purchasers of Buyer Agent Services**

Plaintiff's antitrust claims are not barred by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) because he and the putative class members directly purchased, consumed, and/or paid for the buyer

agent services at issue in this lawsuit. Defendants' argument to the contrary flies in the face of *Apple v. Pepper,* 139 S. Ct. 1515 (2019), which made clear that "immediate buyers from . . . antitrust violators" are entitled to sue under the antitrust laws, *id.* at 1521. Here, the alleged antitrust violators are the buyer agents, and it is home buyers that select which buyer agents will be involved, enter into contracts with those agents, and directly pay those agents. These facts render Plaintiff and putative class members the immediate buyers from the buyer agents—the antitrust violators—entitling them to sue under the federal antitrust laws.

Instead of confronting these simple facts, Defendants argue that the buyer commissions are determined by the seller agent. Defs. Br. at 4.[3] This is irrelevant under *Pepper*, which expressly rejected Apple's attempt to transform the straightforward *Illinois Brick* direct-purchaser test into a "who sets the price theory." 139 S. Ct. at 1522. Defendants also make much of the fact that "the commissions are technically paid through the seller broker," Defs. Br. at 4, suggesting that this means that the seller agent somehow purchases the buyer agent's services and sells them to the home seller, who in turn resells them to the buyer, *see id.* at 3-7.[4] But this bizarre, convoluted view of real estate transactions does not reflect economic reality, which controls the *Illinois Brick* analysis. *See United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 208 (1968) (antitrust standing analysis must consider the "economic reality of the relevant transactions"); *see also Animal Sci. Prods., Inc., v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 502 (D.N.J. 2014) ("[T]o determine whether plaintiff is a direct purchaser, the court must look to the 'economic substance' of the transaction."). And the economic reality of real

---

[3] "Defs. Br." refers to the Memorandum in Support of Defendants' Joint Motion to Dismiss, ECF No. 61-1.

[4] In an attempt to gloss over the lack of connection between the seller and the buyers' agent, Defendants refer to generic "brokerage services" and "broker commissions" rather than "buyer agent services" and "buyer agent commissions" in the direct purchaser section of their brief. S*ee* Defs. Br. at 3-7. This artful dodge ignores the market for buyer agent services alleged in the complaint, *see* ¶ 44, and is entirely inconsistent with Defendants' separate argument that the real estate market is a two-sided platform, which offers "different products or services to two different groups[.]" Defs. Br. at 10-11 (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280 (2018)).

estate transactions, as the Complaint explains, is that buyers—not sellers nor sellers' agents—choose, hire, and pay the alleged antitrust violators, the buyer agents.

Defendants also forget that the buyer is the only party to a real estate transaction paying any money in the transaction, a major factor in antitrust standing. ¶ 42. As the Supreme Court recognized in *Pepper*, a plaintiff's payment of funds to the defendant in connection with a purchase is dispositive on the question of whether a plaintiff is a direct purchaser. *See* 139 S. Ct. at 1521 ("The iPhone owners pay the alleged overcharge directly to Apple."); *accord, e.g.*, *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1414 (7th Cir. 1995) ("[T]he money went directly from Blue Cross to the Clinic…. We do not think more is required to establish Blue Cross' right to sue to collect these overcharges."); *In re NorthShore Univ. HealthSystem Antitrust Litig.*, No. 07-cv-4446, 2018 WL 2383098, at *6 (N.D. Ill. Mar. 31, 2018) (under *Blue Cross*, a "direct payment" is a "key element" when identifying a direct purchaser); *Dolan v. Fairbanks Capital Corp.*, No. 03-CV-3285 (DRH)(MLO), 2006 WL 8441225, at *7 (E.D.N.Y. Dec. 15, 2006) (plaintiff was a direct purchaser because he was "the one ultimately responsible for the payments"). Here, the homebuyer deposits the purchase price into an escrow account and the escrow agent simultaneously distributes the funds to the home seller and the agents to compensate each. ¶ 42. The escrow agent ensures that neither the seller nor the seller agent ever actually handles the buyer agent's commission. *See* ¶¶ 42-43. Under *Pepper* and *Blue Cross*, the buyer's direct payment of a commission to the buyer agent makes the buyer a direct purchaser of the buyer agent's services—that the payment was via escrow rather than by check or cash is irrelevant.

