IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JUDAH LEEDER, individually and on behalf of all others similarly situated, ) ) ) Plaintiff, ) ) ) v. ) ) ) THE NATIONAL ASSOCIATION OF REALTORS, et al., ) ) ) Defendants. ) | No. 21-cv-00430<br><br>Judge Andrea R. Wood |

## MEMORANDUM OPINION AND ORDER

Plaintiff Judah Leeder bought a home listed on a local database of properties for sale known as a Multiple Listing Service ("MLS") with the assistance of a real-estate broker. Like all sellers of homes listed on an MLS, the person selling Leeder's home was required to include in the listing a single, set offer of compensation to the broker assisting the person who ultimately bought the property. According to Leeder, restricting MLS access to only home sellers who make a set commission offer to the successful buyer-broker is anticompetitive and results in artificially inflated, supracompetitive commission rates being incorporated into purchase prices for homes. For that reason, he has brought the present antitrust action alleging that Defendants National Association of Realtors ("NAR"), Realogy Holdings Corp., HomeServices of America, Inc., HSF Affiliates, LLC, Long & Foster Companies, Inc., BHH Affiliates, LLC, RE/MAX LLC, and Keller Williams Realty, Inc. engaged in a conspiracy in restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. (Class Action Complaint ("CAC"), Dkt. No. 1.) Defendants have moved to dismiss the CAC pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 61.) For the reasons that follow, the Court grants Defendants' motion.

**BACKGROUND**

For the purposes of the motion to dismiss, the Court accepts all well-pleaded facts in the CAC as true and views those facts in the light most favorable to Leeder as the non-moving party. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The CAC alleges as follows.

Defendant NAR is a 1.4 million member trade association that advocates for the interests of real estate brokers. (CAC ¶¶ 20, 29.) In addition, NAR oversees 54 state and territorial realtor associations and over 1,200 local realtor associations, each of which are NAR members. (*Id.*) Those local realtor associations own and operate in their markets a centralized database of properties listed for sale in the region known as an MLS. (*Id.* ¶¶ 3, 34, 37, 95.) Listing a property for sale on an MLS is essential to market that property effectively to prospective buyers. (*Id.* ¶ 3.)

NAR issues the rules and policies governing MLSs that are set forth annually in the Handbook on Multiple Listing Policies ("Handbook"). (*Id.* ¶ 38.) Those rules and policies are then enforced by the local realtor associations that own the MLSs, which NAR requires to agree to adhere to and enforce the Handbook. (*Id.* ¶¶ 38, 50–52, 95.) And given the commercial necessity of having access to an MLS, real estate brokers and individual realtors[1] must comply with the Handbook's provisions and all other NAR rules, including the NAR's Code of Ethics and Standards of Practice. (*Id.* ¶¶ 50–52, 92–95.)

As relevant here, the Handbook requires any broker listing a property for sale on an MLS to make a blanket unilateral offer of compensation to any broker who finds a buyer for the home

---

[1] Under state laws governing the real estate market, there are two types of licensees: the real estate broker (*i.e.*, the brokerage firm) and the individual real estate agent (also referred to as a realtor). (CAC ¶ 32.) Real estate brokers are legally responsible for their licensed agents' activities. (*Id.*) Moreover, all brokerage contracts with sellers and buyers are with the real estate broker rather than the individual realtor, and all payments to the realtor pass through the broker. (*Id.* ¶ 33.) For purposes of this opinion, the Court refers to the brokerage firm and agent collectively using the term "broker."

("Commission Rule"). (*Id.* ¶¶ 7, 55–56.) That offer must be expressed either as a percentage of the gross selling price or as a definite dollar amount. (*Id.* ¶ 56.) The Commission Rule further prohibits "general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships." (*Id.*) Accordingly, when a homeowner contracts with a seller-broker, the parties' listing agreement will set the total commission to be paid to the seller-broker, usually with a portion of the commission designated to be paid to the buyer-broker. (*Id.* ¶ 40.) On the other hand, a buyer's contract with their buyer-broker will disclose that the buyer-broker's compensation will come from the total commission paid by the seller. (*Id.* ¶ 41.) Consequently, in the typical home sale, the buyer-broker's compensation will come from the total commissions paid by the home seller to the seller-broker. (*Id.*)

