**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MYA BATTON, AARON BOLTON,
MICHAEL BRACE, DO YEON IRENE KIM,
ANNA JAMES, JAMES MULLIS,
THEODORE BISBICOS, and DANIEL
PARSONS, individually and on behalf of
all others similarly situated,

        Plaintiffs,

v.

THE NATIONAL ASSOCIATION OF
REALTORS, ANYWHERE REAL ESTATE, INC.
FORMERLY KNOWN AS REALOGY HOLDINGS
CORP., RE/MAX LLC, and KELLER WILLIAMS
REALTY, INC.,

        Defendants.

Case No. 1:21-cv-00430

Judge LaShonda A. Hunt

Magistrate Judge M. David Weisman

**[UNDER SEAL]**

**<u>PLAINTIFFS' CORRECTED MOTION FOR CLASS CERTIFICATION AND
APPOINTMENT OF CO-LEAD CLASS COUNSEL</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF COMMON FACTS AND EVIDENCE ............................................. 4

    1.   The Real Estate Industry. .......................................................................................... 4

    2.   Defendants. ................................................................................................................ 5

    3.   The Anticompetitive Rules. ...................................................................................... 8

    4.   Defendants' Agreements.......................................................................................... 12

    5.   Anticompetitive Impact of Defendants' Conspiracy. ............................................. 16

    6.   Plaintiffs. ................................................................................................................. 17

CLASS CERTIFICATION STANDARD ....................................................................... 17

ARGUMENT ................................................................................................................... 18

    I.     Plaintiffs Satisfy the Requirements of Rule 23(a). ................................................ 18

        A.   Numerosity................................................................................................. 18

        B.   Typicality ................................................................................................... 18

        C.   Adequacy ................................................................................................... 19

        D.   The Critical Questions of Law and Fact Are Common to all Class Members.............. 20

    II.    Rule 23(b)(3) is Satisfied Because Common Issues Predominate............................... 21

        A.   Common Issues Concerning the Existence of an Antitrust Conspiracy Predominate. . 22

        B.   Common Issues Concerning Unreasonable Restraints Predominate. .......................... 23

        1.   Common issues concerning the relevant markets and market power predominate. ..... 24

        a.   Common issues concerning anticompetitive effects predominate............................... 25

        b.   Common issues concerning alleged procompetitive justifications predominate.......... 27

        c.   Common issues concerning antitrust impact predominate. ......................................... 27

        C.   Common Issues Concerning Damages Predominate. .................................................. 31

        D.   Common Issues Regarding Issue Preclusion Predominate ......................................... 33

        E.   There Are No Material Variations in State Law That Defeat Predominance............... 34

    III.   A Class Action is Superior to Other Methods for Adjudication.................................... 35

    IV.   The Class is Clearly Defined. ...................................................................................... 36

CONCLUSION................................................................................................................ 37

## <u>TABLE OF AUTHORITIES</u>

Cases

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
 683 F.3d 328 (7th Cir. 2012) ................................................................................. 24, 25, 27

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013) .................................................................................................... 23

*Arandell Corp. v. Xcel Energy Inc.*,
 No. 22-3279, 2025 WL 2218111 (7th Cir. Aug. 5, 2025) ........................................... 3

*Arizona v. Maricopa Cnty. Med. Soc.*,
 457 U.S. 332 (1982) .................................................................................................... 25

*Beaton v. SpeedyPC Software*,
 907 F.3d 1018 (7th Cir. 2018) .................................................................................... 22

*Benson v. Newell Brands, Inc.*,
 No. 19 C 6836, 2021 WL 5321510 (N.D. Ill. Nov. 16, 2021) ................................... 37

*Burnett v. Nat'l Ass'n of Realtors*,
 No. 19-CV-00332-SRB, 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022) ........................ passim

*Castro v. Sanofi Pasteur Inc.*,
 134 F. Supp. 3d 820 (D.N.J. 2015) ............................................................................. 28

*Catalano, Inc. v. Target Sales, Inc.*,
 446 U.S. 643 (1980) .................................................................................................... 25

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013) ...................................................................................................... 32

*Conrad v. Boiron, Inc.*,
 869 F.3d 536 (7th Cir. 2017) ...................................................................................... 21

*Dennis v. Andersons, Inc.*,
 20 C 4090, 2025 WL 1331795 (N.D. Ill. May 7, 2025) .............................................. 21

*Howard v. Cook Cty. Sheriff's Off.*,
 989 F.3d 587 (7th Cir. 2021) ...................................................................................... 19

ii

*In re Allstate Corp. Sec. Litig.*,
  966 F.3d 595 (7th Cir. 2020) ........................................................ 23

*In re Broiler Chicken Antitrust Litig.*,
  No. 16 C 8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) ................................... 3, 21, 32, 37

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 326 (E.D. Mich. 2001) ........................................................ 33

*In re College Athlete NIL Litig.*,
  No. 20-cv-03919, 2025 WL 1675820 (N.D. Cal. June 6, 2025) ............................. 28

*In re Currency Conversion Fee Antitrust Litig.*,
  264 F.R.D. 100 (S.D.N.Y. 2010) ........................................................ 38

*In re Microcrystalline Cellulose Antitrust Litig.*,
  218 F.R.D. 79 (E.D. Pa. 2003) ........................................................ 24

*In re Namenda Indirect Purchaser Litig.*,
  338 F.R.D. 527 (S.D.N.Y. 2021) ........................................................ 37

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
  235 F.R.D. 127 (D. Me. 2006) ........................................................ 33

*In re Pork Antitrust Litig.*,
  665 F. Supp. 3d 967 (D. Minn. 2023) ........................................................ 37

*In re Ranbaxy Generic Drug Application Antitrust Litig.*,
  338 F.R.D. 294 (D. Mass. 2021) ........................................................ 30

*In re Suboxone Antitrust Litig.*,
  421 F. Supp. 3d 12 (E.D. Pa. 2019) ........................................................ 28

*In re Sulfuric Acid Antitrust Litig.*,
  No. 03 C 4576, 2007 WL 898600 (N.D. Ill. Mar. 21, 2007) ................................. 20

*In re Turkey Antitrust Litig.*,
  No. 19 C 8318, 2025 WL 264021 (N.D. Ill. Jan. 22, 2025) ................................... 3, 32, 36, 37

*Johnson v. Diakon Logistics*,
  No. 16-cv-06776, 2020 WL 405636 (N.D. Ill. Jan. 23, 2020) ................................. 37

*Kirkbride v. Kroger Co.*,
  349 F.R.D. 160 (S.D. Ohio 2025) ........................................................ 32

iii

*Kleen Prods. LLC v. Int'l Paper*,
  306 F.R.D. 585 (N.D. Ill. 2015) ............................................................ 22

*Kleen Prods. LLC v. Int'l Paper*,
  831 F.3d 919 (7th Cir. 2016) .................................................... 29, 30, 33

*Lytle v. Nutramax Labs., Inc.*,
  114 F.4th 1011 (9th Cir. 2024) .............................................................. 32

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) .................................................... 23, 29, 33

*Moehrl v. Nat'l Ass'n of Realtors*,
  No. 19-CV-01610, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ..................................... passim

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) ............................................................ 37, 38

*Mulvania v. Sheriff of Rock Island Cnty.*,
  850 F.3d 849 (7th Cir. 2017) .............................................................. 19

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
  435 U.S. 679 (1978) .................................................................... 25

*Orr v. Shicker*,
  953 F.3d 490 (7th Cir. 2020) .............................................................. 19

*Parklane Hosiery Co., Inc. v. Shore*,
  439 U.S. 322 (1979) .................................................................... 35

*Retired Chicago Police Ass'n v. City of Chicago*,
  7 F.3d 584 (7th Cir. 1993) ................................................................ 20

*Saltzman v. Pella Corp.*,
  257 F.R.D. 471 (N.D. Ill. 2009) ........................................................... 36

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) .............................................................. 22

*Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*,
  577 F. Supp. 3d 970 (D. Minn. 2021) ...................................................... 33

*Thomas v. UBS AG*,
  706 F.3d 846 (7th Cir. 2013) .............................................................. 37

*Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC,*
    No. 22 CV 1648, 2024 WL 2785142 (N.D. Ill. May 30, 2024) ............................................. 26

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ......................................................................................................... 22

Rules

Fed. R Civ. P. 23 (g)(1)(A) ........................................................................................................ 21

Fed. R Civ. P. 23(a)(3) .............................................................................................................. 20

Rule 23(a) and (b)(3); (ii) .......................................................................................................... 39

Rule 23(a)(2) .............................................................................................................................. 22

Rule 23(a)(4) ........................................................................................................................ 21, 22

Rule 23(b)(3) .................................................................................................................. 22, 23, 37

## INTRODUCTION

Plaintiffs Aaron Bolton, Michael Brace, Do Yeon Irene Kim, Anna James, and Daniel Parsons ("Plaintiffs")[1] now move on behalf of themselves and all others similarly situated, pursuant to Rules 23(a) and 23(b)(3), for certification of two classes:

(1) All persons who purchased residential real estate in one of the Antitrust Subject States from the beginning of the State Statutory Period[2] through December 31, 2021 that was listed on a Subject MLS[3] and for which a buyer-broker commission was paid.

(2) All persons who purchased residential real estate in one of the Consumer Protection States that was listed on a Subject MLS from the beginning of the State Statutory Period[4] through December 31, 2021, that was listed on a Subject MLS and for which a buyer-broker commission was paid.

Excluded from the Classes are: (1) sales of residential real estate for a price below $56,500; and (2) employees and officers of the Defendants, their affiliates, the Judge, and the Judge's staff.[5]

---

[1] Plaintiffs Mya Batton, James Mullis, and Theodore Bisbicos' claims are stayed pending resolution of Mr. Mullis' appeal of certain settlements in the Eighth Circuit. *See* ECF No. 162.

[2] The Antitrust States and their Statutory Periods are: Arizona (Jan. 25, 2017), California (Jan. 25, 2017), Connecticut (Jan. 25, 2017), District of Columbia (Jan. 25, 2017), Illinois (Jan. 25, 2017), Iowa (Jan. 25, 2017), Kansas (Jan. 25, 2018), Maine (Jan. 25, 2015), Michigan (Jan. 25, 2017), Minnesota (Jan. 25, 2017), Nevada (Jan. 25, 2017), New Mexico (Jan. 25, 2017), New York (Jan. 25, 2017), North Carolina (Jan. 25, 2017), Oregon (Jan. 25, 2017), Utah (Jan. 25, 2017), Vermont (Jan. 25, 2015), West Virginia (Jan. 25, 2017), and Wisconsin (Jan. 25, 2015).