Defendants' argument that the buyer commissions are "technically paid" or "ostensibly paid" by the seller or the seller agent, Defs. Br. at 1, 4, 6-7—despite the buyer choosing the buyer agent, contracting with the buyer agent, and sending money directly to the buyer agent—is precisely the attempt to elevate form over substance that the Supreme Court rejected in *Pepper*. *See Pepper*, 139 S. Ct. at 1523 ("Apple's rule would elevate form … over substance"). While Defendants claim that

Plaintiff is trying to create an industry-specific or escrow-specific exception, Defs. Br. at 7, it is Defendants who attempt to create an industry-specific analysis by parsing the arrangements of upstream market participants instead of reaching the appropriate, bright-line result dictated by Plaintiff's direct payment of money to the antitrust violator, the buyer agent. This is exactly the type of analysis rejected in *Pepper*. *See* 139 S. Ct. at 1523 ("[I]f accepted, Apple's theory would provide a roadmap for monopolistic retailers to structure transactions with manufacturers or suppliers so as to evade antitrust claims by consumers and thereby thwart effective antitrust enforcement.").

All that said, even were it true that buyer agents sell their services to seller agents, who in turn sell the buyer agent services to home buyers, home buyers would still have standing under the co-conspirator "exception" to *Illinois Brick*. That exception allocates the right to recovery to "the first sale outside the conspiracy." *E.g. Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 839 (7th Cir. 2020). Seller agents are part of the conspiracy with the buyer agents because they participate in the implementation of the Buyer Agent Commission Rule and are employees of the Broker Defendants. ¶¶ 58, 100. The buyers' purchase of buyer agent services is the first sale of that service outside the conspiracy. The presence of the home seller does not change this fact, as home sellers are purchasers of seller agent services, a different product. The Court should reject Defendants' indirect purchaser arguments.

### B. Plaintiff Adequately Pleads his Injunctive Relief Claim

Section 16 of the Clayton Act entitles private plaintiffs to seek injunctive relief against the "threatened loss or damage by violation of the antitrust laws." 15 U.S.C. § 26; *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110-11 (1986). Courts consider four factors when evaluating whether a plaintiff may seek such relief: (1) the causal connection between the alleged violation and plaintiff's harm; (2) the presence of an improper motive by the defendant; (3) the type of injury and whether it was one that Congress sought to redress; and (4) the directness of the alleged injury. *In re Dealer Mgmt.*

6

*Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 545 (N.D. Ill. 2019); *see also Cargill*, 479 U.S. at 129 n.6 ("[B]ecause standing under §16 raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under §4 are not relevant under §16."). Plaintiff satisfies all four requirements because, as a result of contractual restraints, Defendants imposed in order to fix buyer agent commissions, he was forced to pay more than he should have for a home he purchased. *See* ¶¶ 4, 59. This injury is one "the antitrust laws were intended to prevent" because it reflects a harm to consumers of buyer agent services and "flows" directly from Defendants' unlawful agreement. *Cargill*, 479 U.S. at 113.

Defendants argue that Plaintiff may not pursue injunctive relief because he is an indirect purchaser of buyer agent services and because home sellers are more directly harmed and are seeking an injunction for the same violation in a separate action. Defs. Br. at 9. This is wrong for several reasons. *First*, Plaintiff is a direct purchaser, as explained above. *Second*, Plaintiff is not just a direct purchaser, but the *only* purchaser of buyer agent services pursuing these claims. Home sellers do not consume buyer agent services at all and therefore are not more direct purchasers. *See Dealer Mgmt.*, 362 F. Supp. 3d at 532 (rejecting argument that purchasers of defendants' services in a separate but related market were "more directly-affected purchasers").