Operating in tandem with the Commission Rule are NAR's rules prohibiting brokers from disclosing to homebuyers the commission offered to the buyer-broker. (*Id.* ¶¶ 53, 75–76.) Although the buyer-brokers will be aware of the commission they will receive from a buyer's purchase of a particular property, the buyer will never know the amount their broker was compensated for representing the buyer in the transaction. (*Id.* ¶¶ 43, 75–76.) Instead, until January 2021, NAR's Code of Ethics permitted and encouraged buyer-brokers to tell clients that their services are free. (*Id.* ¶¶ 53, 79.)

The following example illustrates how these rules typically work in practice. First, a homeowner retains a seller-broker and agrees to pay 6% in total commission to the seller-broker. (*Id.* ¶ 42.) The seller-broker lists the property on an MLS with the promise of a 3% commission to the buyer-broker. (*Id*) Then, if the property is sold for $500,000, the buyer will pay the $500,000 into an escrow account. (*Id.*) In turn, before distributing the sale proceeds to the seller, the escrow agent will deduct from the purchase price the $30,000 total commission and transmit $15,000

3

(*i.e.*, 3% of $500,000) to the buyer-broker and the remaining $15,000 to the seller-broker. (*Id.*) Because the buyer-broker commission is paid out of the funds the buyer used to purchase the home and NAR's rules prevent the buyer from learning details of their broker's commission, the buyer will usually believe that they did not pay anything for the buyer-broker's services. (*Id.* ¶¶ 43, 79.) In reality, however, the buyer-broker's commission is "baked into the price of the house," such that the cost of the total commission is shared by both the buyer and the seller. (*Id.* ¶¶ 43, 59.)

Given that the Commission Rule requires a blanket offer of commissions, buyer-brokers' commissions are not linked to their quality of service or breadth of experience. (*Id.* ¶¶ 58, 61.) As a result, there is substantial uniformity in the compensation paid to buyer-brokers. (*Id.* ¶¶ 60, 67.) Since the Commission Rule has been in effect, total commissions have remained stable at between 5% and 6% of the sale price. (*Id.* ¶¶ 11, 107–08, 112–15.) By contrast, in comparable international markets where buyer-brokers are paid directly by the home buyer, total commission rates are generally between 1% and 3% of the sale price. (*Id.* ¶ 114.) The data on the commission rates charged in other countries suggests that total commissions in the U.S. should be closer to 3% of the sale price. (*Id.*) Ultimately, these supracompetitive commission rates are incorporated into a home's sale price, thereby artificially inflating the purchase prices paid by homebuyers. (*Id.* ¶¶ 43, 59, 62, 106.)

According to Leeder, the Commission Rule facilitates the stability of these allegedly supracompetitive commission rates by enabling buyer-brokers "to easily compare the financial compensation offered" by every seller with a listing in the MLS. (*Id.* ¶ 66.) In turn, that pressures sellers to offer the high standard rate and disincentivizes them from offering a discounted commission. (*Id.* ¶ 67.) A seller or seller-broker whose property listing offers a buyer-broker

commission below the standard rate faces a substantial risk that buyer-brokers will steer potential buyers away from that property and toward properties offering higher commissions. (*Id.* ¶¶ 63–64, 67.) "[E]ssentially, the MLS listing acts as a tool which competing brokers can use to help enforce a near uniform commission rate and drive out discounters." (*Id.* ¶ 67.)

In addition, Leeder points to several other factors that work in conjunction with the Commission Rule to ensure the stability of commission rates. Since buyers are not privy to commission offers, they are prevented from detecting or resisting steering. (*Id.* ¶ 77.) Moreover, most MLSs employ a software program that has a feature allowing buyer-brokers to filter listings based on the value of the buyer-broker commission offer and to send buyer clients electronic property listings that exclude properties where the offered commission falls below a certain rate. (*Id.* ¶¶ 68–69, 81–83.)