[3] The Subject MLSs are: Bay Area Real Estate Information Services, Inc., bridgeMLS, BeachesMLS, California Desert Association of Realtors (CDAR) MLS, California Regional MLS, Charleston Trident, Contra Costa Association of Realtors MLS, Fresno Association of Realtors MLS, Florida Gulf Coast, San Diego Association of Realtors MLS, TheMLS, SmartMLS, Bright MLS, Maris, Midwest Real Estate Data (MRED) MLS, Miami MLS, MLS FLK, MLS PIN, OneKey, Stellar, Des Moines Area Association of Realtors (DMAAR) MLS, Heartland Multiple Listing Service, Inc., South Central Kansas MLS, Maine Listings, MiRealSource, Realcomp II, NorthstarMLS, Greater Las Vegas Association of Realtors (GLVAR) MLS, SWMLS/GAAR, Carolina/Canopy MLS, Triad MLS, Triangle MLS (Doorify), Cascades East MLS, South Oregon MLS, Klamath County Association of Realtors, Regional Multiple Listing Service, Inc. (RMLS), Wasatch Front Regional MLS, Greenbriar Valley MLS, and Metro MLS.

[4] The Consumer Protection States and their Statutory Periods are: California (Jan. 25 2017), Florida (Jan 25, 2017), Massachusetts (Jan. 25, 2017), Missouri (Jan. 25, 2016), New Hampshire (Jan. 25, 2018), and South Carolina (Jan. 25, 2018).

[5] Home sellers have brought and settled a number of cases alleging a substantially similar conspiracy among the Defendants. Settlements in those cases purport to release claims related to both selling and buying homes, including homebuying claims in this case. Plaintiff Mullis is currently appealing that interpretation of the release. If the release as interpreted stands, then the Classes herein will be limited to

Home buyers paid billions in overcharges as a result of a decades-long, nationwide antitrust conspiracy among the country's largest real estate brokerages and the National Association of Realtors to fix buyer agent commissions. This lawsuit seeks to make them whole.

Classes in price-fixing cases, including indirect purchaser cases like this one, are routinely certified. *See, e.g., Arandell Corp. v. Xcel Energy Inc.*, No. 22-3279, 2025 WL 2218111, at *1 (7th Cir. Aug. 5, 2025) ("Class certification is common in price-fixing cases"); *In re Turkey Antitrust Litig.*, No. 19 C 8318, 2025 WL 264021, at *28 (N.D. Ill. Jan. 22, 2025) (certifying indirect purchaser classes in price-fixing case); *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *1 (N.D. Ill. May 27, 2022) (same). It is thus no surprise that this District has already certified classes of home sellers challenging this identical price-fixing conspiracy involving nearly all the same Defendants and using the same common evidence. *See Moehrl v. Nat'l Ass'n of Realtors*, No. 19-CV-01610, 2023 WL 2683199, at *3 (N.D. Ill. Mar. 29, 2023) (certifying classes of "homeowners who sold or intend to sell a home on one of twenty NAR-affiliated MLSs covering various regions across the United States")[6]; *accord Burnett v. Nat'l Ass'n of Realtors*, No. 19-CV-00332-SRB, 2022 WL 1203100, at *20 (W.D. Mo. Apr. 22, 2022) (similar). Class certification is equally appropriate here, where Plaintiffs will rely on common evidence to resolve on a classwide basis the only two issues that were not present in *Moehrl* or *Burnett.* These are: (1) the impact of Defendants' conspiracy on home buyers, and (2) whether Plaintiffs satisfy the requirements of the relevant state laws.

---

first-time home buyers, people who opted out of those settlements, and people whose only sale of a home was outside the settlement class period in that case.

[6] All citations modified (cleaned up) unless otherwise indicated.

*First*, Plaintiffs' expert, Prof. Abrantes-Metz,[7] presents a reliable methodology capable of showing classwide impact and damages using common proof. Prof. Abrantes-Metz researched buyer agent commissions in other countries with real estate markets comparable to that in the United States, but unaffected by Defendants' conspiracy, and found that buyer agent commissions in these competitive markets are approximately 1.38%—less than half the typical 3% rate in the United States. She sets forth a methodology to calculate the "but-for" commission rate (*i.e.*, what the rate would have been in the absence of Defendants' conspiracy) based on the competitive international benchmark rate. To demonstrate how the methodology works, she applies it to four of the Subject MLSs as exemplars: Triad MLS in North Carolina, Stellar MLS in Florida, SWMLS/GAAR in New Mexico, and South-Central Kansas MLS in Kansas (the "Focus MLSs.") Next, Prof. Abrantes-Metz uses established tax incidence principles to determine the rates at which these supracompetitive commissions are passed through to home buyers and increase the total price of the homes. Once again, she sets forth a formula that can be applied to all MLSs and to each Class member, and applies the method to calculate damages in aggregate across the four Focus MLSs and individually for each Class Representative as examples. Finally, Plaintiffs' experts present additional common evidence that Defendants' conspiracy impacted Class members by diminishing the quality of buyer agent services.

*Second*, common evidence will support Plaintiffs' claims under each applicable state law. Each state in the Antitrust Class either expressly parallels the Sherman Act or interprets its antitrust law in harmony with federal antitrust law. *See* Appendix A. Each state in the Consumer Protection class is harmonized with the Federal Trade Commission Act ("FTC Act") and permits Plaintiffs to

---

[7] Ex. 1, Expert Report of Rosa M. Abrantes-Metz, Ph.D. (Sept. 22, 2025) (hereinafter, "AM Report").

show a violation of the statute based on Defendants' anticompetitive conduct, which is common to all class members. *See* Appendix B.

Accordingly, Plaintiffs respectfully request that the Court: (i) certify this action as a class action pursuant to Rules 23(a) and (b)(3); (ii) appoint Plaintiffs as Class Representatives; and (iii) appoint Lowey Dannenberg, P.C. and Korein Tillery, LLC as Class Counsel pursuant to Rule 23(g).

## STATEMENT OF COMMON FACTS AND EVIDENCE

### 1. The Real Estate Industry.

Nearly 90% of residential properties in the United States are bought and sold through real estate brokerages and their agents. *See* Ex. 1[8] attached to the Declaration of Randall P. Ewing (Sept. 22, 2025). Two categories of entities may be licensed under state law to represent real estate sellers and buyers: (1) agents who work directly with buyers and sellers; and (2) real estate brokers (also known as "brokerage firms" or "brokers"), who supervise agents.[9]

Agents typically share and find information about houses for sale on a multiple listing service ("MLS").[10] An MLS is a database of properties listed for sale in a defined region that is

---

[8] RMLLC-Batton_01636388 at 01636395-96 (NAR 2021 Profile of Home Buyers and Sellers: "Eighty-seven percent of buyers recently purchased their home through a real estate agent or broker" and "ninety percent of home sellers worked with real estate agent to sell their home."); 2024 Home Buyers and Sellers Generational Trends Report at slide 62, NAR, *available at* https://www.nar.realtor/sites/default/files/documents/2024-home-buyers-and-sellers-generational-trends-04-03-2024.pdf?_gl=1*d1gmnk*_gcl_au*MTI2ODQ5ODMyOS4xNzA5MDQyNjAw (89% of buyers of all ages used a real estate agent) (last visited Sept. 18, 2025).

[9] *See, e.g.*, Ex. 3, RMLLC-Batton_00197152 at 197175 (2015 Industry Comment by Zellman & Associates); *See* Ex. 4, Deposition of Carey Sylvester (Apr.12, 2022) at 23:22-24:5, *Moehrl* ("A licensed real estate agent has their real estate license. They must be managed by a broker."); Ex. 5, Deposition of Robert Jason Papasan (Nov. 15, 2022) at 22:7-9, 23:2-4, *Moehrl*; Ex. 6, 10/06/21 Deposition of Ruben Gonzalez (Oct. 6, 2021) 227:1-228:25, *Burnett/Moehrl*.

[10] *See, e.g.*, Ex. 7, RMLLC-Batton_01237891 at 01237914 (2019 Brookings report: "Agents agree to share their own listing information with all MLS members by uploading it to the MLS system, which is then disseminated to buyers and the public through buying brokers and various websites. The MLS, the essential repository of listing information, is arguably the most valuable asset in this industry."); Ex. 8, Testimony of Jen Davis (Oct. 30, 2023), *Burnett* Tr. Vol. 10 at 2280:16-2282:23; Ex. 9, Testimony of Rodney Gansho (Oct. 24, 2023), *Burnett* Tr. Vol. 6 at 1180:18-1181:13.

accessible to real estate brokers and their agents.[11] MLSs act as the main source of listings for online websites, such as Zillow.[12] The vast majority of homes in the United States are sold on local or regional MLSs.[13] It is commercially necessary for brokers and agents to access MLSs if they are to succeed.[14]

Seller-brokers receive a commission from sellers that is typically paid as a percentage of a home's sales price.[15] Until recently, buyer agents received their commissions as a portion of the total commission paid to the seller-broker.[16] Because all commissions came from the funds provided by buyers at closing, the home buyer effectively paid the buyer agent's commission.[17]

### 2. Defendants.

Defendants in this case are the National Association of Realtors ("NAR") and three of the country's largest brokerages. NAR is the largest trade association in the U.S., with over 1.4 million

---

[11] Ex. 8, Davis Testimony at 2280:16-2282:23; Ex. 9, Gansho Testimony at 1180:18-1181:13.

[12] Ex. 10, Deposition of Gary Keller (Jan. 19, 2022) at 40:14-41:1, 47:1-19, *Moehrl*; Ex. 11, Deposition of Robert Goldberg (Nov. 22, 2021) at 210:14-212:18, *Burnett*; Ex. 6, Gonzalez Dep. at 152:21-153:22.

[13] Ex. 11, Goldberg Dep. at 327:15-22; Ex. 12, NAR-Batton100008356 at 8364 (2021 NAR Profile of Home Buyers and Sellers stating, "Eighty-nine percent of sellers listed their homes on the Multiple Listing Service (MLS), which is the number one source for sellers to list their home."); Ex. 13, NAR-Batton100008176 at 8183 (2020 NAR Profile of Home Buyers and Sellers stating, "Ninety-one percent of sellers listed their homes on the Multiple Listing Service (MLS), which is the number one source for sellers to list their home.").

[14] *See* Ex. 14, Gary Keller Dep. Designation at 144:23-145:16, Tr. Vol. 1 at 181:5-9 (Oct. 17, 2023), *Burnett*; Ex. 15, Testimony of Gary Keller (Oct. 27, 2023), *Burnett* Tr. Vol. 9 at 2086:7-14; Ex. 5, Papasan Dep. at 108:2-109:3 ("without that access, it's almost impossible to do anything other than give referrals.").

[15] Ex. 16, Deposition of Michelle Figgs (Feb. 4, 2022) 24:4-13, 26:3-16, 49:11-22, *Moehrl*; Ex. 17, Deposition of Jay Papasan (Feb. 4, 2022) at 12:8-13:4, *Moehrl*; Ex. 5, Papasan Dep. at 22:10-23:1.