The decision in *In re Plasma-Derivative Protein Therapies Antitrust Litigation* is not to the contrary. No. 09 C 7666, 2012 WL 39766 (N.D. Ill. Jan. 9, 2012). That case involved claims asserted by a San Mateo County medical center that purchased defendant-manufactured plasma-derivative therapies from "independent distributors" or "group purchasing organizations" that were not part of the alleged cartel. *Id.* at *1. The court held that San Mateo could not pursue injunctive relief because plaintiffs that directly purchased *the same products* from the *same defendants* were pursuing that remedy in the *same* MDL. *Id.* at *9. In contrast, real estate sellers purchase a different product, seller agent services, and

are pursuing their claims in separate actions. Given the differences between the products consumed by buyers and sellers, it is unclear whether home sellers can or will adequately redress Plaintiff's harm.

Defendants argue that any injunctive relief obtained in one case will necessarily be identical to the other because both complaints refer to the "Buyer Agent" commission rule along with "other NAR rules." Defs. Br. at 8. This is pure speculation. There is no reason to believe that homebuyers and sellers—who purchase different broker services and have diametrically opposed interests when it comes to real estate transactions—would seek the same injunctive relief.[5] *In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 3d 772 (N.D. Ill. 2017) (permitting direct and indirect purchasers to pursue injunctive relief).

*Finally*, even assuming for sake of argument that Plaintiff is an indirect purchaser, he may still pursue injunctive relief to address the harm he directly suffered as a result of Defendants' agreement to fix commission prices. *See U.S. Gypsum Co. v. Ind. Gas Co., Inc.,* 350 F.3d 623, 627 (7th Cir. 2003) ("[T]he direct-purchaser doctrine does not foreclose equitable relief."). *Broiler Chicken*, 290 F. Supp. at 772, is instructive in this regard. There, a group of direct purchaser plaintiffs and indirect purchaser plaintiffs both pursued claims against chicken producers for allegedly fixing chicken prices at artificially inflated levels. *Id.* at 779. *Broiler Chicken* held that the indirect purchaser plaintiffs had standing to pursue injunctive relief, even if the direct purchasers were "more immediate victims" of the alleged violation. *Id.* at 813. Because the indirect purchaser plaintiffs were not seeking damages, it did not matter that they occupied a position "further down the distribution chain" or that other, "less 'remote part[ies]'" were also pursuing the same relief. *Id.* at 814. Rather, defendants' argument failed because it fundamentally misunderstood the concept of "directness," which was intended to address

---

[5] Defendants' assurance that the Government will also likely address Plaintiff's concerns (*see* Defs. Br. at 9 n.4) are wholly irrelevant to the question of whether Plaintiff has antitrust standing. *See In re Clark Oil & Ref. Corp. Antitrust Litig.*, 422 F. Supp. 503 (E.D. Wis. 1976); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 635 (1985); *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983).

issues related to the apportionment of damages, not injunctive relief. *Id.* The same reasoning applies here, where Plaintiff can directly trace the higher prices he paid to Defendants' unlawful agreement to fix commission prices. *See* ¶¶ 50-54.

## II. Plaintiff Plausibly Pleads a Section 1 Claim

Whether a plaintiff may pursue a Sherman Act claim turns on "whether the challenged restraint enhances competition." *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 633 (N.D. Ill. 2020) (citations omitted). Courts have developed three modes of analysis for evaluating that question: (1) a *per se* analysis; (2) the "rule of reason"; and (3) an abbreviated or "quick-look," rule of reason analysis. *Id.* at 633. Defendants erroneously assume that the "rule of reason" applies to this case. Defs. Br. at 10-11. Their failure to address the *per se* analysis is fatal to their motion to dismiss.

### A. Defendants Committed a *Per Se* Violation of the Sherman Act

"*Per se*" restraints of trade are so egregious that they are condemned as a matter of law. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). Horizontal price-fixing agreements, like the one alleged here, are *per se* illegal. *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1222 (7th Cir. 1993); *Delta Dental*, 484 F. Supp. 3d at 635; *Leegin Creative Leather*, 551 U.S. at 886. Where a restraint is *per se* illegal, the court need not examine the applicable market. *Denny's Marina*, 8 F.3d at 1221.