Another NAR ethical rule forbids buyer-brokers from attempting to negotiate a buyer-broker commission offer through the submission of a purchase offer. (*Id.* ¶ 84.) Consequently, a buyer-broker violates the NAR's Code of Ethics when they present an offer to a seller that is contingent on the seller reducing the buyer-broker's commission. (*Id.*) Moreover, NAR has interpreted its ethical rules as requiring a buyer-broker that seeks to modify the offered buyer-broker commission to attempt to do so before the property is even shown to any potential buyers. (*Id.* ¶ 85.) That requirement means that a buyer-broker "would effectively need to contact a seller-broker on [their] own to negotiate a reduction to [their] own commission before [their] client has even seen the potential home." (*Id.*) At the same time, NAR's Code of Ethics also prevents the seller-broker from attempting to modify the buyer-broker's commission unilaterally after there has been an offer to purchase the property. (*Id.* ¶ 86.) Finally, NAR has deemed it unethical for a

5

buyer-broker to urge the buyer to negotiate directly with the seller to reduce commissions. (*Id.* ¶ 88.)

Leeder has brought the present putative class action on behalf of himself and a class of similarly situated individuals. His CAC alleges that, by adopting and enforcing the Commission Rule and related anticompetitive rules, Defendants have engaged in a continuing contract, combination, or conspiracy to unreasonably restrain price competition among real estate brokers in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. In addition, the CAC asserts a claim for unjust enrichment. Leeder used a buyer-broker affiliated with Defendant RE/MAX LLC in connection with his October 2020 purchase of his current residence in New Jersey. That home was listed on New Jersey's regional MLS, which is owned by an NAR member broker and adheres to the NAR's Handbook and other rules. (*Id.* ¶ 19.) The proposed class would cover any homebuyer who purchased residential real estate that was listed on an NAR MLS after December 1, 1996. (*Id.* ¶ 128.)

## DISCUSSION

To survive a motion under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

According to Defendants, because Leeder was an indirect purchaser of his buyer-broker's services, he is precluded from recovering damages for Defendants' alleged antitrust violations. Moreover, because Leeder cannot seek damages in connection with his antitrust claim, Defendants contend that he is also prohibited from bringing a claim for damages under an unjust enrichment theory. Finally, Defendants argue that Leeder lacks antitrust standing to bring a claim for injunctive relief because plaintiffs who suffered a more direct injury from Defendants' conduct are already pursuing the same relief. The Court begins by addressing Leeder's damages claims before turning to his request for injunctive relief.

## I. Claims for Damages

Leeder contends that Defendants have conspired to agree to, comply with, and implement NAR's Commission Rule and other anticompetitive rules governing buyer-broker commissions in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. He claims that the alleged conspiracy injures homebuyers like him because it results in supracompetitive buyer-broker commission rates that artificially inflate the purchase prices of residential real estate. Accordingly, Leeder seeks damages for his injuries caused by Defendants' alleged antitrust violations pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15(a). Similarly, Leeder asserts that by promulgating anticompetitive rules that artificially inflate commission rates, Defendants have unjustly enriched themselves at the expense of him and other homebuyers. Thus, he argues that Defendants must be required to return the proceeds of their unlawful conduct.

### A. Sherman Act

Section 1 of the Sherman Act makes illegal "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. The Supreme Court has understood § 1 "to outlaw only unreasonable restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Under

§ 4 of the Clayton Act, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . and shall recover threefold the damages by him sustained." 15 U.S.C. § 15(a). Nonetheless, the statute's use of "the words 'any person' cannot be taken literally." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 837 (7th Cir. 2020). Instead, the Supreme Court concluded in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977), that only "the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property'" who is entitled to recover damages from antitrust violators.

The *Illinois Brick* decision "established a bright-line rule that authorizes suits by **direct** purchasers but bars suits by **indirect** purchasers." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019). Consequently, "a downstream plaintiff cannot sue an alleged monopolist or cartel member on a theory that a middleman passed an anticompetitive overcharge to [him]." *Marion Healthcare*, 952 F.3d at 838. Put differently, "[a] plaintiff who asserts that [he] indirectly bore the brunt of an overcharge passed on by the direct purchaser has no claim." *Id.* "For example, if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A. But B may sue A if A is an antitrust violator. And C may sue B if B is an antitrust violator." *Apple*, 139 S. Ct. at 1521.