[16] Ex. 16, Figgs Dep at 28:20-25, 49:23-50:8, 69:21-70:4; Ex. 17, Papasan Dep. at 13:25-14:4; 23:9-17.

[17] *See* Ex. 18, Deposition of Jay Papasan (Apr. 14, 2023) at 39:18-40:1, *Burnett* (stating "a lot of that cost may be showing up in the financing"); Ex. 5, Papasan Dep. at 23:23-24:12 ("The buyer's agent is effectively paying it but indirectly. They're paying it through the transaction. They get to finance basically their cost of having a buyer's agent into the loan ...."); Ex. 19, Testimony of Krista Wilson (Oct. 24, 2023), *Burnett* Tr. Vol. 7 at 1692:4-9; *cf.* Ex. 6, Gonzalez Dep. at 187:10-17.

members called "REALTORS®" that are competitors in the marketplace.[18] NAR is comprised of the national association and state and local associations of REALTORS®.[19] Membership in NAR provides real estate professionals with a number of benefits, including liability insurance, trainings, and access to MLSs.[20] NAR sets rules and policies for its members, including a Code of Ethics and a Handbook on Multiple Listing Policy (the "NAR Handbook").[21] NAR's rules are enacted through agreements among the Board of Directors and relevant committees.[22]

Defendant Anywhere is the "world's largest franchisor of residential real estate brokerages."[23] It owns, operates, and franchises real estate brokerage firms under brands including Century 21, Coldwell Banker, Sotheby's International Realty, Corcoran, and Better Homes and Garden Real Estate.[24] "Substantially all of [Anywhere's] real estate franchising revenues" are derived from royalties "based on a percentage of the franchisees' sales commissions," and

---

[18] *See* Ex. 20, Rodney Gansho Designation at 41:10-42:2, 62:11-23, *Burnett* Tr. Vol. 2 at 206:21-25 (Oct. 18, 2023); Ex. 11, Goldberg Dep. at 36:22-37:17, 50:17-51:6; Ex. 14, Keller Dep. Designation at 27:12; Ex. 15, Keller Testimony at 2045:22-2046:2; Ex. 5, Papasan Dep. in *Moehrl* at 95:5-18.

[19] *See* NAR,, *available at* https://www.nar.realtor/ (noting NAR has "1,200 local and state/territory associations serving REALTORS® and their communities"); *see also* "About NAR", NAR, https://www.nar.realtor/about-nar ("Members belong to one or more of approximately 1,200 local associations/board and 54 state and territory associations of REALTORS®.") (last visited Sept. 22, 2025).

[20] Ex. 21, Deposition of Rodney Gansho (Jan. 24, 2021) at 126:4-15, *Burnett*; NAR 2025 Membership Guide at 11–17, 28–30, NARm *available at* https://www.flipsnack.com/759C5EAA9F7/nar-2025-member-guide/full-view.html via https://www.nar.realtor/membership (last visited Sept. 22, 2025).

[21] Governing Documents, NAR, *available at* https://www.nar.realtor/about-nar/governing-documents (last visited Sept. 22, 2025).

[22] *See* NAR Handbook at iii (2025), *available at* https://www.nar.realtor/sites/default/files/2025-01/PDF-HMLP-2025-Handbook-on-Multiple-Listing-Policy-2025-01-23.pdf (the NAR Handbook "is intended to guide member associations of REALTORS® in the operation of multiple listing services consistent with the policies established by the National Association's Board of Directors") (last visited Sept. 22, 2025).

[23] *See* Anywhere 10-K (2020) at 5, *available at* https://s201.q4cdn.com/405473695/files/doc_financials/2020/ar/4Q20-10K.pdf.

[24] *See* Ex. 22, Nick Bailey Designation at 24:6-10, *Burnett* Tr. Vol. 2 at 210:15-20 (Oct. 18, 2023); Ex. 23, Michael Gorman Designation at 6:20-24, 9:24-10:2, *Burnett* Tr. Vol. 2 at 281:22-282:1 (Oct. 18, 2023).

marketing fees.[25] The "average broker commission" is a "key driver" of the company's revenue.[26] Anywhere required its franchisees to comply with the NAR Code of Ethics until March 30, 2023.[27]

Defendant RE/MAX similarly franchises local RE/MAX brokers around the country.[28] RE/MAX currently has more than 8,600 franchised offices and 130,000 affiliated sales agents.[29] RE/MAX receives revenue from broker fees, which are a "[p]ercentage fee paid by RE/MAX franchisees on agent-generated transactions."[30] RE/MAX required its franchisees to comply with the NAR Code of Ethics until June 16, 2023.[31]

Defendant Keller Williams has the most real estate agents of any brokerage in the United States.[32] Keller Williams has approximately 800 franchises (also called "market centers") in the United States.[33] Keller Williams required its franchises to be members of NAR and the local MLS

---

[25] *See* Anywhere 10-K (2020) at 10-11, at n.11, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001398987/000139898721000038/rlgy-20201231.htm.

[26] *Id.* at 14, 28 (Anywhere's "company owned real estate brokerages business derives revenue primarily from gross commission income received as the broker at the closing of real estate transactions.")

[27] *See* Ex. 23, Gorman Dep. Designation at 42:12-49:7, 52:23-53:4, 54:5-9, 55:10-57:12.

[28] *See* RE/MAX 10-K (2020) at 4, https://investors.remaxholdings.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=13942702.

[29] *Id.* at 6.

[30] *Id.* at 16-17.

[31] *See* Ex. 22, Bailey Dep. Designation at 20:21-21:2, 34:17-20, 39:11-18; *see also* Ex. 24, RMLLC-Batton_00035181 at 5237 (Franchise Agreement for Multistate, dated April 2021); Ex. 25, RMLLC-Batton_00123678 at 3737 (Franchise Agreement for Northern Illinois, dated April 2019); Ex. 26, RMLLC-Batton_00002323 at 2364 (Franchise Agreement for RE/MAX of New England, Inc., dated 6/24/19); Ex. 27, RMLLC-Batton_00034755 at 4802 (Franchise Agreement for New York Region, dated March 2017); Ex. 28, RMLLC-Batton_00159949 at 9984 (Franchise Agreement for St. Louis Region, dated April 2018).

[32] *See* Ex. 14, Keller Dep. Designation at 7:22-8:2; *cf.* Ex. 29, Deposition of Darrell King (Feb. 20, 2022) 02/02/22 at 13:3-5, *Moehrl* (Keller Williams has around 180,000 agents in in the United States).

[33] *See* Ex. __, Ex. 14, Keller Dep. Designation at 10:17-19,10:23-11:23; Ex. 15, Keller Testimony at 1946:23-1947:8; Ex. 30, Deposition of Darrell King (Feb. 20, 2022) 10:18-11:11, *Burnett*.

until May 2024.[34] Keller Williams receives a royalty on commissions earned by agents at its franchisees.[35]

### 3. The Anticompetitive Rules.

NAR enacts rules, policies, procedures, and guidelines for MLSs, brokerages, and real estate agents through its Handbook on Multiple Listing Policy, Code of Ethics, Standards of Practice, and Case Interpretations.[36] These rules, policies, and practices are enforced by local MLS associations.[37] Violations are punishable by fines, suspension, and termination of MLS access.[38]

Plaintiffs' expert, Prof. Norman Miller, provides common evidence that all of the MLSs in this lawsuit required adherence to the Anticompetitive Rules (described below) either by limiting membership to REALTORS® subject to the restraints or by imposing the restraints on non-REALTOR® agents as a condition of access to MLSs.[39] Approximately 98% of MLSs are NAR-affiliated, meaning they are wholly or partially owned by state and local NAR associations.[40] NAR affiliation required the NAR MLSs to enforce the restraints or risk having their charter revoked,

---

[34] *See* Ex. 14, Keller Dep. Designation at 22:18-23; Ex. 29, King Dep. at 56:9-25, 65:14-66:24; Ex. 5, 11/15/22 Papasan Dep. at 177:18-20.

[35] *See* Ex. 16, Figgs Dep. at 56:19-24, 57:23-60:24; Ex. 29, King Dep. in *Moehrl* at 37:10-16; Ex. 5, Papasan Dep. at 24:13-25:8, 25:16-26:7, 26:24-27:1, 39:2-10; Ex. 30, Deposition of James Talbot (Oct. 8, 2021), *Burnett/Moehrl* at 69:1-70:5.

[36] *See* n.21, *supra*.

[37] *See* Ex. 9, Gansho Testimony at 1184:14-23; NAR Handbook (2025) at iii, 8, 35–39, NAR, *available at* https://www.nar.realtor/sites/default/files/2025-01/PDF-HMLP-2025-Handbook-on-Multiple-Listing-Policy-2025-01-23.pdf (local REALTOR® associations must follow and enforce the NAR Handbook) (last visited Sept. 22, 2025).

[38] *See* Ex. 21, Gansho Dep. at 126:4-130:2, 133:17-134:20; NAR Handbook (2025) at iii, 8 (stating MLSs must follow NAR rules "to ensure coverage under the master professional liability insurance program" and that MLSs "failing to conform with these policies will be required to show cause why their charters should not be revoked") (last visited Sept. 18, 2025).

[39] Ex. 31, Expert Report of Norman Miller, Ph.D. (Sept. 22, 2025) (hereinafter, "Miller Report") at ¶ 101.

[40] Miller Report ¶ 44.

losing NAR insurance, and having their officers removed.[41] For the few MLSs that permit non-REALTOR® participation, NAR still requires that those members adhere to the NAR Constitution, Bylaws, and policies.[42] The Anticompetitive Rules applied to all MLSs at issue in this lawsuit during the class period and consequently constitute common evidence for purposes of class certification.[43] They are described in turn below.

**The Buyer Broker Commission Rule.** From 1992 to at least 2023, NAR's MLS Policy Statement 7.23—the "Buyer Broker Commission Rule"—required listing brokers to "mak[e] blanket unilateral offers of compensation to … MLS participants" working with buyers.[44] The rule required the offer to be a fixed percentage or dollar amount and prohibited any "general invitation[]" to discuss and negotiate terms. *Id.* at 10. Participants were not allowed to submit, and MLSs were not allowed to publish, any noncompliant listings. *Id.* at 11. In other words, the rule mandated sellers to offer the exact same compensation terms to every buyer agent without regard

---

[41] *See* Ex. 32, Pl. Trial Ex. 334, *Burnett* (12/21/18 email from Gansho); Ex. 9, Gansho Testimony at 1248:2-1253:3 (discussing *Burnett* Pl. Trial Ex. 334); NAR Handbook (2025) at iii, 8 (stating MLSs must follow NAR rules "to ensure coverage under the master professional liability insurance program" and that MLSs "failing to conform with these policies will be required to show cause why their charters should not be revoked") (last visited Apr. 17, 2025).