Plaintiff here alleges that the Broker Defendants, a group of horizontal competitors (¶¶ 4, 9, 21-24), and Defendant NAR conspired to promulgate rules conditioning access to real estate listings on an agreement to charge a fixed commission price. *See* ¶¶ 44, 102, 148. These contractual restraints reduced price competition among buyer agents by, among other things, banning agents from negotiating commissions (¶¶ 84-88) or utilizing alternative commission structures not based on a fixed dollar amount or percentage of the sale price. ¶ 56. These restraints had the effect of raising and stabilizing agent commissions. *Id.* at ¶¶ 54, 11.

Restraints that "impede[] the ordinary give and take of the marketplace" and effectively stabilize prices have long been held to be *per se* violations of Section 1. *Nat'l Soc'y of Prof'l Eng'rs v. United* States, 435 U.S. 679, 692 (1978); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984) (*per se* treatment appropriate where challenged "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output"); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647-48 (1980) ("a horizontal agreement among competitors to use a specific method of quoting prices" held *per se* unlawful); *see also United States v. Gasoline Retailers Ass'n*, 285 F.2d 688, 691 (7th Cir. 1961) (agreement to limit competition was *per se* illegal where "aimed . . . at affecting the market price").

Indeed, "private standard-setting associations"—like NAR—"have traditionally been objects of antitrust scrutiny," as "the members of such associations often have economic incentives to restrain competition" and "product standards set by such associations have a serious potential for anticompetitive harm." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 774 (2d Cir. 2016) (citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988)). And restrictions on competition imposed by trade associations and their members have long been found to violate the Sherman Act. *See Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982) (finding trade association's adoption of new rule violated Section 1); *Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457, 464-65 (1941) (finding conditions imposed by trade association on its members violated Section 1); *see also Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 595 (7th Cir. 1984) (agreement between association members not to compete and divide market considered *per se* violation of Sherman Act Section 1). Defendants' conspiracy to restrain trade by promulgating rules that fix agent commissions are no different from the kind of restraints found unlawful in these cases.

### B. Defendants' Rule of Reason Arguments Fail

#### 1. Plaintiff Satisfies the "Quick Look" Analysis

While not necessary, Plaintiff also satisfies the rule of reason standard. At this stage, Plaintiff need only allege: (1) the boundaries of the relevant product market; and (2) that the challenged conduct adversely impacted competition in that market. *Dealer Mgmt.*, 362 F. Supp. 3d at 538-39.

Courts applying the "rule of reason" may apply an abbreviated "quick-look" analysis where "no elaborate industry analysis is required to demonstrate the anticompetitive character" of the alleged conduct. *Delta Dental*, 484 F. Supp. 3d at 633. The contractual restraints on buyer agent commissions at issue in this action are exactly this kind of limitation. It is readily apparent that conditioning agent access to real estate listings on an agreement not to negotiate commissions will have an anticompetitive effect on the prices that home buyers pay for their agent services. Defendants fail to even address application of the "quick look" analysis and have therefore waived any argument that it does not apply. *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) (citations omitted) ("[A] party waives an argument by failing to make it before the district court.").

#### 2. Plaintiff Plausibly Pleads a Relevant Market and Anticompetitive Effects in the Market

Even if the Court takes a longer look, Plaintiff sufficiently alleges both "rule of reason" requirements: (1) a relevant market and (2) anticompetitive effect on that market. First, Plaintiff alleges a plausible relevant product market, the market for "buyer agent services." ¶ 44. Where, as here, the complaint "describes in detail residential real estate commission structures and how brokers in the industry utilize MLS marketplaces, including the [s]ubject MLS, to sell and purchase homes" and "present[s] factual allegations demonstrating the ubiquitous use of MLS services and the limited alternatives available to those who cannot utilize MLS listings," Plaintiff has "define[d] a plausible,

valid, and sufficiently-broad relevant market to which a rule-of-reason analysis can be applied." *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 914 (W.D. Mo. 2019). ¶¶ 34-37.[6]

Second, Plaintiff sufficiently alleges anticompetitive effects in the relevant market. The anticompetitive effect of Defendants' conduct in this market is demonstrated by the increased commission price paid by homebuyers (¶ 114) and the stability of commission prices over the years (¶¶ 112-113), among other things. These allegations sufficiently plead that Defendants' conduct adversely impacted the prices paid by home buyers in the United States. *Moehrl*, 492 F. Supp. 3d 768, 783-86 (N.D. Ill. 2020) (allegations comparing U.S. commissions to those in other countries, regarding NAR's rules requiring blanket offers of compensation, restricting buyer's ability to negotiate his agent's commission, and increased commissions sufficient to state a claim).