Here, the CAC's allegations depict homebuyers like Leeder as indirect purchasers. It is the home seller who agrees in their listing agreement to pay a single, total commission, and the buyer-broker's compensation comes from that fund. (CAC ¶ 41.) By contrast, the homebuyer's contract with their broker usually makes clear that the buyer-broker's compensation comes from the total commission paid by the seller. (*Id.* ¶¶ 41, 79.) And under the NAR's rules, even after agreeing to purchase a home, the buyer will not learn how much commission their buyer-broker will be paid (*id.* ¶ 75); the implication is that they will never be expressly or directly charged that commission.

8

Instead, the buyer-broker's commission will be deducted from the home seller's proceeds from the sale. (*Id.* ¶ 43.) As the CAC expressly acknowledges, NAR's rules create a procedure where the buyer-broker is "technically paid through the seller-broker." (*Id.* ¶ 79.) While the CAC denies that the buyer-broker's services are "free" as to the buyer, it is apparent that any portion of the total commission borne by the buyer is by virtue of the fact that the "commission rate is baked into the price of the house." (*Id.* ¶ 59.) Alleging that a cost paid by the buyer is "baked into" the purchase price is simply another way of saying that the cost is "passed through" to the buyer. *See, e.g.*, *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 480 (7th Cir. 1980) ("*Illinois Brick* prohibits any pass on theory of damages.").

Leeder argues that to reject his damages claim based on the fact that only the home seller has responsibility for determining the total commission would amount to an adoption of the discredited "who sets the price theory." Specifically, in *Apple Inc. v. Pepper*, the Supreme Court declined to construe *Illinois Brick* as "allow[ing] consumers to sue only the party who sets the retail price, whether or not that party sells the good or service directly to the complaining party." *Apple*, 139 S. Ct. at 1521–22. In *Apple*, four iPhone owners sued Apple over its practice of charging the developers of smartphone applications a commission of 30% of the sale price for each sale of an "app" on Apple's App Store. *Id.* at 1519. Apple's App Store was the only place where iPhone owners could buy apps and the plaintiff iPhone owners claimed that, in a competitive market, Apple would face substantial pressure to charge a lower commission rate to app developers. *Id.* Thus, the plaintiffs alleged that Apple used its monopoly power in the iPhone-app-sales market "to force iPhone owners to pay Apple higher-than-competitive prices for apps." *Id.* at 1520. Apple responded that, under *Illinois Brick*, the iPhone owners were indirect purchasers because the app developers, rather than Apple, set the retail price for apps. *Id.* at 1521–

9

22. In rejecting Apple's "who sets the price" theory, the Supreme Court emphasized the fact that "[t]he iPhone owners purchase[d] apps directly from the retailer Apple, who is the alleged antitrust violator," which meant that they "pa[id] the alleged overcharge directly to Apple." *Id.* at 1521. In other words, "[t]here [was] no intermediary in the distribution chain between Apple and the consumer" and, to the Supreme Court, "[t]he absence of an intermediary [was] dispositive." *Id.*

This Court finds *Apple* inapposite here. Unlike the third-party app developers in *Apple*, home sellers not only set the total commission price, but they also agree in their listing agreements to pay that price. On the other hand, the buyer's agreement with their buyer-broker typically makes clear that a third-party (*i.e.*, the seller) will be responsible for the broker's fees. Once there has been a successful sale, the buyer pays to the seller only the purchase price of the home and the price of both the seller-broker's and buyer-broker's commissions is deducted from funds to which the seller would otherwise be entitled as proceeds of the home sale. In operation, the home seller is an intermediary in the flow of funds from homebuyer to buyer-broker—because the buyer never directly agrees to pay the buyer-broker, no portion of the buyer's money would reach the buyer-broker absent the seller's agreement to pay a total commission compensating both the seller-broker and the buyer-broker. Stated succinctly, in *Apple*, the plaintiffs bought apps directly from the party *charging* the commission; whereas here, the homebuyer purchases from the party *paying* the commission.