[42] *See* Providing MLS Access, Products and Services to Non-Members, NAR, https://www.nar.realtor/sites/default/files/2025-04/Providing-Non-Member-MLS-Access-guidance-for-AEs-2025-04-24.pdf ("While non-member participation is determined at the local level, associations and association-owned MLSs must adhere to applicable state and federal law as well as the NAR Constitution, Bylaws and policies."); Ex. 33, KWRI-Batton-00143347 at 3438-41 & n.* (2019 NAR Handbook Standards of Conduct for MLS Participants applicable "if the association's MLS is open to nonmember participants"); *see also id.* at 3415 ("Model Association Bylaw Provisions Authorizing MLS as a Committee of an Association with REALTOR and REALTOR-ASSOCIATE Members" imposing mandatory rule that if an NAR MLS admits a non-REALTOR member, evidence must be supplied that the nonmember will complete a course of instruction covering MLS rules and the nonmember must agree to abide by MLS rules).

[43] Miller Report ¶¶ 88-101.

[44] *See* Ex. 34, NAR Responses and Objections to Interrogatories (Aug. 5, 2025) at pp. 7-15 (quoting MLS Policy Statement 7.23).

to their experience, the services they were providing to the buyer, or the financial arrangement they made with the buyer.

**Restraints on Negotiation.** Beginning in at least January 2004, NAR established further rules restraining the negotiation of buyer broker commissions. NAR Standard of Practice 16-16 prohibited REALTORS® from attempting to condition an offer to purchase a home on a seller-broker's agreement to lower buyer broker compensation or from encouraging a buyer to impose such a condition.[45] NAR Standard of Practice 3-2 required that "[a]ny change in compensation offered … must be communicated" before a "Realtor® submits an offer to purchase/lease the property" and prohibited seller-brokers from "attempt[ing] to unilaterally modify the offered compensation" to the buyer broker once a purchase offer has been submitted.[46] And NAR's Case Interpretation #16-15 required that Realtors complete any negotiation over "cooperating broker compensation … prior to the showing of the property" to a potential buyer.[47]

**Commission Filtering, Disclosure, and Free Service Rules.** In addition, until November 2021, NAR mandated via MLS Rules Section 18.2.4 and Section 19.12 that MLSs permit brokers

---

[45] *See* Ex. 35, Pl. Trial Ex. D4034 at Standard of Practice 16-16, *Burnett* (2023 NAR Code of Ethics stating: "REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation."); Ex. 34, NAR Interrogatory Responses at pp. 18–20.

[46] *See* Ex. 35, at Standard of Practice 3-2 (2023 NAR Code of Ethics) ("Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction."); Ex. 34, NAR Interrogatory Responses at pp. 16–18.

[47] Interpretations of the Code of Ethics (34th ed.), #16-15 at 92, NAR, https://www.nar.realtor/sites/default/files/documents/coe-2022-case-interpretations-2022-03-28.pdf.

to filter listings displayed to buyers based on the level of buyer agent commissions offered.[48] That is, while buyer agents could readily view the offered compensation in the MLS, they could exclude homes from being displayed to their client home buyers if the offered compensation was below a certain amount.

At the same time, until January 2022, MLS Rule Section 18.3.1 and 19.15 permitted MLSs to prohibit MLS brokers from displaying the offer of compensation to home buyers.[49] Most of the Subject MLSs adopted these rules and prohibited MLS brokers from displaying broker compensation to consumers.[50]

Finally, until 2022, NAR's Code of Ethics expressly permitted and encouraged buyer agents to represent that their services were "free," because their fee was always paid by the seller.[51] This was false—home buyers are paying for buyer agent services, just not directly.[52] Keller

---

[48] Ex. 34, NAR Interrogatory Responses at pp. 52–53 (quoting MLS Policy Statement 7.58); *id.* at pp. 53–55 (quoting former MLS Rules Section 18.2.4 and former Model MLS Rules Section 19.12).

[49] *See* Ex. 36, NAR_BattonI00003363 at 3407, Pl. Trial Ex. 136 at p. 34 , *Burnett* (2015 NAR Handbook on Multiple Listing Policy, Policy Statement 7.23 stating: "The multiple listing service shall not have a rule requiring the listing broker to disclose the amount of total negotiated commission in his listing contract, and the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant."), p. 79 (Section 18.3.1 stating: "Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed."), p. 85 (Section 19.15 stating: "A Participant's VOW may not make available for search by or display to Registrants any of the following information: … (b) The compensation offered to other MLS Participants."); Ex. 34, NAR Interrogatory Responses at pp. 56–57 (quoting former Model MLS Rule Section 19.15 and former MLS Policy Statement 7.91); *id.* at pp. 60–62 (quoting former MLS Policy Statement 18.3.1).

[50] Miller Report ¶ 101.

[51] *See* Ex. 34, NAR Interrogatory Responses at pp. 68, 70 (quoting Code of Ethics Standard of Practice 12-1 and 12-2); Ex. 37, NAR_BattonI00003945 at 3973 (NAR 2019 Code of Ethics Standard of Practice 12-2); Code of Ethics Standard of Practice 12-2 (204), NAR, https://www.nar.realtor/sites/default/files/documents/COE2014.pdf (last visited Apr. 18, 2025); Ex. 38, KWRI-Batton-00923050 at 3051 (03/19/21 email stating, "Lots of buyer agents tell their clients that their services are 'free' because it's always paid by the seller.").

[52] *See* Ex. 18, Papasan Dep. at 39:18-40:1 (stating "a lot of that cost may be showing up in the financing"); Ex. 5, Papasan Dep. at 23:23-24:12 ("The buyer's agent is effectively paying it but indirectly. They're

Williams pushed this "free" service fable especially hard,[53] which it later admitted was "lazy," "sloppy," and not "how a competent agent would describe it today."[54] NAR eventually repealed Standard of Practice 12-2 after it and its co-Defendants were sued. The NAR Code of Ethics now says, "REALTORS® must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the REALTOR® will receive no financial compensation from any source for those services."[55]

In sum, the Anticompetitive Rules: required sellers to offer blanket, unilateral buyer-broker commissions; mandated that buyer agents be able to view the buyer agent commissions offered and to filter properties displayed to buyers on that basis; encouraged MLSs to prohibit buyer agents from even disclosing the offered compensation provided to consumers; and encouraged agents to tell buyers their services were free even though they weren't.

### 4. Defendants' Agreements.

Real estate agents and brokers must abide by NAR's restraints because MLS access is necessary to their professional survival. In return for entering into the agreement among NAR members, NAR offers them supracompetitive pricing and protection from competition.

Common evidence demonstrates that Anywhere, RE/MAX, and Keller Williams all accepted this agreement. Each of them required their franchisees and agents to join REALTOR®

---

paying it through the transaction. They get to finance basically their cost of having a buyer's agent into the loan .…"), 282:10-21 ("The buyer is paying the commission indirectly. They're getting to finance it.").

[53] *See* Ex. 39, KWRI-Batton-01147238 at 7240 (2017 Creating Urgency So Buyers Buy Fast telling agents to tell buyers, "The commission in our market is paid by the seller so as long as I represent you there is no cost to you…isn't that great!"); Ex. 40, KWRI-Batton-01147235 at 7236 (Why You Need a Realtor stating, "And the best thing about your Realtor is that all this help normally *won't cost you a cent*. Generally speaking, the seller pays the commission to the Realtor (but this may vary from province to province and state to state)."); Ex. 41, Deposition of Jen Davis (Sept. 28, 2023) at 37:5-24, *Burnett*.

[54] *See* Ex. __, 11/15/22 Papasan 30(b)(6) Dep. in *Moehrl* at 282:3-9, 283:5-12, 285:6-13, 291:10-19, 292:6-17.

[55] *See* Ex. 35, Pl. Trial Ex. D4034 at Standard of Practice 12-1.

associations, local MLSs, and/or follow NAR's Code of Ethics.[56] They also each encouraged or required their franchisees and agents to become members of NAR, which in turn meant those franchisees and agents were required to follow NAR's rules.[57]

The broker Defendants also participated in the conspiracy through their extensive involvement in and influence over NAR and the real estate industry. Defendants' executives, employees, and their affiliates held central positions on NAR committees and advisory boards and NAR's Board of Directors, which is responsible for approving NAR's MLS Rules and NAR's Code of Ethics.[58] For example, in 2017, approximately 57 Keller Williams real estate agents were

---

[56] *See* Ex. 29, King Dep. at 60:19-22 (Keller Williams expects its agents to follow the NAR Code of Ethics); Ex. 42, ANYWHERE-BATTONI-00072065; Ex. 22, Bailey Dep. Designation at 20:21-21:2, 34:17-20, 39:11-18 (RE/MAX requires all of its brokers and real estate agents to NAR follow all NAR rules and regulations, including the Code of Ethics).

[57] *See* Ex. 14, Keller Dep. Designation at 22:13-17, 30:1-5, 34:24-35; Ex. 43, Deposition of Ashley Kelm (Feb. 2, 2022) 28:9-21, 31:7-23, 33:17-34:16, 45:11-20, *Moehrl* at (same); Ex. 4, Bailey Dep. in at 34:7-15 (RE/MAX affiliates and agents must join local board of Realtors, which is part of NAR); Ex. 42, Di Napoli Dep. at 23:25-24:9 (Realogy encourages its franchisees to become members of NAR).

[58] Ex. 44, Anywhere-BattonI-00032100 (2017 email discussing ███████████████████████████
█████████████████████████████████████████████████████████████████████████████████ Ex. 45, Anywhere-BattonI-00032082 (2018 email in which NAR writes to Anywhere and other RES Advisory Group members: "We appreciate your participation in the Advisory Group and your input on the policy issues that affect our large residential real estate companies."); Ex. 46, Anywhere-BattonI-00030230 (2018 Interoffice memorandum from Anywhere's Alex Perriello to the NAR LEADERSHIP TEAM in which Perriello states, "It has been an honor to serve this organization for the past twelve months."); Ex. 47, RMLLC-Batton_00776089 (2018 emails between NAR and RE/MAX appointing RE/MAX EVP Mike Ryan to the RES Group); Ex. 48, RMLLC-Batton_00404689 (2019 email in which NAR writes to RE/MAX and other RES Advisory Group members: "We appreciate your participation in the Advisory Group and your input on the policy issues that affect our large residential real estate companies."); Ex. 49, RMLLC-Batton_01553795 (2020 email from NAR sending agenda and Zoom link to the RES Advisory Group for "[o]ur next meeting"); Ex. 50, RMLLC-Batton_01561985 (2021 email from NAR providing meeting details for NAR's upcoming RES Advisory Group meeting in Washington, D.C.).

on the NAR Board of Directors—6% of the total Board.[59] Keller Williams described itself as "tied at the hip" with NAR.[60]

To force as many home listings as possible onto the MLS in the face of competitive threats from companies like Zillow, NAR—with help from Defendants—passed the Clear Cooperation Policy in November 2019. NAR Rule 8.0 (a/k/a the "Clear Cooperation Policy" or "Off-MLS listing rule") says, "[w]ithin one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants."[61] Agents cannot opt out of NAR Rule 8.0.[62] Several agents and at least one former legally-trained NAR employee spoke out in opposition to the proposed NAR Rule 8.0, citing antitrust concerns.[63]

Defendants enforced their agreement and the Anticompetitive Rules by training their agents on how to set commissions, which resulted in near uniform commission rates implemented across the board by the broker Defendants. Common evidence shows that broker Defendants specifically trained their agents to seek a 3% commission each for buyer agents and seller agents,

---

[59] *See* Ex. 14, Keller Dep. Designation at 35:2-6; Ex. 51, Pl. Trial Ex. 485, row 5, *Burnett*; Ex. 44, Kelm Dep. at 50:19-51:18; Ex. 52 Deposition of Cary Sylvester at 45:16-46:7 (Apr. 12, 2022), *Burnett* (testifying that this was a nine-person increase from 2016).