### 3. *American Express* Does Not Dispose of Plaintiff's Per Se Claim

Defendants next argue that Plaintiff's antitrust claim fails as a matter of law under *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), because it does not account for the "two-sided" nature of the real estate market. Defs. Br. at 10. Courts routinely reject such self-serving characterizations of the relevant market unless it is absolutely certain the market is improperly defined. *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1070-71 (N.D. Ill. 2016) ("Courts should dismiss antitrust claims based on a market [definition] argument only when it is certain" that the alleged market is improperly defined). Defendants fall far short of demonstrating the required certainty; *Delta Dental*, 484 F. Supp. at 638 ("This is not a dispute that can be resolved at this stage."). Defendants' arguments fall far short of demonstrating the required certainty for the reasons below.

---

[6] Defendants do not deny their market power, waiving any argument on that subject. *G & S Holdings*, 697 F.3d at 538. Nor could they credibly deny their market power. As this Court has recognized, "the Seventh Circuit and several other courts have recognized that MLSs have market power." *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 782 (N.D. Ill. 2020).

*First*, even if this case involved a "two sided" market, "it is not always necessary to consider both sides of a two-sided platform." *American Express*, 138 S. Ct. at 2886. For example, *American Express*, which dealt only with vertical restraints of trade in the credit card market, *see* 138 S. Ct. at 2284, did not change the application of the *per se* analysis in this Circuit. *See Delta Dental*, 484 F.Supp.3d at 637 ("At the outset, the parties in *AmEx* agreed that the plaintiffs' claim challenged a vertical restraint governed by the Rule of Reason. Accordingly, the Court did not discuss the *per se* mode of analysis at all."); *id.* ("[E]ven assuming that dental insurers operate in a two-side market, *AmEx* does not necessarily foreclose plaintiffs' claim that defendants' agreement to eliminate . . . competition . . . is anticompetitive *per se*."). Thus, a *per se* violation on either side of the market—like the one pleaded here—would establish an antitrust claim even if this case involved a two-sided platform.

*Second*, this case does not allege a "two-sided transaction platform" like the one analyzed in *American Express*. 138 S. Ct. at 2286. Two-sided transaction platforms "facilitate a single, simultaneous transaction between participants." *Id.* Put another way, such platforms "(1) offer different products or services, (2) to different groups of customers, (3) whom the 'platform' connects, (4) in simultaneous transactions." *Id.* at 2298 (Breyer, J., dissenting); *see also US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 58 (2d Cir. 2019). None of these requirements are met by the market for buyer agent services alleged in the Complaint, which concerns a single product offered to one group of consumers (i.e., home buyers). Defendants attempt to avoid this result by focusing on the MLSs. But the fact that MLSs bring buyer and seller agents together does not render the relevant market a two-sided transaction platform any more than a grocery store, mall, or any other venue that joins buyers and sellers.[7] Rather, the *AmEx* analysis fails because the MLSs provide the same product to both buyer

---

[7] Defendants cite *PLS.com, LLC v. Nat'l Ass'n of Realtors*, No. 2:20-cv-04790-JWH-RAOx, 2021 WL 369545, at *9 (C.D. Cal. Feb. 3, 2021), to support their argument that the relevant market is a two-sided market, but this case is distinguishable. There, an off-MLS listing called a pocket listing service brought a Section 1 claim against NAR and regional MLSs alleging that a policy adopted by NAR and its members eliminated the PLS's ability to attract brokers and market listings. *Id.* at *7. The court called the market the "real estate market," but these

and seller agents—the MLS itself—which "lack[s] the 'key feature' of a transaction platform: simultaneity of the exchange." *Delta Dental*, 484 F. Supp. 3d at 637.