Yet Leeder contends that the Court must consider the fact that the homebuyer's money never reaches the seller because the buyer places the purchase price in an escrow account and commissions are directly distributed to the brokers from there. The Court does not believe that the use of an escrow account changes the analysis. Indeed, a typical escrow agreement "imports a

10

legal obligation on the part of the depositary to retain the money . . . until the performance of a condition or the happening of an event, at which time the money or documents are to be delivered in accordance with the terms of the agreement." *Colegrove v. Behrle*, 164 A.2d 620, 625 (N.J. Super. Ct. App. Div. 1960).[2] While the seller may never handle the funds distributed as commissions to the brokers by virtue of the escrow agreement, in making those distributions, the escrow agent is carrying out the seller's agreement with the seller-broker (and the seller-broker's agreement with the buyer-broker). Because the commission payments are distributed out of the escrow account to satisfy the seller's contractual obligation, the seller is properly deemed to be the direct purchaser as to the services of both the seller-broker and the buyer-broker.

Leeder also contends that treating the seller as the direct purchaser of the buyer-broker's services is nonsensical and ignores the economic reality that buyer-brokers are chosen by and exclusively serve the buyers. To the extent that Leeder contends that the end-consumer of services must be considered the direct purchaser, he finds no support in the caselaw. On the contrary, there are numerous instances where the end-consumer is considered an indirect purchaser. For example, in the healthcare context, the Seventh Circuit has deemed an insurer to be a direct purchaser of healthcare services provided to the insured where it pays the provider directly for the portion of the insured's fees it has agreed to cover. *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1414 (7th Cir. 1995) ("[H]ere the money went directly from [the insurer] to the Clinic, and although the two entities were not linked by any overarching contract, each payment and acceptance was a separate completed contract. We do not think more is required to establish [the insurer's] right to sue to collect these overcharges."); *see also In re NorthShore*

---

[2] Since Leeder purchased a home in New Jersey, the Court assumes that New Jersey law governed the escrow process for that sale. The Court presumes for present purposes that New Jersey's escrow law does not depart substantially from other states' laws, at least at a high level.

11

*Univ. HealthSystem Antitrust Litig.*, No. 07-cv-4446, 2018 WL 2383098, at *6 (N.D. Ill. Mar. 31, 2018) (explaining that, in *Blue Cross*, "the **direct** payment from insurer to healthcare provider was the key element to deeming the insurer as the direct purchaser"). Moreover, Leeder's suggestion that the seller gets no benefit from the commission they pay to the buyer-broker is contradicted by the CAC's allegations. Because a buyer-broker can steer potential buyers away from sellers who offer a commission below the industry standard (CAC ¶¶ 60, 63–64, 67), the seller receives a critical benefit from their buyer-broker commission payment: an adequate pool of potential buyers. Essentially, the buyer-broker commission operates as a finder's fee of sorts. As pleaded in the CAC, the economic reality of residential-real-estate transactions is that the buyer-broker is being compensated less for matching a homebuyer with a home than for matching a seller with a homebuyer.[3]

Finally, Leeder argues that even if the seller is the direct purchaser of the buyer-brokers' services, homebuyers can still recover damages under the coconspirator exception to *Illinois Brick*. The coconspirator exception allows a plaintiff "[t]he right to sue middlemen that joined the conspiracy." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631–32 (7th Cir. 2002). "It is not so much a real exception as it is . . . . a rule inhering in *Illinois Brick* that allocates the right to collect 100% of the damages to the first non-conspirator in the supply chain." *Marion Healthcare*, 952 F.3d at 839. But for this "exception" to save Leeder's antitrust damages claim, the home seller would have to be in on the conspiracy and Leeder does not allege that to be the case. (*See* CAC ¶¶ 25–28 (list of conspirators that does not include home sellers).)

---

[3] The CAC notes that in some instances the buyer-broker does very little to find a buyer a home even though that is "the exact task the buyer[-broker] is paid to do." (CAC ¶ 63.) For example, many buyers will use online services to locate the home they want to buy and only then retain a buyer-broker. (*Id.* ¶ 107.)

In sum, the Court concludes that Leeder and other homebuyers are indirect purchasers of their buyer-brokers' services because buyer-broker services are purchased for them by home sellers. And because *Illinois Brick* bars indirect purchasers from recovering damages from antitrust violators under § 4 of the Clayton Act, the Court dismisses Leeder's claim for damages for Defendants' purported Sherman Act violations.