[60] *See* Ex. 5, Papasan Dep at 175:12-177:11.

[61] *See* Ex. 34, NAR Interrogatory Responses at pp. 70–71; Ex. 53, KWRI-Batton-01046131 at 6181(2020 NAR Handbook on Multiple Listing Policy, Section 17 Clear Cooperation, Policy Statement 8.0, adopted November 2019); Ex. 22, Bailey Dep. Designation at 117:20-118:1.

[62] *See* Ex. 20, Gansho Dep. Designation at 31:24-32:4, 187:22-1885:5; Ex. 54, Testimony of Rodney Goldberg (Oct. 24, 2023), Tr. Vol. 6 at 1108:14-17, 1115:15-16, *Burnett.*

[63] Ex. 55, Pl. Trial Ex. 1724 , *Burnett* (02/06/19 email from Galicia to Elson and Gansho); Ex. 56, Rene Galicia Dep. Designation at 9:21-22, 13:11-16, 18:23-19:15, 21:16-24:9, Tr. Vol. 2 at 207:1-5, *Burnett*; Ex. 20, Gansho Dep. Designation at 129:16-137:22, 138:21-139:4, 146:8-147:16, 167:9-25, 188:13-190:12.

for a total commission of 6%.[64] And agents followed this training, as evidenced by the real-world

numbers showing commissions averaging at those levels.[65]

Defendants likewise each ███████████████████████████████████████[66]

Notably, Defendants all used the overlapping trainers, presentations, and scripts with near-

identical language in training their agents to obtain the standard 6% total commission.[67] These

training aids further advised agents that ████████████████████████████████████████

███████████████████████[68]



---

[64] *See, e.g.*, Ex. 57, Anywhere-BattonI-00028427 (script for agents entitled "Words That Work" instructing agents to tell sellers "Our fee to market or list your home is only 3%. Of course, you will also have to pay a fee to the company that brings the buyer. We recommend that you pay them the same fee, 3%"); Ex. 58, Pl. Trial Ex. 2879, *Burnett* (discussing trainings encouraging agents to set their commissions at 6%); Ex. 59, 2015 KW MAPS, Pl. Trial Ex.1642 at slide 7, *Burnett* (training noting the "standard 6% commission"); Ex. 41, Davis Dep. at 95:4-96:19 (admitting Keller Williams agents were being trained in 2020 to tell sellers that there is a standard 6% commission).

[65] *See* Ex. 29, King Dep. at 24:24-25:19 (the average commission earned by Keller Williams agents was 2.66% in 2013, 2.65% in 2014, 2.64% in 2015, 2.63% in 2016, 2.61% in 2017, and 2.61% in 2018); Ex. 60, Anywhere-BattonI-00028828 (2018 strategy presentation stated that Anywhere's average total broker commissions was ████.); Ex. 61, Anywhere-BattonI-00097588 (2019 Anywhere Q&A document: "ABCR has remained relatively steady at 5.2% (split between buyer and seller agents) for the last 15 years even with the existence of discount brokerages (e.g., Redfin), who offer agent services at a lower price."); Ex. 62, Deposition of Callahan Dep (Sept. 27, 2022) at 29:9-30:12, *Moehrl* at (RE/MAX's average broker commission rate was "about" 2.5% in last quarter).

[66] *See, e.g.*, Ex. 63, Anywhere-BattonI-00028580 at 28581 (In the "Words that Work" material, Anywhere provided "over 50 additional ways to handle the commission objection."); Ex. 64, RMLLC-Batton_01684943 at 5018 ███████████████████████████████████ ████████████████████ .

[67] *See, e.g.*, Ex. 65, KWRI-Batton-01144997 at 5045 (2016 Policies & Guidelines Manual); Ex. 66, KWRI-Batton-00888301 at 8349 (2021 Policies & Guidelines Manual); Ex. 17, Papasan Dep. at 41:18-42:2, 110:17-114:16.; Ex. 67, RMLLC-Batton_01259554 at 01259724–26 (KWU Scripts Catalog Vol. 3 Lead Generation with scripts on how to handle commission objections and discussing getting "a full 6 percent"); Ex. 68, RMLLC-Batton_01259792 at 9859 (KWU Scripts Catalog Vol. 1 Working with Buyers with scripts on how to handle commission objections and telling buyers their services are free).

[68] *See* Ex. 69, Pl. Trial Ex. 505, p. 150, KWRI_00574778 at 4949, *Burnett* (Feb. 2009 KWU Scripts Catalog: Vol. 2: Working with Sellers) ("When you reduce the commission, you reduce the incentive for that agent to bring a buyer to your house. If an agent has ten different houses, nine of which come with a 3% commission, one of which comes with a 2.5% commission, which houses do you think they're going to show?"); Ex. 14, Keller Dep. at 72:12-15; Ex. 17, Papasan Dep. at 43:15-45:8; Ex. 70, Anywhere-BattonI-00031114 at 31178 (A 2010 Anywhere script booklet instructing agents to tell their seller clients

The real estate industry itself recognizes that broker commissions remained high due to collusion.[69] Indeed, Gary Keller, the CEO of Defendant Keller Williams and one of the "most powerful" people in real estate,[70] strongly believed that real estate commissions were largely stable around 6% due to "collusion theory," which hypothesizes that real estate brokers are colluding to set commissions at a certain rate.[71] A Keller Williams research analyst put it bluntly, "Why have commissions remained so high? Collusion seems most likely answer."[72]

### 5. Anticompetitive Impact of Defendants' Conspiracy.

Common evidence and analysis from Plaintiffs' experts—Prof. Miller and Prof. Abrantes-Metz—and common evidence from Defendants and third parties demonstrates that the Anticompetitive Rules inflated buyer agent commissions classwide and that these buyer agent commissions were passed on to home buyers in the form of higher home prices. Prof. Abrantes-Metz's analyses and methodology further provide a common damages methodology for quantifying the resulting harm to Class members. She calculates that Class damages are

---

"one of the fastest ways to increase showings is to improve the financial opportunity for the buyer's agents."); Ex. 71, RMLLC-Batton_01012002 at 2003 (RE/MAX instructed its franchisee brokers and agents ███████████████████████████████████████████████████████████████████████

██████████████ .

[69] *See* Ex. 72, KWRI-Batton-00198900 at 8900 (2002 International Real Estate Review stating, "It is commonly understood that residential real estate brokerage fees in the US tend to run 6% or 7% within local markets for existing property resales."); *id.* at 8901 ("Agents seem to compete for business on every dimension except price (commission rates) …."); Ex. 73, Jordan M. Barry et al., *Et Tu Agent? Commission-Based Steering in Residential Real Estate*, 110 Iowa L. Rev. 1473, 1495 (2025).

[70] *See* Ex. 10, Keller Dep. at 8:21-9:3.

[71] *See* Ex. 14, Keller Dep. at 7:13-15, 8:3-6, 8:21-9:11; Ex. 30, King Dep. at 39:2-24; *See* Ex. 74, Pl. Trial Ex. 654A, KWRI_00729074 at 9074 (Figgs notes); *Burnett;* Ex. 75 Figgs Dep. Designation at 26:3-28:11, 29:1-8, 31:5-33:20 (discussing *Burnett* Pl. Trial Ex. 654A); Ex. 76, KWRI-Batton-01138910 at 8928 (05/29/15 Figgs notes); Ex. 16, Figgs Dep. at 26:3-15, 27:19-28:2, 30:4-15, 31:5-34:6 101:8-102:15, 103:12-18.

[72] *See* Ex. 16, Figgs Dep. at 111:19-114:2; Ex. 77, KWRI-BATTON-00732451 at 2454.

approximately $3.6 billion for these four exemplar MLSs alone. Prof. Abrantes-Metz methodology can be applied to determine damages across all of the Subject MLSs and for each Class member.

### 6. Plaintiffs.

The proposed Class Representatives are Aaron Bolton, Michael Brace, Do Yeon Irene Kim, Anna James, and Daniel Parsons. Each was harmed in the same way by Defendants' conduct: each purchased a home in one of the Subject Antitrust or Consumer Protection States, using a buyer broker, on one of the Focus MLSs.[73] Each Class Representatives also paid a price inflated by Defendants' anticompetitive actions.[74] As a result, each was harmed in the exact same way as other Class members.

### CLASS CERTIFICATION STANDARD

Plaintiffs seeking class certification must "satisfy all four requirements of Rule 23(a)— numerosity, commonality, typicality, and adequacy of representation—and any one of the general categories of Rule 23(b)." *Orr v. Shicker*, 953 F.3d 490, 497 (7th Cir. 2020). A class may be certified under Rule 23(b)(3) if a court "find[s] that common questions of law or fact 'predominate' over individual ones and that a class action is 'superior' to other methods of adjudicating the case." *Howard v. Cook Cty. Sheriff's Off.*, 989 F.3d 587, 597 (7th Cir. 2021). In deciding certification, "a court's preview of the merits must remain tethered to its Rule 23 analysis. The merits themselves are not on the table at this early stage." *Id.*

---

[73] *See, e.g.*, AM Report ¶ 352.

[74] *Id.* ¶ 353.

## ARGUMENT

### I.  Plaintiffs Satisfy the Requirements of Rule 23(a).

#### A.  Numerosity

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable." While there is no "magic number" necessary to establish numerosity, courts often find 40 members sufficient. *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017). Here, Prof. Abrantes-Metz calculates based on MLS data that Class members were involved in 2 million transactions across the Focus MLSs alone between 2017 and 2021.[75] Even if some of the Class members involved in these transactions were repeat home buyers, this data supports a common sense assumption that Class members across all the Subject MLSs number in the millions. *Moehrl*, 2023 WL 2683199, at \*11 (courts "make evidence-based common sense assumptions in assessing numerosity."). Numerosity is therefore easily satisfied. *See Moehrl*, 2023 WL 2683199, at \*11 ("the numerosity requirement is undoubtedly satisfied" where class members "expected to number in the thousands, at minimum.").