## III.  Plaintiff Plausibly Pleads an Unjust Enrichment Claim

To plead an unjust enrichment claim, Plaintiff must simply allege facts that establish a clear and direct relationship between Plaintiff's loss and Defendants' benefit. *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 909 (N.D. Ill. 2011) (citing *Montana v. Crow Tribe of Indians*, 523 U.S. 696, 721 (1998) ("[A] claim for unjust enrichment generally must state that the defendant has been unjustly enriched at the expense of plaintiff."). Plaintiff pleads that Defendants receive supracompetitive agent commissions at his expense. ¶¶ 43, 53.

Defendants' arguments that Plaintiff's unjust enrichment claim should be dismissed (Defs. Br. at 11-14) are unavailing. Defendants argue that New Jersey law applies and that Plaintiff cannot satisfy New Jersey's requirements for pleading unjust enrichment. Defs. Br at 13-14. As an initial matter, the question of what law applies is a fact-intensive inquiry inappropriate for resolution on a motion to dismiss. *See In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004). It is sufficient at this stage for Plaintiff to plead that Defendants unjustly retained a benefit (inflated commissions) at his expense. *See id.* (citing Restatement (First) of Restitution § 1 (1937)); *In re Dairy Farmers*, 767 F. Supp. 2d at 909. Defendants also argue that Plaintiff does not have standing for his antitrust claim under *Illinois Brick*. This repackaged argument that Plaintiff is an indirect purchaser fails for the same reason explained above.[8] For these reasons, Plaintiff's unjust enrichment claim should be upheld.

---

facts reveal the market was specific to real estate listing services. Here, the market is the market for buyer agent services consumed only by the home buyer. To the extent that the Court does find *PLS* applicable to this case, however, Plaintiff respectfully submits that the real estate market is not, as the *PLS* court concluded, governed by *American Express*. *Id.* at *9.

[8] Defendants fail to cite to a single case that clearly and unequivocally imposes a direct contact or privity requirement to sustain an unjust enrichment claim under New Jersey's laws.

## IV.     Plaintiff Should be Given Leave to Amend

If this Court concludes that dismissal of any or all of Plaintiff's claims is appropriate, that dismissal should be without prejudice and with leave to amend, which should be granted "freely . . . when justice so requires." *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) (reversing denial of leave to amend as an abuse of discretion).

Defendants' arguments to the contrary are without merit. Defendants argue that any amendment would be futile because Plaintiff does not have standing (Def's. Br. at 14). Not so—courts frequently grant leave to amend claims that were initially dismissed for lack of standing. *See, e.g., City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 753 (N.D. Ill. 2019); *In re Surescripts Antitrust Litig.*, No. 1:19-cv-06627, 2020 WL 4905692, at *6 (N.D. Ill. Aug. 19, 2020). And here, were the Court to rule that Plaintiff and the class are indirect purchasers, Plaintiff could allege as such and bring claims for damages under various state antitrust laws. Similarly, if the Court dismissed Plaintiff's injunctive relief claim for lack of standing, Plaintiff would still be able to bring his claims before this Court under the Class Action Fairness Act. 28 U.S.C. § 1332(d).

## <u>CONCLUSION</u>

For all the reasons set forth above, Defendants' motion should be denied in its entirety.

Respectfully submitted,

Dated: June 4, 2021

<u>Randall P. Ewing, Jr.</u>
George A. Zelcs (Ill. Bar No. 3123738)
Randall P. Ewing, Jr. (Ill. Bar No. 6294238)
Jonathon D. Byrer (Ill. Bar No. 6292491)
Ryan Z. Cortazar (Ill. Bar No. 6323766)
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750

15

gzelcs@koreintillery.com
rewing@koreintillery.com
jbyrer@koreintillery.com
rcortazar@koreintillery.com

Michael E. Klenov (Ill. Bar No. 6300228)
Jamie Boyer (Ill. Bar No. 6281611)
Carol O'Keefe (Ill. Bar No. 6335218)
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: 314-241-4844
mklenov@koreintillery.com
jboyer@koreintillery.com
cokeefe@koreintillery.com

Vincent Briganti (pro hac vice)
Christian Levis (pro hac vice)
Noelle Feigenbaum (pro hac vice)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
vbriganti@lowey.com
clevis@lowey.com
nfeigenbaum@lowey.com

*Attorneys for Plaintiff and the Proposed
Class*

16