### B. Unjust Enrichment

Leeder also asserts a claim for unjust enrichment based on the same facts underlying his antitrust claim. An unjust enrichment claim is a state-law claim. *Dunkin' Donuts Inc. v. N.A.S.T., Inc.*, 266 F. Supp. 2d 826, 831 n.10 (N.D. Ill. 2003). "Federal courts hearing state law claims under diversity or supplemental jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). Thus, the Court looks to Illinois's choice of law rules.

For unjust enrichment claims, "the court applies the law of the forum that has the most significant relationship to the parties and the occurrence." *Paris v. Amoco Oil Co.*, 149 F. Supp. 2d 478, 480 (N.D. Ill. 2001). Relevant factors include the place where the parties' relationship was centered; "the place where the benefit or enrichment was done;" "the place where the act conferring the benefit or enrichment was done;" "the domicile, residence, place of incorporation, and place of business of the parties;" and "the place where the physical thing, such as the land or chattel, which was substantially related to the enrichment, was situated at the time of the enrichment." *Id.* (citing Restatement (Second) Conflict of Laws § 221). Here, the Court concludes that New Jersey law governs Leeder's unjust enrichment claim because this action arises from Leeder's purchase of a New Jersey residence that was listed on a New Jersey MLS. (CAC ¶ 19.)

13

In New Jersey, an unjust enrichment claim requires a plaintiff to "show that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994). However, most courts do not allow indirect purchasers to use an unjust enrichment claim as an end-run around *Illinois Brick*'s damages bar unless the relevant state's antitrust law permits indirect purchasers to sue for damages. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2020 WL 4032932, at *4 (N.D. Ill. July 15, 2020); *In re Opana Er Antitrust Litig.*, No. 14 C 10150, 2016 WL 4245516, at *1 (N.D. Ill. Aug. 11, 2016); *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 849 (N.D. Ill. 2020) ("Some states have enacted '*Illinois Brick* repealer' statutes that allow indirect purchasers to sue for money damages."). New Jersey interprets its antitrust statute consistent with federal antitrust law and the New Jersey Supreme Court has confirmed that it adheres to the *Illinois Brick* rule. *Wilson v. Gen. Motors Corp.*, 921 A.2d 414, 416 (N.J. 2007) ("[I]ndirect purchasers . . . have no standing to assert a private right of action under the New Jersey Antitrust Act."). The Court believes that it would undermine New Jersey's choice to follow *Illinois Brick* if Leeder could simply repackage his antitrust claim as one for unjust enrichment. For that reason, Leeder's unjust enrichment claim is dismissed.

## II. Injunctive Relief for Alleged Antitrust Violations

In addition to seeking damages for Defendants' purported violations of § 1 of the Sherman Act, Leeder also seeks to enjoin Defendants from continuing to maintain and enforce the challenged buyer-broker commission rules and policies. Under § 16 of the Clayton Act, a person may sue for injunctive relief "against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. Importantly, *Illinois Brick* does not foreclose a claim for injunctive relief under § 16 of the Clayton Act. *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir.

14

2003) ("[T]he direct-purchaser doctrine does not foreclose equitable relief . . . ."); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, No. 09 C 7666, 2012 WL 39766, at *8 (N.D. Ill. Jan. 9, 2012). Nonetheless, Defendants argue that Leeder does not have antitrust standing to maintain his claim for injunctive relief.

Not to be confused with Article III standing, antitrust standing refers to the various doctrines governing "whether the plaintiff is the proper party to bring a private antitrust action." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480–41 (7th Cir. 2002) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 535 n.31 (1983)). To establish antitrust standing, a plaintiff must "demonstrate a direct link between the antitrust violation and the antitrust injury." *Sanner v. Bd. of Trade of City of Chi.*, 62 F.3d 918, 926–27 (7th Cir. 1995) (internal quotation marks omitted). That inquiry "involves a case-by-case analysis of the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.* at 927 (internal quotation marks omitted). In *AGC*, the Supreme Court set out six factors courts should consider in the analysis:

> (1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment.

*Loeb*, 306 F.3d at 484 (citing *AGC*, 459 U.S. at 537–45). When a plaintiff seeks only injunctive relief, courts focus on "the presence of improper motive, the causal connection between the violation and the harm, and the directness of the injury." *In re Plasma-Derivative Protein Therapies*, 2012 WL 39766, at *9.