#### B.  Typicality

Rule 23(a)(3) requires that named plaintiffs' claims and defenses be typical of those of the class. Fed. R Civ. P. 23(a)(3). Plaintiffs' claims need not be identical, but need only "have the same essential characteristics." *In re Sulfuric Acid Antitrust Litig.*, No. 03 C 4576, 2007 WL 898600, at \*4 (N.D. Ill. Mar. 21, 2007) (quoting *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 599 (7th Cir. 1993)). "In the antitrust context, typicality will be established by plaintiffs and all class members alleging the same antitrust violation by the defendants." *Moehrl*, 2023 WL 2683199, at \*12.

---

[75] AM Report ¶ 349.

Here, Plaintiffs and the Class all assert claims based on Defendants' creation and enforcement of the Anticompetitive Rules, which resulted in lower quality agent services and inflated agent commissions, which sellers in turn passed on to home buyers. Plaintiffs and Class members each purchased homes on one of the Subject MLSs during the relevant periods, used a buyer agent, and were injured in the same way—by paying inflated prices for those homes.[76] Plaintiffs' claims, therefore, are typical of the Class because they turn on the same legal theories and same facts as those of other Class members. *See, e.g., Moehrl*, 2023 WL 2683199, at *12 ("Plaintiffs' claims share the same essential characteristics as the rest of the class and typicality is established."); *In re Broiler Chicken*, 2022 WL 1720468, at *5 ("the element of typicality is satisfied because Plaintiffs allege that Defendants engaged in a common scheme relative to all members of the class"); *Burnett*, 2022 WL 1203100, at *7 (typicality satisfied where plaintiffs alleged a "conspiracy to implement and enforce the Anticompetitive Rules caused home sellers to pay a buyer broker commission . . . that they would not have otherwise paid as a condition of listing their market on a Subject MLS.").

### C. Adequacy

Rule 23(a)(4) requires that: "the representative parties will fairly and adequately protect the interests of the class." Rule 23(a)(4). "To be an adequate representative, the named plaintiff must be part of the class and possess the same interest and suffer the same injury as the class members." *Conrad v. Boiron, Inc.*, 869 F.3d 536, 539 (7th Cir. 2017). Here, each named Plaintiff is part of the Class. Plaintiffs and Class members bring the same state antitrust and consumer protection claims for the same price-fixing scheme by the same Defendants, which caused both to

---

[76] AM Report ¶ 344.

pay inflated prices for their homes. They therefore possess the same interests and suffered the same injuries.

In determining whether class counsel are adequate, the Court considers (i) "the work counsel has done," (ii) "counsel's experience in handling class actions," (iii) "counsel's knowledge of the applicable law," and (iv) "the resources that counsel will commit to representing the class." FED. R. CIV. P. 23(g)(1)(A). Proposed Class Counsel's resumes demonstrate that they are highly experienced in complex antitrust litigation and have been appointed as class counsel in numerous other matters where they have secured class certification and significant monetary recoveries. *See* Ex. Nos.81, 82. Proposed Class Counsel have and will continue to zealously advocate for Plaintiffs and the Proposed Classes in this matter. *See Dennis v. Andersons, Inc.,* No. 20 C 4090, 2025 WL 1331795, at *5 (N.D. Ill. May 7, 2025) (adequacy was satisfied "based on the competency of [Plaintiff's] prosecution of the suit thus far, the quality of its counsel, and its assurance that it intends to fully litigate the claims of the class."). Accordingly, Rule 23(a)(4) is satisfied.

### D. The Critical Questions of Law and Fact Are Common to all Class Members.

"To satisfy the commonality requirement found in Rule 23(a)(2), there needs to be one or more common questions of law or fact that are capable of classwide resolution and are central to the claims' validity." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1026 (7th Cir. 2018). "[E]ven a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (citation modified). As here, "[w]here an antitrust conspiracy has been alleged, courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *Moehrl*, 2023 WL 2683199, at *11; *see also Burnett*, 2022 WL 1203100, at *6 ("whether Defendants conspired to enforce the Anticompetitive Rules to artificially inflate seller broker commission rates creates common questions of fact.").

21

The critical common questions in this case are whether a conspiracy existed among Defendants to price-fix buyer agent commissions and whether this conspiracy caused artificially inflated home prices. These common questions are "central" to Plaintiffs' claims. *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 594 (N.D. Ill. 2015), *aff'd sub nom.*, 831 F.3d 919 (7th Cir. 2016) ("the evidence either proving or disproving a conspiracy will be common to the entire class"); *Suchanek v. Sturm Foods, Inc*., 764 F.3d 750, 756 (7th Cir. 2014) ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."). Commonality is therefore satisfied.

## II.    Rule 23(b)(3) is Satisfied Because Common Issues Predominate

Rule 23(b)(3) predominance is established "when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Moehrl*, 2023 WL 2683199, at *12 (citation modified). Predominance asks "the extent to which [Plaintiffs] can prove their case with common evidence." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020). Rule 23(b)(3) requires only that common *questions* predominate, "not [necessarily] that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).

Rule 23(b)(3) predominance begins with the elements of Plaintiffs' and the Classes' claims. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012). For the State Antitrust Class, Plaintiffs must prove (1) Defendants engaged in a combination or conspiracy in violation of antitrust law; (2) that Defendants' violation impacted plaintiffs; and (3) that Plaintiffs suffered damages. *See* Appendix A. As explained herein, Plaintiffs can rely on the same common evidence to prove their consumer protection claims as well.

## A. Common Issues Concerning the Existence of an Antitrust Conspiracy Predominate.

This District recognizes that "the existence of a conspiracy in violation of the antitrust laws is the prototypical example of an issue where common questions predominate because it is much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence." *Moehrl*, 2023 WL 2683199, at *13. Accordingly, in analyzing whether to certify the home-seller classes alleging the same conspiracy, this District held that "evidence regarding Defendants' conduct in joining and advancing a single agreement is undoubtedly common across the class, and the existence of the alleged agreement will be one of the predominant issues in the litigation." *Moehrl*, 2023 WL 2683199, at *13.

The same is true here. As in *Moehrl*, Plaintiffs' evidence consists of "standardized rules promulgated by the NAR and then adopted by the Corporate Defendants, which, in turn, enforce those rules against their affiliated brokers throughout the nation." *Moehrl*, 2023 WL 2683199, at *13. The evidence in this case showing that Defendants and the Subject MLSs all required compliance with the Anticompetitive Rules, Defendants' handbooks and other governing policy documents, Defendants' communications and positions regarding the Anticompetitive Rules, and Defendants' deposition testimony and interrogatory responses will all demonstrate how the Defendants agreed to work together to create and enforce the Anticompetitive Rules. This evidence is common across the Classes and thus satisfies predominance. *See, e.g., Moehrl*, 2023 WL 2683199, at *3 (certifying seller classes, finding evidence of defendants' policies and representations and the involvement of senior executives in NAR's governance "is undoubtedly common across the class"); *Burnett*, 2022 WL 1203100, at *20 (certifying seller classes, finding

23

documents like defendants' franchise disclosure documents and MLS procedures supported a finding of predominance).

### B. Common Issues Concerning Unreasonable Restraints Predominate.

Antitrust cases may be evaluated under the *per se* or "rule of reason" analysis. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). Under the former, the alleged restraint may be presumed unreasonable, whereas under the latter, plaintiffs must prove market power in a relevant market and anticompetitive effects, and rebut any procompetitive justifications. *Id.* Which mode of analysis applies is itself a common question to be resolved in one fell swoop for all class members. *See, e.g.*, *In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79, 86 (E.D. Pa. 2003) (whether agreement "constitutes a *per se* violation … would be common to all putative class members.").

If Defendants' conspiracy is ultimately found to be *per se* unlawful, Plaintiffs will be able to prove their case simply by proving that Defendants participated in a horizontal price-fixing conspiracy. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) (horizontal price fixing is *per se* unlawful). Defendants' own documents and their deposition testimony will show that they are competitors in the marketplace. Their written rules, policies, and procedures explicitly require the same offer of commission be made to all buyer agents, which functions as a "price restraint that tends to provide the same economic rewards to all practitioners regardless of their skill, their experience, their training, or their willingness to employ innovative and difficult procedures in individual cases." *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 348 (1982). And Defendants prohibited disclosures to consumers, which courts have also found *per se* unlawful. *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 693 (1978) (rule preventing consumers from comparing bids anticompetitive "on its face"). Defendants' written rules, policies,

24

and procedures themselves therefore provide common, class wide evidence of a horizontal price-fixing conspiracy.

If ultimately required, Plaintiffs will also satisfy the rule of reason with common evidence. As this District recognized in the seller cases, application of the rule of reason is based on common evidence and capable of being resolved for all class members at once. *Moehrl*, 2023 WL 2683199, at *14. The same is true here, as described in detail below.

### 1. Common issues concerning the relevant markets and market power predominate.

Under the rule of reason, Plaintiffs must first demonstrate that Defendants have market power in a relevant geographic market. *Agnew*, 683 F.3d at 335. Prof. Abrantes-Metz provides common evidence that Defendants have market power in the relevant product and geographic markets. Based on the hypothetical monopolist test ("HMT"), Prof. Abrantes-Metz opines that the relevant product market at issue in this case is "MLS-based brokerage services to home buyers," consisting of a "set of activities performed by real estate agents" in relation to purchases of homes listed on Subject MLSs, such as searching for houses, advising buyers on offers, and assisting with negotiating the home price.[77] Prof. Miller provides common evidence that agents compete at a local level and that the Subject MLSs operate within distinct geographic areas.[78]

Prof. Abrantes-Metz also provides common evidence that Defendants and their co-conspirators possess market power.[79] Prof. Abrantes-Metz analyzes commission rates in four exemplar "Focus MLSs" and concludes that the prevailing buyer agent commission rates in those MLSs are consistently and significantly higher than the competitive level.[80] Supracompetitive

---

[77] AM Report ¶¶ 21, 185-186.

[78] Miller Report ¶¶ 102-127.

[79] AM Report ¶¶ 207-256.

[80] AM Report ¶¶ 208-224.

prices provide direct evidence of market power. *See, e.g.*, *Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*, No. 22 CV 1648, 2024 WL 2785142, at *12 (N.D. Ill. May 30, 2024) (finding plaintiff demonstrated defendants' market power based on allegations that defendants drove up prices); *see also* AM Report ¶ 207. Prof. Abrantes-Metz also shows that the relevant markets feature, *inter alia,* high barriers to entry, centralized decision making, exclusivity, a history of collusion, and inelastic demand, all of which facilitate and incentivize collusion and make it possible for Defendants to impact prices in the relevant market.[81] Prof. Abrantes-Metz's methodology, evidence, analysis, and conclusions are all common to the class. Accordingly, common issues concerning the relevant market and market power predominate.