Here, Defendants contend that Leeder lacks antitrust standing because his injury is too remote and antitrust standing should be limited to the home sellers who are directly injured by Defendants' conduct. In *AGC*, the Supreme Court explained that the "existence of an identifiable

15

class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." *AGC*, 459 U.S. at 542. The Court agrees that home sellers, as the direct purchasers of buyer-broker services, are necessarily more directly injured by Defendants' alleged antitrust violations. Moreover, home sellers are, in fact, vindicating the public interest in antitrust enforcement as they are actively challenging the same NAR rules as Leeder before this Court in *Moehrl v. The National Association of Realtors*, No. 19-cv-01610 (N.D. Ill.). Not only are the plaintiffs in *Moehrl* asserting a claim for damages (which has not been subject to an *Illinois Brick* challenge), they are also requesting the exact injunction that Leeder requests here. Thus, denying Leeder antitrust standing to seek injunctive relief will not "leave a significant antitrust violation undetected or unremedied." *AGC*, 459 U.S. at 542. Courts have found that the directness-of-injury factor "weighs 'particularly heavily'" toward denying antitrust standing when the possibility of an antitrust challenge by the direct purchaser is "no hypothetical proposition." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09 CV 3690, 2013 WL 4506000, at *14 (N.D. Ill. Aug. 23, 2013) (quoting *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 718 (7th Cir. 2006)); *see also In re Plasma-Derivative Protein Therapies*, 2012 WL 39766, at *9 (same).

Although other district courts have permitted indirect purchasers to proceed with their injunctive relief claims even when the direct purchasers are seeking the same relief, the Court finds those cases inapposite to the circumstances here. First, in those cases, the plaintiffs asserted multiple antitrust damages claims, only some of which were barred by *Illinois Brick*, such that the case was going to proceed regardless. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 532 (N.D. Ill. 2019); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 819–21

16

(N.D. Ill. 2017). Here, both Leeder's claim for antitrust damages and his unjust enrichment claim have now been dismissed. Moreover, in both cases allowing indirect purchasers and direct purchasers to seek injunctive relief simultaneously, the indirect purchasers remained participants in the affected market—the indirect purchasers received a continuing service from the defendants in *In re Dealer Management Systems*, 362 F. Supp. 3d at 520–22, 530–31, and the indirect purchasers regularly bought and consumed the defendants' meat products in *In re Broiler Chicken*, 290 F. Supp. 3d at 772, 779, 813–14. By contrast, the CAC expressly acknowledges that "[m]ost people purchase . . . and sell homes only a few times in their lives," (CAC ¶ 2), and Leeder has already purchased his home and does not allege that he intends to purchase a new home in the future. It therefore does not appear that Leeder faces "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969); *see also Cargill, Inc. v. Monfort of Col., Inc.*, 479 U.S. 104, 113 ("[T]o seek injunctive relief under § 16, a private plaintiff must allege threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." (internal quotation marks omitted)).

In sum, because Leeder's damages claims have been dismissed and the more directly injured home seller plaintiffs in *Moehrl* are seeking the same injunction as Leeder, the Court concludes that Leeder lacks antitrust standing to pursue his claim for injunctive relief. Accordingly, that claim is dismissed as well.

### III. Dismissal With or Without Prejudice

Having dismissed all of Leeder's claims, the Court next considers Defendants' request that the CAC be dismissed with prejudice. Ordinarily, "a plaintiff whose original complaint has been

dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend [his] complaint before the entire action is dismissed." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015). Yet denying leave to amend will be appropriate where it "is ***certain*** from the face of the complaint that any amendment would be futile or otherwise unwarranted." *Id.* at 519–20 (internal quotation marks omitted). While the Court believes that it is unlikely Leeder will be able to plead adequately that he is a direct purchaser of buyer-broker services, it will nonetheless grant him leave to amend to afford him the opportunity to try. For that reason, the Court dismisses the CAC without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Dkt. No. 61) is granted and the CAC is dismissed without prejudice.

ENTERED:

Dated: May 2, 2022

Andrea R. Wood
United States District Judge