### a. Common issues concerning anticompetitive effects predominate.

The rule of reason next requires Plaintiffs to prove that the challenged conduct "had an anticompetitive effect on a given market within a given geographic area." *Agnew*, 683 F.3d at 335. Plaintiffs' expert analyses provide common evidence that Defendants' agreements regarding the Anticompetitive Rules facilitated and inflated commissions and home prices and resulted in lower quality buyer agent services.

Profs. Abrantes-Metz and Miller demonstrate that Defendants' conspiracy inflated commissions above competitive levels. Prof. Abrantes-Metz also demonstrates how inflated commissions increased total home prices.[82] Her analyses and methodologies are described in further detail below.

Consistent with Prof. Abrantes-Metz's findings regarding inflated commissions, Prof. Miller explains that commission rates in the United States displayed extreme price rigidity,

---

[81] AM Report ¶¶ 225-250.

[82] AM Report ¶¶ 286-284; 288-294.

remaining around the same elevated rates despite inflation and changes in technology that have increased efficiencies and regardless of the agent's experience, hours worked, or tasks performed.[83] The Anticompetitive Rules further contributed to price rigidity by incentivizing agents to "steer" buyers to particular homes based on the home's commission rate.[84] Prof. Miller explains that even the mere *threat* of steering incentivizes agents to charge higher commissions.[85] He performs his own analysis of commission rates over a seven-year period in the Subject MLSs and concludes that these commission rates were narrowly clustered around specific amounts—a pattern consistent with steering.[86]

High commissions have also hindered non-MLS transactions, such as for-sale-buy-owners ("FSBOs"), new home builds directly marketed by the builder, discount brokers, and pocket listings, from gaining meaningful market share[87] or impacting commission levels.[88] They have further resulted in a glut of inexperienced and unproductive agents, unmotivated to earn higher commissions by better performance, who provide lower quality services to Class members.[89] All of this anticompetitive impact will be demonstrated by common evidence, satisfying predominance.

---

[83] Miller Report ¶¶ 153-168.

[84] Miller Report ¶¶ 129-144.

[85] *Id.*

[86] Miller Report ¶¶ 215-267.

[87] *See also* Ex. 78, Anywhere-BattonI-00036026 (2020 presentation listing discounters, showing all but Redfin at 0.01% or lower and Redfin at 0.81% market share).

[88] Miller Report ¶¶ 145-146. One reason why discount rate real estate agencies may not be successful is because buyer's agents are unmotivated to market their houses without getting a better offer of compensation. *See* Ex. 16, Figgs Dep. at 146:13-159:11, 166:14-21, 173:17-23, 177:15-25.

[89] Miller Report ¶¶ 191-205.

### b. Common issues concerning alleged procompetitive justifications predominate.

Defendants have asserted that procompetitive justifications exist for the Anticompetitive Rules. *See* ECF No. 134 at 52; ECF No. 136 at 20; ECF No. 140 at 65; ECF No. 141 at 56. A procompetitive justification defense constitutes a common, predominating question that supports class certification. *See In re Suboxone Antitrust Litig.*, 421 F. Supp. 3d 12, 77 (E.D. Pa. 2019); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 844 (D.N.J. 2015); *In re College Athlete NIL Litig.*, No. 20-cv-03919, 2025 WL 1675820, at *13 (N.D. Cal. June 6, 2025). Here, Defendants' procompetitive justifications will be defeated by common evidence of Defendants' own admissions that ████████████████████████████████.[90] Indeed, Defendant Anywhere testified that the rule should have been rescinded. *Id.*

### c. Common issues concerning antitrust impact predominate.

The central issue at class certification regarding impact is "whether the common evidence could show the fact of injury on a classwide basis." *Kleen Prods.*, 831 F.3d at 927; *Messner*, 669 F.3d at 818 (burden at class certification is to show that "antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members."). Here, common evidence shows that Defendants' conspiracy caused Plaintiffs and Class members to pay inflated home prices.

First, government conclusions, NAR documents, and Defendants' own statements provide common evidence of impact to buyers. As early as 1983, the FTC reported "[a]lthough buyers do not directly pay for real estate brokerage services, they do pay for these services indirectly through

---

[90] *See* Ex. 22, Bailey Dep. at 43:7-44:20; Ex. 22, Gorman Dep. Designation at 62:6-15, 76:16-77:3; 86:18-87:10 ; Ex. 14, Keller Dep. Designation at 143:19-23, 144:6-11; Ex. 30, Talbot Dep. at 54:13-56:10 (testifying he is unaware of any procompetitive benefits of the unilateral offer of compensation); Ex. 79, 08/07/25 Anywhere Responses and Objections to Interrogatories at pp. 21, 30.

the price of the home they buy."[91] The DOJ stated "[t]he buyer-broker commission has a very real cost to homebuyers, who ultimately pay through higher purchase prices."[92] NAR's own Accredited Buyer Representative Course acknowledges: "[a] good principle to keep in mind is that regardless of the compensation arrangements, the buyer ultimately pays the buyer-representative's fees through the purchase price."[93] Defendants themselves also strenuously argued in *Burnett* (when it suited them to try to avoid liability to home sellers) that the parties most harmed by their anticompetitive scheme were U.S. home *buyers* because they would have paid lower prices for their homes. *Moehrl*, 2022 WL 1203100, at *15 (defendants "assert that, under the Challenged Restraints, the cost of buyer-brokers is effectively added to the sales price."); *Burnett,* ECF No. 741 at 30 (defendants "contend that, absent the Challenged Rules, sellers would be worse off because there would be fewer buyers, buyers would make lower offers, and housing prices would decrease").

Second, Prof. Abrantes-Metz's evidence, analyses, and conclusions confirm that Defendants' conspiracy caused inflated home prices on a classwide basis. Prof. Abrantes-Metz uses well-established benchmarking (also known as yardsticking) methodology comparing the United States to residential real estate markets in other countries not affected by Defendants' conspiracy. Benchmark analysis is a recognized form of common evidence that is routinely found to satisfy predominance. *See*, *e.g., Kleen Prods.*, 831 F.3d at 929 (affirming finding of

---

[91] *See* Federal Trade Commission, *The Residential Real Estate Brokerage Industry* (Dec. 1983) at 21, available at https://www.ftc.gov/system/files/ftc_gov/pdf/The-Residential-Real-Estate-Brokerage-Report--Butters-Report.pdf (last visited Sept. 22, 2025).

[92] *See* DOJ Statement of Interest in *Nosalek v. MLS Property Info. Network, Inc. et al.* at 8, No. 1:20-cv-12244 (D. Mass. Feb. 15, 2024), *available at* https://thedataadvocate.com/wp-content/uploads/2024/02/Amicus_Brief_Filed_By_United_States_Of_America_Statement_Of_Interest_Of_The_United_States-jwr.pdf.

[93] *See* Ex. 80, NAR_BattonI0279248 at p. 57.

predominance where damages were calculated classwide using a benchmark analysis); *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 338 F.R.D. 294, 305 (D. Mass. 2021) ("'yardstick' methodology" is a "widely accepted method[] of proving antitrust injury and damages on a classwide basis"). Prof. Abrantes-Metz first identifies the factors that are most likely to influence commission rates, such as per capita GDP and CDI, corruption levels, real estate market structure, and the presence of dual agency, and then examines many countries to identify those that are most comparable to the United States.[94] Prof. Abrantes-Metz concludes that Australia, Denmark, and the Netherlands are the appropriate benchmark countries.[95] Prof. Abrantes-Metz then collects and analyzes data about those countries, calculating that that buyer agent commissions there average around 1.38% (when adjusted for frequency of agent use and population), compared to the typical 3% in the United States.[96]

Prof. Abrantes-Metz then analyzes commission rates in the four Focus MLSs using fixed criteria and confirms that agent commissions in each Focus MLS were indeed significantly higher than the competitive benchmark level during the Statutory Periods.[97] Prof. Abrantes-Metz explains that she can perform the same analysis to generate common evidence for each of the Subject MLSs based on data currently in her possession.[98]

Finally, Prof. Abrantes-Metz demonstrates based on economic tax theory that higher commissions resulted in higher home prices in the United States, including the relevant markets.[99]

---

[94] AM Report ¶¶ 134-156.

[95] *Id.* ¶¶ 157.

[96] *Id.* ¶¶ 157-181.

[97] *Id.* ¶¶ 211-222.

[98] *Id.* ¶ 125.

[99] *Id.* ¶¶ 255-291.

Tax theory dictates that when a tax is levied, a seller will charge more for a product based on the cost of the tax, rather than on the true costs and benefits of the goods sold.[100] The more inelastic the demand for the product, the more of the tax the seller can pass through.[101] Based on her analysis of extensive economic literature regarding tax theory, elasticities of demand in the residential real estate market, and studies confirming that taxes on real estate are passed on to home buyers, Prof. Abrantes-Metz concludes that sellers passed on inflated commissions to home buyers in the form of higher home prices.[102] She further notes that record evidence is consistent with her conclusion,[103] which provides additional common evidence that Plaintiffs and Class members overpaid for their homes as a result of Defendants' conspiracy. She provides a standard formula of tax incidence to calculate the difference between the as-is and but-for home prices.[104]

Prof. Abrantes-Metz's methodology uses fixed inputs and formulas. It is therefore formulaic and can be applied to each of the Subject MLSs. At this stage, where Plaintiffs need only show that "damages are *capable* of measurement on a classwide basis" (*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) (emphasis added)), Prof. Abrantes-Metz's use of the Focus MLSs as illustrations of the common methodology she developed and her conclusion that she can apply the same common methodology to the rest of the MLSs based on data in Plaintiffs' possession to generate additional common evidence, are both sufficient and appropriate. This District and others have recognized the appropriateness of extrapolating results from a sample dataset for class certification purposes, including indirect purchaser cases. *See, e.g., Lytle v. Nutramax Labs., Inc.*,

---

[100] *Id.* ¶¶ 264-265; 255-258.

[101] *Id.* ¶ 266.

[102] *Id.* ¶¶ 274-291.

[103] *Id.* ¶ 292 (citing, among other things, Defendants' training materials suggesting that ███████████ ██████████████████████████ ).

[104] *Id.* ¶ 275.

114 F.4th 1011, 1024-25 (9th Cir. 2024) ("class action plaintiffs may rely on an unexecuted damages model to demonstrate that damages are susceptible to common proof"); *Turkey*, 2025 WL 264021, at *22 (N.D. Ill. Jan. 22, 2025) (noting the appropriateness of extrapolating pass-through results from a sample of direct purchaser resellers to all indirect purchasers and citing cases); *In re Broiler Chicken*, 2022 WL 1720468, at *19 (pass-through estimates based on 22 of 540 direct purchasers accounting for 65% of sales); *Kirkbride v. Kroger Co.*, 349 F.R.D. 160, 192 (S.D. Ohio 2025) (certification appropriate where expert provides a "proof of concept" damages methodology); *Taqueria El Primo LLC v. Illinois Farmers Ins. Co.*, 577 F. Supp. 3d 970, 987, 1002-03 (D. Minn. 2021) (certifying class raising claim under Minnesota Consumer Fraud Act where expert provided methodology with sufficient explanation of how he would eventually calculate damages on a classwide basis); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 329 (E.D. Mich. 2001) (certifying class in multistate action using a single state as exemplar); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 235 F.R.D. 127, 148 (D. Me. 2006), *supplemented,* 241 F.R.D. 77 (D. Me. 2007), *vacated,* 522 F.3d 6 (1st Cir. 2008) (granting certification based on exemplar approach). Dr. Abrantes-Metz's analysis and methodology—which are common to the class—therefore are capable of demonstrating impact to Plaintiffs and Class members in the form of inflated house prices. "The ability to use such common evidence and common methodology to prove [Plaintiffs'] claims is sufficient to support a finding of predominance on the issue of antitrust impact for certification under Rule 23(b)(3)." *Messner*, 669 F.3d at 819.

### C.  Common Issues Concerning Damages Predominate.

Class certification is proper if Plaintiffs can show "a classwide method for proving damages," *Kleen Prods.*, 831 F.3d at 929. Here, Prof. Abrantes-Metz offers a common methodology for quantifying the impact of Defendants' conspiracy, both on an aggregate basis by

MLS and for each individual Class member.[105] She explains: "[D]amages to Class members (home buyers) are equal to the difference between what each Class member paid for the home (including closing costs) and what each Class member would have paid for the home (including closing costs) in the But-For World. There are three components to this calculation that are relevant to my analysis: (i) the difference between the actual and but-for price paid by the buyer to the seller for the home; (ii) the out of pocket cost for the buyer agent commission that is funded by the buyer in the but-for world; and (iii) any difference in closing costs that the buyer pays."[106] Her formula for damages to any home buyer ($D_B$) is shown below:

$$D_B = (p^A - p^B) - c_B^B * p^B + (p^A - p^B) * \tau_B$$

$p^A$ is the actual price paid by the buyer, $p^B$ is the "but-for" price that the buyer would have paid absent the conspiracy, $c_B^B$ is the but-for buyer commission rate, and $\tau_B$ are any closing costs paid by the buyer that are based off of the transaction price for the home.[107]

To calculate the rate at which inflated commissions are passed through into home prices, Dr. Abrantes-Metz measures the elasticity of supply and demand "using the finest level of geographic aggregation that is reasonable" for each MLS.[108] She then walks through application of her formula to the Focus MLSs to calculate $8,524 in damages to the Class Representatives[109] and $3.5 billion[110] in damages for Class members covered by the Four Focus MLSs. Her

---

[105] AM Report ¶¶ 339-365.

[106] *Id.* ¶¶ 295.

[107] *Id.*

[108] *Id.* ¶¶ 332-333.

[109] *Id.* ¶ 345.

[110] *Id.* ¶ 343.

methodology provides a reliable way to calculate damages on a uniform, classwide basis based on available data, while still taking into account the specific features of each relevant geographic area.

Prof. Abrantes-Metz also identifies the only two scenarios in which Class members would *not* have been damaged: if the passthrough rate was zero or if the individual transaction commission rate was lower than the but-for commission rate. [111] Prof. Abrantes-Metz shows that a zero passthrough rate is unlikely, contradicted by the literature, and contrary to her calculations. [112] She further concludes that approximately 0.64% of Class members purchasing properties on the Four Focus MLSs had buyer commission rates lower than the predicted but-for commission rates and that 0.32% of Class members purchasing properties on the Four Focus MLSs would not have been damaged, [113] providing common evidence that the percentage of Class members with negative damages is likely to be extremely small, if there are any at all.

### D.  Common Issues Regarding Issue Preclusion Predominate

The judgments in *Burnett* create common, class-wide preclusion questions. Offensive issue preclusion allows a plaintiff that was not a party to a prior judgment to "use that judgment 'offensively' to prevent a defendant from relitigating issues resolved in the earlier proceeding." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979). The issues on which Plaintiffs here would seek to invoke collateral estoppel include: (1) application of the *per se* standard; (2) existence of an anticompetitive agreement; and (3) that the anticompetitive agreement inflated broker commissions. These common questions justify initial certification at least until they are resolved.

---

[111] *Id.* ¶ 366.

[112] *Id.* ¶ 368-374.

[113] *Id.* ¶ 376.

The evidence Plaintiffs will rely upon to establish collateral estoppel will be the same for all class members, *i.e.*, the relevant pleadings, orders, jury instructions, verdict form, and transcripts and exhibits from the *Burnett* case. Whether or not Plaintiffs are ultimately correct about issue preclusion, the evidence relevant to this determination is undoubtedly common to the class (materials from the *Burnett* case), will generate common answers to common questions for the Classes, and predominates over every other issue in this case, including potential individualized issues.

### E. There Are No Material Variations in State Law That Defeat Predominance.

Variation in state law will not defeat predominance. For the State Antitrust Class, every state for which Plaintiffs seek certification harmonizes their state antitrust law with federal antitrust law and thus, by extension, with each other state. *See* Appendix A. Similarly, each state consumer protection statute is harmonized with the FTC Act and permits plaintiffs to show a violation based on Defendants' anticompetitive conduct. *See* Appendix B. As such, there are no material differences in state law with respect to either the antitrust or consumer protection state law. *Turkey*, 2025 WL 264021, at *28 (finding no material differences in state law claims predicated on antitrust violations where plaintiff "provided an analysis of the state antitrust statutes that are construed in harmony with the Sherman Act and authority that allows indirect purchasers to recover damages from a horizontal antitrust violation via the state's consumer protection or unjust enrichment law"); *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 484, n.12 (N.D. Ill. 2009), *aff'd*, 606 F.3d 391 (7th Cir. 2010) ("although there are some differences in state consumer protection statutes, the factual and legal questions to be answered are substantively the same" and "the consumer fraud laws … have nearly identical elements.").

35

Accordingly, the same common evidence highlighted above regarding Defendants' conduct and its impact will satisfy the elements of Plaintiffs' state law claims. Indeed, courts in this District and elsewhere routinely certify class actions involving multistate antitrust and consumer protection claims predicated on an antitrust violation for these same reasons. *See, e.g.*, *Turkey*, 2025 WL 264021, at *28 ("The Court is not convinced that the differences in laws are material here where [indirect purchasers] premise their state consumer protection and unjust enrichment claims on proof of an antecedent violation of federal antitrust law"); *In re Broiler Chicken*, 2022 WL 1720468, at *20 (no material differences in state antitrust claims and "the differences in consumer protection laws concerning reliance and intent are simply not relevant to a price-fixing claim"); *In re Namenda Indirect Purchaser Litig.*, 338 F.R.D. 527, 575 (S.D.N.Y. 2021) (predominance met where state antitrust laws were harmonized with federal antitrust law and state consumer protection laws were harmonized with the Federal Trade Commission Act).

Moreover, any procedural differences in state law can be accounted for (if necessary) through additional subclasses and special verdict forms. *Thomas v. UBS AG*, 706 F.3d 846, 849 (7th Cir. 2013) ("The problem of choice of law created by a nationwide class action governed by laws of different states or other jurisdictions is usually solved by the district court's certifying a different subclass for class members in each jurisdiction whose law differs in some relevant respect."); *see also In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 990 (D. Minn. 2023); *Turkey*, 2025 WL 264021, at *28; *Benson v. Newell Brands, Inc.*, No. 19 C 6836, 2021 WL 5321510, at *9 (N.D. Ill. Nov. 16, 2021). Thus, variations in state law do not defeat predominance.

### III. A Class Action is Superior to Other Methods for Adjudication

Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). While class actions may appear more complex to manage than individual suits, "refusing to certify on manageability

grounds alone should be the last resort." *Mullins v. Direct Digital, LLC,* 795 F.3d 654, 664 (7th Cir. 2015) (affirming certification of 9-state consumer fraud class action). When "common questions are found to predominate in an antitrust action," as here, "then courts generally have ruled that the superiority [requirement] is satisfied." 7AA Charles Alan Wright et al., Federal Practice & Procedure § 1781 (3d ed. 2021); *see also Johnson v. Diakon Logistics*, No. 16-cv-06776, 2020 WL 405636, at *7 (N.D. Ill. Jan. 23, 2020). As in *Moehrl*, "the large number of potential class members indicates the superiority of the class action device here." *Moehrl*, 2023 WL 2683199, at *22. And, as demonstrated by the Class Representatives' damages, individual damages are small compared to high cost of maintain a complex antitrust suit like this one. *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 117 (S.D.N.Y. 2010) ("A class action is the superior method of adjudicating these claims. Many of the class members' claims will be small relative to the high costs of maintaining an antitrust action."). A class action is the superior method for adjudicating this case.

## IV.    The Class is Clearly Defined.

The Seventh Circuit requires that the class "be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind." *Mullins*, 795 F.3d at 657. The class (1) must "identify a particular group, harmed during a particular time frame, in a particular location, in a particular way;" (2) must be defined by objective, rather than subjective criteria; and (3) should not be "defined in terms of success on the merits." *Id.* at 660.

The proposed Class here is clearly defined because it is composed of an identifiable group (individuals who purchased homes listed on specific MLSs in specific states and who used a buyer

agent) harmed during a specific time (the beginning of the State Statutory Period through December 31, 2021), and is not defined by success on the merits.[114]

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court: (i) certify the Classes pursuant to Rule 23(a) and (b)(3); (ii) appoint Plaintiffs as Class Representatives; and (iii) appoint Lowey and Korein Tillery as Class Counsel.

---

[114] In the event the releases in the seller settlements are upheld, Plaintiffs can identify any class members that need to be excluded using ATTOM data, which contains records of housing transactions throughout the United States. *See* AM Report at ¶¶ 346-348.

Dated: September 26, 2025

Respectfully submitted,

 /s/ *Randall P. Ewing, Jr.*
George A. Zelcs (Ill. Bar No. 3123738)
Randall P. Ewing, Jr. (Ill. Bar No. 6294238)
Ryan Z. Cortazar (Ill. Bar No. 6323766)
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
(312) 641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Carol O'Keefe (N.D. Ill. Bar. No. 6335218)
Steven M. Berezney (N.D. Ill. Bar No. 56091)
Michael E. Klenov (N.D. Ill. Bar. 6300228)
Peter Rocque (pro hac vice)
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
(314) 241-4844
cokeefe@koreintillery.com
sberezney@koreintillery.com
mklenov@koreintillery.com
procque@koreintillery.com

Vincent Briganti (pro hac vice)
Margaret MacLean (pro hac vice)
Noelle Forde (pro hac vice)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
(914) 997-0500
vbriganti@lowey.com
mmclean@lowey.com
nforde@lowey.com

*Counsel for Plaintiffs and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 26, 2025, a true and correct copy of the foregoing was filed electronically through the Court's CM/ECF system, which will send notification of the same to all counsel of record in this matter.

*Noelle Forde*
Noelle Forde
