# Exhibit 31

HIGHLY CONFIDENTIAL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

MYA BATTON, AARON BOLTON, MICHAEL BRACE, DO YEON IRENE KIM, ANNA JAMES, JAMES MULLIS, THEODORE BISBICOS, and DANIEL PARSONS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

THE NATIONAL ASSOCIATION OF REALTORS, ANYWHERE REAL ESTATE, INC. FORMERLY KNOWN AS REALOGY HOLDINGS CORP., RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,

Defendants.

Case No.: 1:21-cv-00430

Judge LaShonda A. Hunt

Magistrate Judge M. David Weisman

Expert Report of

Norman Miller, Ph.D.

September 22, 2025
San Diego, CA

**HIGHLY CONFIDENTIAL**

# Table of Contents

I.  Introduction .................................................................................................................. 1

II.  Qualifications and Compensation ................................................................................ 7

III.  Background on the Residential Real Estate Industry .................................................. 10

    A.  Market Players, NAR, and the MLS .................................................................... 10

IV.  The Anticompetitive Rules and Their Enforcement .................................................... 19

    A.  The Buyer Agent Commission Rule...................................................................... 25

    B.  Restraints on Negotiation .................................................................................... 29

    C.  Commission Filtering and Disclosure Rules ........................................................ 33

    D.  Free-Service Rule ................................................................................................. 37

V.  Common Evidence Demonstrates that the Subject MLSs Imposed the Anticompetitive Rules Uniformly During the Class Period .................................................................... 42

VI.  Common Evidence Demonstrates that NAR MLSs and the REALTORS Operate within Distinct Geographic Markets and Dominate Listings in those Areas. ........................... 50

    A.  The Department of Justice, the FTC, and Courts Have Defined Regional Markets for MLS Borker Services................................................................................................ 50

    B.  My Experience and My Reivew of the Reocrd is Consistent With the Observation that MLSs Operate in Distinct Geographic Regions ............................................... 53

VII.  Common Evidence Demonstrates that the Anticompetitive Rules Encouraged and Facilitated the Threat of Steering Across the Subject MLSs. ...................................... 67

    A.  Common Evidence Demonstrates That Commission Fees Have Substantially Exceeded Inflation. ............................................................................................. 81

    B.  Common Evidence Demonstrates that Buyer's Agent Fees Did Not Vary with Buyer Agent Experience, the Services Provided to Homebuyers, or the Amount of Hours Expended by the Buyer's Agent. .......................................................................... 85

    C.  Efficiency has increased in the real estate market, yet costs of services to the buyer have not decreased comparably. ........................................................................ 90

    D.  High Commissions Flood the Market with Inexperienced and Incompetent Agents. . 100

    E.  International Fees and Practices Suggest that U.S. Buyer-Agent Fees Could Easily Be Much Lower............................................................................................................ 106

IX.  Common Evidence Demonstrates That There Were Not Viable Means for the Vast Majority of Homebuyers to Avoid the Anticompetitive Rules. ...................................... 110

    A.  Non-NAR MLS Options Either Represent a De Minimus Percentage of Home Sales or Serve Niche Homebuyers. ...................................................................................... 111

HIGHLY CONFIDENTIAL

## I.    Introduction

1.  I have been retained by Korein Tillery, LLC and Lowey Dannenberg, P.C., counsel for Plaintiffs in this class action case against Defendants, to evaluate the structure of the residential real estate industry in the United States and Defendants' conduct in enacting, maintaining, and implementing several rules and policies governing the listing of homes through Multiple Listing Services.

2.  I understand Plaintiffs bring this action against Defendants "for agreeing, combining, and conspiring to impose, implement, and enforce [Anticompetitive Rules] that reduce price competition in the markets for buyer-agent services[...]"[1] and that they now seek to certify classes comprising:

- All persons who purchased residential real estate in one of the Antitrust Subject States from the beginning of the State Statutory Period[2] through December 31, 2021, that was listed on a Subject MLS[3] and for which a buyer-broker commission was paid ("Antitrust Class").

---

[1] Amended Complaint ¶4.

[2] The Antitrust States and their Statutory Periods are: Arizona (Jan. 25, 2017), California (Jan. 25, 2017), Connecticut (Jan. 25, 2017), District of Columbia (Jan. 25, 2017), Illinois (Jan. 25, 2017), Iowa (Jan. 25, 2017), Kansas (Jan. 25, 2018), Maine (Jan. 25, 2015), Michigan (Jan. 25, 2017), Minnesota (Jan. 25, 2017), Nevada (Jan. 25, 2017), New Mexico (Jan. 25, 2017), New York (Jan. 25, 2017), North Carolina (Jan. 25, 2017), Oregon (Jan. 25, 2017), Utah (Jan. 25, 2017), Vermont (Jan. 25, 2015), West Virginia (Jan. 25, 2017), Wisconsin (Jan. 25, 2015).

[3] The Subject MLSs are: Bay Area Real Estate Information Services, Inc., bridgeMLS, BeachesMLS, California Desert Association of Realtors (CDAR) MLS, California Regional MLS, Charleston Trident, Contra Costa Association of Realtors MLS, Fresno Association of Realtors MLS, Florida Gulf Coast, San Diego Association of Realtors MLS, TheMLS, SmartMLS, Bright MLS, Maris, Midwest Real Estate Data (MRED) MLS, Miami MLS, MLS FLK, MLS PIN, OneKey, Stellar, Des Moines Area Association of Realtors (DMAAR) MLS, Heartland Multiple Listing Service, Inc., South Central Kansas MLS, Maine Listings, MiRealSource, Realcomp II,

HIGHLY CONFIDENTIAL

- All persons who purchased residential real estate in one of the Consumer Protection States that was listed on a Subject MLS from the beginning of the State Statutory Period[4] through December 31, 2021, and for which a buyer-broker commission was paid ("the Consumer Protection Class")[5].

## Summary of Complaint

3. According to the complaint,[6] 1) most home buyers and sellers buy or sell homes via a real estate broker, and most real estate brokers are members of the National Association of Realtors ("NAR"); 2) most homes in the United States are sold on a Multiple Listing Service ("MLS") – a marketplace to share information about homes for sale, and most MLSs are controlled by NAR and NAR members; and 3) in order to be a member of NAR and have access to the NAR MLSs, NAR members must follow certain rules and practices concerning the offering, disclosure, and negotiation of real estate agent commissions.

---

NorthstarMLS, Greater Las Vegas Association of Realtors (GLVAR) MLS, SWMLS/GAAR, Carolina/Canopy MLS, Triad MLS, Triangle MLS (Doorify), Cascades East MLS, South Oregon MLS, Klamath County Association of Realtors, Regional Multiple Listing Service, Inc. (RMLS), Wasatch Front Regional MLS, Greenbriar Valley MLS, and Metro MLS.

[4] The Consumer Protection States and their Statutory Periods are: California (Jan. 25 2017), Florida (Jan 25, 2017), Massachusetts (Jan. 25, 2017), Missouri (Jan. 25, 2016), New Hampshire (Jan. 25, 2018), and South Carolina (Jan. 25, 2018).

[5] "Excluded from both Classes are: (1) sales of residential real estate for a price below $56,500 and (2) employees and officers of the Defendants, their affiliates, and the Judge's staff."

[6] Amended Complaint ¶¶1-5.

HIGHLY CONFIDENTIAL

4.   The complaint alleges[7] that through their dominance of MLSs, Defendants and their coconspirators collectively possess market power; and that certain of the rules imposed by NAR ("Anticompetitive Rules") along with the market power they possess "enable NAR, its co-defendants, and its members to maintain buyer-agent commissions at supracompetitive levels unrelated to brokers' experience or the services provided, steer home buyers away from lower commission homes, and drive out discounters – among other harms."[8]

**Assignment and Summary of Opinions**

5.   I have been asked to evaluate whether common evidence can establish:

- if the Subject MLSs imposed the Anticompetitive Rules uniformly during the Class Period;

- if the Subject MLSs operated in distinct geographic areas and dominated sales in those areas;

- if the Anticompetitive Rules facilitated steering incentives in each of the Subject MLSs;

- if an increase in real estate agent commissions have substantially exceeded inflation and whether commission prices have become divorced from

---

[7] *Id.*

[8] Amended Complaint ¶2.

**HIGHLY CONFIDENTIAL**

fundamental economic characteristics such as level of experience, effort and costs expended, or services provided.

- if the vast majority of homebuyers in the Subject MLSs could avoid the Anticompetitive Rules through other options;

6.   Based on my decades of experience in the real estate industry, and a detailed review of evidence that is common to the class, including among other materials, industry reports, research articles, policies and industry practices, documents produced in this case, and data analyses conducted on MLS data produced in this case, I arrived at the following opinions:

7.   There are 39 Subject MLSs in this case. 34 of those are NAR-Affiliated or wholly owned by a REALTOR® association, 3 are partly owned by a REALTOR® association and partly broker-owned, and 2 broker-owned only. The 2 broker-owned MLSs are owned in part by subsidiaries of the broker Defendants. I reviewed evidence common to the class and determined that, through the control of NAR or through its members' participation in NAR, each of the Subject MLSs and their participants followed or modeled the Anticompetitive Rules established by NAR in a uniform fashion during the Class Period.

8.   I also reviewed evidence common to the class and determined that the Anticompetitive Rules encouraged a market in which 1) buyer agents could falsely advertise their services as free, 2) sellers and seller's agents set unconditional and unilateral offers of compensation to buyer agents which were not necessarily disclosed to

HIGHLY CONFIDENTIAL

home buyers; 3) the price of buyer-agent services was set by home sellers' agents and home sellers as opposed to homebuyers, the actual consumers of the service; and 4) filtering of properties based on compensation to the buyer's agent was permitted.

9.   The combination of the Anticompetitive Rules reduced the ability (as a result of asymmetric information) and desire (as a consequence of misunderstanding services to be free or paid by another party) of consumers to negotiate for services they receive to determine whether such a fee is acceptable for the quality and characteristics of services received (e.g., experience of agents, amount of services provided). The combination of these rules has also facilitated steering (the practice of buyer agents showing homes to buyer clients on the basis of the commissions being offered). The inability of consumers to police such practice has allowed steering to become ingrained in the system and keep brokers from competing on the basis of price. I demonstrate herein evidence common to the class demonstrating that offers of commission consistent with the steering.

10. I also reviewed evidence common to the class and determined that the lack of negotiating power or awareness of who pays the commissions on the part of consumers, the lack of success of discount brokers, and the steering away from discounters has kept buyer commission rates rigid over time at rates higher than those observed in other countries without similar rules, and has caused commission fees to increase at rates substantially higher than inflation. Moreover, evidence common to the class demonstrates that buyer agent commission rates became disconnected from economic principles such

**HIGHLY CONFIDENTIAL**

as the services being provided, amount of hours or costs expended, or the agent's experience.

11. This report describes my work and opinions. The materials I relied on for purposes of forming my opinions are listed in Exhibit 1 of this report.

12. Where I present analyses in this report, unless I say otherwise, I use MLS data provided to me by counsel, which I understand was produced via subpoena to the Subject MLSs. I also understand the MLS data produced was processed by BRG at the direction of Dr. Abrantes-Metz (another expert in this case). I reviewed the description of the methodology used to process the data and agree that those processes were reasonable and that the data is appropriate to conduct the analyses herein.[9] In this report, I refer to the BRG processed MLS data as the "MLS Data".

13. I understand discovery in this case is ongoing. I reserve the right to amend or supplement this report as appropriate should new information become available to me.

14. In Section III, I provide background on the residential real estate industry, including the market players, NAR, and MLSs.

15. In Section IV, I describe the NAR rules being challenged in this litigation (the "Anticompetitive Rules").

---

[9] Abrantes-Metz Rpt., Exhibit C – Data Appendix.

**HIGHLY CONFIDENTIAL**

16. In Section V, I explain how common evidence demonstrates that the Anticompetitive Rules were enforced uniformly across the Subject MLSs through the use of evidence common to the class.

17. In Section VI, I present evidence common to the class that the Subject MLSs operated in defined and distinct geographies;

18. In Section VII, I describe common evidence that the Anticompetitive Rules facilitated and maintained steering incentives that led to higher commissions.

19. In Section VIII, I describe the common evidence that commissions have substantially exceeded inflation and become disconnected from fundamental economic characteristics, including from services provided by the agent and technological efficiency.

20. In Section IX, I present common evidence that the vast majority of homebuyers could not avoid the Anticompetitive Rules through alternatives means of purchasing a home.

## II. Qualifications and Compensation

21. I have over 50 years of experience in real estate. I received my Bachelor of Science degree in Real Estate & Urban Analysis, my Master of Arts degree in Finance, and my doctorate in Real Estate and Finance from the Ohio State University. I am currently the Ernest W. Hahn Chair and Emeritus Professor of Real Estate Finance at the University of San Diego.

HIGHLY CONFIDENTIAL

22. My professional experience in real estate began as a part-time residential appraiser during my junior and senior years of my undergraduate degree. In 1973, I co-founded a real estate brokerage firm named "CREMs" (Contemporary Real Estate Marketing Systems).

23. I served as an Assistant Professor at the University of Georgia from 1978 to 1980, an Associate Professor at the University of Cincinnati from 1980 to 1988, the West Shell Jr. Chaired Professor at the University of Cincinnati from 1988 to 2007, and Professor at University of San Diego from 2007 to 2009. During this time, I served as a Visiting Chair at University of Hawaii from 1985 to 1986 and a Visiting Professor at DePaul University from 2003 to 2004. From 2009 to 2011, I was Vice President of Analytics at CoStar Group. I returned to University of San Diego to my current post as Professor at University at San Diego.

24. Throughout my academic career, I have been active on Editorial Boards of several national and international journals. For 45 years I have been the author of numerous publications and blogs on the housing market with many on the housing market dynamics and brokerage industry. Some of these were with Collateral Analytics, New City, Fidelity, or in academic journals. I have also published papers and research where I analyze the residential real estate industry in the U.S. compared to other countries. My work in this space has been cited multiple times, including by the FTC and other researchers. I have

**HIGHLY CONFIDENTIAL**

been invited by multiple news outlets to present and discuss on topics related to the residential real estate industry, including CNN, the New York Times, and others.

25. I am a past President and member of the board of the American Real Estate Society.

26. I am currently a Homer Hoyt Land Use Institute Faculty and Board member, where I am involved with some premier thought leaders among academics and industry professionals in a think tank setting. See www.hoytgroup.org. This is an invitation-only think tank and the only post-doctoral real estate school in the world.

27. From 1980 to 2007, I served on the Ohio Real Estate Commission Advisory Board in Columbus, Ohio, and occasionally engaged in contract research for this board related to agent performance.

28. I have acted as a consultant in the private sector for a number of companies who participate in the real estate industry including discount brokers, data providers, investors, and aggregators. Some of the companies I have consulted with include Home Sellers Centers, Homes that Click, Locations, Inc., Prudential Realty, Fidelity National Information Solutions, New City Technology, Collateral Intelligence, Collateral Analytics, and CoStar Group. I further describe some of my experiences in the residential real estate industry throughout this report.

29. In 1980-1982, I consulted for the Department of Justice in the Atlanta Antitrust division as part of their effort to reduce discriminatory barriers to joining the Multiple Listing Service (MLS).

HIGHLY CONFIDENTIAL

30. I have also served as an expert witness in several matters related to residential real estate valuation, including, but not limited to the use and accuracy of automated valuation methods (AVMs).

31. A copy of my Curriculum Vitae and list of past testimony is provided with Exhibits 2 and 3 of this report.

32. I am being compensated for my work on this engagement at a rate of $600 per hour.[10] The payment of these fees is not contingent on the opinions I express in connection with this engagement.

## III. Background on the Residential Real Estate Industry

### A. Market Players, NAR, and the MLS

#### i. Agents and Brokers

33. Agents are real estate brokerage professionals who work directly with clients and are supervised by brokers in facilitating the matching of a home seller with a home buyer.[11] They must be licensed according to requirements set at the state level. "Typically, agents solicit listings, work with homeowners to sell their homes, and show buyers homes that are likely to match their preferences."[12] Brokers provide agents tools to help agents

---

[10] IMS Legal Strategies, LLC receives $250 for each hour of my time on this case for a total combined hourly rate of $850 an hour. In developing this report, I have been assisted by  support staff at IMS Legal Strategies, LLC, who worked under my direction. I receive compensation from IMS Legal Strategies, LLC based on its staff billings for their support in this case.

[11] U.S. Department of Justice & Federal Trade Commission, *Competition in the Real Estate Brokerage Industry* (April 2007) [hereinafter "DOJ/FTC Report"] at 4-5.

[12] *Id.*

complete transactions, including branding, advertising, training, office space, and equipment.[13]

34. Although most agents do not specialize in serving only buyers or sellers, what they offer differs depending on which side of the negotiation they are assisting. Agents working with home buyers "typically attempt to find houses that match buyers' tastes, show buyers prospective homes, advise them in making offers, and provide assistance in the negotiation process."[14] They are often referred to as "cooperating agents" (or "cooperating brokers" or "buyer agents").[15]

35. An agent working with home sellers helps sellers "list the house on the MLS, assist sellers in staging and marketing the house, advise sellers on the listing price, help sellers evaluate offers and formulate counteroffers, help sellers negotiate directly with the buyer or the buyer's agent, and provide assistance in closing a transaction." (citation modified).[16] Such an agent is often referred to as the "listing agent" (or "listing broker" or "seller agent").

36. Becoming an agent is a relatively easy process requiring 1) a limited number of hours of training, and 2) low-cost fees. Becoming a broker always requires that one first

---

[13] *Id.*

[14] Lu Han & William Strange, *The Microstructure of Housing Markets: Search, Bargaining, and Brokerage,* Handbook of Regional and Urban Economics Vol. 5 (May 2015) at 851.

[15] *DOJ/FTC Report* at 6.

[16] Lu Han & William Strange, *The Microstructure of Housing Markets: Search, Bargaining, and Brokerage,* Handbook of Regional and Urban Economics Vol. 5 (May 2015) at 851.

HIGHLY CONFIDENTIAL

be a real estate agent working under a broker. For most states, the requirement is at least 2-4 years' experience under a broker and a number of minimum transactions.[17]

37. Brokers and agents are more informed about local real estate markets and the transaction process than most homebuyers and sellers.[18] Among the main reasons why buyers may seek the help of real estate professionals when purchasing a home are 1) to help them find homes, 2) negotiate terms, and 3) help with price negotiations.[19] For performing these services, residential real estate agents typically earn commission fees, generally calculated as percentage of the property sales price. Historically, as I cover in more detail in this report, the fee has been around 5-6%, often split equally[20] between seller's and buyer's agents.

38. During the Class Period, between 86-89% of buyers purchased their home through a real estate agent or broker; between 6-8% purchased from home builders and their agents; and between 4-7% of buyers purchased their home directly from the previous owner.[21]

---

[17] For example, in Ohio the minimum number of transactions is 20 and many agents never reach this.

[18] DOJ/FTC Report at 4-5.

[19] *2020 Profile of Home Buyers and Sellers,* The National Association of REALTORS, at 6, NAR_BattonI00008176 at -8181.

[20] When it is not equal, the buyer agent fee is still typically 2.5% or 3.0%. This is discussed further in this report when discussing commission rate clustering and steering.

[21] *2020 Profile of Home Buyers and Sellers* (Exhibit 4-1, *Method of Home Purchase*, 2001 – 2020), The National Association of REALTORS, at 74, NAR_BattonI00008176 at -8249; *2021 Profile of Homebuyers and Sellers*, The National Association of REALTORS, at 6, NAR_BattonI00008356 at -8361.

HIGHLY CONFIDENTIAL

39. Likewise, most sellers listed their homes for sale through a real estate agent or broker. For example, between 2019 and 2021 the percentage of sellers who worked with a real estate agent to sell their home ranged between 89% and 91%.[22]

### ii. The National Association of Realtors

40. NAR is the largest trade association in the United States and is involved in all aspects of residential real estate.[23] It was founded in 1908 with the objective of "unit[ing] the real estate men of America for the purpose of effectively exerting a combined influence upon matters affecting real estate interests."[24] Members of NAR include professionals involved in the real estate industry, including appraisers, brokers, and agents.[25] "The term REALTOR® is a registered collective membership mark that identifies a real estate professional who is a member of the National Association of REALTORS® and subscribes to its Code of Ethics."[26] The difference between a real estate agent and a REALTOR® is that a REALTOR® is a member of NAR. There are three requirements for an agent to become a REALTOR®. The first is that one needs to be a licensed real estate agent, the second is that the licensed agent needs to join a local REALTOR® association,

---

[22] *2019 Profile of Home Buyers and Sellers*, The National Association of Realtors, at 8, NAR_BattonI00006629 at -6636; *2020 Profile of Home Buyers and Sellers*, The National Association of REALTORS, at 128, NAR_BattonI00008176 at -8303; *2021 Profile of Homebuyers and Sellers*, The National Association of REALTORS, at 6, NAR_BattonI00008356 at -8361.

[23] *About NAR*, NAR, https://www.nar.realtor/about-nar (last accessed Sept. 22, 2025).

[24] *History*, NAR, https://www.nar.realtor/about-nar/history? (last accessed Sept. 22, 2025).

[25] *How to Become a REALTOR®*, NAR, https://www.nar.realtor/membership/how-to-become-a-realtor (last accessed Sept. 22, 2025).

[26] *About NAR*, NAR, https://www.nar.realtor/about-nar (last accessed Sept. 22, 2025).

HIGHLY CONFIDENTIAL

and the third is that the agent should pay applicable dues, at the local, state, and national level.[27] As of 2025, the total number of NAR members is around 1.4 million.[28] These "[m]embers belong to one or more of approximately 1,200 local associations/boards and 54 state and territory associations of REALTORS®."[29]

### iii. Multiple Listing Services

41. To facilitate the process of matchmaking between buyers and sellers, real estate professionals use the multiple listing service ("MLS"). MLSs are marketplaces in which real estate agents share and learn about information on property listings.[30] It is the most complete and up-to-date source of listings and information on listings in a market, including both information on properties currently for sale and past sales data that helps agents assess appropriate listing prices or offer prices.[31, 32]

42. Only brokers and agents have direct access to the MLS.[33] To have access to an MLS, a broker or agent needs to be a member of such MLS. Agents consider having access to

---

[27] *How to Become a REALTOR®*, NAR, https://www.nar.realtor/membership/how-to-become-a-realtor (last accessed Sept. 22, 2025).

[28] *NAR Membership Remains Above Forecast*, REALTOR® Magazine Media (June 5, 2025) https://www.nar.realtor/magazine/real-estate-news/nar-membership-remains-above-forecast (last accessed Sept. 22, 2025).

[29] *About NAR*, NAR, https://www.nar.realtor/about-nar (last accessed Sept. 22, 2025).

[30] *MLS & Online Listings*, NAR, https://www.nar.realtor/mls-online-listings (last accessed Sept. 22, 2025).

[31] Declaration of Errol Samuelson (Chief Industry Development Officer at Zillow Group), *Real Est. Exch., Inc. v. Zillow*, Inc., Case No. 2:21-cv-00312, W.D. Wash., Apr. 30, 2021 ¶25. .

[32] Competitive Impact Statement, *United States of America v. National Association of Realtors*, Case No. 1:20-cv-03356, D.D.C., Dec. 10, 2020 at 4.

[33] DOJ/FTC Report at 5.

HIGHLY CONFIDENTIAL

the MLS critical to their ability to compete for home sellers and buyers, given that it offers their seller clients immediate availability of the property for viewing to all other brokers in the area and offers buyers access to the vast majority of possible listings by brokers.[34] Indeed, Gary Keller of Keller Williams testified that real estate agents would not be able to make a living without access to an MLS and "have to join MLS or they have to quit work."[35]

43. Not surprisingly, the "membership of an MLS is generally comprised of nearly all residential real estate brokers and their affiliated agents in an MLS's service area."[36]

44. As of 2025, there are over 500 MLSs in the United States. According to the T3 Sixty Real Estate Almanac, 94% are owned by REALTOR® Associations and another 4% are owned by NAR-affiliated brokerages. The remaining 2% are either hybrid ownership structures or held privately.[37] Thus, through REALTOR® Associations or brokerages operated by NAR, NAR members control approximately 98% of the MLSs.

---

[34] Competitive Impact Statement, *United States of America v. National Association of Realtors,* Case No. 1:05-cv-05140, N.D. Ill., June 12, 2008 at 10.

[35] *See* G. Keller Dep. Designation at *Burnett* Trial at 144:23-145:16 (introduced at *Burnett* Tr. Vol. 1 at 181:5-9, Oct. 17, 2023); G. Keller Testimony in *Burnett* Tr. Vol. 9 at 2086:7-14, Oct. 17, 2023; *accord* Papasan 30(b)(6) Dep. in *Moehrl* at 108:2-109:3, Nov. 15, 2022 ("without that access, it's almost impossible to do anything other than give referrals.").

[36] Competitive Impact Statement, *United States of America v. National Association of Realtors*, Case No. 1:20-cv-03356, D.D.C., Dec. 10, 2020 at 4.

[37] *MLS Index*, Real Estate Almanac, https://www.realestatealmanac.com/organized-real-estate/mls-index/ (last accessed Sept. 22, 2025).

HIGHLY CONFIDENTIAL

45. As a way of example of the MLS' relevance to the matchmaking process, between 89% and 91% of sellers listed their homes in the MLS between 2019 and 2021.[38] Additionally, since November 2019, all REALTORS® are required to upload their listings to the MLS within one business day of marketing a property to the public.[39] Given that most real estate agents are REALTORS® and that most sellers sell through a real estate agent, most properties are listed in NAR MLSs.

### iv. NAR's History of Using the MLSs to Fix Prices and Promote Legally Questionable Behavior

46. Prior to the enactment of the Anticompetitive Rules described below, NAR and its members had a long history of price-fixing through local Realtor associations and MLSs, and engaging in other legally questionable behavior. As the Department of Justice has described:

---

[38] *2019 Profile of Home Buyers and Sellers*, National Association of REALTORS®, at 124, NAR_BattonI00006629 at -6752; *2020 Profile of Home Buyers and Sellers*, National Association of REALTORS® at 128, NAR_BattonI00008176 at -8303; *2021 Profile of Homebuyers and Sellers*, National Association of REALTORS® at 9, NAR_BattonI00008356 at -8364.

[39] *See Handbook on Multiple Listing Policy 2021* ("NAR Handbook 2021"), NAR_BattonI00927454, Section 17 at 33 ("Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public. (Adopted 11/19)"). *See also* Gansho 30(b)(6) Dep. at 31:24–32:23 (Aug. 3, 2022), *Burnett et al. v. National Association of Realtors, et al.*, Case No. 19-cv-332 (W.D. Mo.) ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ .

HIGHLY CONFIDENTIAL

When MLS systems first rose to prominence in the early 1900s, they shared not only property information but also cooperative compensation agreements between brokers. Local real-estate associations later required their members to use fee schedules with fixed commission rates.

In 1939, the National Association of Real Estate Boards—the predecessor to the National Association of Realtors ("NAR")—formed a "Uniform Commission Committee," which campaigned to "standardize commission rates across the country," and by 1950 the 5% commission rate was "an industry standard" with "calls for 6 percent soon follow[ing]." See Roots of Real Estate Models, Chicago Agent Magazine (July 16, 2012), https://chicagoagentmagazine.com/2012/07/16/roots-of-real-estate-models/. The Supreme Court ruled in 1950 that the adoption by a local real-estate board—the Washington Real Estate Board—of standard rates of commission for its members was illegal. *See United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485 (1950). Yet it took nearly two more decades of litigation to bring an end to standard rate lists at the local levels of broker associations across the country. *See, e.g., United States v. Prince George's Cnty. Bd. of Realtors*, No. CIV. A. 21545, 1970 WL 546 (D. Md. Dec. 28, 1970); *United States v. Long Island Bd. of Realtors*, No. 70-cv-1418, 1972 WL 584 (E.D.N.Y. Aug. 1, 1972); *United States v. L.A. Realty Bd.*, No. CIV. A. 70-2855, 1973 WL 767 (C.D. Cal. Mar. 19, 1973); *United States v. Metro MLS, Inc.*, No. CIV. A. 210-73-N, 1974 WL 894 (E.D. Va. Aug. 5, 1974).[40]

47. After this, the residential real estate industry moved to a system of "subagency," which was formalized in the 1970s but widely practiced in the decades prior.[41] The system of subagency extended offers of compensation to real estate agents who procured a

---

[40] Statement of Interest of the United States, *Nosalek, et al. v. MLS Property Information Network, et al.*, Case No. 1:20-cv-12244 (D. Mass.), ECF No. 290 at 6-7.

[41] Stephen Brobeck, *The Agency Mess*, CONSUMER FEDERATION OF AMERICA, (Jan. 14, 2019), https://consumerfed.org/wp-content/uploads/2019/01/the-agency-mess-home-buyer-and-seller-confusion-report.pdf at 5 ("In the 1970s, NAR's chief legal counsel proposed and successfully persuaded NAR members to adopt a solution in which all agents, even those working with buyers (as subagents), would be fiduciaries of sellers. While subagency had been widely practiced for many decades before this time, now the NAR formally and explicitly adopted it as the basis for all relationships between its members and its customers.").

HIGHLY CONFIDENTIAL

buyer of the home as a subagent of the seller.[42] However, "[i]n the 1980s, courts began finding that brokers could inadvertently create agency relationships with buyers simply by advising them during negotiations, or providing other services that might lead buyers to believe they were being represented."[43] This exposed brokers to legal liability for claims relating to "undisclosed dual agency," to "vicarious liability" for subagents, and to "professional negligence claims" by buyers.[44] In addition, "opposition to the subagency system was mounted through litigation, criticism by the Federal Trade Commission, consumer group opposition, and press exposure," such that "[b]y the mid-1990s, the NAR abandoned its strong defense of this system."[45]

48. In the early 1990s, William D. North,[46] who served as Executive President of NAR from 1986 to 1991, discussed the challenges faced with the transition from subagency to full representation and listed the following as consequences:[47]

---

[42] *Id.*

[43] Matt Carter, *From subagency to non-agency: a history*, Inman (Feb. 17, 2012), https://www.inman.com/2012/02/17/from-subagency-non-agency-a-history/ (last accessed Sept. 22, 2025).

[44] *Id.*

[45] *Id.*

[46] *William D. North AE Institute Scholarship*, NAR, https://www.nar.realtor/ae/professional-development/ae-awards-and-recognition/william-d-north-ae-institute-scholarship (last accessed Sept. 22, 2025).

[47] William D. North, AGENCY, FACILITATION AND THE REALTOR (1993), https://thedataadvocateblog.com/wp-content/uploads/2021/09/William-North.pdf.

**HIGHLY CONFIDENTIAL**

- "Make it highly improper and probably a conflict of interest for the listing broker to pay the buyer's broker's commission; [The conflict of interest being implicit where the commission is contingent on price]."

- "Discourage, if not foreclose, the disclosure of information to the buyer's broker which might, in any way, reflect or impact on the price or terms of sale not withstanding its value in promoting the sale of the property."

49. Ultimately, however, as I show below NAR adopted the Anticompetitive Rules in place of the system of subagency, which simply perpetuated the same problems.[48]

## IV.    The Anticompetitive Rules and Their Enforcement

50. In the previous section I noted that the vast majority of MLSs are controlled by NAR or its members. For MLSs controlled either directly or indirectly, NAR, Defendants, and their co-conspirators imposed numerous mandatory policies, as well as some optional policies, which are being challenged in the lawsuit (i.e., the Anticompetitive Rules).

51. The process of establishing, maintaining, or revising a policy issued by NAR .[49] For the Anticompetitive Rules,

---

[48] *See* DOJ/FTC Report at 8 ("The legal relationship between the buyer and the cooperating broker varies from state to state and has changed over time. Until the 1990s it was common for the cooperating broker to be a subagent of the listing broker, working on the seller's behalf. During the 1990s, most states revised their laws to allow buyer representation, and at the same time NAR revised its policies, eliminating seller-subagency as a condition of participation in the MLS...") (citation modified).

[49] Gansho Dep. at 246:8-23, *Moehrl v. National Association of Realtors, et al.*, No. 1:19-cv-016101 (N.D. Ill. Jan. 5, 2022).

**HIGHLY CONFIDENTIAL**

relevant committees include but are not necessarily limited to ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████.[50]  These

committees are typically composed of a NAR employee as a Staff Executive, and

individual committee members consisting of agents and brokers or other industry

participants (e.g., representatives from MLSs).[51]

52. If a committee recommends a new rule or a change to an existing rule, it then goes

to ████████████████████████████████████████.[52] The Executive

Committee is ██████████████████████,[53] and the Board of Directors is composed of

---

[50] *Id.* at 241:11-243:13 (discussing the Multiple Listing Issues and Policies Committee, the MLS Technology and Emerging Issues Subcommittee, and MLS Advisory Board); *id.* at 255:3-13 (discussing Presidential Advisory Groups).

[51] *Id.* at 250:511; *Committee Appointment Process FAQs*, NAR, https://www.nar.realtor/national-leadership/committee-members-liaisons/committee-appointment-process-faqs (stating each committee is supported by one or two staff executives); *NAR Committee Selection Process*, NAR, https://www.nar.realtor/sites/default/files/2025-08/NAR-Committee-Selection-Process.pdf (stating applications for committee slots are "open to members and association executives"); *Committee Selection Policies*, NAR, https://www.nar.realtor/national-leadership/committee-members-liaisons/committee-selection-policies (stating "composition of committees shall be representative of the general membership").

[52] *Moehrl,* Gansho Dep. at 246:8-23.

[53] *Id.* at 246:24-247:2.

HIGHLY CONFIDENTIAL

███████████████.[54] Each is composed largely of real estate agents and brokers.[55]

53. NAR issues rules that apply to MLSs primarily through its Handbook on Multiple Listing Policy ("NAR Handbook"). These rules and policies are classified as either "Mandatory," "Recommended," or "Optional."[56]

54. Failure to comply with the mandatory requirements can have severe consequences. NAR makes this clear in multiple sections of the NAR Handbook:

- "Association and association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program."[57]

---

[54] *See* NAR Constitution at Article IV, sec. 1, https://www.nar.realtor/about-nar/governing-documents/nar-constitution-bylaws#C4; *Burnett*, Gansho 30(b)(6) Dep. at 179:22-180:2, 182:14-17 (stating that the board has ███████ members); Kelm Dep. at 50:19-51:18, *Moehrl v. National Association of Realtors, et al.*, No. 1:19-cv-016101 (N.D. Ill., Feb. 2, 2022) (noting that Keller Williams had 57 members on the NAR Board of Directors in 2017, which was 6% of the board).

[55] *Committee Selection Process*, NAR, https://www.nar.realtor/sites/default/files/2025-08/NAR-Committee-Selection-Process.pdf (stating applications for committee slots are "open to members and association executives"); *Committee Selection Policies*, NAR, https://www.nar.realtor/national-leadership/committee-members-liaisons/committee-selection-policies(stating "composition of committees shall be representative of the general membership").

[56] *See* NATIONAL ASSOCIATION OF REALTORS, *Preface* to HANDBOOK ON MULTIPLE LISTING POLICY, (33rd ed. 2021) at 2 ("The compliance classification category of each item is denoted by the following symbol: M [-] Mandatory, R [-] recommended, O [-] Optional, I [-] Informational.") [hereinafter "NAR Handbook 2021"].

[57] NAR_Battonl00927454 at -7457.

HIGHLY CONFIDENTIAL

- "It is the duty and responsibility of all boards and associations of Realtors® and MLSs owned by or controlled by boards or associations of Realtors® to ensure that all bylaws, rules, regulations, and other governance provisions comply with all mandatory multiple listing policies of the National Association of Realtors®. Boards and associations of Realtors® failing to conform with these policies will be required to show cause why their charters should not be revoked."[58]

- Those associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."[59]

55. To participate in MLSs directly or indirectly owned or controlled by boards or associations of REALTORS® (i.e., NAR MLSs), the residential real estate agent or broker must typically be a member of NAR.[60] Even where access to non-NAR members was mandated by state law, the Subject MLSs conditioned access to the agent or broker agreeing to abide by the MLS rules and regulations, including the rules challenged in this

---

[58] *Id.* at -7476.

[59] *Id.*

[60] *Id.* at -7488 ("To the extent permitted by law, the National Association remains firmly and unequivocally committed to the principle that association membership is a reasonable condition of participation in the association's multiple listing service providing membership in the association is readily available to all eligible and qualified individuals on reasonable and nondiscriminatory terms and conditions. (Amended 11/04))."

HIGHLY CONFIDENTIAL

lawsuit.[61] Thus, non-NAR member MLS participants are subject to mandatory NAR MLS rules when participating in the NAR MLS.

56. All NAR members must comply with the NAR's Code of Ethics and Standards of Practice. The NAR Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."[62] Further, the Code of Ethics states that "REALTORS®, when acting as principals in a real estate transaction, remain obligated by the duties imposed by the Code of Ethics. (Amended 1/93)."[63] Not following the Code of Ethics can also have severe consequences in terms of membership and fines.[64] Therefore, on the limited number of MLSs that are non-NAR MLSs, to the

---

[61] *See id.* at 10, NAR_BattonI00927454 at -7478 ("In states other than California, Georgia, Alabama, and Florida, whenever an association is confronted with a request or demand by an individual for access to the association's multiple listing service without membership in the association, member associations are advised that the association should immediately advise both the state association and the Member Policy Department of the National Association, and the recommended procedures will be provided to the member association with any other pertinent information or assistance. It is important that the state association and National Association be advised immediately if such request or demand for access to the association MLS as described is received.") *See also id.* at 11, NAR_BattonI00927454 at -7479 ("In processing the application of an individual entitled by law to MLS participation without REALTOR® membership, the listing information and services shall promptly be provided upon completion of the following: 1. confirmation applicant has a valid, current, real estate license or certificate 2. applicant's written application and agreement to abide by the MLS rules and regulations 3. Applicant's completion of any required MLS orientation on MLS bylaws, MLS rules and regulations, other MLS related policies or procedures, and computer training related to MLS information entry and retrieval within a reasonable time not to exceed thirty (30) days...").

[62] NATIONAL ASSOCIATION OF REALTORS, *Preface* to CODE OF ETHICS AND ARBITRATION MANUAL, § 2 (2019), NAR_BattonI00003945 at -3964.

[63] *Id.* at 1 ("Standard of Practice 1-1"), NAR_BattonI00003945 at -3968.

[64] *See Burnett*, Gansho Dep. at 126:4-130:2, 133:17-134:20; 2025 NAR Handbook at iii, 8, https://www.nar.realtor/sites/default/files/2025-01/PDF-HMLP-2025-Handbook-on-Multiple-Listing-

**HIGHLY CONFIDENTIAL**

extent REALTORS® participate in them, they are still subject to the Code of Ethics.[65]

Further, as explained *supra*, the Subject MLSs enforce the Code of Ethics on MLS

participants regardless of whether they are NAR members or not.[66]

57. Based on my review of the depositions of various executives from the brokerage

firms that are Defendants in this case, ███████████████████████

███████████. For example, Steven Di Napoli, a Senior Director of Renewals and Seller

Strategy at Coldwell Banker Real Estate under Realogy Holdings Corp, ████████████

███████████████████████████████████████████████████████.[67]

Policy-2025-01-23.pdf (stating MLSs must follow NAR rules "to ensure coverage under the master professional liability insurance program" and that MLSs "failing to conform with these policies will be required to show cause why their charters should not be revoked") (last visited Sept. 18, 2025); KWRI-Batton-01046131 at -6133, -6151 (2020 NAR Handbook stating same); NAR_BattonI00003363 at -3366, -3381 (2015 NAR Handbook stating same).

[65] Note that non-REALTOR members of the MLS tend to be data firms (i.e., CoreLogic, First American, Attom Data, Veros, Black Knight) or residential appraisal firms that need access to market data. For example, appraisers are required by Fannie Mae to provide a 1004MC market conditions report that is attached to all appraisals. It requires information on sales volume trends, marketing times, price trends, expired listing trends, and some appraisers get these from the MLS while others purchase the reports from data vendors who summarize such market condition indicators. Collateral Analytics, now ICE, supplied such 1004MC reports to numerous appraisal forms starting about 10 years ago, but prior to that many appraisers tried to use MLS data to generate their own reports.

[66] *See* NAR Handbook 2021 at 53, NAR_BattonI00927454 at -7521 ("An association may also choose to have the membership committee consider the following in determining a nonmember applicant's qualifications for MLS participation or membership: all final findings of **Code of Ethics** violations and violations of other membership duties in any other association within the past three (3) years….") (emphasis added); *id.* at 9, NAR_BattonI00927454 at -7477 ("If an agreement is in effect or being considered between association of REALTORS® or between MLSs for establishment of an MLS cooperative venture of any type, the agreement should be in writing including, but not limited to, the following items… roles and responsibilities of each association for enforcement of the **Code of Ethics** and for dispute resolution between MLS participants….") (emphasis added); *id.* at 34, NAR_BattonI00927454 at -7502 ("Alleged violations of **Code of Ethics** or the Standards of Conduct for MLS participants shall be referred to the association's grievance committee for processing in accordance with the professional standards procedures of the association….") (emphasis added).

[67] *See* Deposition of Steven Di Napoli in *Burnett et al. vs. NAR et al.* (W.D. Missouri), ANYWHERE-BATTONI-00072065. *See also* 02/02/22 D. King Dep. in *Moehrl* at 60:19-22 (Keller Williams expects its agents to follow

HIGHLY CONFIDENTIAL

58. In sum, in exchange for providing access to NAR MLSs, NAR requires NAR MLSs and REALTORS® to follow key rules in the NAR Handbook and its Code of Ethics, and the MLSs and associations enforce those rules. The key "Anticompetitive Rules" rules at issue in this case are discussed below.[68]

## A. The Buyer Agent Commission Rule

59. During the class period, the seller and seller's agent, not the buyer, determined the amount of compensation to be offered to buyer agents for homes listed on NAR MLSs.[69] During the class period, through Policy Statement 7.23, the NAR Handbook outlined mandatory requirements for how those offers of compensation must be presented. Those requirements are:[70]

- The offers should be blanket, unconditional, and unilateral offers of compensation.

---

the NAR Code of Ethics); Bailey Dep. Designation at *Burnett* Trial at 20:21-21:2, 34:17-20, 39:11-18 (introduced at 10/18/23 *Burnett* Tr. Vol. 2 at 210:15-20) (RE/MAX requires all of its brokers and real estate agents to NAR follow all NAR rules and regulations, including the Code of Ethics).

[68] The relevant rules are also set forth in NAR's August 4, 2025 Response to Plaintiffs' Interrogatory #3.

[69] NAR Handbook 2021 at 37, NAR_Battonl00927454 at -7505-06 ("In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants. This is necessary because cooperating participants have the right to know what their compensation will be prior to commencing their efforts to sell.... Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships.").

[70] *See* NAR_Battonl00003363 at -3406-07 (NAR Handbook 2015); NAR_Battonl00007202 at -7249-50 (NAR Handbook 2016); KWRI-Batton-00146849 at -6896-97 (NAR Handbook 2017); NAR_Battonl00004594 at -4642-43 (NAR Handbook 2018); KWRI-Batton-00143347 at 3395-96 (NAR Handbook 2019); KWRI-Batton-01046131 at -6185-86 (NAR Handbook 2020); NAR_Battonl00927454 at -7505-06 (NAR Handbook 2021).

HIGHLY CONFIDENTIAL

- The offers of compensation must be expressed as a percentage of the gross sales price or a definite dollar amount.

- The offers shall be specified on each MLS listing and they should clearly inform participants of the compensation they will receive.

- The offers shall not include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships.

60. I refer to these mandatory requirements for how commission offers should be set and presented as the "Buyer Agent Commission Rule."

61. NAR claimed that the Buyer Agent Commission Rule was "necessary because cooperating participants have the right to know what their compensation will be prior to commencing their efforts to sell ..."[71] and further stated that "[t]he essential and appropriate requirement by a multiple listing service is that the information to be published shall clearly inform the participants as to the compensation they will receive in cooperative transactions unless advised otherwise by the listing broker in writing in advance of submitting an offer to purchase."[72] NAR directed MLSs to not publish listings that do not include offers of compensation consistent with the Buyer Agent Commission Rule.[73] The requirement that the offers of compensation had to be specified on each MLS

---

[71] NAR_Battonl00927454 at -7505 (NAR Handbook 2021).

[72] *Id.*

[73] *Id.* ("Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, not shall they include

HIGHLY CONFIDENTIAL

listing, and they had to clearly inform participants of the compensation they would receive, incentivized steering and price rigidity through the fear of steering. I discuss this concept (fear of steering) in more detail later in the report.

62. The Buyer Agent Commission Rule created several unusual features in the residential real estate market: 1) it created a market where the person setting the fee for buyer agent services (i.e., the seller and the seller's agent) was not the person who received that service (i.e., the homebuyer), leading to confusion; 2) reduced incentives for homebuyers to negotiate buyer agent fees; 3) imposed barriers to agents attempting to reduce commissions; 4) created a marketplace where agents with different skill levels and who provided different services would receive the same compensation; and 5) promoted and facilitated steering. I discuss these observations in further detail below.

63. The Buyer Agent Commission Rule was unfair to home buyers because it undercut their ability to negotiate for a lower commission in a free market. Say, for example, that a buyer negotiated a 1.5% commission with her buyer's agent but then the seller offered the buyer's agent a 3% commission under the Buyer Agent Commission Rule. Because the commission price is typically baked into the overall home sales price, and because the buyer is indirectly paying the buyer commission through in final sales price (one that is typically financed), the buyer is essentially forced to pay the 3% commission to her own

---

general invitations by listing brokers to discuss terms and conditions of possible cooperative relationships. (Amended 11/96)").

HIGHLY CONFIDENTIAL

agent even though she negotiated for a 1.5% commission. This renders the commission price negotiation between the buyer and her own agent worthless and reduces the buyer's incentive to even bother negotiating over the commission price.[74]

64. The Buyer Agent Commission Rule remained in effect until it was rescinded in August 2024 following a settlement between NAR and a class of home sellers alleging that it violated antitrust laws.[75] NAR discusses that "there are several practice changes following NAR's settlement agreement resolving claims brought by home sellers related to brokerage compensation [and] that consumers can broadly think about changes in two categories:

- "First, written buyer agreements are now required and must meet certain criteria. Buyers and their agents will need to reach an agreement regarding how the agent will be compensated for their services and put it in writing prior to touring a home....

- "Second, offers of compensation (when a seller or a seller's agent share compensation with a buyer's agent) can no longer be shared on Multiple Listing Services (MLS). MLSs are local marketplaces used by both buyer and seller agents

---

[74] I discuss potential exceptions at ¶¶ 246-49, *infra*.

[75] *See National Association of Realtors Reminds Members and Consumers of Real Estate Practice Change Implementation on August 17, 2024*, NAR (Aug. 1, 2024), https://www.nar.realtor/newsroom/national-association-of-realtors-reminds-members-and-consumers-of-real-estate-practice-change (last accessed Sept. 22, 2025).

HIGHLY CONFIDENTIAL

to share information about homes for sale. Offers of compensation are still an option but must be communicated off-MLS if a seller chooses to make an offer available."[76]

## B. Restraints on Negotiation

65. NAR's Code of Ethics reinforced the Buyer Agent Commission Rule through additional rules restricting the ability to modify the offer of compensation made to buyer agents. Compliance with the Code of Ethics is mandatory for all NAR members.[77] These requirements were established through the following Standards of Practice and their "Interpretations of the Code of Ethics":[78]

---

[76] *NAR Settlement FAQs*, NAR (updated Sept. 5, 2024), https://www.nar.realtor/the-facts/nar-settlement-faqs (last accessed Sept. 22, 2025).

[77] 2021 Constitution and Bylaws of the National Association of REALTORS® Article III (Membership), Section 11 at p. 5 ("REALTOR® Members holding membership pursuant to Article III, Section 1(C)(1)(ii) of this Constitution shall be Board Members of the local Board designated by them pursuant to that section of the Constitution and of the state association within whose jurisdiction that local Board is located and shall enjoy all of the rights, privileges and obligations, **including compliance with the Code of Ethics**, of other REALTOR® Members of that state association and local Board except: obligations related to mandatory education, meeting attendance, or indoctrination classes or similar requirements; the right to use the term REALTOR® in connection with their franchise firm's name; and the right to hold elective office in the local Board or state association.") (emphasis added). *See also* 2019 NAR Code of Ethics and Standards of Practice ("While the Code of Ethics **establishes obligations** that may be higher than those mandated by law, in any instance where the Code of Ethics and the law conflict, the obligations of the law must take precedence.") (emphasis added); 2021 NAR Handbook at p.19, NAR_BattonI00927454 at -7487 ("When an MLS participant is expelled from the MLS for failing to abide by a membership duty (i.e., **violation of the Code of Ethics**, association bylaws, MLS bylaws, MLS rules and regulations, or other membership duties except for failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS by the expelled participant shall, at the participant's option, be retained in the MLS until sold, withdrawn, or expired.") (emphasis added).

[78] *See* Interpretations of the Code of Ethics of the National Association of REALTORS®, 34th Edition at p.1 describing that Interpretations of the Code of Ethics "present specific situations involving charges of alleged unethical conduct by REALTORS® which are reviewed by peer panel of Association Members and in which decisions as to ethical conduct are reached[,] … [and were] developed … to help REALTORS® understand the ethical obligations created by the Code of Ethics…."

HIGHLY CONFIDENTIAL

- **Standard of Practice 3-2:** "Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® has submitted an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction (Amended 1/14)."[79]

- **Standard of Practice 3-3:** "Standard of practice 3-2 does not preclude the listing broker and cooperating broker from entering into an agreement to change cooperative compensation. (Adopted 1/94)."[80]

- **Standard of Practice 16-16:** "REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation. (Amended 1/04)."[81]

- **Case #16-15: Cooperating Broker's Compensation Specified on Deposit Receipt:[82]** "The Hearing Panel's decision noted that REALTOR® B was indeed

---

[79] Code of Ethics 2019, NAR_BattonI00003945 at -3970. *See also* 08/04/25 NAR Responses to Interrogatory No. 3 at 16-18.

[80] Code of Ethics 2019, NAR_BattonI00003945 at -3970.

[81] Code of Ethics 2019, NAR_BattonI00003945 at -3976.

[82] Interpretations of the Code of Ethics, 34th edition at 92 (emphasis added).

HIGHLY CONFIDENTIAL

entitled to negotiate with REALTOR® A concerning cooperating broker compensation but that **such negotiation should be completed prior to the showing of a property** by REALTOR® B."

66. During the class period, the combination of these rules made it impractical for buyer agents to lower their commissions since they had to request a reduced rate from the seller's broker before each visit to the property. The combination of these rules likewise made it impractical for the seller agent to make changes to offers by having to make adjusted offers in writing and prior to the submission of an offer on the listing. A 2022 report by NAR describes that "[h]ome buyers **who successfully purchased a home** [in 2021] viewed a median of eight homes before purchasing."[83] Below is a copy of a chart describing number of homes viewed over the years presented by NAR in its report. These requirements meant that if buyer and seller agents wanted to agree on commissions other than those reported via the listing in the MLSs, they were forced to reach multiple separate agreements in writing without having any certainty the buyer will ultimately pursue the listing.

Chart 1: Number of Homes Viewed by Buyers

---

[83] *Home Buyers Narrow Home Search with Techonology*, NAR (Jan. 18, 2022) https://www.nar.realtor/blogs/economists-outlook/home-buyers-narrow-home-search-with-technology (last accessed Sept. 22, 2025) (emphasis added).

**HIGHLY CONFIDENTIAL**



67. Additionally, Case #16-15: Cooperating Broker's Compensation Specified on Deposit Receipt described:[84]

> "[R]ealtor® B responded that he had a right to negotiate with Realtor® A as to the cooperating broker compensation **he would receive for his work**, and the amount he had put on the deposit receipt was the **compensation for which he was willing to work**. Realtor® B said that Realtor® A would have to make his own decision as to whether he would present the offer or not. The Hearing Panel's decision noted that Realtor® B was indeed entitled to negotiate with Realtor® A concerning cooperating broker compensation but that **such negotiation should be completed prior to the showing of the property by Realtor® B**."

---

[84] Interpretations of the Code of Ethics, 34th edition at 92 (emphasis added).

**HIGHLY CONFIDENTIAL**

68. The allegations by REALTOR® B and the response by the Panel that negotiations need to be completed prior to the showing without further clarification implied that if negotiations would not result in the desire outcome for REALTOR® B, then REALTOR® B had the choice not to show the property (i.e., decide not to work).

## C. Commission Filtering and Disclosure Rules

69. NAR, Defendants, and their co-conspirators implemented additional rules that facilitated steering and that limited homebuyers' ability to observe the offered buyer-agent commission.

70. Mandatory Policy Statement 7.23 of the NAR Handbook prohibited MLSs from disclosing to prospective buyers the total commissions offered to buyer-agents. The policy which was in effect during the class period states the following:

> "The listing service shall not have a rule requiring the listing broker to disclose the amount of total negotiated commission in his listing contract, and the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant. The multiple listing service shall not disclose in any way the total commission negotiated between the seller and the listing broker."[85]

---

[85] NAR_Battonl00927454 at 7506 (NAR Handbook 2021). *See also* NAR_Battonl00003363 at -3407 (NAR Handbook 2015) .

**HIGHLY CONFIDENTIAL**

71. I refer to this rule as the "Concealment Rule." The Concealment Rule is not the only requirement from the MLSs to limit the disclosure of commission offers. Other optional rules in the NAR Handbook and other documents describing NAR's policies also promote non-disclosure.[86]

72. For example, Policy Statement 7.58 of the NAR Handbook allowed buyer brokers during the class period to filter properties they showed buyers on IDX and VOW feeds of available properties provided to them based on the commission offered by seller brokers ("The Commission Filter Rules"). The NAR Handbook effective through 2021 stated:[87]

---

[86] *See also* NAR Handbook 2015 at 79, NAR_Battonl00003363 at -3452 (Section 18.3.1 stating: "Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed."), 85 (Section 19.15 stating: "A Participant's VOW may not make available for search by or display to Registrants any of the following information: ... (b) The compensation offered to other MLS Participants."); Section IV.1.a.iii of the NAR Virtual Office Websites Policy, *available at* https://www.nar.realtor/sites/default/files/handouts-and-brochures/2008/MLS-data-VOW-policy-2008-11-13.pdf ("A Participant's VOW may not make available for search by or display to Registrants the following data intended exclusively for other MLS Participants and their affiliated licensees: ... The compensation offered to other MLS Participants.") (last visited Apr. 18, 2025); 08/04/25 NAR Responses to Interrogatory No. 3 at 56-57, 60-62.

[87] 2021 NAR Handbook, 24–28 (NAR_Battonl00927454 at -7492-96) Section 1 Internet Data Exchange (IDX) Policy (Policy Statement 7.58) sub-section on "Policies Applicable to Participants' IDX Websites and Displays" at paragraph 4 (note that end of section on Policy Statement 7.58 at p.28 denotes the letter "M" for Mandatory). Similar language is found in Model MLS Rule Section 18.2.4 ("Participants may select the listings they choose to display through IDX based only on objective criteria including, but not limited to, factors such as geography or location ("uptown," "downtown," etc.), list price, type of property (e.g., condominiums, cooperatives, single-family detached, multi-family), cooperative compensation offered by listing brokers, type of listing (e.g., exclusive right-to-sell or exclusive agency), or the level of service being provided by the listing firm. Selection of listings displayed through IDX must be independently made by each participant. (Amended 5/17)"). Section 18.2.4 (2021 NAR Handbook at p.84) shows next to the symbol "M" denoting this is a mandatory rule. Similar language is also found in Section 19.12 regarding participant VOWs ("A participant's VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, type of property, cooperative compensation offered by listing broker, and whether the listing broker is a Realtor®."). Section 19.12 (2021 NAR Handbook at.139) shows next to the symbol "M" denoting this is a mandatory rule. *See also* 08/04/25 NAR Responses to

HIGHLY CONFIDENTIAL

"Participants may select the IDX[88] they choose to display based only on objective criteria including, but not limited to, factors such as geography or location ("uptown", "downtown", etc.), list price, type of property (e.g., condominiums, cooperatives, single family detached, multi-family), **cooperative compensation offered by listing brokers,** type of listing (e.g., exclusive right-to-sell or exclusive agency), or the level of service provided by the listing firm. Selection of IDX listings to be displayed must be independently made by each participant."

73. I refer to the combination of the Concealment Rule, additional non-disclosure rules cited, and to the Commission Filter Rules combined as the "Commission Filtering and Disclosure Rules."

74. By prohibiting NAR MLSs and their participants from disclosing commissions NAR provided for unequal access to commission information to home buyers, who did not have access, and to MLS participants, who did have access via the Buyer Agent Commission Rule. Further, by allowing NAR MLS participants to select properties to show on the basis of cooperative commissions, NAR provided a mechanism for not having to disclose to buyers properties with lower commission rates, thus facilitating the threat of steering to home sellers and the use of steering by buyer's agents.

---

Interrogatory No. 3 at 52-55 (quoting MLS Policy Statement 7.58, former MLS Rules Section 18.2.4, and former MLS Rules Section 19.12).

[88] IDX stands for Internet Data Exchange.

HIGHLY CONFIDENTIAL

75. These rules fostered an environment where the quality of the services that home buyers receive by agents decline by allowing agents to screen buyers from matching with properties that otherwise might have been part of their choice set. My conclusions are consistent with those presented by DOJ conclusions on similar cases,[89] FTC reports, and academic research, which I describe in detail in Section VII.

76. The lack of transparency resulting from these rules and their consequences are further highlighted by NAR and other market participants. The Commission Filtering and Disclosure Rules were rescinded at the end of 2021 following a settlement between NAR and the Department of Justice alleging anticompetitive practices based on these rules.[90] NAR, when describing changes to its practices as a result of their settlement with the Department of Justice described the changes as 1) "changes [that] provide consumers on both sides of a residential real estate transaction with additional choice and transparency," and 2) "changes [that] preserve the choices consumers have regarding real estate services and compensation."[91]

---

[89] *See* Competitive Impact Statement, *United States v. NAR*, December 10, 2020 at 7 ("When potential home buyers can't see commission offers, they can't detect or resist this type of steering. Steering not only results in higher prices for buyer broker services, it also reduces the quality of the services that are rendered to the potential home buyer, making it less likely that the buyer will ultimately be matched with the optimal home choice.").

[90] 08/04/25 NAR Responses to Interrogatory No. 3 at pp.52-55 (quoting MLS Policy Statement 7.58, former MLS Rules Section 18.2.4, former MLS Rules Section 19.12, MLS Policy Statement 7.91).

[91] *NAR Settlement FAQs*, NAR (updated Sept. 5, 2024), https://www.nar.realtor/the-facts/nar-settlement-faqs (last accessed Sept. 22, 2025)

HIGHLY CONFIDENTIAL

77. After these changes, Redfin, one of the largest listing aggregators in the U.S., published commissions on over 700,000 homes for sale. Commenting on the release of this information, Redfin CEO Glenn Kelman stated, "[h]omebuyers will finally see how much money their agent stands to earn on any home for sale, letting them evaluate whether they are getting good value for their money…. This information could usher in a new era of price competition that saves consumers billions of dollars."[92]

### D. Free-Service Rule

78. During the class period, through the NAR Code of Ethics, NAR permitted REALTORS® to represent their services to homebuyer clients as "free." From April 1996 through November 2019, the NAR Code of Ethics Standard of Practice 12-1, stated:[93]

> "REALTORS® may use the term 'free' and similar terms in their advertising and in other representations provided that all terms governing availability of the offered product or service are **clearly disclosed** at the same time."

79. This rule (the "2019 Free-Service Rule") was a clear deviation from an earlier version of it, which was in effect from February 1975 through April 1996. The text for the predecessor rule stated:[94]

---

[92] https://www.redfin.com/news/real-estate-commission-transparency/?msockid=0e8e023476d1604317f016bc777061d1

[93] Objections and Responses of Defendant National Association of REALTORS® to Plaintiffs' First Set of Interrogatories at p.68 (emphasis added).

[94] Objections and Responses of Defendant National Association of REALTORS® to Plaintiffs' First Set of Interrogatories at p.68.

HIGHLY CONFIDENTIAL

"The REALTOR® shall not offer a service described as free when there is an expectation of obtaining a benefit such as a listing or a commission."

80. Encouraging buyer agents to represent their services as free was in contrast with

████████████████████████████████████████████████████████████████

████████████████████████.[95]

81. From 1996 to 2019, REALTORS® representing buyers received the benefit of commissions upon helping buyers purchase a home during that time period, and that fact was not "clearly disclosed" to buyers. Evidence of this is a survey conducted by Redfin in August 2019 of respondents who successfully bought a home. The survey indicated that "More than half of recent homebuyers [out of a sample of 1,000 respondents] don't fully understand how their agent was paid."[96]

---

[95] *See* 04/14/22 Papasan 30(b)(6) Dep. in *Burnett* at 39:18-40:1 (stating "a lot of that cost may be showing up in the financing"); 11/15/22 Papasan 30(b)(6) Dep. in *Moehrl* at 23:23-24:12 ("The buyer's agent is effectively paying it but indirectly. They're paying it through the transaction. They get to finance basically their cost of having a buyer's agent into the loan ...."); NAR_BattonI0324451 at 1 ████████████████████

████████████); NAR_BattonI0215749 at 5861 (2013 Accredit Buyer Representative Course stating, ████████████████████████████); Anywhere-BattonI-00029414 & 9415 at slide 7████████████████████

[96] https://www.redfin.com/news/buyers-agent-commissions-display/. The same article quotes Redfin Corporation's CEO, Glenn Kelman stating that "...[buyers] have always assumed the buyer's agent is free..."

HIGHLY CONFIDENTIAL

82. Lack of clarity is not only evident from surveys of consumers conducted by market participants but also by NAR's own actions, who in November 2019 updated the rule once more to add further clarification, to Standard of Practice 12-1:[97]

> Unless they are receiving no compensation from any source for their time and services, REALTORS® may use the term "free" and similar terms in their advertising and other representations only if they clearly and conspicuously disclose: a) by whom they are being, or expect to be paid; b) the amount of the payment or anticipated payment; c) any conditions associated with the payment, offered product or service, and d) any other terms relating to their compensation.

83. This Rule change did not eliminate confusion about the cost of buyer agent services to homebuyers, as NAR changed the rule yet again effective in 2022 as follows:

> REALTORS® must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the REALTOR® will receive no financial compensation from any source for those services.

84. The combination of the Commission Concealment Rule and NAR's Free-Service Rule facilitated perceptions for homebuyers that they were not paying for a buyer-agent,

---

[97] Objections and Responses of Defendant National Association of REALTORS® to Plaintiffs' First Set of Interrogatories at pp.67-69.

HIGHLY CONFIDENTIAL

thereby eliminating their incentive to research, find, or negotiate lower buyer-broker commission fees.

85. In fact, the same article from Redfin Corporation that discusses the results of its survey on home buyer awareness regarding buyer agent commissions and who pays for them, quotes its CEO describing the following:[98]

> We've spent more than a decade trying to compete not just on the quality of our service to homebuyers, but on price, by refunding part of our commission back to the homebuyer. **But the refund hasn't been well understood by buyers, who have always assumed the buyer's agent is free, even though buyer's agent fee is often baked into the price the buyer paid for the house. As a result, over the past five years Redfin has shifted most of our technology-driven commission savings to the seller, not the buyer.** Now, as buyers see more and more listings where the commission paid to the buyer's agent is publicly displayed, we expect the marketplace for buyers' agents to become more efficient, with buyers comparing agents' fees just as sellers already do."

86. Research related to consumer behavior on pricing of hidden add-ons and on the effects of zero-price references, supports the idea that representing something as free and concealing information regarding pricing has important effects on consumer's decision-making process. Shampanier, Mazar, and Ariely (2007) described that "people

---

[98] https://www.redfin.com/news/buyers-agent-commissions-display/

**HIGHLY CONFIDENTIAL**

appear to act as if zero pricing of a good not only decreases its cost, but also adds to its benefits."[99] Gabaix and Laibson (2005) conclude that "[d]ebiasing a consumer [(i.e., educating or informing consumers about hidden attributes)], improves consumer welfare, but no firm can capture or even partially share these benefits. Firms receive lower profits when they interact with debiased consumers. Debiased consumers know how to avoid high-priced items."[100]

87. The discussion of the Anticompetitive Rules above demonstrates that NAR plays a pivotal role in establishing and enforcing the structural incentives that restricted buyers' ability to negotiate commissions, discouraged buyers from negotiating commissions, impeded their understanding of the true cost of buyer agent services, and facilitated steering. During the class period, the Anticompetitive Rules made home buyers less likely and less able to negotiate commissions, reduced the quality of services home buyers received, and inflated, raised, or stabilized commission rates.

88. It is worth noting that in response to increasing legal pressure, NAR reached a settlement with private plaintiffs asserting damages on behalf of home sellers in 2024. This agreement included the elimination of the long-standing "Buyer-Agent Commission Rule" and requires that buyers sign written representation agreements outlining

---

[99] Shampanier, Kristina, Nina Mazar, and Dan Ariely. Zero as a Special Price: The True Value of Free Products. Marketing Science 26, no. 6 (November–December 2007): 742–757 at p.742.

[100] Gabaix, Xavier, and David Laibson. Shrouded Attributes, Consumer Myopia, and Information Suppression. NBER Working Paper No. 11755, National Bureau of Economic Research, November 2005 at p.25.

commission terms before they tour homes or submit offers. These reforms, which took

effect on August 17, 2024, aim to enhance transparency and encourage buyers to

negotiate commissions with their agents. However, I would expect given the long history

of price-fixing on behalf of NAR members and the extent to which the Anticompetitive

Rules were entrenched in the residential real estate industry, that it will take a substantial

amount of time to observe measurable effects of the 2024 rule changes on the residential

real estate industry.

## V.    Common Evidence Demonstrates that the Subject MLSs Imposed the Anticompetitive Rules Uniformly During the Class Period

89. There are a total of 39 Subject MLSs in this case.



. A

summary of all 39 MLSs is provided in Appendix 1.

90. The 34 Subject NAR MLSs, by definition (as covered in Section IV), must 1) conform

their governing documents to the mandatory MLS policies established by NAR,[102] and 2)

ensure its rules and regulations comply with those mandatory policies.[103]  Not conforming

---

[101] See Objections and Responses of Defendant National Association of REALTORS® to Plaintiff's First Set of Interrogatories, Interrogatory No. 1 Answer at pp.5–6 ▮▮▮▮ ▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ and BattonI01176862

[102] NAR Handbook 2021 at "Preface" Section, NAR_BattonI00927454 at 7457.

[103] NAR Handbook 2021 at p.8, NAR_BattonI00927454 at 7476.

HIGHLY CONFIDENTIAL

with these rules risk these MLSs and their association of REALTORS® losing their status as member boards and coverage under the master liability professional insurance program.[104]

91. Therefore, during the class period by definition the NAR MLSs adopted the Buyer Agent Commission Rule, the Concealment Rule, and the Commission Filter Rules.

92. Several Subject NAR MLSs also adopted rules that further facilitated steering or concealment of information, including IDX and VOW Non-Disclosure Rules,[105] and rules restricting co-mingling in displaying REALTOR® Association MLS listings along with those from other sources.[106] Appendix 1 provides details for each of the NAR MLSs that adopted these optional rules.

93. In its handbook, NAR recommends association membership as a condition of participation in NAR MLSs. To the degree participants of the MLSs are NAR members, they

---

[104] NAR Handbook 2021 at "Preface" Section, NAR_Battonl00927454 at 7457.

[105] NAR Handbook 2021 Section 18.3.1 at p.133, NAR_Battonl00927454 at 7601 ("Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed. (Amended 05/12)"). *See also* NAR Handbook 2021 at Section 19.15 at p.139, NAR_Battonl00927454 at 7607 ("A participant's VOW may not make available for search by or display to Registrants any of the following information…b. the compensation offered to other MLS participants.").

[106] See NAR Handbook 2021 Section 18.3.11 at p.134, NAR_Battonl00927454 at 7602 ("Listings obtained from IDX feeds from REALTOR® Association MLSs where the MLS participant holds participatory rights must be displayed separately from listings obtained from other sources. Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained.* (Amended 05/17)."

HIGHLY CONFIDENTIAL

must follow the NAR Code of Ethics and Standards of Practice. This includes following the Restraints on Negotiation and Service-Free Rules.

94. To the degree a NAR MLS allows participation of non-NAR members, they are still subject to the MLS rules and regulations which, in turn, adopt the NAR Handbook mandatory rules. As the NAR Handbook points out, application for MLS participation without a REALTOR® membership requires the "applicant's written application and agreement to abide by the MLS rules and regulations."[107] Likewise, through the rules in its Handbook, NAR requires the MLSs to conduct an "orientation on MLS bylaws, MLS rules and regulations."[108] These requirements are mandatory for NAR MLSs. Documents for almost all of the Subject NAR MLSs who accepted non-NAR participants contained the written agreement to abide by the MLS rules requirement. To the extent they did not, they did include other requirements that aligned non-NAR participants to the Anticompetitive Rules. Appendix 1 provides details for each of the NAR MLSs.

95. Non-NAR participants in NAR MLSs are also subject to NAR's Code of Ethics. The NAR Handbook under the section "Complaints of Unethical Conduct" describe that "[a]lleged violations of the Code of Ethics or the Standards of Conduct for **MLS participants** shall be referred to the association's grievance committee for processing in accordance with the professional standards procedures of the association."[109] Note that

---

[107] NAR Handbook 2021 at p.11, NAR_Battonl00927454 at 7479.

[108] NAR Handbook 2021 at p.11, NAR_Battonl00927454 at 7479.

[109] NAR Handbook 2021 at p.34, NAR_Battonl00927454 at 7502 (emphasis added).

HIGHLY CONFIDENTIAL

there is no distinction for NAR or Non-NAR MLS participants in this language.[110] Consistent with the conclusion that MLSs enforce the adoption of the Code of Ethics and Standards of Practice on non-NAR MLS participants, I find that all of the Subject NAR MLSs which allowed non-NAR member participation also incorporated a rule equivalent to Standards of Practice 16-16 in the NAR Code of Ethics. The language used by the MLSs in describing the equivalent to Standard of Practice 16-16 did not restrict this rule to REALTOR® members only (See Appendix 1). Thus, during the class period, non-NAR participants in this MLSs were subject to Restraints on Negotiation Rules.

96. The three Hybrid NAR MLSs are Bay Area Real Estate Information Services, Inc. ("BAREIS MLS"), Midwest Real Estate Data MLS ("MRED MLS"), and SMART MLS. MiRealSource MLS and MLS Property Information Network (MLS PIN) are NAR Broker MLSs.

---

[110] *See also* NAR Handbook 2021 E. Model Bylaws for a Multiple Listing Service Separately Incorporated but Wholly-owned by an Association of REALTORS® under subsection "Option Provision for Establishing Nonmember Participatory Rights (Open MLS)" describing that "[p]articipation in the service is also available to nonmember principals who mee the qualifications established in the association's bylaws and MLS rules and regulations… The nonmember principal of any firm, partnership, corporation, or the branch office manager designated by said firm, partnership, or corporation as the participant shall have only those rights, benefits, and privileges as specified by the service, and shall accept all obligations to the service for the participant's firm, partnership, or corporation, and for compliance with the bylaws and rules and regulations of the service by all persons affiliate with the participant who utilize the service. (Amended 11/08)."

**HIGHLY CONFIDENTIAL**

97. 



HIGHLY CONFIDENTIAL

98. █████████████████████████ ██ ████████

████████████████████████████████████

███████████████████████████ █ █████████

████████████ ██ ████████████████████████

████████████████████████████████████

███████████████████████████████████.

---



[114] BATTON_MLS-0019824 at 19837 ████████████████████████
████████████████████████████████ *id.* at
19841 █████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████

[115] *Compare* BATTON_MLS-0019664 (rev. 9/24/2019) at 19697 *and* BATTON_MLS-0019882 (rev. 3/23/2020)
at 19914 ████████████████████████████████████████████
███████████ ██ ████████ ██ ██ ██ *with*
BATTON_MLS-0019766 (rev. 9/30/2020) at 19798 ██████████
███████████████████████████████████████████
███████████████████████████████████ *and*
BATTON_MLS-0019824 (rev. 3/26/2021) at 19856 ██████████
███████████████████████████████████████████
████████████████████████████████████

[116] BATTON_MLS-0019824 at 19864 █████
████████████████████████████████ ███
████████

[117] BATTON_MLS-0019824 at 19857 ████████
███████████████████████████████████████████
█████████████████████

[118] BATTON_MLS-0019824 at 19832 ████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████

**HIGHLY CONFIDENTIAL**

99. Smart MLS describes that ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████ ██████████████████

█████████████ ████████████████████████████████

███████████████████████████████████████████████

█████████ ██████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

100.     MiRealSource MLS ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[119] BATTON_MLS-0001899 at 1901.

[120] BATTON_MLS-0001899 at 1901 ████████████████████████

████████████████████████████████████████████████
████████████████████████████

[121] BATTON_MLS-0001899 at 1902 ██████████████████████
████████████████████████████████████████████████
██████████████████████████████

[122] BATTON_MLS-0004114 at 4136 ████████████████████
████████████████████████

[123] BATTON_MLS-0004114 at 4160 ██████████████████████
████████████████████████████████

**HIGHLY CONFIDENTIAL**



101.    MLS PIN ███████████████████████ ██ ████████

.[128]

102.    In sum, at a minimum all Subject MLSs followed the Buyer Agent Commission Rule. Likewise, all members of the Subject MLSs were subject to the NAR Code of Ethics and Standards of Practice, and therefore to the Restraints on Negotiation

---



[124] BATTON_MLS-0004114 at 4119

[125] See, e.g., BATTON_MLS-0003840 (listing subsidiaries like ███████████ ███████████████ as MiRealSource shareholders)

[126] MLSPINBL 001508 at 3063

[127] MLSPINBL 001508 at 001882

[128] See, e.g., MLSPINBL 003191 at 3276-3283 (listing subsidiaries like ████████ ███████ as MLS PIN shareholders).

HIGHLY CONFIDENTIAL

and Free-Service Rules; and almost all of the Subject MLSs followed some form of concealment and non-disclosure rules. Further, all of the Subject MLSs members were subject to sanctions for noncompliance, including the possibility of fines, suspension, or termination (See Appendix X). Therefore, to a high degree, all Subject MLS participants complied with the Anticompetitive Rules discussed in this report.

## VI.     Common Evidence Demonstrates that NAR MLSs and REALTORS® Operate within Distinct Geographic Markets and Dominate Listings in those Areas.

103.     I have been asked to consider whether common evidence exists demonstrating that the Subject MLSs operate within distinct geographic boundaries. Consistent with findings by the Department of Justice, the FTC, and courts, I conclude that they do. That is because real estate agents operate locally, the Subject MLSs and other MLSs have defined service areas that do not meaningfully overlap, and data from the Subject MLSs demonstrate that they dominate residential home sales within their geographic areas.

### A. The Department of Justice, the FTC, and Courts Have Defined Regional Markets for MLS Broker Services.

104.     The FTC and DOJ have repeatedly concluded that the market for real estate brokerage services is based on the geographic area covered by an MLS:

The geographic coverage of the MLS serving an area normally establishes the geographic market in which competition among brokers occurs, although meaningful competition among brokers may also occur in smaller areas, like a

HIGHLY CONFIDENTIAL

particular area of a city, in which case that smaller area may also be a relevant geographic market.[129]

105.    Similarly, the DOJ's 2005 complaint against NAR explained:

The real estate brokerage business is local in nature. Most sellers prefer to work with a broker who is familiar with local market conditions and who maintains an office or affiliated sales associates within a reasonable distance of the seller's property. Likewise, most buyers seek to purchase property in a particular city, community, or neighborhood, and typically prefer to work with a broker who has knowledge of the area in which they have an interest. The geographic coverage of the MLS serving each town, city, or metropolitan area normally establishes the outermost boundaries of each relevant geographic market, although meaningful competition among brokers may occur in narrower local areas.[130]

---

[129] See Competitive Impact Statement, *U.S. v. National Association of Realtors* at p.4 (Dec. 10, 2020), available at: https://www.justice.gov/atr/case-document/file/1344346/download. *See also* Complaint, *U.S. v. National Association of Realtors*, at paragraph 9 (Nov. 19, 2020), available at: https://www.justice.gov/atr/case-document/file/1338661/download (same).

[130] See Amended Complaint, *U.S. v. National Association of Realtors* at ¶17 (Oct. 4, 2005), available at: https://www.justice.gov/atr/cases/f211700/211751.htm. The DOJ's logic was the same in its 2020 complaint against NAR. *See* Complaint, *U.S. v. National Association of Realtors* at ¶8 (Nov. 19, 2020), available at: https://www.justice.gov/atr/casedocument/file/1338661/download ("The real estate brokerage business by its nature tends to be local. Most buyers and sellers prefer to work with a broker who is familiar with local market conditions. As a result, NAR's member brokers and agents compete with one another in local listing broker and buyer broker service markets to provide real estate brokerage services to home sellers and home buyers.").

HIGHLY CONFIDENTIAL

106.　　The DOJ again concluded in in 2008: "the relevant geographic markets in which brokers compete are local and normally no larger than the service area of the MLS or MLSs in which they participate."[131]

107.　　Similarly, the 2007 FTC-DOJ Real Estate Brokerage Industry Report stated:

> Competition among brokers is primarily local because real estate is fixed in a geographic location, and buyers and sellers often want some in-person interaction with a broker who has experience and expertise. relevant to that particular location. For example, a broker in Alexandria, Virginia, competes with other brokers able to meet the needs of consumers who are buying and selling homes in the area; this is likely to include other brokerage firms located in and around Alexandria, but not those located in California.[132]

108.　　The same reports notes "research supported by NAR states that 'the U.S. real estate industry is a collection of many local real estate markets."[133] Moreover, one court has affirmed an FTC finding that relevant geographic markets consist of the area served by an MLS.[134]

---

[131] Competitive Impact Statement, *U.S. v. National Association of Realtors* at p.9, fn.7 (June 12, 2008), available at: https://www.justice.gov/atr/cases/f234000/234013.htm.

[132] *See* 2007 FTC-DOJ Real Estate Brokerage Industry Report at pp. 30-31.

[133] *Id.* (citing "Steve Sawyer, Local Real Estate Market Competition: Evidence and Insight From an Analysis of 12 Local Markets 3 (2005)").

[134] *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 828-29 (6th Cir. 2011) ("Because of the local nature of real-estate markets, the ALJ found that counties in southeastern Michigan define the geographic scope of competition for real-estate-brokerage services....").

### B. My Experience and My Review of the Record Is Consistent With the Observation that MLSs Operate in Distinct Geographic Regions.

109.     Home buyers consider it "very important" for agents to 1) understand the market, and 2) to be familiar with the local area to help them find homes.[135] Understanding the market and being familiar with the local area is critical for buyers' agents to be effective at pricing and placing informed offers on properties that match clients' needs.[136]

110.     For example, with regards to matching to clients' needs, an informed buyer's agent will know the quality and ratings of each school in the neighborhood, crime ratings, noise levels by street, access to the highway or public transit, the past selling prices of neighborhood homes and the status of their improvements, flood ratings, fire risks, fault lines and more, although more and more of this is becoming available online. With regards to pricing and negotiating terms, an informed agent will be better able to provide

---

[135] National Association of Realtor's 2020 Profile of Home Buyers and Sellers Exhibit 4-18 Agent Skills and Qualities Considered "Very Important" by First-Time and Repeat Buyers, and Buyers of New and Previously Owned Homes at p.82, NAR_BattonI00008176 at 8257. Note that across all buyers, 91% of respondents considered "Knowledge of Real Estate Markets" to be very important. Likewise, 76% of respondents considered "Knowledge of local area" to be very important.

[136] 2007 FTC-DOJ Real Estate Brokerage Industry Report at p.30 ("Competition among brokers is primarily local because real estate is fixed in a geographic location, and buyers and sellers often want some in-person interaction with a broker who has experience and expertise relevant to that particular location.").

HIGHLY CONFIDENTIAL

for guidance consistent with the prevailing market conditions in such areas as compared to conditions in other areas, which could be substantially different.[137]

111.     The unwillingness for consumers to use buyer agents that do not serve their local market is highlighted by findings from NAR in its survey on home buyers and sellers in 2020.  The survey shows that the percentage of home sellers that used the same real estate agent to represent them purchasing their next home decreases in correlation with how far the consumer is moving. I have summarized the results presented by NAR in the table below:

**Table 1: Proportion of sellers using the same agent to purchase their next property based on miles moved**[138]

| Miles Moved | Proportion Using the Same Agent |
|---|---|
| 10 miles or less | 84% |
| 11 to 20 miles | 83% |
| 21 to 50 miles | 68% |
| 51 to 100 miles | 26% |
| 101 to 500 miles | 7% |
| 501 miles or more | 5% |

---

[137] *See, e.g.*, Redfin Corp. Form 10-K 2020 describing differences in markets when describing its own markets ("Local and regional conditions in these markets may differ significantly from prevailing conditions in the United States or other parts of the country.").

[138] National Association of Realtor's 2020 Profile of Home Buyers and Sellers Exhibit 7-4 Seller Used Same Real Estate Agent for Their Home Purchase, by Miles Moved at p.130, NAR_BattonI00008176 at 8305.

HIGHLY CONFIDENTIAL

112.      The local nature of the business is well understood and confirmed by market participants and is a critical consideration in the way brokerage services are marketed or delivered.

113.      Take, for example, how various real estate agents from Defendants in relevant states describe their focus beginning with the first three letters of the alphabet in the agent roster. Starting with the letter A, agent David Ahedo from Keller Williams Fresno in California states in the very beginning of his online biography that "Being a Fresno native, I am familiar with the community and my knowledge of the region is beneficial when searching for a home." [139] Agent Rachel Austin similarly states in the beginning of her biography that she has "spent two decades excelling in the competitive landscape of Fresno/Clovis real estate."[140] Keller Williams' agents are not alone in touting their local focus. Starting with letter B, RE/MAX agents in suburban Chicago, Illinois also list their service areas, which are local in nature.[141] Starting with letter C, Coldwell Banker agents in Albany, New York do the same thing.[142]

---

[139] https://kwfresno.kw.com/agent/david-ahedo/832642

[140] https://kwfresno.kw.com/agent/rachel-austin/419285

[141] *E.g.*, Camille Baker (https://www.remax.com/real-estate-agents/camille-baker-wheaton-il/100001356 and noting that after 46 years, "DuPage, Kane, and Will Counties are my areas of expertise") and Jaymi Block (https://www.remax.com/real-estate-agents/jaymi-block-oakbrook-terrace-il/100270099).

[142] *E.g.*, Lynda Cameron (https://www.coldwellbanker.com/ny/slingerlands/agents/lynda-cameron/aid-P00200000FDdsFEisesheuXfsvDlfj19QI57fvDS) and Christopher Culihan (https://www.coldwellbanker.com/ny/loudonville/agents/christopher-culihan/aid-P00200000FDdtAAROK2zz4EKPUDbQGTcEJWCR7zn, stating "I know the area, and I know the schools ….").

HIGHLY CONFIDENTIAL

114.     Zillow, which derives a significant portion of its revenue from selling advertising and generating leads for real estate agents via their Premier Agent program,[143] markets agents to buyers and sellers while emphasizing the importance of the local nature of their services.

115.     For example, its agent search page (a screenshot provided in Figure 1-A below) demonstrates this by 1) prompting consumers in search for agents to enter a "City, neighborhood, or Zip code" when searching based on location; and 2) by highlighting that "with over a million agents from all the top brokerages, **a local agent knows your market and can guide you through the process from start to finish."**[144] Similar statements are made throughout Zillow's website that help consumers navigate through the selection of agents. For example, when offering help in finding an agent, Zillow's site provides a single click button which states, "Connect with a **local** agent" (See Figure 1-B below).[145] Further when describing how to pick a real estate agent, Zillow describes: "Choose a real estate agent or broker with **local expertise** to guide you through the process of renting, buying, or selling your next home. **Since each location's**

---

[143] *See* Zillow 10-K Form 2019 at p.7 describing Premier Agent revenue accounting for 34% of total revenue for the year ended December 31, 2019. *See also* Zillow 10-K Form 2021 at p.12 describing Premier Agent revenue accounting for total revenue for the year ended Dec. 31, 2020.

[144] https://www.zillow.com/professionals/real-estate-agent-reviews/

[145] https://www.zillow.com/professionals/real-estate-agent-reviews/

**HIGHLY CONFIDENTIAL**

**housing market is unique, a local real estate agent will understand your needs the best."**[146]

Figure 1-A: Zillow Web Interface for Searching for Agents



Figure 1-B: Zillow Web Interface to Connect with Local Agents



---

[146] https://www.zillow.com/professionals/real-estate-agent-reviews/

HIGHLY CONFIDENTIAL

116.     Likewise, when discussing its reliance on partner agents, Redfin (discount broker) describes that "[it] refers customers to third-party partner agents where [it] do[es] not have a lead agent available due to … **geographic limitations**[,] [and that] dependence on partner agents can be particularly heavy in certain new markets as we build our operations to scale in those markets."[147] Redfin does not rely on its agents in a different market to meet demand in other regions. Even though it could maximize its profit margin (considering that Redfin hires their own agents), Redfin still seeks to meet the consumer demand for brokerage services, which is local in nature.

117.     Agent licensure and participation in associations is also local. For example, agent licensure is governed at the state level, and requirements to become a REALTOR® include the need to join a local REALTOR® association.[148,149] Local associations form MLSs to become marketplaces in which information about local listings is exchanged to facilitate the delivery of brokerage services. As previously covered, between 89% and 91%

---

[147] Redfin Corp. Form 10-K 2020 at p.10.

[148] https://www.nar.realtor/membership/how-to-become-a-realtor

[149] 2021 Constitution and Bylaws of the National Association of REALTORS® Article III (Membership) Section 2 at p. 3 ("A local board may accept **for primary membership individuals whose principal place of business is situated within the territory of the state in which the local board's jurisdiction is located or any state contiguous to that state**, provided however, that individuals who are employed by or affiliated as independent contractors with the REALTOR® principals of a real estate firm shall be eligible to be considered for primary membership as REALTORS® or REALTOR-ASSOCIATE®s only in those local boards in which a principal of the real estate firm or an individual in a position of management control on behalf of a principal who is not physically present and engaged in the real estate business in connection with the firm's real estate office holds REALTOR® membership.") (emphasis added).

**HIGHLY CONFIDENTIAL**

of sellers listed their homes in the MLS between 2019 and 2021.[150] NAR encourages associations to establish MLSs that encompass **natural market areas** and to review them periodically to ensure that they remain relevant.[151]

118.     NAR's rules require that each MLS have a geographically defined "service area," within which all listings by participating brokers are required to be submitted to the MLS.[152] Consistent with this rule, each of the Subject MLSs has a defined geographic service that is geographical or local in scope, as I described in Appendix 1.

119.     For example, the Triad MLS, describes their service area as follows:[153]



120.     Aggregators who work closely with MLSs to provide consumers with access to listing data via their portals, confirm the local nature of MLSs in describing the MLS. For example, Zillow states "Across the United States there are approximately 585 MLSs,

---

[150] National Association of Realtor's 2019 Profile of Home Buyers and Sellers at p.124; National Association of Realtor's 2020 Profile of Home Buyers and Sellers at p.128, NAR_BattonI00008176 at 8303; National Association of Realtor's 2021 Profile of Homebuyers and Sellers at p.9, NAR_BattonI00008356 at 8364.

[151] National Association of Realtor's 2021 Handbook at Section 6 at p.10 (emphasis added).

[152] *See* NAR Model MLS Rules, Section 1.12 ("Only listings of the designated types of property located within the service area of the MLS are required to be submitted to the service. Listings of property located outside the MLS's service area will (or will not) be accepted if submitted voluntarily by a participant, but cannot be required by the service. (Amended 11/17)").

[153] BATTON_MLS-0023659 at 23665.

HIGHLY CONFIDENTIAL

each of which generally covers a <u>discrete geographic region</u> and facilitates broad access to all listings within that area."[154]

121.    As an example, Figure 42 provides a map of MLS zip codes involving Triad MLS transactions. As can be seen from the map, the vast majority of Triad's transactions generally take place within the geographies Triad defines (Appendix 2 provides similar maps for other MLSs).[155] The same is true with respect to other MLSs.

Figure 2: Triad MLS transactions for years 2015-2021



---

[154] Declaration of Errol Samuelson (Chief Industry Development Officer at Zillow Group) in *REX v. Zillow* ¶34 and ¶24 (emphasis added). *See also* Declaration of Errol Samuelson (Chief Industry Development Officer at Zillow Group) in *REX v. Zillow* ¶34 and ¶49 ("Zillow's syndication agreements with MLSs were individually negotiated with **each of the local MLSs** [...] There were instances in which certain MLSs actually withdrew [from syndication agreements], or threatened to withdraw, their listings from Zillow, causing Zillow **to 'go dark' in that area** for a period of time.").

[155] The maps were generated using the MLS Data.

HIGHLY CONFIDENTIAL

122.     Because the residential real estate industry operates locally, because most MLSs dominate their geographic regions, and because the location of the home is fixed, most selling agents list their client's home for sale on one only MLS.

123.     In the following Section, I conduct an analysis of most of the Subject MLSs. My analysis supports the conclusion that the Subject MLSs operate in distinct geographic locations that they dominate.

### i.     Geographic overlaps between MLSs are minimal

124.     As discussed in the previous section, MLSs cover distinct geographic areas. In this section, I examine overlaps among MLSs using data for some of the Subject MLSs. The same methodology can be applied to develop common evidence for any Subject MLSs not analyzed below at the merits stage based on data currently in the possession of Plaintiffs' counsel.

125.     To begin my analysis, I first identified geographic areas (i.e., states) in which more than one Subject MLSs  for which I have data in the MLS Data primarily operates in. Then, for states in which more than one MLS operates in, using the MLS Data available, I performed an analysis of zip codes and transactions to evaluate the MLSs relative level of participation within those regions.  Table 2 below summarizes my results.

Table 2: Zip Code Participation Distribution Across MLSs[156]

---

[156] Starting with MLS Data with a sale date between Jan 1, 2015 and Dec 31, 2021, I aggregated the transaction counts for each MLS by zip code. For each state with two or more MLS's operating in the state, I use the records from those MLS's to calculate the participation rate. The participation rate is the percent of transactions amongst all the other MLSs operating in the state for each zip code. Each zip code is

**HIGHLY CONFIDENTIAL**

| MLS in State | State | Largest Participation | Number of Zip codes | Percent of Zip codes | Number of Transactions | Percent of Transactions |
|---|---|---|---|---|---|---|
| BAREIS, BRIDGEMLS, CDAR, CONTRACOSTA, CRMLS, FRESNO | CA | a. 90-100% | 1,020 | 59.61% | 1,234,754 | 77.51% |
| | | b. 80-89.99% | 225 | 13.15% | 194,321 | 12.20% |
| | | c. 70-79.99% | 143 | 8.36% | 83,451 | 5.24% |
| | | d. 60-69.99% | 125 | 7.31% | 49,189 | 3.09% |
| | | e. 50-59.99% | 115 | 6.72% | 24,756 | 1.55% |
| | | f. 40-49.99% | 60 | 3.51% | 5,971 | 0.37% |
| | | g. 30-39.99% | 21 | 1.23% | 568 | 0.04% |
| | | h. 20-29.99% | 2 | 0.12% | 63 | 0.00% |
| BEACHESMLS, FGC, FLKEYS, MIAMIMLS, STELLAR | FL | a. 90-100% | 805 | 79.78% | 1,775,299 | 84.93% |
| | | b. 80-89.99% | 64 | 6.34% | 85,910 | 4.11% |
| | | c. 70-79.99% | 41 | 4.06% | 60,687 | 2.90% |
| | | d. 60-69.99% | 45 | 4.46% | 110,089 | 5.27% |
| | | e. 50-59.99% | 51 | 5.05% | 58,185 | 2.78% |
| | | f. 40-49.99% | 3 | 0.30% | 195 | 0.01% |
| MARISMLS, MRED | IL | a. 90-100% | 1,086 | 86.74% | 1,035,565 | 96.15% |
| | | b. 80-89.99% | 73 | 5.83% | 29,499 | 2.74% |
| | | c. 70-79.99% | 42 | 3.35% | 11,166 | 1.04% |
| | | d. 60-69.99% | 30 | 2.40% | 585 | 0.05% |
| | | e. 50-59.99% | 21 | 1.68% | 162 | 0.02% |
| MIREALSOURCE, REALCOMPII | MI | a. 90-100% | 586 | 69.85% | 282,832 | 55.61% |
| | | b. 80-89.99% | 99 | 11.80% | 59,400 | 11.68% |
| | | c. 70-79.99% | 35 | 4.17% | 14,568 | 2.86% |
| | | d. 60-69.99% | 50 | 5.96% | 35,218 | 6.92% |
| | | e. 50-59.99% | 69 | 8.22% | 116,602 | 22.93% |
| DOORIFY, TRIAD | NC | a. 90-100% | 592 | 86.05% | 480,586 | 91.39% |
| | | b. 80-89.99% | 19 | 2.76% | 11,517 | 2.19% |
| | | c. 70-79.99% | 17 | 2.47% | 7,391 | 1.41% |
| | | d. 60-69.99% | 28 | 4.07% | 19,993 | 3.80% |
| | | e. 50-59.99% | 32 | 4.65% | 6,358 | 1.21% |
| BRIGHTMLS, GREENBRIER | WV | a. 90-100% | 253 | 97.31% | 31,848 | 99.89% |
| | | b. 80-89.99% | 2 | 0.77% | 13 | 0.04% |
| | | d. 60-69.99% | 1 | 0.38% | 3 | 0.01% |
| | | e. 50-59.99% | 4 | 1.54% | 18 | 0.06% |

binned into what the largest participation percentage is. For these bins, all the zip codes and transactions in those zip codes are aggregated in the table.

**HIGHLY CONFIDENTIAL**

126.     To provide a more visual representation of this review, for each of these states for which I have data for more than one MLS operating in them, I also provide maps of their respective coverage by zip code. What we see from these maps is that not only are zip codes largely dominated by a single MLS but that they are largely clustered and that larger overlaps occur only on the borders of areas clearly dominated by them. Note that these maps do not incorporate the number of transactions within each zip code. They simply flag by a color zip codes with certain levels of participation by each MLS.

**HIGHLY CONFIDENTIAL**

Figure 2-A: Map of Participation –  State of California[157]



---

[157] Here I present maps for California and North Carolina only. Remaining maps corresponding to other states listed in table 2 are provided in Appendix 3.

**HIGHLY CONFIDENTIAL**

Figure 2-B: Map of Participation – State of North Carolina



127.    I generally find that, in a large proportion of zip codes, a single MLS dominates. For example, in California, out of 1,711 zip codes in the MLS data for the MLSs listed, 72.8% are zip codes in which one MLS has 80% or more participation. When one considers the total number of transactions occurring in zip codes with 80% or more participation, we see that 89.7% of the transactions across all six MLSs occur in these 72.8% of zip codes. That the rate increases when computed on the basis of transactions is an indication that zip codes with lower levels of dominance by a single MLS are also zip codes that have fewer transactions, which is more common of rural areas, for example. We observe this effect (that a larger number of transactions are concentrated in some zip codes) in all states with the exception of Michigan, which is discussed further below.

128.    Overlaps in participation in zip codes could be the result of overlaps in service areas MLSs cover. For example, both BARIES MLS and CCAR MLS service the

HIGHLY CONFIDENTIAL

counties of ██████████████████████████ [158] Likewise, both MiRealSource MLS and RealComp II MLS ████████████████████████████████████ ████████████████████████████████████. [159] Overlaps can also be the result of two different counties representing different service areas sharing a zip code. Note that zip codes can be divided by county lines and that MLSs typically define their areas of service by zip codes. Likewise, other overlaps can also occur as a result of reciprocal agreements which permit agents from one MLS to list properties and access the listings of other MLSs that have signed the same agreement. For example, both Stellar and Miami MLS indicate having such agreements. [160] Notably, and as an example of the concept I discuss below, both Stellar and Miami MLS ████████████████████ ████████████████████████████

129.     Regardless of the reasons, the fact that there are small overlaps does not reflect any meaningful difference in application of the Anticompetitive Rules. Given that most MLSs are NAR MLSs (approximately 98%), and that many of the remainder nonetheless adopt the Anticompetitive Rules (as demonstrated through my analysis of the Hybrid NAR and Broker NAR Subject MLSs), the vast majority are compelled to adhere to stringent regulations established by NAR. Therefore the chances and extent of overlap

---

[158] See Appendix 1 describing each of the Subject MLSs service areas.

[159] See Appendix 1 describing each of the Subject MLSs service areas.

[160] https://rules.stellarmls.com/hc/en-us/articles/14692921258519-Article-05-19-Listing-Acceptance-from-Non-Member-REALTOR and https://www.miamirealtors.com/mls/mls-forms/statewide-reciprocal-information/

HIGHLY CONFIDENTIAL

in a Subject MLS with a MLS that did not impose Anticompetitive Rules appear minimal. The overlap between MiRealSource MLS and Realcomp II MLS ███████████ ████████████████████████████.[161]

## VII. Common Evidence Demonstrates that the Anticompetitive Rules Encouraged and Facilitated the Threat of Steering Across the Subject MLSs.

130.　　The Buyer Agent Commission Rule, Concealment Rule, Filtering Rules, and Free-Service Rules resulted in 1) the asymmetric distribution of information to MLS participants and consumers, 2) the opportunity for buyer agents to identify and select properties to show buyers based on the commissions being offered, and 3) reduced incentives on the buyer side to negotiate buyer-agent fees. The combination of all of these encouraged and facilitated steering.

131.　　"Steering" in the real estate industry refers to the practice whereby a buyer agent intentionally directs its client to a particular home based on the fact that the buyer's agent would receive a higher commission, which is wrongful conduct.[162] Even though it is wrong and a violation of fiduciary duty, some buyer's agents consider commission rates in their recommendation to clients, including ████████████████████.[163]

---

[161] Finally, I note that even for non-NAR MLSs that did not impose the Anticompetitive Rules, to the extent they exist, REALTORS operating within those MLSs were nonetheless subject to NAR's Code of Ethics, which as previously discussed contained many of the Anticompetitive Rules.

[162] *See* G. Keller Dep. Designation at *Burnett* Trial at 62:3-21 (introduced at 10/17/23 *Burnett* Tr. Vol. 1 at 181:5-9).

[163] *See* KWRI-Batton-00923050 at 3051 (03/19/21 email stating, "There are certainly agents who consider commission rates in their recommendation to clients."); Anywhere-BattonI-00030235 (noting █████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████

**HIGHLY CONFIDENTIAL**

132.     Steering and its impact on rigidity of commission rates has concerned

regulators for many years. In a 1983 report on the real estate industry by the Federal Trade

Commission, the FTC said it considered steering by cooperating brokers to be a primary

factor contributing to rigidity in commissions;[164] that MLSs facilitate steering by providing

access to relevant information on fees for all available properties to cooperating

brokers;[165] and that steering creates a disadvantage in the marketability of listings of

discount and alternative brokers aided by the gap in knowledge regarding pricing on the

buyer's side.[166] A 2007 report by the FTC and DOJ on the competition in the real estate

---

███████████████████████████████████████████; NAR_BattonI00991987 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; RMLLC-Batton_01260139 (Keller Williams University Script for working with sellers) at 0139 (reducing buyer agent offer ████████████████████████████████████████████████████████); at 60141 ████████████████████████████; Anywhere-BattonI-00031114 at 64-65 ("one of the fastest ways to increase showings is to improve the financial opportunity for the buyer's agents.").

[164] Federal Trade Commission Staff Reports, "The Residential Real Estate Brokerage Industry," Los Angeles Regional Office Staff Report: Volumes I and II and the Butters Report at p.17 ("FTC 1983 Staff Report") ("[rate] uniformity [referring to an analysis they conducted] may result in part from the knowledge that cooperating brokers may steer buyers away from listings which offer them lower splits"). *See also* fn. 546 p.185 ("[W]e hypothesize that the steering by cooperating brokers away from listings of discount brokers may be a primary contributing factor to commission rate stability.").

[165] FTC 1983 Staff Report at p.18 ("In one sense, the MLS can be viewed as passive structures which, while producing significant joint-marketing and informational benefits, link competitors in such a way that price competition and the free flow of information to consumers are both impeded. Steering of buyers away from listings which offer cooperating brokers a lower "split" and price coordination could both be facilitated. The disciplining of those who deviate from standard practices could also be made both easy and effective.").

[166] FTC 1983 Staff Report at 39-40 ("Brokers appear to steer buyers toward the house listed by traditional, full-commission broker. This tendency could be corrected for if a 'discount' broker is prepared to offer a cooperating broker a 'standard' percentage and absorb the entire reduction in commission him or herself. This, of course severely limits the amount of discount which a broker can offer and still cover operating costs[...] One result of cooperating brokers' apparent tendency to steer buyers away from the listings of discount broker is that discount brokers may be at a substantial disadvantage in marketing their listings.").

HIGHLY CONFIDENTIAL

brokerage industry makes similar points in that the asymmetry of information between consumers and brokers facilitated steering, and that attempts for brokers to discount was discouraged by the threat of steering.[167]

133.     Critically, as noted by the Department of Justice below, the existence of steering incentives incentivized high buyer broker commission offers through the MLS whether or not steering generally occurred or whether or not a particular homebuyer was subject to steering. Because the Buyer Agent Commission Rule mandated offers of commission upon listing on an MLS and made that price available to all buyer agents simultaneously with other properties, buyer agents could compare the offered commission on available properties, and sellers and seller agents knew their offer could be compared to others. With the Commission Filtering and Non-Disclosure Rules, selling agents also knew that buyers could not effectively police steering by their agents. In combination, the Anticompetitive Rules created a market where home sellers had to fear the possibility of steering and account for it in their offer of buyer agent commission. And because of the Buyer Agent Commission Rule and Restraints on Negotiation Rules, the fear of steering incentives had to be accounted for as part of the price before the property was listed, before a particular buyer hired a particular agent, and before a buyer ever saw the property.

---

[167] *See* U.S. Department of Justice FTC, Competition in the Real Estate Brokerage Industry, Apr. 2007 at 27, 68 ("[B]rokers may be deterred from discounting if cooperating brokers threaten to "concentrate their efforts" or steer buyers toward transactions for which higher commissions are available.").

**HIGHLY CONFIDENTIAL**

134.     A substantial demand for a seller's listing has and continues to come either directly or via an agent. The Buyer-Agent Commission Rule by which seller agents were obligated to present the commission being offered to buyer agents via the MLS required sellers to determine the price for buyer agents and gave buyer agents the opportunity to identify profit-maximizing listings on which to focus. The Filtering Rules then allowed agents to limit the matching inventory to profit-maximizing properties, allowing them to effectively reduce the demand and probability of a sale for properties outside of the filtered set if an industry standard rate of compensation was not offered.

135.     Thus, listing agents, ███████████████████, were aware of the incentive to steer in that they did not reduce the offered buyer's agent's commission if they wanted to ensure their listing is shown by all buyer's brokers.[168] For example,



---

[168] *See, e.g.,* KWRI-Batton-00923050 at -3051 (03/19/21 email stating, "There are certainly agents who consider commission rates in their recommendation to clients."); *See also* 04/26/21 Bash Dep. in *Sitzer* at 221:2-18, NAR_BattonI0074964 at -5020:



HIGHLY CONFIDENTIAL

████████████████████████████████████████████████████████

████████████████████████████ ██ ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████[170] Similarly, Keller

Williams's February 2009 training script for real estate agents stated, "When you reduce

the commission, you reduce the incentive for that agent to bring a buyer to your house.

If an agent has ten different houses, nine of which come with a 3% commission, one of

which comes with a 2.5% commission, which houses do you think they're going to

show?"[171]

136.　　Detecting missing homes from the available inventory matching consumer

preferences has become more viable through the use of the internet and the presence of

aggregators like Zillow or Redfin. However, during the class period, the Concealment Rule

provided a safe harbor for agents choosing to steer and thus did not remove the threat

of steering faced by sellers and seller agents. It did so by masking the potential bias in

candidate selection observable to buyers, thus preventing buyers from policing such

---

[169] Realogy-Sitzer-00848457 (emphasis added).

[170] RMLLC-WDMO-00334084 (emphasis added).

[171] *See* KWRI_00574778 at 574949 (Feb. 2009 KWU Scripts Catalog: Vol. 2: Working with Sellers). The current Keller Williams vice president responsible for training thousands of Keller Williams agents disavows these types of statements in training scripts. *See* 09/28/23 Davis Dep. in *Burnett* at 89:5-90:5, 91:21-92:22.

HIGHLY CONFIDENTIAL

behavior. I discuss additional examples of steering when discussing discount brokers in Section IX.

### A. Government Regulators and Published Research Provides Empirical Evidence of the Impact of Steering Incentives.

137.     My opinions here and in Section IV regarding the role the Anticompetitive Rules played in facilitating steering and anticompetitive behavior are supported by those of other academics and regulators.

138.     In its December 10, 2020 Competitive Impact Statement in *United States v. NAR*, the DOJ concluded:

> "Because of the Commission-Concealment Rules, buyer brokers may steer potential home buyers away from properties with low commission offers by filtering out, failing to show, or denigrating homes listed for sale that offer lower commissions than other properties in the area. When potential home buyers can't see commission offers, they can't detect or resist this type of steering. [...] Fear of having potential home buyers steered away from a property is a strong deterrent to sellers who would otherwise offer lower buyer broker commissions, which further contributes to higher prices for buyer broker services." [...] NAR's Commission-Filter Rules and Practices, which have been widely adopted by NAR-affiliated MLSs, are anticompetitive because they facilitate steering by helping

HIGHLY CONFIDENTIAL

buyer brokers conceal from potential home buyers any property listings offering lower buyer broker commissions."[172]

139.    The DOJ and FTC in their April 2007 Report, "Competition in the Real Estate Brokerage Industry," described:

> "[C]onsumers may be unaware of the possibility that their brokers may have conflicting interests that lead them not to provide the consumer with the best possible advice. [...] [B]rokers have certain incentives to 'steer' consumers toward those homes that offer the highest cooperating broker commission payment and away from homes listed by brokers known to charge home sellers discounted commission rates. In this manner, brokers can take advantage of their superior knowledge of market conditions by steering clients away from home listings that otherwise match the criteria identified by the consumers, but provide lower financial gains for the broker than other homes."[173]

140.    In their 2019 paper, "Competition in the Real Estate Brokerage Industry: A Critical Review," Barwick and Wong stated:

> "When a listing agent uploads property information to MLS on behalf of a seller, he is required to specify the commission split that is offered to any buying agent who produces a buyer. While buying agents observe commissions offered on MLS, such information is hidden from potential buyers or non-real-estate professionals. [...] All else being equal, buyers' agents have an incentive to prioritize properties that offer high commissions and steer buyers away from low-commission listings. As a result, listings that offer low commissions would suffer from poor sales performances. Knowing this, sellers are less likely to offer low commission rates. In this way, the threat of steering offsets the competitive force of price competition, limiting the growth of discount brokerages that offer low commission rates."[174]

---

[172] *See United States v. NAR* Competitive Impact Statement, Dec. 10, 2020 at 7, 9.

[173] U.S. Department of Justice FTC, Competition in the Real Estate Brokerage Industry, Apr. 2007 p.27 (internal quotes omitted).

[174] *See* Barwick-Wong (2019) at 11.

HIGHLY CONFIDENTIAL

141.      Recently published studies provide the first larger scale studies to provide empirical evidence of steering. "Et Tu, Agent? Commission-Based Steering in Residential Real Estate" by Jordan Barry, Will Fried, and John William Hatfield is one example. Using nationwide data from Redfin search views and subsequent sales activity, they conclude:

> "[W]e find that low-commission listings receive fewer page views. This effect is most pronounced for listings with the lowest commissions, but even listings with commissions that are slightly below the going rate receive significantly fewer page views. We also find evidence that this steering has meaningful economic consequences. Homes with lower buyer agent commissions take longer to sell and are less likely to sell at all. Again, these effects are the largest for the listings with the lowest commissions, which take 33% longer to sell nationwide. In a typical geographic market, our best estimate is that these lowest-commission properties face a 75% greater risk of not selling at all. Here too, even commissions that are slightly below the going rate are associated with longer sale times and higher risk of a failed sale."[175]

142.      The Barry et al. study provides data on the percentage of buyer agent commissions below 2%. As pointed out in an Exhibit from their papers, none of the markets shown have more than 3.5% of buyer commissions below 2%. This suggests that extremely few brokerage firms compete on the basis of fee cutting.[176] A copy of the chart provided in the study and referred to here is provided in Chart 2 below:

---

[175] Jordan M. Barry et al., *Et Tu Agent? Commission-Based Steering in Residential Real Estate*, 110 Iowa L. Rev. 1473, 1473-74 (2025).

[176] *Id.* at 1495.

**HIGHLY CONFIDENTIAL**

Chart 2: Percentage of Sellers Offering a Buyer Agent Commission Below 2%



143.    Another study that provides similar conclusions is "Conflicts of Interest and Steering in Residential Brokerage" by Panle Barwick, Parag Pathak, and Maisy Wong.[177] This study covers 653,475 residential listings from 1998-2011 in Eastern Massachusetts and concludes that:

> "[P]roperties listed with lower commissions are 5% less likely to sell and take 12% longer to sell. These adverse outcomes reflect decreased willingness of buyers' agents to intermediate low commission properties (steering), rather than heterogeneous seller preferences or reduced effort of listing agents."[178]

---

[177] Barwick, Panle Jia et al. (2017). Conflicts of interest and steering in residential brokerage. *American Economic Journal: Applied Economics*, *9*(3), 191-222.

[178] *Id.* at 191.

HIGHLY CONFIDENTIAL

144.     Of course, what is unobservable in the study are homes that did not sell at all and needed to be relisted at customary commission rates.

145.     Empirical analysis has not only demonstrated that properties with lower commission rates are less likely to sell but also that the level of commissions offered impacts performance in the market. In "Competition in the Real Estate Brokerage Industry: A Critical Review," expanding on their 2017 study on the same dataset, Barwick and Wong concluded among other things that:

> "[P]roperties more susceptible to the threat of steering suffer worse consequences. For example, sale outcomes are best for listings that offer more than 2.5 percent, compared to those that offer exactly 2.5 percent, while those that offer less than 2.5 percent have the worst outcomes."[179]

### B. The Subject MLSs Demonstrate Commission Clustering Behavior Consistent with Steering Incentives.

146.     To assess whether the Subject MLSs exhibit a pattern of commissions consistent with what one would expect based on the steering incentives I have described above, I analyzed the Subject MLSs in the MLS Data and determined the percentage of times an offer of buyer-agent commission was below 2%.[180] As demonstrated in Chart 3 below, generally, 98% or more of transactions on each MLS had buyer-agent commissions greater than or equal to 2%.[181]

---

[179] Barwick, P. J., & Wong, M. (2019). Competition in the real estate brokerage industry: A critical review. *The Brookings Institution Publication*, 1-38.

[180] Other empirical work examining MLS data has also found that buyer-broker commissions below 2% are very rare. For example see Jordan M. Barry et al., *Et Tu Agent? Commission-Based Steering in Residential Real Estate*, 110 Iowa L. Rev. 1473, 1494-5 (2025).

[181] The single exception to this conclusion was MARIS MLS ████████████
████████████████████████████

**HIGHLY CONFIDENTIAL**

Chart 3: Percentage of Buyer-Agent Commissions Below 2%



147.     To further observe whether the threat of steering influenced buyer-agent commission rates, I examined each of the Subject MLS data for closed transactions and determined the extent to which offered commissions were narrowly clustered around specific amounts. Note that this data spans a period of 7 years (starting on January 1, 2015 and ending on December 31, 2021). Table 3 below demonstrates my results, and supports the conclusion that offered buyer-agent commissions were consistent with the threat of steering incentives. The vast majority of transactions have commissions that are exactly equal to one of the three most common commission rates. That offered commissions clustered so strongly around the 3 most common rates, and that the

**HIGHLY CONFIDENTIAL**

majority of buyer broker compensation offers ended up at exactly a single number, is

strong evidence that steering incentives influenced buyer agent commission offers.

Table 3: Buyer Broker Commissions Clustered at One to Three Fixed Commission Rates

| MLS | Relative Frequencies of Common Buyer Broker Commissions | | | |
|---|---|---|---|---|
| | Most Common Rate | 2nd Most Common Rate | 3rd Most Common Rate | 3 Most Common Rates |
| BAREIS | 80.08% | 13.57% | 2.69% | 96.35% |
| BEACHESMLS | 68.19% | 26.63% | 1.36% | 96.19% |
| BRIDGEMLS | 84.54% | 10.42% | 2.49% | 97.45% |
| BRIGHTMLS | 50.38% | 41.03% | 1.87% | 93.27% |
| CDAR | 53.60% | 41.38% | 2.26% | 97.25% |
| CHTRIDENT | 71.22% | 24.16% | 1.38% | 96.76% |
| CLAW | 84.55% | 7.29% | 4.99% | 96.83% |
| CONTRACOSTA | 88.99% | 3.96% | 3.38% | 96.32% |
| CRMLS | 60.53% | 18.49% | 14.24% | 93.26% |
| DMAAR MLS | 63.22% | 31.54% | 3.60% | 98.36% |
| FGC | 74.04% | 19.45% | 2.22% | 95.71% |
| FLKEYS | 79.89% | 14.76% | 2.59% | 97.24% |
| FRESNO | 55.02% | 33.33% | 6.15% | 94.50% |
| GREENBRIER | 65.36% | 20.79% | 6.50% | 92.65% |
| MAINELISTINGS | 35.86% | 23.59% | 19.40% | 78.86% |
| MARISMLS | 52.37% | 17.49% | 10.49% | 80.35% |
| MIAMIMLS | 70.57% | 21.55% | 3.92% | 96.04% |
| MIREALSOURCE | 81.74% | 5.65% | 5.11% | 92.50% |
| MLSPIN | 50.32% | 41.11% | 3.82% | 95.26% |
| MRED | 78.01% | 13.95% | 2.36% | 94.32% |
| OREGON | 79.15% | 15.60% | 1.69% | 96.44% |
| REALCOMPII | 86.24% | 6.88% | 0.87% | 93.99% |
| SCKANSAS | 94.00% | 2.30% | 0.60% | 96.90% |
| SMARTMLS | 79.59% | 11.28% | 3.95% | 94.82% |
| STELLAR | 58.31% | 32.69% | 3.51% | 94.51% |
| SWMLS | 92.97% | 3.93% | 0.81% | 97.71% |
| TRIAD | 77.15% | 18.30% | 0.89% | 96.34% |

Notes: The data in the table above includes all sold listings with non-missing buyer agent commissions in the MLS data where the sold date was on or after January 1, 2015 and on or before December 31, 2021.

148.    From 2015 through 2021, the average commissions across MLSs are also

fairly consistent. As shown in Table 4 below, the average buyer-agent commissions for

**HIGHLY CONFIDENTIAL**

approximately three-quarters of the MLSs examined were greater than 2.5%. The remaining MLSs all had average buyer-agent commissions greater than 2.25%.

Table 4: Average Buyer Agent Commissions from 2015 through 2021

| MLS | Average Buyer Agent Commission |
|---|---|
| BAREIS | 2.53% |
| BEACHESMLS | 2.83% |
| BRIDGEMLS | 2.54% |
| BRIGHTMLS | 2.69% |
| CDAR | 2.76% |
| CHTRIDENT | 2.84% |
| CLAW | 2.48% |
| CONTRACOSTA | 2.49% |
| CRMLS | 2.46% |
| DMAAR MLS | 3.12% |
| FGC | 2.84% |
| FLKEYS | 2.86% |
| FRESNO | 2.63% |
| GREENBRIER | 2.82% |
| MAINELISTINGS | 2.43% |
| MARISMLS | 2.43% |
| MIAMIMLS | 2.83% |
| MIREALSOURCE | 2.93% |
| MLSPIN | 2.29% |
| MRED | 2.55% |
| OREGON | 2.56% |
| REALCOMPII | 2.96% |
| SCKANSAS | 2.95% |
| SMARTMLS | 2.52% |
| STELLAR | 2.78% |
| SWMLS | 2.96% |
| TRIAD | 2.89% |

Notes: The data in the table above includes all sold listings with non-missing buyer agent commissions in the MLS data where the sold date was on or after January 1, 2015 and on or before December 31, 2021 and the commission was between 0% and 5%.

HIGHLY CONFIDENTIAL

149.     My analyses in this section, both in general and with respect to the Subject MLSs, are based on evidence common to the Class and will apply equally to the Class. My assessments and methodology herein can be applied equally to each Subject MLS not identified above based on data currently in possession of Plaintiffs' counsel.

## VIII.   Common Evidence Demonstrates That Commissions Were Disconnected from Fundamental Economic Characteristics.

150.     Buyer Agent Commission rates in the residential real estate industry have remained fairly uniform over decades.[182] While percentage rates have experienced a very slight decline over time, as I discuss in more detail, real (adjusted for inflation) commission fees have increased significantly as a result of the increase in home prices.

151.     The increase in price in buyer agent services was inconsistent with core principles of economics. It was disconnected from costs, which decreased through the Class period as a result of efficiencies brought by the use of the internet and new technology. It was disconnected from economic principles that govern compensation in the professional services industry, where experience, services provided, and the amount of hours expended is correlated with higher prices.

---

[182] *See, e.g.*, U.S. Department of Justice FTC, Competition in the Real Estate Brokerage Industry, Apr. 2007 at p.39 reporting summarized commission rates from REAL Trends 500©, showing that average commission rate in 1991 was 6.10% and has declined to 5.02% in 2005. *See also* Barwick and Wong (2019) Figure 1, reporting commission on buyers over time in the city of Boston consistently at around 2.5%; and Section VII-B in the report discussing steering over time.

HIGHLY CONFIDENTIAL

### A. Common Evidence Demonstrates That Commission Fees Have Substantially Exceeded Inflation.

152.    As discussed and demonstrated in previous sections in this report, most buyer agent commissions are a fixed percentage of the sales price. Consequently, these commissions tend to rise at the same rate as home prices.

153.    According to the Federal Housing Finance Agency (FHFA), from 2000 to 2024, national home prices have increased by 207%.[183] This means that home buyers in 2024 paid nearly three times as much as they did in 2000 for buyer agent commissions. In contrast, the headline Consumer Price Index (CPI) only increased by 88%, while the CPI for services rose by 114% during the same period.[184] In other words, services provided by real estate agents are becoming increasingly expensive compared to other goods and services in this economy.

154.    In Table 5 below, I demonstrate that the increase in home prices, thus in commissions, has outpaced inflation in each of the areas selected to represent each MLS. For each MLS, I used the Consumer Price Index (CPI) for the appropriate Census Region to track inflation and the FHFA all-transactions home price index (HPI) largest MSA within the MLS's service area.[185]

---

[183] U.S. Federal Housing Finance Agency, All-Transactions House Price Index for the United States [USSTHPI], retrieved from FRED, Federal Reserve Bank of St. Louis.

[184] U.S. Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis.

[185] I did not conduct this analysis for two FL Keys MLS and Greenbriar MLS because of the lack of MSA in their service area. I could conduct this analysis using broader home price indices for MLS distant from MSAs.

**HIGHLY CONFIDENTIAL**

155.     The first three columns describe growth in prices (home prices, consumer

prices, and the ratio of the first to the second) for the time period from 1999 to 2021. The

last three columns describe the same measures but for the time period from 2015 to 2021.

**HIGHLY CONFIDENTIAL**

Table 5: Growth in Home Prices has Outpaced Inflation[186]

| MLS | 1999-2021 | | | 2015-2021 | | |
|---|---|---|---|---|---|---|
| | MSA HPI Growth | Regional CPI Growth | HPI Growth to CPI Growth | MSA HPI Growth | Regional CPI Growth | HPI to CPI Growth |
| BAREIS | 193% | 70% | 2.75x | 41% | 18% | 2.23x |
| BEACHESMLS | 211% | 61% | 3.44x | 82% | 14% | 6.05x |
| BRIDGEMLS | 211% | 61% | 3.44x | 22% | 14% | 1.62x |
| BRIGHTMLS | 190% | 63% | 3.00x | 44% | 12% | 3.51x |
| CANOPY | 127% | 61% | 2.07x | 63% | 14% | 4.64x |
| CDAR | 228% | 70% | 3.25x | 59% | 18% | 3.20x |
| CHTRIDENT | 194% | 61% | 3.16x | 58% | 14% | 4.27x |
| CLAW | 259% | 61% | 4.23x | 48% | 14% | 3.57x |
| CONTRACOSTA | 211% | 61% | 3.44x | 22% | 14% | 1.62x |
| CRMLS | 259% | 61% | 4.23x | 48% | 14% | 3.57x |
| DMAAR MLS | 87% | 55% | 1.58x | 33% | 13% | 2.60x |
| DOORIFY | 121% | 61% | 1.97x | 55% | 14% | 4.06x |
| FGC | 189% | 61% | 3.08x | 65% | 14% | 4.77x |
| FRESNO | 182% | 70% | 2.59x | 55% | 18% | 3.03x |
| GLVAR | 150% | 70% | 2.14x | 77% | 18% | 4.20x |
| HEARTLAND | 113% | 55% | 2.05x | 54% | 13% | 4.36x |
| MAINELISTINGS | 179% | 63% | 2.82x | 53% | 12% | 4.29x |
| MARISMLS | 94% | 55% | 1.70x | 35% | 13% | 2.79x |
| METROMLS | 96% | 55% | 1.74x | 38% | 13% | 3.06x |
| MIAMIMLS | 252% | 61% | 4.11x | 61% | 14% | 4.50x |
| MIREALSOURCE | 50% | 55% | 0.90x | 50% | 13% | 4.03x |
| MLSPIN | 170% | 63% | 2.69x | 44% | 12% | 3.52x |
| MRED | 75% | 55% | 1.37x | 26% | 13% | 2.06x |
| NORTHSTAR | 125% | 55% | 2.27x | 44% | 13% | 3.51x |
| ONEKEY | 164% | 63% | 2.59x | 32% | 12% | 2.60x |
| ORGEON | 176% | 70% | 2.51x | 61% | 18% | 3.31x |
| REALCOMPII | 50% | 55% | 0.90x | 50% | 13% | 4.03x |
| RMLS | 195% | 70% | 2.77x | 60% | 18% | 3.26x |
| SCKANSAS | 88% | 55% | 1.59x | 38% | 13% | 3.03x |
| SDARMLS | 237% | 70% | 3.38x | 50% | 18% | 2.76x |
| SMARTMLS | 86% | 63% | 1.36x | 22% | 12% | 1.76x |
| STELLAR | 177% | 61% | 2.89x | 67% | 14% | 4.97x |
| SWMLS | 103% | 70% | 1.47x | 41% | 18% | 2.25x |
| TRIAD | 73% | 61% | 1.20x | 42% | 14% | 3.13x |
| WASATCH | 195% | 70% | 2.77x | 79% | 18% | 4.32x |

156.    For more than 90% of the MLSs examined, the growth rate of home prices

was at least twice as much as the growth rate in consumer prices between 2015-2021. In

---

[186] This table does not use the MLS Data.

HIGHLY CONFIDENTIAL

fact, between 2015 and 2021, more than a third of the MLSs examined above saw home prices grow at rates more than 4 times as large as the growth rate in consumer prices. Furthermore, I provide a chart plotting both growth in the CPI and HPI price indices for each MLS between 1999 and 2021 by MLS in Appendix 4.

157.     In drawing conclusions in the paragraph above, I did consider that average commission rates may have decreased during the same time period. To rule this out as an alternative explanation, I used the average buyer-agent commissions calculated from the MLS data in 2015 and 2021 to arrive at an estimated growth in buyer agent commissions when considering the increase in home prices. For each MLS I had data for, I found that commissions outpaced inflation for the period 2015-2021. See Table 6 below for MLS-specific estimates. For any Subject MLS not analyzed below, I can apply the same methodology to generate common evidence for that MLS based on data in Plaintiffs' possession.

158.     This analysis demonstrates that services provided by real estate agents have become increasingly expensive compared to other goods and services in this economy.

HIGHLY CONFIDENTIAL

Table 6: Growth in Commissions has Outpaced Inflation[187]

| MLS | Average Buyer Agent Commission 2015 | Average Buyer Agent Commission 2021 | Change in Average Commissions 2015-2021 | (HPI x Average Commission Rate) Growth 2015-2021 | (HPI x Average Commission Rate) to CPI Growth 2015-2021 |
|---|---|---|---|---|---|
| BAREIS | 2.58% | 2.49% | -0.09% | 36% | 1.96x |
| BEACHESMLS | 2.87% | 2.73% | -0.14% | 73% | 5.38x |
| BRIDGEMLS | 2.57% | 2.50% | -0.07% | 18% | 1.36x |
| BRIGHTMLS | 2.78% | 2.56% | -0.21% | 33% | 2.63x |
| CDAR | 2.85% | 2.60% | -0.24% | 45% | 2.47x |
| CHTRIDENT | 2.91% | 2.70% | -0.21% | 46% | 3.43x |
| CLAW | 2.51% | 2.45% | -0.06% | 45% | 3.32x |
| CONTRACOSTA | 2.53% | 2.47% | -0.06% | 19% | 1.40x |
| CRMLS | 2.55% | 2.30% | -0.25% | 34% | 2.48x |
| FGC | 2.90% | 2.72% | -0.17% | 55% | 4.05x |
| FRESNO | 2.73% | 2.53% | -0.20% | 44% | 2.40x |
| MAINELISTINGS | 2.57% | 2.32% | -0.24% | 39% | 3.12x |
| MARISMLS | 2.58% | 2.35% | -0.23% | 23% | 1.84x |
| MIAMIMLS | 2.85% | 2.77% | -0.08% | 56% | 4.17x |
| MIREALSOURCE | 2.94% | 2.89% | -0.04% | 48% | 3.86x |
| MLSPIN | 2.34% | 2.22% | -0.12% | 36% | 2.92x |
| MRED | 2.60% | 2.51% | -0.09% | 21% | 1.72x |
| OREGON | 2.63% | 2.50% | -0.13% | 52% | 2.87x |
| REALCOMPII | 2.99% | 2.92% | -0.07% | 47% | 3.75x |
| SCKANSAS | 2.96% | 2.95% | 0.00% | 38% | 3.02x |
| SMARTMLS | 2.55% | 2.46% | -0.09% | 18% | 1.42x |
| STELLAR | 2.89% | 2.62% | -0.27% | 52% | 3.81x |
| SWMLS | 2.97% | 2.95% | -0.02% | 40% | 2.20x |
| TRIAD | 2.93% | 2.80% | -0.13% | 36% | 2.67x |

Notes: The average commissions were calculated from all sold MLS listings for the given year with non-missing buyer agent commissions in the MLS data where the commission was between 0% and 5%.

## B. Common Evidence Demonstrates that Buyer's Agent Fees Did Not Vary with Buyer Agent Experience, the Services Provided to Homebuyers, or the Amount of Hours Expended by the Buyer's Agent.

159. In other service industries, for example, accounting or law, consumers will pay more for experienced providers and avoid less experienced providers.[188] But in the real estate industry, a less experienced agent often gets the same pay for assisting a buyer

---

[187] The analysis presented in this table utilizes average buyer agent commission information from the MLS Data.

[188] "Prestige, Promotion, and Pay," Harvard Law School Forum on Corporate Governance, April 2024: https://corpgov.law.harvard.edu/2024/04/01/prestige-promotion-and-pay ("[I]n professional services firms, being promoted to managing director or partner usually results in an increase in both pay and prestige. There are good reasons why prestigious jobs pay more. After all, we expect those promoted to top positions to be highly talented, and top talent is scarce.").

HIGHLY CONFIDENTIAL

on purchasing a particular home than a more experienced agent assisting a buyer to purchase that same home.

160.    In 1977, Bruce M. Owens published "Kickbacks, Specialization, Price Fixing, and Efficiency in Residential Real Estate Markets" in the Stanford Law Review.[189] He stated that agent fees should vary with the experience of the agent, but they do not, and that this was an indication of price fixing. The system described by Bruce Owen in 1977 continues today.

161.    Gilbukh and Goldsmith-Pinkham (2019) uses data from 10.4 million listings in 60 different MLSs over the periods 2001-2014 to show that seller agents' experience is an important determinant of client outcomes. In their study they find that inexperienced agents have a large market share in those MLSs and recognize that the compensation to real estate agents does not appear to vary across agents.[190] The chart below is a copy of Figure 1 in Gilbukh and Goldsmith-Pinkham (2109) showing the distribution of agent experience, equal and listing-weighted.[191]

---

[189] Owen, B. M. (1977). Kickbacks, Specialization, Price Fixing, and Efficiency in Residential Real Estate Markets. Stanford Law Review, 931-967.

[190] Gilbukh, Sonia, and Goldsmith-Pinkham, Paul, "Heterogeneous Real Estate Agents and the Housing Cycle," Oct. 14, 2019.

[191] *See* Gibukh and Goldsmith-Pinkham (2019), figure 1, at 37 ("This figure plots the distribution of agent experience in two ways. Panel A plots the distribution of experience at the agent-year-level. Panel B plots the same distribution, but weights agents by the number of listings that they participate on that year. In both panels, agents with experience greater than 50 are pooled with agents who have experience of 50. Agent experience is defined as the number of clients an agent worked with in the previous calendar year.").

**HIGHLY CONFIDENTIAL**

Chart 4: Distribution of Agent Experience in Gilbukh and Goldsmith-Pinkham (2019)



162.     Barwick and Wong (2019), perform an empirical analysis on 650,000 listings in eastern Massachusetts between 1998 and 2011, and conclude among other things that "agents who have substantial experience appear to be compensated with similar commission rates as those with little experience."[192]

163.     In their data, they find that "the average agent has four years of experience as defined relative to the year when an agent obtained his/her license, with a wide inter-quartile range where the 25[th] percentile is zero and the 75[th] percentile is seven years."[193] This means that 25% of the agents in the data have zero years of experience, 50% of the agents in the data have between zero and 7 years of experience, and 25% of the agents have more than 7 years of experience.

---

[192] Barwick & Wong (2019) at 9.

[193] *Id.*

HIGHLY CONFIDENTIAL

164.     Further, they find that experience as measured by number of transactions per year "is also very heterogeneous, with the average agent having 2.6 transactions per year, the median agent having only one, and a standard deviation of five transactions."[194] This means that half of the agents in the data have less than 1 transaction a year and the other half more than 1 and that the distribution is skewed to the right, meaning that there are agents with many more transactions than 1 per year.

165.     The ability for inexperienced agents to capture market share regardless of the fact they charge the same price as experienced agents is not surprising when considering the Anticompetitive Rules.

166.     As I have previously discussed, on the buyer's side, given that buyers most often believe (as a result of the Free-Service Rule) that the seller pays the fee for their agent, taken from a standard fee, they are less likely to shop around for agent services. For example, in 2020, NAR found that 73% of buyers interviewed just a single agent before hiring brokerage services.[195]

167.     Further, given the volume of agents in the industry at any given time, it is highly likely that consumers know friends and family who are agents or know friends and family who know an agent and may be even happy to steer income their way. Note that NAR finds that 40% of buyers described finding their agent via a "[referral] by (or is) a

---

[194] *Id*.

[195] NAR 2020 Profile of Home Buyers and Sellers Exhibit 4-15 at p.81, NAR_BattonI00008176 at 8256.

friend, neighbor, or relative."[196] Similarly, surveys taken in Ohio in the early 2000s for the Ohio State Real Estate Center found that most sellers and buyers selected agents who they already knew; that is, over half were identified as friends, and one-fourth were identified as relatives.[197]

168.     On the seller side, a similar pattern arises.[198] Some sellers may believe that all agents charge the same rate and that those rates are non-negotiable.[199]

169.     Testimony from the Defendants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



170.     Mr. Rodney Gansho, Director of Engagement at NAR, testified as follows:



[200]

---

[196] NAR 2020 Profile of Home Buyers and Sellers Exhibit 4-13 at p.80, NAR_BattonI00008176 at 8255.

[197] A survey presented at the INMAN conference in San Diego in 2025 suggested that 60% of buyers and sellers were either family or a friend of the agent they utilized.

[198] *See* NAR 2020 Profile of Home Buyers and Sellers at pp.129–130 (NAR_BattonI00008176 at -8304-05), showing that 41% of sellers described they found their agent via a "[referral] by (or is) a friend, neighbor, or relative." And that 77% of sellers interviewed by NAR in 2020, stated that they interviewed a single agent before hiring brokerage services.

[199] Barwick and Wong (2019) at 17.

[200] Deposition of Rodney Gansho, dated Jan. 5, 2022 at 84: 7-13. *See also* 10/08/21 Talbot Dep. in *Burnett/Moehrl* at 136:10-16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**HIGHLY CONFIDENTIAL**

171.     In addition, one would expect that the level of a buyer's agent compensation would typically increase or decrease based on the level of services to be provided or the amount of hours and costs expended to provide the service. But under the Buyer-Agent Commission Rule, neither was true.[201] When asked ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████ [202]

### C. Efficiency has increased in the real estate market, yet costs of services to the buyer have not decreased comparably.

172.     The level of service offered by real estate agents has evolved over time as a result of more efficient systems and processes for matchmaking between buyers and sellers, yet commission rates have remained relatively uniform (See Section VII-B) and commission fees have increased dramatically (See Section VIII-A).

173.     Owens (1977) described that, before the arrival of the MLSs, housing market information was not readily available. Therefore, brokers competed with one another on the basis of harnessing housing market information, and those that worked harder had access to more and better housing market information. He pointed out that with the MLS, however, all brokers had access to similar information, which eliminated a considerable

---

[201] Deposition of Rodney Gansho, dated Jan. 5, 2022 at 84:18–85:4 ██████████████

███████████████████████████████████████████████

█████████████████████████ .

[202] Deposition of Rodney Gansho, dated Jan. 5, 2022 at 83:2-14. ████████████

█████████████████████████████████████████████████

████████████████████████████████ .

**HIGHLY CONFIDENTIAL**

amount of quality-of-service competition in the industry.[203] This also reduced the amount of time and effort put into this portion of the brokerage industry services.

174.    In 1983, the FTC described that:[204]

> "An obvious but important fact about real estate brokerage is that the demand for it derives from the demand for and supply of housing. Buyers seek information about the available housing stock and sellers about the demand for housing in order to make informed decisions. Brokers develop **expertise in the acquisition, processing, and transmission of such information**, and they therefore **perform these tasks more easily and more efficiently than buyers and sellers can for themselves**."

175.    In the same way the competitive advantage of collecting information (pointed out by Owens) dissipated with cooperative marketing via the MLS, the competitive advantage brought by brokers expertise in acquiring, processing, and transmitting data described by the FTC has been significantly reduced as a result of efficiencies brought by the use of the internet and new technologies. Technology and the internet have resulted in significant changes to the way matchmaking, as well as document delivery, signing, and transaction management, takes place in the industry. This reduces the cost of services agents and brokers provide to consumers.

176.    From 1973 through 1977 and again from 1980 through the mid-1980s, I held a real estate license and was required to join the local MLS and the local, state, and national chapters of NAR by the firm holding the license. Various REALTOR®-sponsored

---

[203] Owens, B. "Kickbacks, Specialization, Price Fixing, and Efficiency in Residential Real Estate Markets," Stanford Law Review, Vol. 29, No. 5 (May 1977), 931–67 at 947–48 (internal quotes omitted).

[204] FTC 1983 Staff Report at 26 (emphasis added).

HIGHLY CONFIDENTIAL

MLSs from 1885 through about 1995 produced a printed red book every week with a single photo of all listings organized by the neighborhood, a short list of data about the property, and a single paragraph of description. Pink sheets were also produced to highlight new listings. The typical listing would be advertised in local newspapers and with a lawn sign. Sometimes, a listing was featured in a magazine or brochure. Most buyers would work with an agent who had access to the MLS and also the pre-show tours that some agents provided. Selling a property without access to the MLS was very difficult.

177.    Since buyers were dependent on agents for access to the MLS, the typical way a buyer would learn what was available was by getting into a car driven by an agent who would arrange for some home showings. This would allow the agent to learn the buyer's filters (preferences) and then check for homes that might come on the market fitting these preferences. Buying a home could require a significant amount of time driving around and visiting open houses. Most buyers would look at more than ten homes, and some would look at many more.

178.    Around 1990, various MLSs became digital and, at first, only accessible to licensed member agents. It was not until 1995 or after, when private MLS-type systems proliferated, that the REALTORS® opened up to the public as REALTOR.com, and generally, they were only localized markets not connected on a national platform. From

HIGHLY CONFIDENTIAL

this point on, the use of the internet in the home search process grew exponentially, going from 2% of buyers using the internet in the search process in 1995 to 41% in 2001.[205]

179.     In 2001, a strategic analysis conducted by NAR recognized the impact of the internet on the industry and outlined the likely effects of the internet and new technologies facilitated by it. Among other things, NAR identified that: [206]

- Without a REALTOR® buyers can select a home on the internet, and that in the future buyers will do much of the search on their own.

- Sellers can post a notice on the internet and reach millions of potential buyers.

- Technology is being used to accomplish the same tasks more efficiently.

180.     From 2001 to 2020, the proportion of buyers that found the home they purchased via the internet increased from 8% to 51%.[207] During the same time period, the proportion of buyers who found their home via a real estate agent decreased from to 48% to 28%.[208] The percentage of buyers who use the internet in their home search process quickly climbed from 41% in 2001 to more than 80% by 2006 and reaching over 90% in years 2012 and after.[209] Further, according to NAR, as of 2020, only 51% of buyers

---

[205] NAR 2020 Profile of Home Buyers and Sellers Exhibit 3-11 Buyer Use of Internet in Home Search Process, 1995-2020 at 64, NAR_BattonI00008176 at 8329.

[206] National Association of Realtors® Leadership Team/Strategic Thinkers Group Meeting, Feb. 07 – 08, 2001 Strategic Analysis, NAR_BattonI0160256 - NAR_BattonI0160259 (emphasis added).

[207] NAR 2020 Profile of Home Buyers and Sellers Exhibit 3-9 Where Buyer Found the Home They Purchased, 2001-2020 at 63, NAR_BattonI00008176 at -8238.

[208] *Id.*

[209] NAR 2020 Profile of Home Buyers and Sellers Exhibit 3-11 Buyer Use of Internet in Home Search Process, 1995-2020 at 64, NAR_BattonI00008176 at -8239.

HIGHLY CONFIDENTIAL

considered what they wanted most from their real estate agent was to help them find the right home to purchase.[210] And 43 percent of recent buyers (2020) stated that the first step they took in the home buying process was to look for properties online compared to 18% whose first step was to contact an agent.[211]

181.　　In large part this evolution has been influenced by the proliferation of portals or aggregators during the 2000s. Aggregators gather data from MLSs and other data sources to present real-time listing information along with other relevant data points in a user-friendly format for the vast majority of homes for sale in the U.S.[212] These include web portals like Zillow and Redfin which I discuss in more detail in Section IX. These portals attract a significant number of users. For example, the 2014-2015 D.A.N.G.E.R. Report noted that "[t]he leading portal's [Zillow] [...] online traffic garners between 30 and 50 percent of the eyeballs browsing for houses."[213] By 2019, Zillow described reaching eight billion visits to their mobile applications.[214]

182.　　What these statistics show is that the need for brokers to aggregate and present data, and for agents to conduct detailed searches and present those to their

---

[210] NAR 2020 Profile of Home Buyers and Sellers Exhibit 4-10 at 78, NAR_BattonI00008176 at -8253.

[211] NAR 2020 Profile of Home Buyers and Sellers at 7, NAR_BattonI00008176 at -8182.

[212] *See* Zillow Group Inc., 2019 Form 10-K (describing, "At the core of Zillow is our inimitable, living database of more than 110 million U.S. homes and our differentiated content ....").

[213] D.A.N.G.E.R. Report, NARSITZER0000315626 at 62.

[214] Zillow Group Inc., 2019 Form 10-K.

HIGHLY CONFIDENTIAL

clients, has become less relevant. Therefore, the level of service real estate agents and value both brokers and agents bring to consumers has reduced over time.

183.     In contrast to the single photo provided in days when newspapers were the primary medium for public disclosure of homes for sale, today a typical listing has over four dozen photos, often a video tour, Google Street images to see the surrounding neighborhood, information on past sales prices, sales offerings, buyer viewing activity, disclosure on crime rates, walkability, school quality, climate-related risks and more. None of this additional information was furnished by services provided by the buyer agent. This has reduced the need for physical inspections and allowed for more efficient buyer search utilizing many buyer-inserted search filters.[215]

184.     Consistent with this conclusion, in 2022 a study by NAR stated that in 2021 buyers looked at an average of eight homes in person, the "lowest number recorded" since NAR began collecting data, and that it took only eight weeks on average for buyers to decide on which home to buy compared to twelve weeks in 2009. In that same study, NAR stated that "among the eight homes viewed by buyers – three were viewed online through virtual tours, virtual video tours, or virtual open houses."[216] Thus, technology has

---

[215] *See* Barwick and Wong (2019) at 25 ("[d]igital platforms exhibit massive economies of scale and scope due to low marginal costs and the non-rivalry of data. This can dramatically reduce search costs and lead to faster and better matches between buyers and sellers.").

[216] *Home Buyers Narrow Home Search With Technology*, NAR (Jan 18. 2022), https://www.nar.realtor/blogs/economists-outlook/home-buyers-narrow-home-search-with-technology (last accessed Sept. 22, 2025).

**HIGHLY CONFIDENTIAL**

not only reduced the role of agents in identifying and marketing houses for sale but also reduced buyer's agent's role in showing homes to buyers.

185.    The efficiency gains and quality in the residential real estate market via the use of the internet and access to data via the aggregators can be observed through market indicators such as days on market and expired listings.

186.    While it is an imperfect statistical indicator of market efficiency in that interest rates and recessions also affect it, time on the market has been coming down in general for many years. Chart 5  below shows days on market at the national level since 2012, as published by Lawrence Yun (Chief Economist at NAR) on June 2, 2025.

Chart 5: Days on Market National Level from NAR[217]



[217] Published on LinkedIn by Lawrence Yun, June, 2025. *See also* www.nar.realtor "Research and Statistics".

**HIGHLY CONFIDENTIAL**

187.     As demonstrated above, the industry has been revolutionized in the past two decades through internet and technology. The level of service real estate agents and brokers provide has decreased with portions of those services taken over by buyers, sellers, and aggregators. Changes of this magnitude suggest corrections in the pricing of services should occur in a competitive market.

188.     

.[221]

189.     In stark contrast to these expectations, as pointed out at the beginning of this section and demonstrated in this report, commission rates have remained relatively uniform (See Section VII-B) and commission fees have increased substantially (See Section

---

[218] National Association of Realtors® Leadership Team/Strategic Thinkers Group Meeting, Feb. 07 – 08, 2001 Strategic Analysis, NAR_BattonI0160256 - NAR_BattonI0160259 (emphasis added).

[219] RE/MAX Competitive Intelligence Briefing, May 2019 Board Meeting, RMLLC-Batton_00196988 at -7023 (emphasis added).

[220] *Id.*

[221] *Id.* at -7030.

HIGHLY CONFIDENTIAL

VIII-A). Researchers point to the disconnect between technological changes and commissions observed in the real estate industry compared to the effect these changes have had on other industries.

190. In an Economic Brief published by the Federal Reserve Bank of Richmond in 2024, Gorchulsky and Wang write:

> Despite technological advances substantially lowering home search and matching costs, real estate agents continue to command relatively high-percentage commission rates...Comparing across industries, the persistently high real estate commission is also puzzling. In the past few decades, the internet has squeezed margins in many sales and advisory professions. For example, the number of employees has declined drastically in travel agencies, while many financial advisors – who used to charge between 1 and 2 percent of the assets they managed for clients – have shifted to fee-for-services.[222]

191. Researchers further adjudicate the lack of change to anticompetitive practices. For example, Roger Alford and Benjamin Harries (2021) describe:[223]

> [D]espite those [technological] innovations, the MLS has maintained its market position and broker commissions have remained virtually unchanged for decades. This reality stands in stark contrast to the effects of technological advances in other industries. The introduction of online platforms lowered the cost of trading stocks and transferring funds electronically, decreased the cost of life insurance policies, and eliminated fees collected by travel brokers. **The absence of these effects in the realty market can be attributed to the MLS's anticompetitive practices**. The expected gains provided by these advances will materialize if free competition returns to the market.

---

[222] Real Estate Commissions and Home Search Efficiency by Borys Grochulski and Zhu Wang, Federal Reserve Bank of Richmond, Economic Brief No. 24-08, available at: Real Estate Commissions and Home Search Efficiency | Richmond Fed.

[223] Anticompetition in Buying and Selling Homes by Roger P. Alford and Benjamin H. Harries at 29 (emphasis added).

**HIGHLY CONFIDENTIAL**

192.      Defendants 

_____

[footnote reference]

224 Deposition of Carole McCabe in *Burnett, et al. v. The National Association of Realtors, et al.* ("McCabe Dep. Tr.") at 42:7–12, 62:2–64:9.

HIGHLY CONFIDENTIAL

### D. High Commissions Flood the Market with Inexperienced and Incompetent Agents.

193.     The excessive commission fees and limitations on negotiations facilitated by the Anticompetitive Rules, along with the low barriers of entry into the industry, have resulted in an oversupply of real estate agents. The oversupply of real estate agents results in 1) a significant number of inexperienced real estate agents, 2) lower productivity levels for existing more experienced agents, and 3) significant risks of missing something materially important when representing buyers such as relevant comparable sales, potential zoning restrictions, or less obvious facts about the property or buyer.[225]

194.     In my 2021 study, I noted that "as real estate prices increased relative to inflation, and the profitability of making a home sale increased for agents, the number of agents going after the same pie resulted in far more real estate agents in the U.S. than in any other developed country." As of 2019, I estimate that 1 in every 110 working adults in the U.S.[226] was a REALTOR®. The table below summarizes the growth in the number of REALTORS® over time.[227]

---

[225] For example, the home might have no sewer access and a fairly tight yard in which an old septic tank system is still used but not adequate for a larger family.  Connecting to a sewer system might be financially exorbitant or impossible and a less experienced agent might not catch this significant risk for the home buyer.

[226] I estimate the working population by multiplying the U.S. population by a rate of 78% (Population over the age of 18) and 60% (working population).

[227] The numbers in the table are numbers taken directly from my 2021 study. I updated the table to include information as of 2024. Population data is pulled from FRED, *see* https://fred.stlouisfed.org/series/POPTHM , and REALTOR membership was pulled from earlier years using the NAR Research site.

**HIGHLY CONFIDENTIAL**

Table 7: Growth in Number of REALTORS® Over Time

| Year | NAR Membership | US Population | Population/REALTORS |
|------|----------------|--------------|---------------------|
| 1920 | 10,000 | 106,461,000 | 10,646 |
| 1948 | 40,000 | 146,631,302 | 3,666 |
| 1975 | 250,000 | 215,973,199 | 864 |
| 2019 | 1,400,000 | 329,062,917 | 235 |
| 2024 | 1,500,000 | 340,100,000 | 227 |

195.　　In the United States, the average household consists of approximately 3.1 people. Given this, we can calculate that each NAR member serves about 76 households (235 divided by 3.1). Considering that around 65% of households own a home, this brings the number down to about 49 homes per NAR member. If we adjust these figures for 2024, the estimate is closer to 48 homes.

196.　　In a typical year with a healthy economy, about 5% of all homes are sold. This rate implies that each REALTOR® sells approximately 2.5 homes per year (49 homes multiplied by 5%). This explains why more than half of the REALTORS® sell one home or fewer each year, and why such dabblers in the industry seldom become real experts. These calculations are supported by the analysis of other researchers. As discussed earlier, based on their data, Barwick and Wong (2019) identified the average agent having 2.6 transactions per year, with the median agent having only one.

197.　　Stewart (2021) states, using NAR data, that "the average yearly income of a real estate agent in the United States is $42,183, and those in the ninetieth percentile earn

HIGHLY CONFIDENTIAL

an average of $64,101 as of February 2020."[228] Using 50% of a 3% fee and an average home price of $410,000, this would require just under seven transactions per year on the buyer's side, ignoring Zillow required referral fees.

198.     Similar to the NAR figures, the US BLS May 2023 survey data covered 162,020 residential agents making an average hourly rate of $26.11 and $53,300 per year. With an average home price of about $410,000 and using a figure of 3% for the agent's share (buyer and seller agents), this would require only $1,776,667/$410,000 = 4.3 home sales per year per surveyed agent.[229]

199.     Multiple research papers support the idea that there is an oversupply of real estate agents in the U.S. and its impacts on productivity.

200.     Grochulski and Wang (2024)[230] concludes that "labor productivity in the brokerage industry has declined over the last 30 years." According to their study, the number of real estate transactions in the 2010s was moderately higher than in the 1990s, yet the number of agents and firms has nearly doubled. Compared to the United Kingdom, where real estate commissions are much lower, the United States has about six

---

[228] Stewart, M. (2021). Buyer Beware: Who Is Paying the Home Buyer's Real Estate Agent?. University of Miami Business Law Review, 30, 73. at p.25.

[229] See Real Estate Brokers and Sales Agents : Occupational Outlook Handbook: : U.S. Bureau of Labor Statistics and Real Estate Brokers and Sales Agents : Occupational Outlook Handbook: : U.S. Bureau of Labor Statistics although I used data from 2023 which was available when I started to work on this report. In 2024 the average agent income was $56,320 versus $53,300 in 2023.

[230] Grochulski, B., & Wang, Z. (2024). Real Estate Commissions and Homebuying (No. 24-01). Federal Reserve Bank of Richmond.

HIGHLY CONFIDENTIAL

times more housing transactions annually but twenty-six times more agents. In other words, **agents in the UK are roughly four times more productive than their peers in the U.S.**

201.     One academic paper specifically deals with the question of how price fixing can exist in an industry with ease of entry, "Can Free Entry Be Inefficient? Fixed Commissions and Social Waste in the Real Estate Industry" by Chang-Tai Hsieh and Enrico Moretti, published in the very rigorous academic Journal of Political Economy. They explain what they term as social waste (inefficiency) via a comparison of the number of real estate agents that vary by average home prices. They state:

> "[B]ecause there is relatively free entry into the real estate business, an average real estate agent in Boston does not earn twice as much as an agent in Minneapolis. Because the commission from selling a typical house is twice as high in Boston as it is in Minneapolis, there are more real estate agents in Boston seeking these high commissions, although the total number of homes sold each year is actually larger in Minneapolis. Consequently, the average real estate agent in Minneapolis is much more productive than a typical agent in Boston, selling 6.6 houses each year in Minneapolis as compared to an average of 3.3 houses a year in Boston.[231]"

---

[231] Hsieh, C. T. & Moretti, E. (2003). Can Free Entry Be Efficient? Fixed Commissions and Social Waster in the Real Estate Industry. *Journal of Political Economy*, 111(5), 1076-1122 at 1078.

HIGHLY CONFIDENTIAL

202.     Using more recent NAR data[232] for all fifty states on the number of REALTORS® and FHFA data on average quality adjusted home prices[233] over the period of 2013 through 2023, we observe the following graphed results, below. These results are consistent with findings from Hsieh and Moretti—the larger the increase in home prices, the larger the increase in the number of REALTORS®. I conducted a simple linear regression analysis to examine the relationship between the 10-year growth rates of house prices and the number of REALTORS®, represented by the red line. The coefficient estimate I obtained was 0.32, meaning that for every 10 percent increase in house prices, the number of REALTORS is expected to increase by 3.2 percent. Given that many states have seen their house prices more than double over the past decade, the rise in the number of REALTORS has been enormous.

203.     The correlation between home price growth and REALTOR® membership growth rate is .495, meaning that approximately 50% of the growth in REALTOR® membership can be explained by the growth in home prices.  Rather than fostering competition and value creation for consumers and society, the rules and mechanics of the

---

[232] Information regarding the number of REALTORS in each state was obtained from the National Association of Realtors (NAR) website. Specifically, the document available at this link (https://www.nar.realtor/sites/default/files/documents/membership-count-by-state-jan-2024.pdf) provides the NAR membership count by state from 1908 to 2023.

[233] The House Price Indices at the state level are sourced from the Federal Reserve Economic Data (FRED), which is a database managed by the Research Division of the Federal Reserve Bank of St. Louis. The All-Transactions House Price Index is a periodical publication by the U.S. Federal Housing Finance Agency.

HIGHLY CONFIDENTIAL

industry attracted more agents into the industry, each of them taking a smaller slice of the fixed price pie.

Chart 6: Home Price Increases in Selected Metros Relative to CPI



204.      Low barriers and fixed pricing not only result in more agents who facilitate a smaller number of transactions but also a large number of inexperienced agents who capture a non-negligible portion of the market. Gilbukh and Goldsmith-Pinkham (2019) while studying data from 60 MLSs note that "[n]otably, almost thirty percent of all agents are completely inexperienced, with no previous clients[,] [and] [t]wenty-five percent of listings are handled by agents who had four or less clients in the past year[...]."[234]

---

[234] Gilbukh and Goldsmith-Pinkham (2019) at 8–9.

HIGHLY CONFIDENTIAL

205.     Concerns about the level of experience and its impact on consumers have also been raised in analyses commissioned by NAR. For example, in 2014-2015, NAR commissioned a report on negative game changers emerging in real estate (the "D.A.N.G.E.R. Report"). The report noted among other conclusions that "[t]he real estate industry is **saddled with a large number of part-time, untrained, unethical, and/or incompetent agents**. This knowledge gap threatens the credibility of the industry."[235] The lack of agent knowledge combined with the lack of basic competency **"could be destructive and harmful to both the industry and the consumer**."[236]

### E.  International Fees and Practices Suggest that U.S. Buyer-Agent Fees Could Easily Be Much Lower.

206.     As pointed out by research as well as demonstrated through data in this case, commission rates in the U.S. have remained uniform over the years (See Section VII-B). These commission rates are substantially higher than those observed in other countries that 1) are not subject to the same restraints present in the U.S., and 2) have been similarly impacted by technological changes resulting in efficiencies. This is further evidence that buyer-agent fees in the United States were disconnected from relevant economic principles.

207.     In 2001, with my colleague, Natalya V. Delcoure, I published an international survey of residential brokerage fees around the world. This study and some confirming

---

[235] D.A.N.G.E.R. Report, NARSITZER0000315626 at .20.

[236] D.A.N.G.E.R. Report, NARSITZER0000315626 at 21 (emphasis added).

**HIGHLY CONFIDENTIAL**

studies have been referenced by the Wall Street Journal, the New York Times, and in the D.A.N.G.E.R Report. Our study was titled "How do US Residential Brokerage Trends & Fees Compare to the Rest of the World?" and was published in Real Estate Issues, Fall, 2001. Among some of the highly developed countries, we noted much lower fees than in the U.S., far fewer real estate agents, and far higher volumes of transactions per agent.

208.     In 2002, I published a more rigorous study on brokerage fees with the same co-author titled "International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry," in International Real Estate Review. In this paper, we showed that nationally, U.S. home prices had increased by 800% from 1960 through 1999 while the CPI increased by about 480%[237]. Real estate agents' average income increased by 120% over this time period, and the number of agents increased by 300%. We concluded that U.S. residential fees (buyer and seller) should be closer to 3% if set in a competitive market.

209.     My international study titled "Revisiting Residential Brokerage Fees in a More Technologically Advanced World" was updated in 2021 in Real Estate Issues. It was based on data from 2020 in various countries. The chart below is a copy of a chart in my study and summarizes commission rates in those countries broken down by portions

---

[237] Delcoure, N. & Miller, N. G. (2002). International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry. *International Real Estate Review*, 5(1), 12-39.

HIGHLY CONFIDENTIAL

going to seller and buyer agents.[238] Exhibit 4 to this report provides a more detailed table from my study summarizing the results.

Chart 7: Residential Real Estate Commissions Around the World – Miller (2021)



210.     From this article, I summarized as follows, referring to the changes in the past twenty years: "Globally brokerage fees have dropped over time: What is most noticeable is the significant drop in brokerage fees in three highly developed countries, Finland, Denmark, and Sweden, and in Russia, a less developed country. In Russia, fees

---

[238] Miller, N. G. (2021). Revisiting Residential Brokerage Fees in a More Technologically Advanced World. *Real Estate Issues*, 45(2), 1-7.

**HIGHLY CONFIDENTIAL**

dropped from 10% or so to less than half that, mostly as a result of utilizing technology. In these three more developed countries (Finland, Denmark, and Sweden), we notice significant home price increases and also the impact of technology, both of which, in a competitive market, explain the drop in brokerage rates to about half the former prices for brokerage services. Adjusted for inflation in home prices, the real commission rates dropped slightly less than half.[239]"

211.    Likewise, I concluded "One would expect the U.S. residential brokerage rates to be more in line [with] advanced economies like Sweden, Finland, Norway, or at worst case, like those in Australia, the UK, Israel, Singapore where sellers pay 1 or 2% and buyer fees run 1 or 2%." Expectations described here are supported by consensus in the industry.

212.    According to the D.A.N.G.E.R Report commissioned by NAR, "[t]he continued rise in home prices has facilitated the elevation of real estate earnings based on commissions. Those earnings have not gone unnoticed by consumers, who are responding by placing increased pressure on real estate agents to reduce their commission rates. As a result, **many fear a gradual downward slide or a realignment of fees as charged in other countries in the world**."[240]

---

[239] Miller, N.G. (2021) at 5.

[240] D.A.N.G.E.R. Report, NARSITZER0000315626 at 22.

**HIGHLY CONFIDENTIAL**

213.     In short, my prior research and review of the record and data in this case leads me to conclude that buyer-agent commission rates in the U.S. have been disconnected from fundamental economic principles.

## IX.  Common Evidence Demonstrates That There Were Not Viable Means for the Vast Majority of Homebuyers to Avoid the Anticompetitive Rules.

214.     As pointed out in Section III, the vast majority of buyers buy homes through the assistance of a real estate professionals who provide access to listings via the MLS. As discussed in Section V, each of the Subject MLSs imposed the Anticompetitive Rules. As discussed in this section, there were no alternative methods for buying homes during the class period through which the vast majority of class members could avoid the Anticompetitive Rules. That is because those alternate methods provide access to a restricted inventory that could not substitute the volume transacted via MLSs, appeal to particular circumstances, or have characteristics that are distinct from inventory available through the MLSs.

215.     Further, I observe that despite a substantial increase in buyer-agent commission fees (Section VIII-A) and decrease in the marginal value received for those fees (Section VII), alternative methods for buyers to avoid the Anticompetitive Rules have not meaningfully increased in market share. This further supports my conclusion that these alternate means of purchasing a home do not serve the needs of a vast majority of homebuyers and are not effective means of avoiding the Anticompetitive Rules.

HIGHLY CONFIDENTIAL

### A. Non-NAR MLS Options Either Represent a De Minimis Percentage of Home Sales or Serve Niche Homebuyers.

216.    Public Transactions that are not MLS Transactions subject to the Anticompetitive Rules are minor and limited to mostly new home builders, properties listed for sale by owner ("FSBO"), or certain discount brokers.

### i. FSBOs Are Not Viable for the Vast Majority of Homebuyers to Avoid the Anticompetitive Rules.

217.    FSBO is a method for selling and buying homes without a listing agent. FSBOs, however, are limited in volume and appeal to niche markets that are not representative of the general home buyer and seller population.

218.    First, only a small number of FSBO properties are available for matchmaking between a typical buyer and seller. During the period 2011 to 2020, between 7% and 9% of homes were sold as FSBOs compared to 87% to 91% that sold using an agent or broker.[241] Over 50% of FSBO sellers knew the buyer for the home, compared to 4% for homes that sold with the assistance of an agent.[242, 243] Of those that did not know the buyer of the home, 22% sold this way because they were contacted directly by the

---

[241] National Association of Realtor's 2020 Profile of Home Buyers and Sellers Exhibit 6-31 Method Used to Sell Home 2001-2020 at 120, NAR_BattonI00008176 at -8295.

[242] *See* National Association of Realtor's 2020 Profile of Home Buyers and Sellers at 103, NAR_BattonI00008176 at -8278 ("[5]1 percent of FSBO sellers said they knew the buyer of their home before the transaction.). *See also* National Association of Realtor's 2021 Profile of Homebuyers and Sellers at 9, NAR_BattonI00008356 at -8364 ("The majority of FSBO sellers, 57 percent, knew the buyer for the home."). Known buyers could include relatives or friends.

[243] National Association of Realtor's 2020 Profile of Home Buyers and Sellers at 103, NAR_BattonI00008176 at -8278.

HIGHLY CONFIDENTIAL

buyer.[244] Note that contacting a home seller directly is the exception rather than the norm for home purchasers. For example, in 2020, according to NAR, home buyers who reported to have contacted a home seller directly as a first step during the home buying process, represented only 2% of buyers.[245] It is possible that a good portion of those that reach out directly to homeowners are real estate investors.[246] Multiple real estate investment blogs list FSBOs as one of the top options for sourcing real estate investment leads.[247] From these statistics it is clear that FSBO is not the preferred transaction method for the general population of buyers and sellers.

219.     To illustrate the limited availability of FSBOs to the general public, I perform a search for FSBOs compared to properties listed for sale by agents in Zillow in Orlando, Florida (an area covered by Stellar MLS). First, I filter my search to only include homes listed by agent. Then I do the same filtering only to homes posted by owners. Zillow

---

[244] National Association of Realtor's 2020 Profile of Home Buyers and Sellers at 139, NAR_BattonI00008176 at -8314.

[245] National Association of Realtor's 2020 Profile of Home Buyers and Sellers Exhibit 3-1 First Step Taken During the Home Buying Process, First-Time and Repeat Buyers at 58, NAR_BattonI00008176 at -8233.

[246] For example, in the mid-1980s when the Yen was strong relative to the dollar, Japanese investors would canvass neighborhoods door by door and ask if they could buy the homes directly.

[247] *See* for example https://flippingprosperity.com/how-to-find-flip-houses/ ("A great resource for potential house flips is for sale by owners or FSBO's as there often called."). *See also* https://www.myhousedeals.com/blog/house-flipping/craigslist-hacks-finding-deals ("Motivated Sellers: For-Sale-By-Owner (FSBO) (off-market) properties posted on Craigslist directly by sellers who are looking for cash-buyer investors to buy their distressed properties."

HIGHLY CONFIDENTIAL

returns 500 homes for the first search, while it returns only 25 for the search on FSBOs.[248]

Figure 1 and Figure 2 below summarize these results.

220.       The level of inventory of FSBOs (from this one site) is not sufficient to satisfy

the purchasing patterns by a typical home buyer who likes to compare alternatives before

choosing a match. For example, according to a NAR report from 2020, buyers "looked at

a median of nine homes, and viewed five of these homes online only."[249]

Figure 4-A: Zillow.com Search for Homes for Sale Listed by Agent in Orlando Florida



---

[248] I perform a similar search for FSBOs on a different site "For Sale by Owner" which also returns 25 homes (although they may be a different set of homes).

[249] *2020 Profile of Home Buyers and Sellers*, National Association of REALTORS, at 7, NAR_BattonI00008176 at -8182.

**HIGHLY CONFIDENTIAL**

Figure 4-B: Zillow.com Search for Homes for Sale Listed by Owner in Orlando Florida



221.     Second, the characteristics of homes sold as FSBOs differ from those sold

assisted by real estate agents. According to NAR's 2020 Profile of Home Buyers and

Sellers, "Twenty-two percent of FSBO sales were located in rural areas compared to only

14 percent of agent-assisted sales. Likewise, FSBO homes were proportionally more likely

to be mobile or manufactured homes at 9% compared to 2% for homes that sold with the

assistance of a real estate agent.[250]

222.     Third, FSBO properties that are marketed are not typically marketed within

the MLSs. Therefore, their visibility is limited to a very small subset of buyers who

---

[250] *2020 Profile of Home Buyers and Sellers,* National Association of REALTORS, at 138, NAR_BattonI00008176 at -8313.

HIGHLY CONFIDENTIAL

purposely search across multiple databases.[251] I note that most of the major aggregators of listings either do not accept FSBOs or were (at some point) forced by their agreements with NAR MLSs to report them in such a way that decreased their visibility significantly. For example, Homes.com does not accept listings not already in the MLS, and the REALTOR® controlled MLSs do not accept FSBOs.[252] Realtor.com only provides listings that come from REALTORS® and REALTOR®-owned and operated MLSs.[253] Zillow, on the other hand, accepts FSBOs, but after they became a broker and agreed to follow some of the Anticompetitive Restraints, their display changed significantly, reducing their visibility and marketability.

223.　　As I pointed out earlier in this report, between 89% and 91% of sellers listed their homes in the MLS between 2019 and 2021.[254] Of those, only a small number (6% in 2020) reported marketing their home via the MLS.[255] FSBOs can be listed in the MLS by paying for MLS-only services that list properties for a nominal fee. For example, Houzeo

---

[251] Hendel, I., Nevo, A., & Ortalo-Magné, F. (2009). The relative performance of real estate marketing platforms: MLS versus FSBOMadison. com. American Economic Review, 99(5), 1878-1898.

[252] Filers for "Listing Type" in Homes.com include "Shor-Sale, Resale, Auction, Foreclosure, New Construction, and Pre-Foreclosure" but does not include For Sale by Owner.

[253] *See* https://support.realtor.com/s/article/does-realtor-com-display-for-sale-by-owner-listings ("All listings displayed on Realtor.com® come from REALTOR® Brokers and REALTOR® owned and operated MLSs, where the real estate licensee has established an agency relationship through an exclusive right-to-sell or exclusive agency listing agreement.").

[254] *2019 Profile of Home Buyers and Sellers*, National Association of REALTORS, at 124, NAR_BattonI00006629 at -6752; *2020 Profile of Home Buyers and Sellers*, National Association of REALTORS, at 128, NAR_BattonI00008176 at -8303; *2021 Profile of Homebuyers and Sellers,* National Association of REALTORS, at 9, NAR_BattonI00008356 at -8364.

[255] *See* Exhibit 8-13, Method Used by FSBO Seller to Market Home, in *2020 Profile of Home Buyers and Sellers*, National Association of REALTORS at 146, NAR_BattonI00008176 at -8321.

HIGHLY CONFIDENTIAL

is a company that offers these services and was offering them during the class period.[256] The small percentage of FSBO sellers who did market their homes via the MLS during the class period, however, were still subject to the Anticompetitive Rules and their effects, including steering. Evidence of this is Houzeo's answer to the frequently asked question of "Should I offer the buyer's agent a commission?" captured from its website in 2020:[257]

> "You can choose not to, but we recommend that you do. A majority of buyers are still represented by an agent, so it's recommended that you offer the buyer's agent commission to incentivize agents to bring you buyers and help sell your home faster. Remember: with Houzeo, you've saved the seller's agent commission, which would normally be between 2% to 3%."

224.    The fact that FSBOs are subject to steering is further confirmed by more formal studies. For example, a study conducted in 2021 pointed out that "FSBO sellers who are not on the MLS are easily avoided by Realtors who use the MLS as their sole source of available homes, while sellers choosing the MLS-only option are subject to [steering because of lower commissions being offered]."[258]

---

[256] *Pricing*, Houzeo, https://www.houzeo.com/pricing (last accessed Sept. 22, 2025).

[257] *For Sale By Owner FAQ*, Houzeo, https://web.archive.org/web/20200620194053/https://www.houzeo.com/faq (last accessed Sept. 22, 2025)

[258] Anticompetition in Buying and Selling Homes by Roger P. Alford and Benjamin H. Harries at 30. Note also that private vendors like Zillow and Homes.com derive most of their inventory from the MLS.

HIGHLY CONFIDENTIAL

225.     Whether because of available inventory, limitations in the product offering, visibility, or steering, transacting via FSBO is not an effective means for homebuyers to avoid the Anticompetitive Rules.

226.     The lack of change in market share observed over time further demonstrates that FSBOs were not an effective means for the vast majority of homebuyers to avoid the Anticompetitive Rules. For example, during 2011 and 2020 the number of homes sold as FSBOs remained relatively constant at around 8%,[259] even when taking into consideration significant increases in buyer-agent commission fees for homes listed through an MLS during that time (See Section VIII-A).

227.     In sum, to the extent FSBOs could be available to home buyers to purchase without the assistance of an agent with access to the MLS, they do not meet the requirements of the general population of home buyers and, therefore, could not be an effective means for them to avoid the Anticompetitive Rules imposed through the Subject MLSs. From a seller perspective, the strategy appeals to a very small set of sellers who know a potential buyer, are motivated to sell, or are willing to patiently wait for the right buyer. From buyers' perspective, because the strategy makes it difficult to find a sufficient quantity of homes and a proportion of FSBOs are listed through MLS-only services that are nonetheless subject to the Anticompetitive Rules, they face the prospect of being

---

[259] Exhibit 6-31, Method Used to Sell Home 2001-2020, *2020 Profile of Home Buyers and Sellers*, National Association of REALTORS at 120, NAR_BattonI00008176 at -8295.

HIGHLY CONFIDENTIAL

steered away from such homes. Therefore, it is not a strategy for the general population of home sellers or homebuyers.

### ii. Off-MLS New Home Construction Was Not an Adequate Substitute for the Vast Majority of Homebuyers to Avoid the Anticompetitive Rules.

228.    While buyers could avoid the Anticompetitive Rules by purchasing directly from home builders, the inventory of new homes is insufficient to provide for an alternative to the homes that are marketed and sold via the MLS, and their characteristics do not respond to the need of the general population of home buyers.

229.    First, the volume of new homes is minimal. New homes represent less than 1.5% of the existing home stock per year[260] and less than 15% of total home sales in most years,[261] skewed heavily towards growing and urban fringe markets.  According to a 2018 study by the National Association of Home Builders (NAHB), housing production between 2014 and 2017 fell below levels needed to even accommodate the number of net new households.[262]

230.    In addition, a substantial number of these new homes are listed on MLSs and thus subject to the Anticompetitive Rules, further reducing the available options to

---

[260] U.S Department of Housing and Urban Development (2020), "American Housing Survey – Components of Inventory Change: 2015-2017" (https: //www.huduser.gov/portal/datasets/cinch/cinch15/National-Report.pdf) at Exhibit 3-1, Flows Out of and Into the Housing Stock. Comparing "New Construction" to "End Year Housing Stock" for periods 2009-2011 (1.5%), 2011-2013 (0.9%), and 2015-2017 (1.5%).

[262] *See* Emrath, Paul, "More New Homes Needed to Replace Older Stock", NAHB Economics and Housing Policy Group, August 2, 2018: https://www.nahb.org/-/media/435F51356E0640EC93852876CFB89F4B.ashx.

**HIGHLY CONFIDENTIAL**

home buyers outside of the MLS from new homes. For example, a search on Zillow on July 29, 2025 for new construction homes in Davidson County, NC, an area covered by the Triad MLS, yielded 52 results. Of those 52 results, at least 19 (37%) of the homes were listed in the MLS. A similar search on Davie County, also an area covered by the Triad MLS, yielded 72 results out of which 30 (42%) were listed in the MLS. For example, Figure 5 below depicts a new construction listing in the MLS available on Zillow.

Figure 5: Example of New Construction Home Listed in MLS



231. Second, the characteristics of new construction homes are different and appeal to a different group of buyers on the basis of price and preferences. For example, "In the 2021 AHS assessment of housing market data, the median price of homes purchased was $318,185, compared to $429,204 for new homes and $271,445 for homes

**HIGHLY CONFIDENTIAL**

purchased by first-time buyers. The median sales price of the new homes was 34.9% above the median for all homes purchased."[263] Regarding preferences, according to NAR, in 2020 buyers that chose new homes did so to a high degree with the goal of avoiding renovations and having the ability to customize their homes, while those that bought previously owned homes considered better price and a home with more charm and character as drivers.[264]

232.     As demonstrated here, new construction homes sold outside of an MLS are insufficient to supply the necessary volume to be an effective means for the vast majority of homebuyers to avoid the Anticompetitive Rules. Additionally, as I discuss later in this report (See Section VIII-A), prices for real estate agents have increased dramatically, yet the number of buyers purchasing directly from builders has remained relatively stagnant for the past 15 years. According to NAR, during the class period, the percentage of buyers who found the home they purchased via a home builder or their agent remained stable between 5% and 6%, and the percentage of home buyers who **bought directly** from the builder or builder's agent remained stable at between 5% and 7%.[265, 266] That new homes

---

[263] *New and Existing Home Sales Report, National Association of Home Builders*, https://www.nahb.org/news-and-economics/housing-economics/national-statistics/new-and-existing-home-sales-reports (last accessed Sept. 22, 2025).

[264] *2020 Profile of Home Buyers and Sellers*, National Association of REALTORS, at 32, NAR_BattonI00008176 at -8207.

[265] Exhibit 3-9, Where Buyer Found the Home They Purchased, *2020 Profile of Home Buyers and Sellers*, National Association of REALTORS at 63, NAR_BattonI00008176 at -8238.

[266] Exhibit 4-1, Method of Home Purchase, 2001 – 2020, *2020 Profile of Home Buyers and Sellers*, National Association of REALTORS at 74, NAR_BattonI00008176 at -8249.

**HIGHLY CONFIDENTIAL**

purchases without the assistance of an agent have not gained market share even as buyer-agent fees have increased further supports the conclusion that they are an insufficient means for the vast majority of homebuyers to avoid the Anticompetitive Rules.

### iii. Discount Brokers Were Not an Effective Means for the Vast Majority of Homebuyers to Avoid the Anticompetitive Rules.

233. Discount brokers provide services typically offered by brokerage services at a discounted fee.[267] Historically, becoming a discount broker has been limited by 1) the rules for becoming a broker, which help perpetuate the status quo; and 2) steering in the industry.[268] More recently, aided by the development of the internet and new technologies, new large scale discount brokers have entered the market. While they have demonstrated their ability to bring savings to home sellers and buyers at a larger scale, they still face similar barriers that have substantially limited their ability to generate transaction volume. Thus, they are not yet an effective method for the vast majority of homebuyers to avoid the Anticompetitive Rules.[269]

---

[267] "Competition in the Real Estate Brokerage Industry," Federal Trade Commission and U.S. Department of Justice Report, Apr. 2007 at 15.

[268] According to one Keller Williams witness, one reason why discount rate real estate agencies may not be successful is because buyer's agents are demotivated to market their houses without getting a better offer of compensation. *See* 02/04/22 Figgs Dep. in *Moehrl* at 146:13-159:11, 166:14-21, 173:17-23, 177:15-25. She noted that when someone tries to offer lower commissions, one of the big barriers is the backlash from the real estate community against them. *See* 02/04/22 Figgs Dep. in *Burnett* at 56:8-57:23.

[269] Keller Williams does not view these discounters as a competitive threat. *See* 02/04/22 Figgs Dep. in *Moehrl* at 145:5-23, 164:3-9; 10/06/21 Gonzalez Dep. in *Burnett/Moehrl* at 219:2-220:5; 11/15/22 Papasan 30(b)(6) Dep. in *Moehrl* at 194:12-195:25, 198:7-15.

HIGHLY CONFIDENTIAL

### a. Rules for becoming a broker perpetuate the status quo and help enforce challenged rules.

234.     Obtaining a sales agent license is a straightforward process, involving a few courses and passing a license exam.[270] By contrast, the process of becoming a licensed real estate broker who can set fees is governed by a complex set of regulatory requirements that vary significantly from state to state but generally requires a substantial amount of time operating under the supervision of a broker.

235.     One of the most significant barriers is the required experience before qualifying to apply for a broker's license. States generally require between two and four years of active experience as a licensed real estate salesperson. For example:

- Florida and New Mexico require that a candidate must be registered as an active sales associate for at least 24 months during the preceding five years.[271]

- North Carolina requires that candidates have at least two years of full-time or four years of part-time real estate brokerage experience within the previous five years.[272]

- Kansas requires that candidates have been an active licensee in Kansas for two of the previous three years.[273]

---

[270] On average, 60% of individuals taking the real estate agent exam pass on their first attempt.

[271] https://www2.myfloridalicense.com/re/documents/REBKRequirements.pdf

[272] https://www.ncrec.gov/Pdfs/Licensing/RELINC.pdf

[273] https://www.krec.ks.gov/applicants/broker-requirements

**HIGHLY CONFIDENTIAL**

- California mandates two years of full-time licensed experience within the past five years.[274]

236.     These requirements ensure that new brokers are closely integrated into established firms, allowing them to learn industry norms and practices through direct experience. Given that most agents and brokers are members of NAR and follow NAR rules, mentorship and supervision requirements further embed new entrants within the existing conventions.

### b. Discount brokers' ability to compete on price was restrained because of the Anticompetitive Rules and steering.

237.     When listing properties in the MLS, discount brokers are subject to the Buyer Agent Commission rule and other Anticompetitive Rules. As I have previously covered, these rules facilitate steering away from discounters by 1) sharing the offered buyer-agent commission for all properties simultaneously to buyer agents, 2) limiting their disclosure to those outside of the MLS (including consumers), and 3) allowing buyer agents to filter out the properties presented to buyers on the basis of commissions offered. Listing outside of the MLS significantly reduces the demand. Note that between 89% and 91% of sellers sold their homes in the MLSs between 2019 and 2021.

238.     Within the MLS, the ability to steer buyers results in a reduction in demand for discount broker properties, and that reduction in demand cannot be offset by the demand generated by alternative buyers such as direct buyers or discount investor-type

---

[274] https://www.dre.ca.gov/examinees/requirementsbroker.html

HIGHLY CONFIDENTIAL

buyers as these represent a very small portion of purchases in the residential real estate industry.[275] Therefore, the potential shift in demand that a discount broker faces is such that the discount broker listing does not sell and the discount broker goes out of business as costs exceed revenues. My paper "Do Antitrust Laws Apply to The Real Estate Brokerage Industry?" published in the American Business Law Journal in 1979 was one the first papers to describe the economics of steering and the high degree of interdependency of brokerage firms and it expands on the interactions and effects I discussed here. The explanations I provided in the paper remain intact today.

239.     My own career in real estate has been influenced by steering. In 1973, I co-founded a real estate brokerage firm named Contemporary Real Estate Marketing Systems, CREMS. Our commission rates included full services for the seller and buyer combined, ranging from 3% to 8%, averaging around 5.5%. In active neighborhoods, the rates were generally below the industry norm of 6%. We quickly attracted sellers eager to save on commission fees and list their homes with us. However, it soon became known among local REALTORS® that we were "discounter" agents charging lower fees. After about two years, we found buyer's agents would not show our listings despite reasonable asking prices. We heard buyer's agents were not permitted to show our homes unless we

---

[275] According to NAR, from 2011 to 2020, homebuying companies consistently represented 1% of the market for homes sold in the United States (See National Association of Realtor's 2020 Profile of Home Buyers and Sellers Exhibit 6-31 "Method Used to Sell Home, 2001-2020" at p. 120).

**HIGHLY CONFIDENTIAL**

agreed to align with customary commission-sharing practices. Consequently, we had to close the business and re-open at full commission rates under a new name.

240.    From 1980 through 1985, I consulted for several discount broker start-ups, each believing that they could compete on price. Examples included "Home Sellers Centers" and "Homes That Click." Later in the 1980s and 1990s, FIZBOdepot.com, FSBOFreedom.com, iown.com, and others would try and compete on price but fail.

241.    Even two British entrants, Foxtrons and Purplebricks, tried to enter the U.S. market in the late 1980s only for local brokers to shun them.[276] Today, Foxtrons remains successful in the UK. Yet, these firms found that securing listings based on a lower fee in the U.S. would lead to subtle stealthy steering that would put them out of business.

242.    Steering as a reason for the lack of success of discount brokers is recognized by Defendants. For example, Michelle Figgs, senior industry analyst at Keller Williams testified that:[277]

> "Q. ... And the backlash you were referring to was where others in the real estate community would refuse to show properties listed by a discount broker, correct?...

---

[276]  See "Behind Discounter Foxtrons demise" published in The Real Deal - Real Estate News, https://therealdeal.com/new-york/2007/11/15/behind-discounter-foxtons-demise-2/ and "Property Natter: Why didn't Foxtrons' American Dream work out?" https://www.estateagenttoday.co.uk/features/2020/09/property-natter-why-didnt-foxtons-american-dream-work-out/

[277] Figgs Dep. in *Moehrl* 157:2-159:5.

HIGHLY CONFIDENTIAL

THE WITNESS: The way I would describe it is that there was a short term financial incentive for buyer's agents to preferentially market listings where they felt they were fairly compensated...

Q... Your viewpoint at the time was that one factor why discounters had been unsuccessful was that buyer's agents would prefer to show homes with higher commissions than the discount broker was offering, correct?...

THE WITNESS: That's correct."

243.    Because of the fear of steering and the need to access an MLS to reach the broadest pool of available buyers, most discount brokers listed properties on an MLS and thereby had to comply with the Anticompetitive Rules. This meant that they had to offer a buyer-broker commission through the MLS. If their offer was below-market, the seller risked having buyers steered away from their property.[278]

244.    Steering against discount brokers has been well documented. For example, Trelora's former CEO Joshua Hunt testified at a 2018 FTC-DOJ workshop on real estate brokerage competition:

So when I started the company, we did a flat fee on the front side, and we began to take the buyer agent commission fully when we would represent buyers. And after about three months of doing that, I realized it was very hypocritical to say

---

[278] *See* "Why the real estate industry does not compete on commission rates," Inman (2014) at 3 ("Twenty-five percent fear that if they represent a seller at a reduced commission, other brokers won't promote their listings to their buyers."); The 1983 FTC report discusses that the tendency to steer "could be corrected for if a discount broker is prepared to offer a cooperating broker a standard percentage and absorb the entire reduction in commission him or herself. This, of course severely limits the amount of discount which a broker can offer and still cover operating costs[...]." Competition in the Real Estate Brokerage Industry, Federal Trade Commission and U.S. Department of Justice Report, April 2007 at 49 (internal quotes omitted).

HIGHLY CONFIDENTIAL

that it was worth a flat fee on the sell side, but not the buy side. And through the myth of "the buyer agent's free because the seller pays me," we shifted and pivoted to a $2,500 flat fee on the buy side as well.

What we've done that has caused us as a company a lot of frustration and anguish is we offer— we allow our sellers to offer a flat fee to a buyer's agent with any other brokerage. So any of these gentlemen, if they were in our market bringing buyer agents in and representing, they would only receive a $2,500 commission as it's offered in the MLS.

We've had bricks thrown through car windows. We've had our cars egged. We've had hate mail sent to our sellers. And so the anticompetitive nature we've dealt with is—I've got here a list of over 719 brokerages in Denver alone that have flat out said, we will not show TRELORA listings. We tell every seller, 40% of agents will go out of their way, above and beyond, and push hard not to show or sell your commissions to buyers, the competitiveness of this around commissions is going to continue. home if you don't offer a 2.8% to 3% commission.

And to the pocket listing conversation that took place in the last group, there's only one reason an agent pockets a listing and that's because they want both commissions. And so until we make commissions transparent to consumers and/or stop sellers and their agents offering.[279]

245.     On the buyer's side, discount brokers were limited by the initial offer of compensation made by seller agents (which was unilateral), and which through the Restraints on Negotiation Rules was difficult to change without incurring significant costs – i.e., the costs of writing separate contracts on multiple properties before a buyer visits them without the assurance of a transaction.

246.     Under the typical listing agreement between a selling agent and seller, the selling agent kept the full or unused buyer-agent fee if the buyer did not have an agent

---

[279] See What's New in Residential Real Estate Brokerage Competition – An FTC-DOJ Workshop (June 5, 2018), Panel on Developments in Real Estate Fee and Service Models, transcript available at: https://www.ftc.gov/system/files/documents/public_events/1361534/ftcdoj_residential_re_brokerage_com petition_workshop_transcript_segment_2.pdf.

HIGHLY CONFIDENTIAL

or negotiated a lower rate with their agent than what was offered in the MLS.[280] Thus buyers could not effectively avoid the Anticompetitive Rules by foregoing an agent or by negotiating a lower buyer-agent commission fee with their agent, including discount brokers.

247.     According to NAR, dual or variable rate commission agreements as those that provide that the total commission paid by the seller could vary (1) if the property is sold "by the listing broker without assistance" or instead "through the efforts of a cooperating broker," or (2) if the property is sold "with or without the assistance of a cooperating broker" or instead "through the efforts of a seller[]."[281] Critically, these type of commission arrangements apply if no buyer agent was involved in the sale or if the seller sold the property on their own. In the event a buyer uses an agent and the seller

---

[280] *See, e.g.*, "The Pros and Cons of Buying a Home Without an Agent," Glink & Tamkin, *Washington Post*, Oct. 12, 2020, available at: https://www.washingtonpost.com/business/2020/10/12/pros-cons-buying-home-without-anagent/ ("Sellers who have listed their homes generally pay between 4 percent and 6 percent of the sales prices as a commission to the listing agent. The listing agent, in turn, typically pays the buyer's broker around half of the total commission. No buyers [sic] agent means the listing agent doesn't have anyone to share in the commission. So, unagented buyers unwittingly allow the listing agent to pocket the entire commission."); "Why you Need A Real Estate Agent to Buy a Home" by Dan Bergman, Redfin Blog, Feb. 12, 2015, available at: https://www.redfin.com/blog/whyyou-  need-a-real-estate-agent-to-buy-a-home/ ("It's tempting to think that if you don't use a buyer's agent, their part of the commission can go in your pocket, but this is generally not the case. The commission rate is agreed upon via a contract before the listing even goes on the market. If you choose not to have legal representation from a buyer's agent, the entire commission is then paid to the listing agent. The listing agent would have to agree to modify their contract to cut you in on part of their compensation, and this is unlikely."); *See also* Amended Complaint, United States v. National Association of REALTORS®, Oct. 4, 2005, available at: https://www.justice.gov/atr/cases/f211700/211751.htm at paragraph 19 ("In a typical transaction, the seller agrees to pay a commission to the broker who has contracted with the seller to market the home (the 'listing broker'). If the listing broker finds the buyer, the listing broker keeps the full commission. Frequently, however, a second broker (the 'cooperating broker') finds the buyer, and the two brokers share the commission.").

[281] 2021 NAR Handbook at 69-70, NAR_Battonl00927454 at -7537-38.

**HIGHLY CONFIDENTIAL**

uses an agent, any reductions in the buyer-agent commission revert to the listing agent even if a dual or variable rate of commission structure is used. I understand that Dr. Abrantes-Metz has analyzed MLS data and found that such type of commissions offer were rare. The percentages found by Dr. Abrantes-Metz do not further reduce down to the number of closed dual or variable rate commission offers that did not involve agent, which I would expect would be a small fraction of that number.

248.    Given the barriers imposed by the Anticompetitive Rules, a discount broker seeking to compete on the basis on price on the buyer's side, therefore, was limited to utilizing rebates or refunds. Rebates were, however, not permitted in every state. For example, as of 2007, rebates were prohibited in 10 states: Alabama, Alaska, Kansas, Louisiana, Mississippi, Missouri, New Jersey, North Dakota, Oklahoma, and Oregon.[282]

249.    Further, discount brokers offering rebates found that the effect of the Anticompetitive Rules, such as the Buyer Agent Commission Rule and Free-Service Rule, created the perception on homebuyers that they did not pay for the service, which resulted in misunderstandings regarding refunds.

250.    Redfin's business model, and it changes over time, provides an example of this. Redfin first tried to use technology to enable buyers to make offers on properties listed through the use of a buyer's agent, but found that its model would not work as the Buyer Agent Commission Rule meant that "listing agent controls the rules," which "allows

---

[282] DOJ-FTC Report at 49 (citation modified).

HIGHLY CONFIDENTIAL

listing agents to set the price for buyers agents and prevents real price competition among agents."[283]

251.　　　Instead, Redfin pivoted to offering rebates to homebuyers that hired one of its agents, but found that the Anticompetitive Rules made this strategy ineffective as well:

> We've spent more than a decade trying to compete not just on the quality of our service to homebuyers, but on price, by refunding part of our commission back to the homebuyer. **But the refund hasn't been well understood by buyers, who have always assumed the buyer's agent is free, even though buyer's agent fee is often baked into the price the buyer paid for the house. As a result, over the past five years Redfin has shifted most of our technology-driven commission savings to the seller, not the buyer**.[284]

252.　　　Further evidence for the lack of success of rebates is a survey conducted by Inman in 2014 which showed that only 5.75% of respondents offered "cash rebates or other rebate incentives.[285]

253.　　　Another discount broker during the time period at issue was Real Estate Exchange, Inc. ("REX"). Like Redfin, REX was a real estate brokerage firm whose salaried agents help service buyers and sellers in residential real estate transactions with total fees of as low as 2% paid by sellers. Unlike Redfin, REX was not part of the MLS. Instead, to

---

[283] *See* August 29, 2021 interview with Glenn Kelman on the Investor's Podcast, available at:

https://open.spotify.com/episode/0wssOPJRRSiV7L42za9L3W?si=T1WYMiGBQISc3q5CgYgB5w&context=s potify%3Ashow%3A0umSLpOkCt5LszdtrQn9Uc&nd=1 ("The original premise was that we could let people make offers on home through a website, but we weren't the listing agent […] The reason this became a second act was that we had to get listing share first.");

[284] *Shedding Light on Buyer's Agent Commissions*, Redfin News, https://www.redfin.com/news/buyers-agent-commissions-display/ (last accessed Sept, 22, 2025).

[285] See "Why the real estate industry does not compete on commission rates," Inman (2014) at 38.

**HIGHLY CONFIDENTIAL**

match sellers and buyers, REX used technology and platforms like Zillow, Google, and Facebook. From 2015 (when it started operating) to 2020, REX claims that it went from facilitating 4 transactions to facilitating 1,400 transactions, saving consumers an estimated $28.7 million in commissions in those five years of operations.[286]

254.     First, at less than 0.05% of total sales in the United States,[287] REX's volume did not pose a competitive threat to NAR members. The broker Defendants in this case did not see REX or all discounters combined as a competitive threat to their business.[288] When asked if Keller Williams considered discounters a threat, the Chief Economist at Keller Williams, Ruben Gonzales, testified that "[in his] personal opinion [discounters in general] make up a very small percentage of market share..." and estimated the market share of discounters [overall] at around "1 or less of the full market."[289]

255.     Second, REX's dependency on aggregators (who in turn rely on the MLSs) to access a market for buyers and sellers exposed it to barriers that limited its ability to

---

[286] Declaration of Jack Ryan (Chief Executive Officer of Real Estate Exchange "REX") in *REX v. Zillow*.

[287] Calculated based on 2020 number, by dividing 1,400 transactions by REX over the sum of New Homes Sold (column 1) and Existing Homes Total Sales (Column 5) in https://www.nahb.org/-/media/NAHB/news-and-economics/docs/housing-economics/sales/nationwide-sales-and-inventory.pdf?rev=2a0e5741e9ea48c1b6e91a9b03677a5c&hash=D0A99213F8688CE67BB701E648D05ED8 from the National Association of Home Builders (NAHB).

[288] Papasan 30(b)(6) Dep. in *Moehrl* at 194:3–23 ("Q. Has Keller Williams ever viewed REX as a competitive threat to its market share?... A. I think that we benchmark anybody who's doing anything disruptive in our industry. I don't believe we've ever seen REX in particular as a threat to our standing. But if they were doing something disruptive, we would have been paying attention to it.").

[289] Gonzalez Dep. in *Burnett/Moehrl* at 219:2-220:5.

131

HIGHLY CONFIDENTIAL

expand in a meaningful way to impact changes in the market.[290] An example of this was the business interaction between REX and Zillow (the number one aggregator in the industry) and the impact to REX from changes Zillow implemented as part of its agreements with NAR and the MLSs.

256.     Zillow's business model depends on its ability to access complete and up to date listing data to attract consumers who are interested in selling or buying homes. Through the listings they aggregate and consumers they attract, Zillow is able to serve agents that choose to advertise with Zillow by providing them with leads.[291] The majority of the listing data that Zillow obtained prior to 2019 came from thousands of MLS syndication feeds.[292] The data Zillow obtained via syndication feeds posed several data challenges impacting the quality of listings Zillow could deliver. Among others, Zillow faced the following challenges with syndication feeds: lack of desired market coverage, lack of quality and completeness of listings within markets, substantial delays in receiving

---

[290] *See* Declaration of Jack Ryan (Chief Executive Officer of Real Estate Exchange "REX") in *REX v. Zillow* ¶¶19-20 ("REX listing's on Zillow's sites has been critical to REX's ability to reach consumers directly…. Many other sites, particularly Realtor.com, which is the second most visited residential home listing site, have been foreclosed to REX from the outset because they are controlled by NAR or MLSs and closed to REX listings.").

[291] Declaration of Errol Samuelson (Chief Industry Development Officer at Zillow Group) in *REX v. Zillow* ¶4.

[292] Declaration of Errol Samuelson (Chief Industry Development Officer at Zillow Group) in *REX v. Zillow* ¶¶31-32 ("Most recently, until it switched to IDX Feeds, Zillow obtained its property listings by entering into so-called "syndication agreements" with hundreds of MLSs, and thousands of individual participant brokers and franchise brands").

HIGHLY CONFIDENTIAL

data (making it less relevant to consumers), risk of losing access to data (from possible termination of agreements), and renegotiations and costs.[293]

257.     To eliminate these challenges, in 2019 Zillow made the decision to shift its approach to the way it obtained data from multiple MLSs from syndication feeds to IDX (internet data exchange, which is an automated data feed) feeds. This change would allow Zillow to streamline its receipt of more data and ensure the data was received in a timely manner, but also required Zillow to become a broker and member of multiple MLSs. By becoming a broker, however, Zillow was required to follow MLSs and NAR rules. Breaking MLS rules could result in losing IDX feeds and therefore losing access to data for a market.[294]

258.     Those rules included rules on how to display MLS listing data versus other listing data.[295] In implementing this necessary change to comply with MLS rules, Zillow separated MLS listings from other listings, including those from REX (which were not part of the MLS). According to REX, this change reduced traffic to REX listings by making it

---

[293] Declaration of Errol Samuelson (Chief Industry Development Officer at Zillow Group) in *REX v. Zillow* ¶¶ 39-50.

[294] Declaration of Errol Samuelson (Chief Industry Development Officer at Zillow Group) in *REX v. Zillow* ¶61.

[295] Declaration of Errol Samuelson (Chief Industry Development Officer at Zillow Group) in *REX v. Zillow* ¶62. *See also* NAR Handbook 2021 at 85, NAR_Battonl00927454 at -7553, Section 18.2.10 citing a mandatory rule stating, "An MLS An MLS participant (or where permitted locally, an MLS subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS participant (or MLS subscriber) holds participatory rights in those MLSs. As used in this policy, 'co-mingling' means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that participants may display listings from each IDX feed on a single webpage or display. (Adopted 11/14).").

HIGHLY CONFIDENTIAL

harder to see listings other than those in the MLS, severely impacting REX's business.[296]

REX's concern with Zillow's actions ultimately resulted in REX suing Zillow and others, including NAR,[297] for "impairing its ability to execute its innovative and disruptive business model and hence compete with NAR members."[298]

259.     Compounding its business woes, REX reported hundreds of phone calls demonstrating steering against its listed properties for not offering a standard unilateral offer of buyer agent commission.[299] REX subsequently shut down.

260.     The challenges faced by Zillow in accessing the data feeds without becoming a NAR member and implementing the Anticompetitive Rules—rules that limited the proliferation of discounters like REX—is evidence that discount brokers were not an effective means for the vast majority of homebuyers to avoid the Anticompetitive Rules.

---

[296] Declaration of W. Robert Majure in Support of Motion for Preliminary Injunction in *REX v. Zillow, Inc., et al.* (Case No, 2:21-cv-00312) ("Majure Declaration").

[297] *See REX v. Zillow, Inc., et al.* (Case No, 2:21-cv-00312).

[298] Majure Declaration ¶9.

[299] *See* "Recordings of Houston agents by rival brokerage reveal commission steering," Inman (2021), https://www.inman.com/2021/01/12/recordings-of-houston-agents-by-rival-brokerage-reveal-commission-steering/; *see also* "More than 700 agent steering calls suggest price-fixing, lawyers charge," Inman (2022), https://www.inman.com/2022/07/08/more-than-700-agent-steering-calls-suggest-price-fixing-lawyers-charge/.

HIGHLY CONFIDENTIAL

261.　　In light of the challenges I describe above, it is unsurprising that the market share of so-called discount brokers was extraordinarily low during the class period, with most of them less than 0.1%.[300]

### iv.　"Pocket Listings" Were Not a Viable Substitute for the Vast Majority of Homebuyers to Avoid the Challenged Rules.

262.　　Another method sometimes used by some brokers to match sellers and buyers is "pocket listings." Pocket listings are broadly off-MLS or Pre-MLS listings that are handled by brokers and marketed within their closed networks. While not illegal, it is a method 1) that is discouraged by NAR; 2) that has historically been reserved for specific circumstances (that results in different characteristics); and 3) that is limited in reach to a subset of general population. For all these reasons, the volume of these transactions has remained low. It is also worth noting that pocket listings are not necessarily at discounted fees.

263.　　First, the volume of pocket listings is reduced by the Clear Cooperation policy enacted by NAR in November of 2019.[301] This mandatory rule by NAR requires that

---

[300] *See* Anyhwere-Battonl-00036026 at 2 (█████████████████████████████████████

████████████████████████████████████████

████████████████); at 4 (identifying market share of certain discount brokers).

[301] NAR Handbook 2021, Section 17 at 33, NAR_Battonl00927454 at -7501. The rule further describes that "Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public.

HIGHLY CONFIDENTIAL

"[w]ithin one (1) business day of marketing a property to the public, the listing broker must submit the listings to the MLS for cooperation with other MLS participants...."

264.    Second, pocket listings have sometimes been a method pursued for particular circumstances where privacy is preferred over more exposure (via the MLS). Multiple blogs from market participants describe this being a method preferred in some luxury markets. For example, Redfin describes that one of the "pros" for utilizing this strategy is that sellers maintain strict privacy and control over who views their home, which can be appealing for high-profile or luxury properties."[302] Likewise, Realtor.com, quoting a REALTOR® at HomeServices in Los Angeles, describes that "Some people don't want the general public to know they're selling, or don't want to have pictures of the insides of their homes all over the internet – especially celebrities."[303]

265.    Third, the fact that pocket listings will not be on the MLSs intentionally leads to distributions within smaller networks. For example, agents may advertise the property within their brokerage with other agents (and collect fees on both sides).[304] This limits access to these listings by the general population who do not have agents within that

---

[302]*What Is a Pocket Listing?*, *Redfin Blog*, https://www.redfin.com/blog/what-is-a-pocket-listing/?msockid=0e8e023476d1604317f016bc777061d1 (accessed Sept. 22, 2025).

[303]Id. This article also describes that "Certain homeowners prefer selling their homes as a pocket listing...for a reduced commission... [and that while] [m]ost Realtors charge a flat 6% of the home's sale price for commission, [] a shrewd negotiator could knock that down a point or two because the Realtor doesn't have to invest a ton of money or time marketing the property."

[304] Note that many agents will list a property on Friday evening so that they have time to steer the listing to agent friends and colleagues in the same brokerage firm, thereby attempting to retain all of the seller and buyer agent fees. This is all done prior to submission of the listing to the MLS on a Monday, often simply to announce a listing and a sale.

HIGHLY CONFIDENTIAL

network. Note that pocket listings (Pre-MLS submission) will often have a quick private showing for colleagues within the same brokerage firm and to select agents, like a private open house for invited only guests.

266.     The combination of these factors suggest that the volumes of homes sold under this strategy are minimal and that they are not viable options for the general buyer population to bypass the Anticompetitive Rules impacting commissions they pay via MLS listings. This observation is further supported by market shares reflected by this method as analyzed by Zillow in 2025. Zillow states that "[it] analyzed a total of 10 million transactions, with 2.72 million meeting [their] strict inclusion criteria for comparing homes that sold on the MLS with privately listed sales.  In the sample analyzed, 96.7% of transactions were standard, on-MLS listings, **while 'pocket listings' accounted for 2%**. An additional 0.11% were off-MLS transactions with previous MLS records."[305] Similarly, an article by Realtor.com describes that "[p]ocket listings constitute only a slim percentage of total listings, [and that] by most estimates [it is] under 10% of the national total."[306]

---

[305] *Off-MLS Home Sellers Left More than $1 Billion on the Table the Past Two Year*, Zillow, https://www.zillow.com/research/mls-pln-sale-price-34846 (last accessed Sept. 22, 2025).

[306]*What Is a Pocket Listing? A Sneaky Way to Sell Your Home*, Realtor, https://www.realtor.com/advice/sell/pocket-listing-what-is-it/?msockid=0e8e023476d1604317f016bc777061d1 (last accessed Sept. 22, 2025); I will add that while there were observations of increases in "pocket listings" leading up to the implementation of the Clear Cooperation policy, that those were mostly "soon to come" listings that were prelisted as a way to either test the market or spend less time on the MLS.

**HIGHLY CONFIDENTIAL**

267.    In sum, whether by FSBO, through new home builders directly, the use of discount brokers, or pocket listings, the vast majority of homebuyers could not avoid the Anticompetitive Rules.

Respectfully submitted,



---

Norman G. Miller

September 22, 2025

## Bay Area Real Estate Information Services, Inc. (BAREIS MLS)

- ██████████████████████████████████████████████████████
- ██████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████████

████████████████████████████████████████████████████████
███████████████████████████████████████████

BAREIS_000001 ██████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████

[2] https://bareis.com/about/bareis.html ███████████████
BAREIS_000001 ██████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████ BAREIS_001643 at 1693
████████████████████████████████

[3] https://bareis.com/about/bareis.html ████████████████
BAREIS_000001 ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

[4] BAREIS_001643 at 1648 █████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

[5] BAREIS_000001 ████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████





[6] BAREIS_001643 at 1668

[7] BAREIS_001643 at 1679

BAREIS_000001



¹ 

² BEACHESMLS_000080 at 83

³ BEACHESMLS_000383 at 390

⁴ BEACHESMLS_000080 at 83

BEACHESMLS_000383 at 389

⁵ BEACHESMLS_000080 at 83

BEACHESMLS_000383 at 392

⁶ BEACHESMLS_000080 at 84

BEACHESMLS_000383 at 406





## **bridgeMLS**



- ██████████████████████████████████████████
  ███████████████████████████████████████████
  █████████████████████████████████████████[3]

- ██████████████████████████████████████████
  ███████████████

- ██████████████████████████████████████████
  ███████████████

- ██████████████████████████████████████████
  ██████████

---

[1] BRIDGEMLS_000108 ████████████████████████
████████████████████████████████████

[2] ████████████████████████████████████████
███████████████████

[3] BRIDGEMLS_000108 at 126 ██████████████████
████████████████████████████████████████
███████████████████████

[4] https://www.prnewswire.com/news-releases/east-bay-regional-data-announces-rebranding-and-changes-name-to-bridgemls-300445371.html ████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

[5] BRIDGEMLS_000108 at 115-118 ████████████████
████████████████████████

[6] BRIDGEMLS_000108 at 115-118 ████████████████
████████████████





## Bright MLS



- ██████████████████████████████████ [1] [2] ████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████. [3]

- ███████████████████████████████████████. [4]

- ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████).

- ████████████████████████████████████. [5] ████████
████████████████████████

[1] https://www.brightmls.com/our-story ████████████████████
████████████████

[2] ████████████████████████████████████████████
████████████████████████████████████████████

[3] BATTON_MLS-0004893 at 5390-5391.

[4] https://www.brightmls.com/our-story ████████████████████
████████

[5] BATTON_MLS-0004893 at 5393 ████████████████████████
████████████████████████████████████████████
████████████████████

[6] Id.



---

[7] BATTON_MLS-0004893 at 5413 ███████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████

[8] BATTON_MLS-0004893 at 5418 ███████████

████████████████████████████████████████

████████.

[9] BATTON_MLS-0004893 at 5419-5420 ███████

████████████████████████████████████████

████████████████████

[10] BATTON_MLS-0004893 at 5407-5408 ██████



## California Desert Association of REALTORS® (CDAR) MLS





[2] https://cdaronline.org/about-us/mission-statement

[3] https://cdaronline.org/about-us/mission-statement.

[4] https://cdaronline.org/about-us/mission-statement

BATTON_MLS-0009465 at 9471

[5] BATTON_MLS-0009465 at 9471-9474

[6] BATTON_MLS-0009465 at 9471-9474





at 950

BATTON_MLS-0009242 at 9244

## Carolina/Canopy MLS



- ████████████████████████████████████████[1] [2]
████████████████████████████████████████
████████████████████████████████████████[3]

- ████████████████████████████████████████
█

- ████████████████████████████████████████
████████████████████████████████████████
████████████████████████

- ███████████████████████████████████████.[5]

- ████████████████████████████████████████
██████████████

    █ ██████████████.[6]

---

[1] ████████████████████████████████████████
████████████

[2]  CMLS_002644 at 2650 ████████████

[3]  https://support.canopymls.com/kb/article/66-canopy-mls-service-area.

[4] CMLS_002644 at 2650 ████████████
███████████

[5] CMLS_003202 at 3205 ████████████████████
████████████████████████████
███████

[6] CMLS_002644 at 2690 ████████████████
████████████████████████
██████

- ○ ██████████████████[7].
  - ○ ████████████████████████████
    ████[8]

- ████████████████████████████████
  ██████████[9].

[7] CMLS_002644 at 2700 ████████████████████
██████████████████████████████████
[8] CMLS_002644 at 2692 ██████████████████████
██████████████████████████████████
████████████████████
[9] CMLS_002644 at 2673 ████████████████████
██████████████████████████████████
██████████████████████████████████
████████████████████

## California Regional MLS (CRMLS)





[1] BATTON_MLS-0002898

BATTON_MLS-0003011 at 3022

BATTON_MLS-0003131

[2]

[3] https://go.crmls.org/coverage-area (CRMLS Coverage Area Map).

[4] BATTON_MLS-0002898

BATTON_MLS-0003011 at 3022

BATTON_MLS-0003131





---

[5] BATTON_MLS-0003011 at 3022-3024 █████████████████████████
████████████████████████████████████

[6] BATTON_MLS-0003011 at 3022-3024 █████████████████████████
████████████████████████████████████

[7] BATTON_MLS-0003011 at 3039 ████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████

[8] BATTON_MLS-0003011 at 3052 ████████████████████████████

[9] BATTON_MLS-0003011 at 3055-3056 ████████████████████████

## <u>Charleston Trident (CHS) MLS</u>





[2] BATTON_MLS-0011057

[3] BATTON_MLS-0011258

[4] BATTON_MLS-0011057

[5] BATTON_MLS-0011057 at 11058





## Contra Costa Association of REALTORS® (CCAR) MLS



----

[1] ████████████████████████████████████████████████████

[2] https://ccartoday.com ████████████████████████████████████████████████

[3] CTRL02212370 at p. 15.

[4] https://ccartoday.com ████████████████████████████ CTRL02212370 at p. 6

[5] CTRL02212370 at pp. 6-8 ████████████████████████



[6]

[7]

- 

  ○ [8]
  ○

    [9]

- [10]

[1]

- ion.[12]

---

[6] CTRL02212370 at pp. 6-8

[7] CTRL02212370 at p. 23

[8] CTRL02212370 at pp. 44-45

[9] CTRL02212370 at p. 37

[10] CTRL02212370 at pp. 6-8

[11] CTRL02212370 at pp. 6-8

[12] CTRL02212370 at pp. 48-49



## Des Moines Area Association of REALTORS® (DMAAR) MLS



[2] https://www.dmaar.com/about-us

[3] https://www.dmaar.com/members/mls-info/des-moines-mls-area-definition-map; https://www.dmaar.com/members/membership-info

[4] https://www.dmaar.com/about-us

[5] BATTON_MLS-0011706 at 12069

[6] BATTON_MLS-0011706 at 12071





[7] BATTON_MLS-0011706 at 12078

[8] BATTON_MLS-0011706 at 12072

[9] BATTON_MLS-0011706 at 12061-12062

### Florida Gulf Coast MLS



- ███████████████████████████████████████ [1] [2]
  █████████████████████████ [3]

- █████████████████████████████████████████████████████ [4]

- ███████████████████████████████████████████████
  ███████████████████████████████████████████████
  ███████████████████████████████████
  ████████████████

- ███████████████████████████████████████████
  ██████████ [5]
  ████████████ [6]
  ████████████████████████████████

- ████████████████████████████████████
  ███████████████████████

---

[1] █████████████████████████████████████████████████
████████████████████████████

[2] https://rpcra.org/about-rpcra/about-us/history.html ████████████
███████████████████

[3] https://rpcra.org/about-rpcra/about-us/history.html.

[4] https://rpcra.org/about-rpcra/about-us/history.html ████████████
████████████████

[5] BATTON_MLS-0023960 at 23965 ████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████

[6] BATTON_MLS-0023960 at 23983 ████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████

- ○ ██████████████████████[7]
- ○ ████████████████████████[8]
- ○ ████████████████████████████████████████████[9]

- ● ██████████████████████████████████████████████
  ███████████████████████████████[10]

---

[7] BATTON_MLS-0023960 at 23989 ████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████

[8] BATTON_MLS-0023960 at 23994 ██████████████████████████████
███████████████████████████████████

[9] BATTON_MLS-0023960 at 23989 ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████

[10] BATTON_MLS-0023960 at 23977 ████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████

### Fresno Association of REALTORS® (Fresno MLS)









## Greater Las Vegas Association of REALTORS® (GLVAR) MLS



- ██████████████████████ [1] [2] ████████████████████
  ███ [3]

- ████████████████████████████████████████████████ [4]

- ████████████████████████████████████████
  ████████████████████████████████████
  ████████████████████████████████
  ██████████████████████████

- ████████████████████████████████████
  ██████ [5] ████████████████████
  █████████████ [6] ██████████████████
  ████████████████████████████

- ████████████████████████████████████
  █████████████████

---

[1] BATTON_MLS-0013051 at 13059 ████████████████████████
██ ██████████████████████████████████████
██ [3] BATTON_MLS-0013051 at 13065 ██████████████████████████
███
[4] BATTON_MLS-0013051 at 13059 ██████████████████████
[5] BATTON_MLS-0013051 at 13059-13060 ███████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████
[6] BATTON_MLS-0013051 at 13103 ██████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████
████████████





[7] BATTON_MLS-0013051 at 13090-13094 ████████████████████████
██████████

[8] BATTON_MLS-0013051 at 13110 ████████████████████████

[9] BATTON_MLS-0013051 at 13096 ████████████████████████

[10] BATTON_MLS-0013051 at 1308 ████████████████████████

## 12.     Heartland Multiple Listing Service, Inc.



- ████████████████████████████████ [1] [2] ████████████
  ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████████████████ [3] ████████████

- ████████████████████████████████████████████████ S®. [4]

- ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████████████████

- ████████████████████████████████████████████. [5]

- ████████████████████████████████████████████████
  ████████████████████████

<hr />

[1] ████████████████████████████████████████████
████████████████████████████████████████

[2] https://kcrar.com/kcrar-members/heartland-mls/about-heartland-mls (█████████████████████████

[3] KCRAR_0000173 at 201 ██████████████████████
████████████████████████████████████████████████████
██████████████████████████
██████████

[4] https://kcrar.com/kcrar-members/heartland-mls/about-heartland-mls ████████
████████████████████ KCRAR_0000173 at 202 ██████
████████████████████████████████

[5] KCRAR_0000173 at 201 ██████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████

- ○ ██████████████[6]
  ○ ████████████████████████[7]

- ██████████████████████████████
  █████████████████████[8]



---

## Maris MLS (Mid-America Regional Information Systems, Inc.)



- ████████████████████████████ [1] [2] ████████████████████████████
  ████████ [3]

- ████████████████████████████████████ [4]

- ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████

- ████████████████████████████ [5]

---

[1] ████████████████████████████████████████████████
████████████████████████████████████████

[2] BATTON_MLS-0017841
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

[3] BATTON_MLS-0017841 at 17845
████████████████
https://marismls.com/userfiles/kcfinder/files/2023%20MARIS%20Footprint.pdf ████████████
████████

[4] BATTON_MLS-0017841
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

[5] BATTON_MLS-0017445
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████
████████████



[6] MLS Grid IDX Rules ¶ 16, available at https://www.mlsgrid.com/resources ("Commingling of Data/Displaying Property Information from Other Sources … The search results and display of listing information and property details sourced from MLSs (including through the MLS GRID) may be augmented with property information from other non-MLS sources subject to the following: … the source of the information must be prominently identified in the search results and in the display of the property's details.").

[7] BATTON_MLS-0017841 at 17857

## Metro MLS



- ██████████████████████████[1] ████████████████████████
  ████████████████████[3].

- ████████████████████████████████████████████████████[4]

- ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████████████

- ██████████████████████████████████[5].

- ████████████████████████████████████████████████████
  ████████████████████████

  - ██████████████████████[6]

---

[1] See Objections and Responses of Defendant National Association of REALTORS® to Plaintiff's First Set of Interrogatories, Interrogatory No. 1 Answer at pp. 5 – 6 ████████████████████████████
████████████████████████████████████████████████████████

[2] METROMLS000001 at 81 ████████████████████████████████
████████████████████████████████████████████████████████

[3] https://metromls.com/index.php/about-metro-mls ████████ https://metromls.com/how-to-join
████████████████████████████████████████

[4] METROMLS000001 at 81 ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

[5] METROMLS000001 at 81 ████████████████████████████████
████████████████████████████

[6] METROMLS000001 at 31 ████████████████████████████████
████████████████████████████████████████████████████████





## Miami MLS





---

[1] ███████████████████████████████████████████

[2] BATTON_MLS-0018104 at 18182 ███████████████

[3] BATTON_MLS-0018104 at 18189.

[4] BATTON_MLS-0018104 at 18182 ███████████████

[5] BATTON_MLS-0018104 at 18184 ███████████████



ngling.[9]



## Midwest Real Estate Data (MRED) MLS

- ███████████████████████████████████████ 
███████████████████████████
███████

- █████████████████████████████████████. ³

- 

- ███████████████████████████████████. ⁵

- █████████████████████████████████
███████

---

¹ https://ww2.mredllc.com/associations-brokerages/brokerages ("While most MLSs around the country are solely owned by REALTOR® Associations, MRED is proud to be brokerage-owned and controlled. Associations do still hold an important ownership aspect, but MRED's distinctive model allows the MLS to cater to the wants and needs of those who use it the most: brokers!").

² https://ww2.mredllc.com/about/who-we-are ("Midwest Real Estate Data (MRED) serves real estate professionals in Chicagoland and the surrounding counties. As a top-rated multiple listing service (MLS), we provide property information for northern Illinois, southern Wisconsin, and northwest Indiana.").

³ https://ww2.mredllc.com/associations-brokerages/brokerages ("While most MLSs around the country are solely owned by REALTOR® Associations, MRED is proud to be brokerage-owned and controlled. Associations do still hold an important ownership aspect, but MRED's distinctive model allows the MLS to cater to the wants and needs of those who use it the most: brokers!").

⁴ BATTON_MLS-0019824 at 19837



BATTON_MLS-0019824 at 19832



---



[6] Compare BATTON_MLS-0019664 (rev. 9/24/2019) at 19697 and BATTON_MLS-0019882 (rev. 3/23/2020) at 19914

BATTON_MLS-0019766 (rev. 9/30/2020) at 19798

BATTON_MLS-0019824 (rev. 3/26/2021) at 19856

[7] BATTON_MLS-0019824 at 19864

[8] BATTON_MLS-0019824 at 19857

[9] BATTON_MLS-0019824 at 19832

[10] BATTON_MLS-0019824 at 19869

## **MiRealSource**

- ███████████████████████████████[1], ████████████████████████████
  ███████████████████[2]

- ███████████████████████████████[3]

- 

- ███████████████████████████████████[6]

- ████████████████████████████████████[7]

---

[1] https://www.mirealsource.com/page.cfm?pageid=115 ("MiRealSource is the largest broker-owned multiple listing service (MLS) in Michigan.... Currently, MiRealSource vendors eight (8) MLSs on their custom version of Black Knight's Paragon platform—giving the vendored MLSs their own board-level autonomy and control. MiRealSource began vendoring MLSs back in 2012 as a way to grow a larger geographic footprint, begin better data sharing operations and to help with standardizing the data for use in new innovative products.").

[2] https://www.mirealsource.com/page.cfm?pageid=115 (noting that "MiRealSource allows agents to quickly and accurately search properties in Southeast Michigan"); https://www.mirealsource.com/page.cfm?pageid=90 (MiRealSource's Data Sharing Map).

[3] https://www.mirealsource.com/page.cfm?pageid=115 ("MiRealSource is the largest broker-owned multiple listing service (MLS) in Michigan.... Currently, MiRealSource vendors eight (8) MLSs on their custom version of Black Knight's Paragon platform—giving the vendored MLSs their own board-level autonomy and control. MiRealSource began vendoring MLSs back in 2012 as a way to grow a larger geographic footprint, begin better data sharing operations and to help with standardizing the data for use in new innovative products.").

[4] BATTON_MLS-0004114 at 4136 ████████████████████████████████████

[5] BATTON_MLS-0004114 at 4160 ████████████████████████████████████
████████████████████████████████████

[6] BATTON_MLS-0004114 at 4119 ████████████████████████████████████
████████████████████████████████████

[7] BATTON_MLS-0004114 at 4152 ████████████████████████████████████
████████████████████████████████████ id. at 4122



## MLS FLK



[1] ██████████████████████████████████████████████████████

[2] CTRL02212574 at p. 56 ████████████████████████████████████████

[3] CTRL02212574 at p. 56 ███████████████████████████████████

[4] CTRL02212574 at p. 56 ████████████████████████████████████████

[5] CTRL02212574 at p. 57 ███████████████████████████████████

[6] CTRL02212574 at p. 58 ████████████████████████████████████████





## **MLS Greenbrier Valley**



- ██████████████████████████████████████[1] [2] ██████████████████████
  ██████████████████████████████████████████████████.[3]

- █████████████████████████████████████████████████████
  ████████████[4]

- ████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████
  ████████████████████████████████████████

- ████████████████████████████████████████.[5]

- ███████████████████████████████████████████████
  ████████████████

  - ██████████████████.[6]

---

[1] ████████████████████████████████████████████████████
  ████████████████████████████████████.

[2] BATTON_MLS-0003304 at 3361
  ████████████████████████████████████████████████████
  ███████████████████████████████

[3] https://gvbor.com/area-information.

[4] BATTON_MLS-0003304 at 3361
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████
  ███████████████████████████

[5] BATTON_MLS-0003304 at 3317
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████
  █████████████████████████████

[6] BATTON_MLS-0003135 at 3142
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ███████████████████████████████

○ [7].
○
8

● 9.

---

[7] BATTON_MLS-0003135 at 3168

[8] BATTON_MLS-0003304 at 3386

[9] BATTON_MLS-0003304 at 3373



## <u>MLS Maine Listings</u>



[1] ███████████████████████████████████████████████████

[2] BATTON_MLS-0015950

BATTON_MLS-0014565

[3] BATTON_MLS-0014565

[4] BATTON_MLS-0015950

[5] BATTON_MLS-0015950 at 15971

[6] BATTON_MLS-0015950 at 15971



- ███████████████████████████████████████████████████████

    ○ ████████████████████.[7]
    ○ █████████████████████.[8]
    ○ █████████████████████████████████████████
      █████████████.[9]

- ████████████████████████████████████████████████████████████
  ██████████████████████.[10]

---

[7] BATTON_MLS-0015950 at 15965-15966 █████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████
[8] BATTON_MLS-0015950 at 15978 ████████████████████████████████████
███████████████████████████████████████
[9] BATTON_MLS-0015950 at 15973 ███████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
[10] BATTON_MLS-0015950 at 15963 ██████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████

## MLS Oregon Data Share [Cascades East MLS, South Oregon MLS, and Klamath County Association of REALTORS®]



---

[1] https://www.oregondatashare.com/whoweare ("The Oregon Data Share is owned by the Cascades East MLS, the Southern Oregon MLS, and the Klamath County Association of REALTORS®. The data share is governed by the ODS Board of Managers, comprised of members from the three owners.").

[2] ████████████████████████████████████████████

[3] https://www.oregondatashare.com/whoweare ████████████████

[4] https://www.oregondatashare.com/whoweare ████████████████████

BATTON_MLS-0021278 ████████████████████
BATTON_MLS-0021279 ████████████

[5] BATTON_MLS-0021123 at 21136-21137 ██████████████
████████████████████████████

[6] BATTON_MLS-0021123 at 21138 ████████████████████
████████████████████████

- ○ ███████████████████.[7]
- ○ ████████████████████████████.[8]

- ███████████████████████████
  ██████████.[9]

---

████████████████████████████████████

[7] BATTON_MLS-0021123 at 21143 ████████████████

████████████████████████████████

[8] BATTON_MLS-0021123 at 21139 ██████████████████████

█████████████████████████████████

████████████████████████████

[9] BATTON_MLS-0021123 ████████████████████████

███████████████████████████████████

████████████████

## MLS Property Information Network (MLS PIN)

- ███████████████████████████████████████████[1]
███████████████████████████████████████████████
████████████████████████████[2]

- ████████████████████████[3]

- ████████████████████████████████████████████████
███████████████[4]████████████████████████████████
████████████████████████████████████████████████
██████████████████

- ██████████████████████████████████.[5]

- ████████████████████████████████████████████████
███████████[6]

---

[1] https://www.mlspin.com/about ("MLS PIN is one of the largest broker-owned multiple listing services in the nation."); https://www.mlspin.com/about/become-a-stockholder ("Stock may be purchased only by an MLS PIN Participant who is a Massachusetts licensed broker and office owner.").

[2] MLSPINBL 001508 at 3080 █████████████████████████████████
███████████████████████████████████████

[3] https://www.mlspin.com/about ████████████████████████████████████
███████████████████████████

[4] MLSPINBL 001508 at 3063 ██████████████████████████████████████
██████████████████████████████████████

[5] MLSPINBL 001508 at 307 ███████████████████████████████████████
█████████████

[6] MLSPINBL 001508 at 3066 █████████████████████████████████████
█████████████████████████████████████

## NorthstarMLS





3 BATTON_MLS-0020765 at 20767.

5 BATTON_MLS-0020765 at 20767





[6] BATTON_MLS-0020765 at 20775

[7] BATTON_MLS-0020765 at 20782

[8] BATTON_MLS-0020765 at 20775

## OneKey MLS

-  [1] [2] . [3]

- [4]

- 

- [5]

- 

---

[1] See Objections and Responses of Defendant National Association of REALTORS® to Plaintiff's First Set of Interrogatories, Interrogatory No. 1 Answer at pp. 5 – 6 ("The Spreadsheet Bates-stamped NAR_BattonI01176862 …reflects all NAR-Affiliated MLSs as of July 29, 2025.") and BattonI01176862.

[2] https://www.onekeymls.com/about-us ("OneKey® MLS is owned and operated by the Long Island Board of REALTORS® and the Hudson Gateway Association of REALTORS®.").

[3] BATTON_MLS-0020949 at 20964

[4] https://www.onekeymls.com/about-us ("OneKey® MLS is owned and operated by the Long Island Board of REALTORS® and the Hudson Gateway Association of REALTORS®.").

[5] ONEKEY_000115 at 123-124





## Realcomp II



- ██████████████████████████ [1] [2] ████████████████████
  ██ [3]

- ████████████████████████████ . [4]

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████

- ████████████████████████████ . [5]

- ████████████████████████████████████████████████████
  ████████████████████

  ○ ████████████████ ule. [6]
  ○ ████████████████████████████ . [7]

---

[1] See Objections and Responses of Defendant National Association of REALTORS® to Plaintiff's First Set of Interrogatories, Interrogatory No. 1 Answer at pp. 5 – 6 ██████████████████████
███████████████████

[2] BATTON_MLS-0006628 ████████████████████████████████

[3] BATTON_MLS-0008947 at 8952.

[4] BATTON_MLS-0006628 ████████████████████

[5] BATTON_MLS-0008947 at 8949 ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

[6] BATTON_MLS-0008947 at 8987 ████████████████████████
████████████████████████████████████████████████████

[7] BATTON_MLS-0008947 at 8981 ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████

- ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████[8]

---

[8] BATTON_MLS-0008947 at 8962 ████████████████████████████████

## Regional Multiple Listing Service, Inc. (RMLS)



- ████████████████████████████████ [1] [2] ████████████████████████████████████████████████████ [3]

- ████████████████████████████████████████████████████ [4]

- ████████████████████████████████████████████████████████████

- ████████████████████ [5]

---

[1] See Objections and Responses of Defendant National Association of REALTORS® to Plaintiff's First Set of Interrogatories, Interrogatory No. 1 Answer at pp. 5 – 6 ████████████████████

[2] RMLS000120 ████████████████████████████████████

[3] RMLS000462 at 465. See also https://rmlscentral.com/our-story-2 ████████████████████████

[4] RMLS000120 ████████████████████████████████

[5] RMLS000120 at 120-121 ████████████████████████████





## San Diego Association of REALTORS® (SDMLS)





---

[1] See Objections and Responses of Defendant National Association of REALTORS® to Plaintiff's First Set of Interrogatories, Interrogatory No. 1 Answer at pp. 5 – 6 ███████████████████

[2] SDMLS_000007 at p. 2 ███████████████████████████████

[3] SDMLS_000007 at p. 1 ████████████████████

[4] SDMLS_000007 at p. 2 ██████████████████████ SDMLS_000261 at 267 ██████████████████████████████████████████████

[5] SDMLS_000261 at 268-270 ████████████████████

[6] SDMLS_000261 at 268-270 █████████████

[7] SDMLS_000261 at 284 ██████████████████████████████████████





## SmartMLS



BATTON_MLS-0001899 at 1942

[2] BATTON_MLS-0002093 at 2095

[3] BATTON_MLS-0002093

BATTON_MLS-0001899 at 1942

[4] BATTON_MLS-0001899 at 1901

[5] BATTON_MLS-0001899 at 1901

BATTON_MLS-0001899 at 1902

- ██████████████████████████████████████████████████████████████[7]

---

[7] BATTON_MLS-0001899 at 1929-1930

## South Central Kansas MLS



- ██████████████████████████████████ [1] [2]
  ███████████████████████████████████
  ███████████████ [3]

- ███████████████████████████████████ [4]

- ███████████████████████████████████
  ███████████████████████████████████
  ████████████████████

- █████████████████████████████. [5]

- ███████████████████████████████████
  ███████████████████████

  ○ ██████████████. [6]

---

[1] https://www.sckrealtors.com/resources/south-central-kansas-mls ("SCK MLS is a wholly-owned subsidiary of the REALTORS of South Central Kansas.").

[2] See Objections and Responses of Defendant National Association of REALTORS® to Plaintiff's First Set of Interrogatories, Interrogatory No. 1 Answer at pp. 5 – 6 ███████████████████
████████████████████████████████████

[3] https://www.sckrealtors.com/resources/south-central-kansas-mls ("SCK MLS covers a service area of 18 counties—Barton, Butler, Chase, Cloud, Cowley, Ellsworth, Harvey, Jewell, Lincoln, Marion, Mitchell, Morris, Ottawa, Republic, Russell, Saline, Sedgwick, and Sumner.").

[4] https://www.sckrealtors.com/resources/south-central-kansas-mls ("SCK MLS is a wholly-owned subsidiary of the REALTORS of South Central Kansas.").



[5] BATTON_MLS-0021728 at 21735 █████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████

[6] BATTON_MLS-0021728 at 21752 ███████████████████████████████
████████████████████████████████████
████████████████████████████████





### Stellar MLS





---

[1] See Objections and Responses of Defendant National Association of REALTORS® to Plaintiff's First Set of Interrogatories, Interrogatory No. 1 Answer at pp. 5 – 6 ████████████████████

[2] STELLAR_001246 at 1296 ████████

[3] https://www.stellarmls.com/about/shareholders (Stellar MLS Coverage Map).

[4] STELLAR_001246 at 1296 ████████

[5] STELLAR_001246 at 1300 ████████████████████

[6] STELLAR-001246 at 1286 ████████████████████





## SWMLS/GAAR





[1] See Objections and Responses of Defendant National Association of REALTORS® to Plaintiff's First Set of Interrogatories, Interrogatory No. 1 Answer at pp. 5 – 6

[2] BATTON_MLS-0022243

[3] https://www.gaar.com/about.

[4] BATTON_MLS-0022243

[5] BATTON_MLS-0022804

BATTON_MLS-0022243 at 22541

[6] BATTON_MLS-0022243 at 22563

- ○ █████████████████████[7]
- ○ ████████████████████████████████████████[8]

- ● █████████████████████████████████████████████████████████
  ████████████████████████[9]

---

[7] BATTON_MLS-0022243 at 22569 ████████████████████████
████████████████

[8] BATTON_MLS-0022243 at 22564 ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

[9] BATTON_MLS-0022243 at 22553 ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

## TheMLS/CLAW (Combined Los Angeles/Westside MLS)



- ███████████████████████████[1][2]████████████████████
  █████████████████[3]

- ██████████████████████████████████████████████████
  ████████████████[4]

- ██████████████████████████████████████████████████
  ██████████████████████████████████████████████████
  ███████████

- ██████████████████████████████████████████████████
  ████████████████████[5]

---

[1] See Objections and Responses of Defendant National Association of REALTORS® to Plaintiff's First Set of Interrogatories, Interrogatory No. 1 Answer at pp. 5 – 6 ████████████████████████
███████████████████████████████████

[2] CTRL02212667 at p. 7 ██████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████

[3] https://www.themls.com/Signin/login#/about (stating that TheMLS/CLAW is "a leading multiple listing service that serves over 16,000 agents and brokers in Southern California");
https://www.themls.com/vestamapareas.

[4] CTRL02212667 at p. 7 ████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████
██████████████████████████████████████████

[5] CTRL02212667 at pp. 7-9 ████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████



- ███████████████████████████████████████████████████████████████████

  ○ ████████████████████████████████████████████████.[7]

- ███████████████████████████████████████████████████████████████████.[8]

---

[6] I did not find evidence of the adoption of this rule in the documents that I reviewed.

[7] CTRL02212667 at p. 40 █████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

[8] CTRL02212667 at p. 19 ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

## Triad MLS



- ████████████████████ [1] [2]
  ███████████████████████████.[3]

- ██████████████████████████
  ████████[4]

- ████████████████████████████
  ████████████████████████████
  ██████████████████

- ████████████████.[5]

---

[1] See Objections and Responses of Defendant National Association of REALTORS® to Plaintiff's First Set of Interrogatories, Interrogatory No. 1 Answer at pp. 5 – 6 ███████████████.

[2] BATTON_MLS-002296 ████████████████
████████████████████████
████████████████████

[3] BATTON_MLS-0023659 at 23665 ██████████
████████████████████████

[4] BATTON_MLS-0022966 ████████████████
████████████████████████
█████████████████████

[5] BATTON_MLS-0022966 at 22967 ████████████
████████████████████████
████████████████████
████████████████

- ███████████████████████████████████████████████████████
  ████████

  - ███████████████████████████████████████████████████.[6]

- ███████████████████████████████████████████████████████
  █████████████[7]

[6] BATTON_MLS-0023659 at 23687 ████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████

[7] BATTON_MLS-0023659 at 23675-23676 ████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████

## Triangle MLS (Doorify)



- ██████████████████████████████████[1] [2]████████████████████
  ██████████████████████████████████████████████████████████.[3]

- ███████████████████████████████████████████.[4]

- ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ██████████████████████████████

- ███████████████████████████████████████████.[5]

- ████████████████████████████████████████████████
  ████████████████████████████████

  ○ ██████████████████████.[6]

---



[1] See Objections and Responses of Defendant National Association of REALTORS® to Plaintiff's First Set of Interrogatories, Interrogatory No. 1 Answer at pp. 5 – 6██████████████████████████

[2] DOORIFYMLS_000139██████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

[3] DOORIFYMLS_000591 at 601.

[4] DOORIFYMLS_000139███████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████

[5] DOORIFYMLS_000591 at 618 ('████████████████████████████████
██████████████████████████

[6] DOORIFYMLS_000591 at 618 ████████████████████████████████████
████████████████████████████████████████████

- ○ ███████████████████████████████████████████████.[7]

- ● ████████████████████████████████████████████████████
  ███████████████████████████.[8]

███████████████████████████████████████████████████████
██████████

[7] DOORIFYMLS_000591 at 622 █████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

[8] DOORIFYMLS_000591 at 611-612 ████████████████████████
████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████

## **Wasatch Front Regional MLS**



* ███████████████████████████████████████████ [1] [2]
  ███████████████████████████████████████
  ██████ [3]

* █████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████. [4]

* ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  █████████████████████████████

* ████████████████████████████████████████. [5]

* ████████████████████████████████████████████
  ████████████████████████

  ○ ████████████. [6]
  ○ ██████████████. [7]

---

[1] See Objections and Responses of Defendant National Association of REALTORS® to Plaintiff's First Set of Interrogatories, Interrogatory No. 1 Answer at pp. 5 – 6 ████████████████████████.

[2] BATTON_MLS-0002798 ████████████████████████████████████████
██████████████████████████████████████

[3] BATTON_MLS-0002505 at 2522.

[4] BATTON_MLS-0002798 ████████████████████████████████████
████████████████████████████████████████████
██████████████████████████

[5] BATTON_MLS-0002505 at 2514 ████████████████████

[6] BATTON_MLS-0002505 at 2546 ████████████████████
████████████████████████████████████████████
███████████████████████████

[7] BATTON_MLS-0002505 at 2553 ████████████████████
████████████████████





[8] BATTON_MLS-0002505 at 2544-2545

[9] BATTON_MLS-0002505 at 2535

**Appendix 2 – MLS Footprint Maps**

MLS Transactions for CRMLS



MLS Transactions for DMAAR MLS



MLS Transactions for DOORIFY



MLS Transactions for FGC



MLS Transactions for FLKEYS



MLS Transactions for FRESNO



MLS Transactions for GREENBRIER



## MLS Transactions for MAINELISTINGS



MLS Transactions for MARISMLS



MLS Transactions for MIAMIMLS



MLS Transactions for BAREIS



MLS Transactions for MIREALSOURCE



MLS Transactions for MRED



MLS Transactions for ONEKEY



MLS Transactions for OREGON



MLS Transactions for REALCOMPII



MLS Transactions for SCKANSAS



MLS Transactions for SMARTMLS



MLS Transactions for STELLAR



MLS Transactions for SWMLS



MLS Transactions for TRIAD



MLS Transactions for BEACHESMLS



MLS Transactions for BRIDGEMLS



MLS Transactions for BRIGHTMLS



MLS Transactions for CDAR



MLS Transactions for CHTRIDENT



MLS Transactions for CLAW



MLS Transactions for CONTRACOSTA



**Appendix 3 – State-Level Market Participation Maps**

## MLS Participation by Zip Code in California



## MLS Participation by Zip Code in Florida



## MLS Participation by Zip Code in Illinois



## MLS Participation by Zip Code in Michigan



## MLS Participation by Zip Code in North Carolina





**Appendix 4 – Local HPI vs. CPI Growths for Each MLS**























































28

















## Case Documents

Amended Complaint

Competition in the Real Estate Brokerage Industry," Federal Trade Commission and U.S. Department of Justice Report, April 2007

Objections and Responses of Defendant National Association of REALTORS® to Plaintiffs' First Set of Interrogatories

08/04/25 NAR Responses to Interrogatory No. 3

## Books and Publications

Barwick, P. J., & Wong, M. (2019). Competition in the real estate brokerage industry: A critical review. The Brookings Institution Publication, 1-38.

Gilbukh, S., & Goldsmith-Pinkham, P. (2019). Heterogeneous Real Estate Agents and the Housing Cycle.

Viscusi, W. K., Harrington Jr, J. E., & Sappington, D. E. (2018). Economics of Regulation and Antitrust. MIT press.

Han, L., & Strange, W. C. (2015). The microstructure of housing markets: Search, bargaining, and brokerage. Handbook of regional and urban economics, 5, 813-886.

Shampanier, K., Mazar, N., & Ariely, D. (2007). Zero as a special price: The true value of free products. Marketing Science, 26(6), 742-757.

Gabaix, Xavier and Laibson, David, (2005), Shrouded attributes, consumer myopia, and information suppression in competitive markets, No 11755, NBER Working Papers, National Bureau of Economic Research, Inc.

Barry, J. M., Fried, W., & Hatfield, J. W. (2024). Et tu, agent? commission-based steering in residential real estate. Iowa Law Review, 110, 1473.

Barwick, P. J., Pathak, P. A., & Wong, M. (2017). Conflicts of interest and steering in residential brokerage. American Economic Journal: Applied Economics, 9(3), 191-222.

Owen, B. M. (1977). Kickbacks, Specialization, Price Fixing, and Efficiency in Residential Real Estate Markets. Stanford Law Review, 931-967.

Alford, R. P., & Harris, B. H. (2021). Anticompetition in Buying and Selling Homes. Regulation, 44, 28.

Stewart, M. (2021). Buyer Beware: Who Is Paying the Home Buyer's Real Estate Agent?. University of Miami Business Law Review, 30, 73.

Hendel, I., Nevo, A., & Ortalo-Magné, F. (2009). The relative performance of real estate marketing platforms: MLS versus FSBOMadison. com. American Economic Review, 99(5), 1878-1898.

Hsieh, C. T., & Moretti, E. (2003). Can free entry be inefficient? Fixed commissions and social waste in the real estate industry. Journal of Political Economy, 111(5), 1076-1122.

Miller, N. G., & Shedd, P. J. (1979). Do antitrust laws apply to the real estate brokerage industry. American Business Law Journal , 17, 313.

Miller, N. (2021).Revisiting Residential Brokerage Fees in a More Technologically Advanced World. Real Estate Issues, 45(2)

Delcoure, N., & Miller, N. G. (2002). International residential real estate brokerage fees and implications for the US brokerage industry. International Real Estate Review, 5(1), 12-39.

Delcoure, N., & Miller, N. G. (2001).How do US Residential Brokerage Trends & Fees Compare to the Rest of the World?  Real Estate Issues,  Fall

Emrath, Paul, "More New Homes Needed to Replace Older Stock", NAHB Economics and Housing Policy Group, August 2, 2018

"Why you Need A Real Estate Agent to Buy a Home" by Dan Bergman, Redfin Blog, Feb. 12, 2015,

"The Agency Mess" by Stephen Brobeck, Consumer Federation of America, Jan. 14, 2019,

Butters, G. R. (1983). The residential real estate and brokerage industry: Los Angelas Regional Office Staff Report. Federal Trade Commission.

"Prestige, Promotion, and Pay," Harvard Law School Forum on Corporate Governance, April 2024

"From subagency to non-agency: a history" by Matt Carter, Feb. 17, 2012

Real Estate Commissions and Home Search Efficiency by Borys Grochulski and Zhu Wang, Federal Reserve Bank of Richmond, Economic Brief No. 24-08

**Data**

mls_wAttom_ID_final.dta ("MLS Data")

Exhibit C ("Data Appendix") to Dr. Rosa Abrantes-Metz Report

U.S. Federal Housing Finance Agency, All-Transactions House Price Indices

U.S. Bureau of Labor Statistics, Consumer Price Indices retrieved from FRED, Federal Reserve Bank of St. Louis.

**Produced Documents**

BATTON_MLS_0003840

MLSPINBL 003191

**Anyhwere-BattonI-00036026**

**Anywhere-BattonI-00029414**

**Anywhere-BattonI-00030235**

Anywhere-BattonI-00031114

BAREIS_000001

BAREIS_001643

BATTON_MLS-0001899

BATTON_MLS-0002093

BATTON_MLS-0002505

BATTON_MLS-0002798

BATTON_MLS-0002988

BATTON_MLS-0003011

BATTON_MLS-0003131

BATTON_MLS-0003135

BATTON_MLS-0003304

BATTON_MLS-0004114

BATTON_MLS-0004893

BATTON_MLS-0006628

BATTON_MLS-0008947

BATTON_MLS-0009465

BATTON_MLS-0011057

BATTON_MLS-0011258

BATTON_MLS-0011706

BATTON_MLS-0013051

BATTON_MLS-0014565

BATTON_MLS-0015950

BATTON_MLS-0017445

BATTON_MLS-0017841

BATTON_MLS-0018104

BATTON_MLS-0019766

BATTON_MLS-0019824

BATTON_MLS-0020765

BATTON_MLS-0020949

BATTON_MLS-0021123

BATTON_MLS-0021278

BATTON_MLS-0021279

BATTON_MLS-0021390

BATTON_MLS-0021728

BATTON_MLS-0022243

BATTON_MLS-0022804

BATTON_MLS-0022966

BATTON_MLS-0023659

BATTON_MLS-0023960

BEACHESMLS_000080

BEACHESMLS_000383

BRIDGEMLS_000108

CMLS_002644

CTRL02212370

CTRL02212574

CTRL02212667

DOORIFYMLS_000139

DOORIFYMLS_000591

FRESNO_000001

KCRAR_0000173

KWRI_00574778

KWRI-Batton-00143347

KWRI-Batton-00146849

KWRI-Batton-00923050

KWRI-Batton-01046131

METROMLS000001

MLSPINBL 001508

NAR_BattonI00003363

NAR_BattonI00003945

NAR_BattonI00003945

NAR_BattonI00006629

NAR_BattonI00008176

NAR_BattonI00008356

NAR_BattonI00976458

NAR_BattonI00991987

NAR_BattonI01176862

NAR_BattonI0215749

NAR_BattonI0324451

**NAR_BattonI0356931**

NAR_Battonl00004594

NAR_Battonl00007202

ONEKEY_000115

Realogy-Sitzer-00848457

**RMLLC-Batton_01260139**

RMLS000120

RMLS000462

SDMLS_000007

SDMLS_000261

STELLAR_000090

STELLAR_001246

BATTON_MLS-0023659

NAR_Battonl01176862

BATTON_MLS-0002898

BATTON_MLS-0009242

BATTON_MLS-0019664

BATTON_MLS-0019882

CMLS_003202

FRESNO_000745


**Depositions**

Gansho 30(b)(6) Dep. in Burnett

08/03/22 Gansho 30(b)(6) Dep. in Burnett

G. Keller Dep. Designation at Burnett Trial

G. Keller Testimony in 10/27/23 Burnett Tr.

22 Papasan 30(b)(6) Dep. in Moehrl

Gansho Dep. in Moehrl

01/05/22 Gansho Dep. in Moehrl

02/02/22 Kelm Dep. in Moehrl

01/24/21 Gansho Dep. in Burnett

Deposition of Steven Di Napoli in Burnett et al. vs. NAR et al. (W.D. Missouri)

02/02/22 D. King Dep. in Moehrl

Bailey Dep. Designation at Burnett Trial

04/14/22 Papasan 30(b)(6) Dep. in Burnett

11/15/22 Papasan 30(b)(6) Dep. in Moehrl at 23:23-24:12

G. Keller Dep. Designation at Burnett Trial

04/26/21 Bash Dep. in Sitzer

09/28/23 Davis Dep. in Burnett

Deposition of Rodney Gansho, dated January 5, 2022

10/08/21 Talbot Dep. in Burnett/Moehrl

Deposition of Rodney Gansho, dated January 5, 2022

Deposition of Carole McCabe in Burnett, et al. v. The National Association of Realtors, et al

02/04/22 Figgs Dep. in Moehrl

02/04/22 Figgs Dep. in Burnett

Figgs Dep. in Moehrl

Papasan 30(b)(6) Dep. in Moehrl

Gonzalez Dep. in Burnett/Moehrl


**Other Documents Cited**

Handbook on Multiple Listing Policy 2021

NAR Model MLS Rules

NAR Virtual Office Websites Policy

NAR Model MLS Rules

2025 NAR Handbook

2014 Inman Special Report, Why the real estate industry does not compete on commission rates at p. 3

2021 Constitution and Bylaws of the National Association of REALTORS®

Amended Complaint, United States v. National Association of REALTORS®, Oct. 4, 2005

August 29, 2021 interview with Glenn Kelman on the Investor's Podcast

Competition in the Real Estate Brokerage Industry," Federal Trade Commission and U.S. Department of Justice Report, April 2007

Competitive Impact Statement, U.S. v. National Association of Realtors (Jun. 12, 2008)

Complaint, U.S. v. National Association of Realtors (Nov. 19, 2020)

Complaint, U.S. v. National Association of Realtors at paragraph 17 (Oct. 4, 2005)

D.A.N.G.E.R. Report

Declaration of Errol Samuelson (Chief Industry Development Officer at Zillow Group) in REX v. Zillow

Declaration of Jack Ryan (Chief Executive Officer of Real Estate Exchange "REX") in REX v. Zillow

Declaration of W. Robert Majure in Support of Motion for Preliminary Injunction in REX v. Zillow, Inc., et al. (Case No, 2:21-cv-00312) ("Majure Declaration").

Errol Samuelson (Chief Industry Development Officer at Zillow Group) in REX v. Zillow

February 15, 2024 Statement of Interest of the United States in Nosalek, et al. v. MLS Property Information Network, et al., 1:20-cv-12244 (D. Mass.), ECF No. 290

Realcomp II, Ltd. v. F.T.C., 635 F.3d

Redfin Corporation, Form 10-K for the fiscal year ended December 31, 2020

The Pros and Cons of Buying a Home Without an Agent" by Ilyce Glink and Samuel Tamkin, Washington Post, Oct. 12, 2020

United States of America v. National Association of Realtors Competitive Impact Statement, December 10, 2020

What's New in Residential Real Estate Brokerage Competition – An FTC-DOJ Workshop (June 5, 2018), Panel on Developments in Real Estate Fee and Service Models

Zillow Group, Inc. Form 10-K, for the fiscal year ended December 31, 2019

Feb. 15, 2024 Statement of Interest of the United States in Nosalek, et al. v. MLS Property Information Network, et al., 1:20-cv-12244 (D. Mass.), ECF No. 290 at 6-7

## **Websites**

https://www.nar.realtor/about-nar

https://www.nar.realtor/about-nar/history

https://www.nar.realtor/membership/how-to-become-a-realtor

https://www.nar.realtor/about-nar

https://www.nar.realtor/membership/how-to-become-a-realtor

https://www.nar.realtor/magazine/real-estate-news/nar-membership-remains-above-forecast

https://www.realestatealmanac.com/organized-real-estate/mls-index/

https://www.nar.realtor/ae/professional-development/ae-awards-and-recognition/william-d-north-ae-institute-scholarship

https://thedataadvocateblog.com/wp-content/uploads/2021/09/William-North.pdf

https://www.nar.realtor/national-leadership/committee-members-liaisons/committee-appointment-process-faqs

https://www.nar.realtor/sites/default/files/2025-08/NAR-Committee-Selection-Process.pdf

https://www.nar.realtor/national-leadership/committee-members-liaisons/committee-selection-policies

https://www.nar.realtor/about-nar/governing-documents/nar-constitution-bylaws#C4

https://www.nar.realtor/sites/default/files/2025-08/NAR-Committee-Selection-Process.pdf

https://www.nar.realtor/national-leadership/committee-members-liaisons/committee-selection-policies

https://www.nar.realtor/newsroom/national-association-of-realtors-reminds-members-and-consumers-of-real-estate-practice-change.

https://www.nar.realtor/the-facts/nar-settlement-faqs

https://www.nar.realtor/blogs/economists-outlook/home-buyers-narrow-home-search-with-technology

https://www.nar.realtor/the-facts/nar-settlement-faqs

https://www.redfin.com/news/real-estate-commission-transparency/?msockid=0e8e023476d1604317f016bc777061d1

https://www.redfin.com/news/buyers-agent-commissions-display/

https://www.redfin.com/news/buyers-agent-commissions-display/

https://kwfresno.kw.com/agent/david-ahedo/832642

https://kwfresno.kw.com/agent/rachel-austin/419285

https://www.remax.com/real-estate-agents/camille-baker-wheaton-il/100001356

https://www.remax.com/real-estate-agents/jaymi-block-oakbrook-terrace-il/100270099

https://www.coldwellbanker.com/ny/slingerlands/agents/lynda-cameron/aid-P00200000FDdsFEisesheuXfsvDlfj19QI57fvDS

https://www.coldwellbanker.com/ny/loudonville/agents/christopher-culihan/aid-P00200000FDdtAAROK2zz4EKPUDbQGTcEJWCR7zn

https://www.zillow.com/professionals/real-estate-agent-reviews/

https://www.zillow.com/professionals/real-estate-agent-reviews/

https://www.zillow.com/professionals/real-estate-agent-reviews/

https://www.nar.realtor/membership/how-to-become-a-realtor

https://rules.stellarmls.com/hc/en-us/articles/14692921258519-Article-05-19-Listing-Acceptance-from-Non-Member-REALTOR and https://www.miamirealtors.com/mls/mls-forms/statewide-reciprocal-information/

https://www.nar.realtor/blogs/economists-outlook/home-buyers-narrow-home-search-with-technology

https://fred.stlouisfed.org/series/POPTHM

https://www.bls.gov/ooh/sales/real-estate-brokers-and-sales-agents.htm#tab-5

https://www.bls.gov/ooh/sales/real-estate-brokers-and-sales-agents.htm

https://flippingprosperity.com/how-to-find-flip-houses/

https://www.myhousedeals.com/blog/house-flipping/craigslist-hacks-finding-deals

https://support.realtor.com/s/article/does-realtor-com-display-for-sale-by-owner-listings

https://www.houzeo.com/pricing

https://web.archive.org/web/20200620194053/https://www.houzeo.com/faq

https://www.huduser.gov/portal/datasets/cinch/cinch15/National-Report.pdf

https://www.nahb.org/-/media/NAHB/news-and-economics/docs/housing-economics/sales/nationwide-sales-and-inventory.pdf?rev=2a0e5741e9ea48c1b6e91a9b03677a5c&hash=D0A99213F8688CE67BB701E648D05ED8

https://www.nahb.org/news-and-economics/housing-economics/national-statistics/new-and-existing-home-sales-reports

https://therealdeal.com/new-york/2007/11/15/behind-discounter-foxtons-demise-2/

https://www.estateagenttoday.co.uk/features/2020/09/property-natter-why-didnt-foxtons-american-dream-work-out/

https://open.spotify.com/episode/0wssOPJRRSiV7L42za9L3W?si=T1WYMiGBQISc3q5CgYgB5w&context=spotify%3Ashow%3A0umSLpOkCt5LszdtrQn9Uc&nd=1

https://www.redfin.com/news/buyers-agent-commissions-display/

https://www.nahb.org/-/media/NAHB/news-and-economics/docs/housing-economics/sales/nationwide-sales-and-inventory.pdf?rev=2a0e5741e9ea48c1b6e91a9b03677a5c&hash=D0A99213F8688CE67BB701E648D05ED8

 https://www.inman.com/2021/01/12/recordings-of-houston-agents-by-rival-brokerage-reveal-commission-steering/

https://www.inman.com/2022/07/08/more-than-700-agent-steering-calls-suggest-price-fixing-lawyers-charge/.

https://www.redfin.com/blog/what-is-a-pocket-listing/?msockid=0e8e023476d1604317f016bc777061d1

https://www.realtor.com/advice/sell/pocket-listing-what-is-it/?msockid=0e8e023476d1604317f016bc777061d1

https://www.zillow.com/research/mls-pln-sale-price-34846

https://www.realtor.com/advice/sell/pocket-listing-what-is-it/?msockid=0e8e023476d1604317f016bc777061d1

https://www.ncrec.gov/Pdfs/Licensing/RELINC.pdf

https://www.krec.ks.gov/applicants/broker-requirements

https://www.dre.ca.gov/examinees/requirementsbroker.html

**NORMAN G. MILLER**
Ernest W. Hahn Chair and Emeritus Professor of Real Estate Finance
University of San Diego
Email: nmiller@sandiego.edu

EDUCATIONAL BACKGROUND
Ph.D.   The Ohio State University, Department of Finance, 1977 Real Estate and Finance focus with a minor in City and Regional Planning.
M.A.   (Finance) The Ohio State University, l974, also M.B.A.
B.S.   (Real Estate & Urban Analysis) Ohio State University, Business Honors, 1973.
High School: Walnut Hills College Preparatory H.S. Cincinnati, Ohio 1969

EMPLOYMENT

2011 to 2022: Professor, University of San Diego, Knauss School of Business Education, affiliated with the Burnham-Moores Center for Real Estate.  Emeritus Professor effective 2022.

2009 to 2011:  V.P. Analytics, CoStar Group, 1331 L St. Washington DC Headquarters. Remained a volunteer part time Professor for the University of San Diego.

2007-2009: Professor & Academic Director, University of San Diego, Burnham-Moores Center for Real Estate.

1988-2007:   West Shell Jr. Chaired Professor, Department of Finance, University of Cincinnati.
- o   Visiting Professor, College of Business, DePaul University in Chicago 2003-04.
- o   Visiting Chair holder, Dept of Finance, Business College, University of Hawaii, 1985-86.

1980-1988:   Associate Professor of Finance and Real Estate, College of Business Administration, Director, Real Estate Program, University of Cincinnati.
Acting Chair, Department of Finance 1984-1985
l978-l980:   Assistant Professor, Department of Real Estate, University of Georgia.
l976-l977:   Graduate Administrative Assistant, College of Bus. Admin., Ohio State University.
l973-l975:   Vice President, Contemporary Real Estate Marketing Systems, Inc., Col., OH. (Residential Real Estate Brokerage Firm)
l972-l973:   Appraiser for Real Property Analysts, Inc., Columbus, Ohio.
l971-1972:   Management Intern, Office of Economic Development, State of Ohio.

TEACHING AND SPEAKING EXPERIENCE

Academic course experience includes the full spectrum of real estate courses at the undergraduate and graduate level, plus several finance courses from personal finance to derivatives and alternative investments, as well as PhD committees and dissertation Chair roles. Primary teaching interests include real estate market analysis, investment, finance and valuation analysis, real estate development and risk management. Dr. Miller has provided guest scholar lectures to the National University of Singapore, the University of Thammasat in Bangkok, Thailand, and Saint Petersburg State University, Russia as well as several in Moscow, Russia, New Delhi, India and provided seminars to visiting Chinese, Russian, Japanese, and Korean business professionals within the United States. Industry teaching includes working with trade associations NAIOP, CCIM and the USGBC. Academic presentations and speeches are too numerous to list averaging 10 to 15 each year for over four decades.

SELECTED INDUSTRY EXPERIENCE AND RECOGNITION

In 2020 Dr. Miller received the national **Educators Award** for exemplary contributions to education within the real estate industry from the American Real Estate Society.

In 2015 Dr. Miller received the **James A. Graaskamp Award** from the American Real Estate Society as recognition of outstanding academic contributions, leadership, and scholarship.

In 2013 Dr. Miller received the **Richard Ratcliff Award** from the American Real Estate Society for his pioneering work on sustainable real estate and for founding the Journal of Sustainable Real Estate. In 2012 the School of Business of USD provided the Sr. Faculty Research Award, a year with 7 academic publications not including the 3rd Edition of his graduate level book

Dr. Miller has consulted for various clients such as Fidelity National Information Solutions, New City Technology, Collateral Intelligence, Collateral Analytics, the CoStar Group, the FDIC and worked with various community agencies on the revitalization of urban areas, served as an expert witness on valuation disputes and economic impact cases and was a member of the portfolio management board for the University of Cincinnati from 1992 through 2006. In that capacity he advised on asset selection and risk management. From 1978 through the 1980's Dr. Miller worked on various cases with the Attorney General's office examining antitrust issues, and other valuation disputes, with occasional cases in the 2000-2018 period. Dr. Miller has occasionally served as an expert witness in valuation disputes for underwriting risk analysis for the FDIC from 2014 through 2021. These cases centered around the use and accuracy of AVMs, automated valuation methods.

Dr. Miller served on the Cincinnati Port Authority 1998-2007. He has worked extensively with various trade associations including NAIOP, CCIM, the Urban Land Institute, and has been a frequent speaker to groups such as the USGBC, ICSC, BOMA, AI, CORENET, CREW, MBA, SIOR, and NAHB and a member of the national research committees for ICSC (retail), PREA (Pension Real Estate Assoc.), and the ULI (Urban Land Institute). As a Board and faculty

member of the **Hoyt Land Use Institute** Faculty, based in North Palm Beach Florida he is involved with some premier thought leaders among academics and industry professionals. The Hoyt Institute meets twice per year for think tank discussions with scholars from around the world. See The Hoyt Group | Transcending Boundaries – Real Estate Research, Education, Consulting

Miller received the **Distinguished Real Estate Professional Service Award** in 1999 for Professional and Community Service, an annual award provided to one outstanding professional each year from the Cincinnati region. In 2001 Dr. Miller became a **Distinguished Fellow** of the NAIOP where he served until the end of 2013. He was on the sustainable development and education committees and industry trends task force. In 2004 he received the **NAIOP "Impact" Award**. In 2003 Dr. Miller became the Educational Consultant for CCIM where he helped to rewrite curriculum working with the Body of Knowledge committee and national staff. Currently Dr. Miller serves on several real estate advisory boards. He is also a member of the Institute of Green Real Estate Professionals and founding **Editor** of the *Journal of Sustainable Real Estate*.

BOOKS

*Routledge Handbook of Sustainable Real Estate (*with Sara Wilkenson, Tim Dixon, and Sarah Sayce) Routledge Pub, 2018

*Commercial Real Estate Analysis and Investment* published by OnCourse Learning, 2014 (third edition) with David Geltner, Piet Eicholtz, Jim Clayton. Currently this book is used at over 60% of the English-speaking graduate schools around the globe with a real estate focus. It has been translated into English, Japanese, Chinese, and Russian. (Cited by over 1100 scholarly academic papers) Fourth Edition is to be released in the fall of 2025. See www.crebook.net

*Real Estate Principles for the New Economy* 2005, Thompson Southwestern Publishers with David Geltner.

*Commercial Real Estate Career Education and Research Guide,* second edition published in 2009 by the Hoyt Institute for Real Estate. Free self-funded guide providing career advice to high school and college students about commercial real estate career opportunities.

Other books now out of print:
*Profiles of Successful Real Estate Agents*, The Ohio State University Center for Real Estate and the Ohio Real Estate Commission Advisory Board, 1999,
*Mortgage Mathematics and Financial Tables*, Prentice Hall, 1982.
The *Complete Guide to Mortgage Mathematics,* Prentice Hall, 1980.

Academic citations: Norman G. Miller (aka Norm G Miller) has over 5000 citations noted on Google Scholar. Norm G Miller or Norman G Miller - Google Scholar

## SELECTED PUBLISHED PAPERS

"Connecting Digitalization and Sustainability:  Proptech in the Real Estate Operations and Management", (2023) Journal of Sustainable Real Estate.

"Saving Real Estate Commissions at Any Price: Does Having a Real Estate Agent Influence the Sales Price of a Home? (2021) with Alison Sanchez, Michael Sklarz, and Adriana Vamosiu, Journal of Housing Research, 30:2, 175-206.

"Flood Risk and Buyer Search Behavior in Ho Chi Minh City" (2021) with Hong Thi Bich Nguyen, Nam Khanh Pham and Hiep Thanh Truong. The International Journal of Housing Markets and Analysis, 14:4.

"Property Tax Rates and House Prices: The Impact of Relatively High and Low Property Tax Rates" with Anthony Pennington-Cross and Michael Sklarz, Journal of Property Tax Assessment and Administration, 2020, Issue 1.

"The Impact of Waterfront Location on Residential Home Values Considering Flood Risks" with Jeremy Gabe and Michael Sklarz. The Journal of Sustainable Real Estate, Vol. 11, 2019.

"Leveling the playing field: out-of-town buyer premiums in US housing markets over time", with Katrin Kandlbinder and Michael Sklarz, (2019) International Journal of Housing Markets and Analysis, https://doi.org/10.1108/IJHMA-02-2018-0017

How Much Does Property Condition Affect Residential Property Value? with Vivek Sah, and Michael A. Sklarz, Journal of Real Estate Research, 2018

"Housing Demand and Immigration Trends" with Paige Mueller and Michael Dinn, Real Estate Issues, 42:1, 2018.

"Market Equilibrium Analysis" with Richard Parli, Appraisal Journal, 85:4, Fall, 2017.

Commercial Buildings: Energy Efficiency and Reliability with Electric, Smart and Microgrids. With Sewalk, S., Liston, S., Gao, W. (2016). Journal of Sustainable Real Estate, 8(1).

The Impact of Proposition 13 on Effective Tax Rates, Turnover and Prices with Michael Sklarz, forthcoming in the Journal of Housing Research, 2016.

Why Housing Price Indices Are Super Tools waiting to be More Fully Utilized: and How to Produce Them? With Michael Sklarz for Real Estate Issues, 45:2, 2016.

Fat Tails and Risk Mitigation: Evidence from the Real Estate Market with Lingxiao Li, Journal of Real Estate Portfolio Management, Vol. 22, Issue 1, 2016.

Commercial Buildings: Energy Efficiency and Reliability with Electric, Smart and Microgrids with Stephan Sewalk, Sunny Liston and Wezhong Gao.  Forthcoming 2016 in the Journal of Sustainable Real Estate, Vol. 8.

"Revisiting the Derivation of an Equilibrium Vacancy Rate" with Richard L. Parli, Journal of Real Estate Portfolio Management, Vol. 20, Issue 3, 2014.

"Workplace Trends in Office Space: Implications for Future Office Demand" Journal of Corporate Real Estate, Vol. 16, No. 3, 2014.  **(Awarded best paper of 2014)**

"Chapter 16: Investing in Green Real Estate" Chapter in the book: ***The Advisor's Guide to Commercial Real Estate Investment,*** published jointly by Summit Media, National Real Estate Investor/Penton Media and the ULI, Urban Land Institute, 2014.

"Downsizing and Workplace Trends in the Office Market" Real Estate Issues, CRE, Vol. 38, No. 3, 2013.

"Are Green REITs Valued?" with Vivek Sah and Biplab Ghosh, Journal of Real Estate Portfolio Management, .Vol 19, (2), 2013. Selected as Best paper of 2013.

"The Economics of Green Retrofits" with Nils Kok and Peter Morris, presented at USGBC Greenbuild 2011 published in the Journal of Sustainable Real Estate, Vol. 4, (1) 2012

"Is there Seasonality in Home Prices – Evidence from CBSAs" with Vivek Sah, Michael Sklarz and Stefan Pampulov, Journal of Housing Research, Vol. 22, No. 1, pp 1-17, 2012.

"Integrating Real Estate Market Based Indicators into Fundamental Home Price Forecasting Systems" with Michael Sklarz, Journal of Housing Research, Vol. 21, No. 2, pp.183-215, 2012.

"Correcting for the Effects of Seasonality on Home Prices" with Vivek Sah and Michael Sklarz, The Appraisal Journal, Winter, 2012.

"Residential Land Values and Walkability" with Stephanie Yates Rauterkus, Journal of Sustainable Real Estate, Vol. 3 (1) 2011

"Explaining LEED Concentration: Effects of Public Policy and Political Party" with Eugne Choi, forthcoming, Journal of Sustainable Real Estate, Vol. 3, 2011.

"Foreclosure Contagion and REO versus Non-REO Sales" with Stephanie Rauterkus, Michael Sklarz and Grant Thrall, International Real Estate Review, Vol. 15 (3) pp. 307-324, 2012.

"House Prices and Economic Growth" with Liang Peng and Michael Sklarz, the Journal of Real Estate Finance and Economics, Vol. 42, No. 4, 2011, pp 522-541..

"The Economic Impact of Anticipated House Price Changes - Evidence from Home Sales" with Liang Peng and Michael A. Sklarz., <u>Real Estate Economics</u>, Vol. 39, No. 2, 2011

"The Operations and Management of Green Buildings in the United States" with Dave Pogue, Jeryldine Saville and Charles Tu, <u>Journal of Sustainable Real Estate</u>, Vol. 2, No. 1, 2010, pp. 51-66.

"Slicing, Dicing and Scoping the Size of the U.S. Commercial Real Estate Market" with Andrew Florance, Ruijue Peng, and Jay Spivey, <u>Journal of Real Estate Portfolio Management</u>, Vol. 16, No. 2, 2010, pp. 101-118 as lead paper.  Won the **Best paper award** for 2011 from the American Real Estate Society.

"Price Volume Correlation in the Housing Market: Causality and Co-movements" with Jim Clayton, and Liang Peng, University of Colorado, <u>Journal of Real Estate Finance and Economics,</u> 40, No. 1, pp. 14-40, 2010.

"Green Buildings and Productivity" with Dave Pogue. <u>The Journal of Sustainable Real Estate,</u> Vol. 1, No. 1, Fall 2009.

"Distressed Home Prices: The True Story" *Mortgage Banking* with Michael Sklarz, March, 2009.

"Does Green Pay Off" with Jay Spivey and Andy Florance, <u>The Journal of Real Estate Portfolio Management.  (Also revised in short format for Research in Real Estate for ICSC) Vol. 14, No. 2, 2008.</u>  Won the **Best paper award** for 2008 from the American Real Estate Society. Posted on over 900 web sites.

"Idiosyncratic Volatility and the Housing Market" with Gurupdesh Pandher, UBC, the <u>Journal of Housing Research</u>, Vol. 17, No. 1, 2008.

 "A Cross-Sectional Analysis of Cap Rates by MSA", with Doina Chichernea, Jeff Fisher, Michael Sklarz and Bob White, <u>Journal of Real Estate Research</u>, Vol. 30, No. 3, 2008. Voted **Best paper award** for JRER in 2009 by the members of the American Real Estate Society.

"A Cross-Sectional Asset-Pricing Analysis of the U.S. Metropolitan Real-Estate Market at the Zip Code Level" with Susanne Cannon and G. S. Pandher, <u>Real Estate Economics</u>, Winter, Vol. 34 No. 4 2006, pp. 519-552.

"Exploring Metropolitan Housing Price Volatility" with Liang Peng, <u>Journal of Real Estate and Financial Economics</u>, Vol. 33: 5-18, 2006.

"The Impact of Interest Rates and Employment on Housing Prices" with Michael Sklarz and Tom Thibodeau <u>International Real Estate Review</u>, Vol.8, No. 1: pp 26-42. 2005

"Estimating User Costs and Rates of Return for Single-Family Residential Real Estate" with Walter Derieux and John Benjamin, <u>Journal of Real Estate Practice and Education</u>, Vol. 8, No. 1, 2005, pp. 1-24.

"The Land Residual Theory and the Absence of Business Value for Real Estate as an Operating Business" <u>Journal of Property Tax Assessment</u>, Vol. 1, 4, 2004, pp 29-36.

"The Effects of 9/11 on Tall and Trophy Office Buildings" with Sergey Markosyan, Andy Florance, Brad Stevenson, Hans Opt Veld, <u>Journal of Real Estate Portfolio Management</u>, Vol. 9, No. 2, 2003. pp. 107-126

"The Academic Roots and Evolution of Real Estate Appraisal" with Sergey Markosyan, <u>The Appraisal Journal</u>, Vol. LXXI, No. 2, April, 2003, pp. 172-184.

"International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry" with Natalya Delcoure, <u>International Real Estate Review</u>, Vol. 5, No. 1, Winter 2002.

"How do US Residential Brokerage Trends and Fees Compare to the rest of the World?" with Natalya Delcour, <u>Real Estate Issues</u>, Fall, 2001, Vol. 26, No. 3.

"Retail Leasing in a Web Enabled World" <u>Real Estate Finance Journal</u>, Spring, 2000. A shorter less academic version of this paper called "E-Commerce Strategies for Shopping Centers" was developed and published in <u>The Journal Of Property Management</u>, May, 2000.

"Ethics as Culturally and Economically Derived" <u>Journal of Real Estate Research</u>, special issue titled Ethics in Real Estate published as Research Issues in Real Estate, Edited by Stephen E. Roulac, Volume 5, Kluwer Academic Publishers, 1999, p 153-162.

"Ethical Codes of Conduct for Business Simplified" <u>Journal of Real Estate Research</u>, special issue titled Ethics in Real Estate published as Research Issues in Real Estate, Edited by Stephen E. Roulac, Volume 5, Kluwer Academic Publishers, 1999, p. 247-256.

"Research on Leases" <u>Real Estate Finance</u> Vol. 14, No. 1, Spring, 1997 with C.F. Sirmans.

"Web Resources and Implications for Real Estate Finance" <u>Real Estate Finance</u>, Vol. 13, No. 3, Fall, 1996.

"Telecommunications Technology and Real Estate: Some Additional Perspectives" <u>Real Estate Finance</u>, Vol. 13, No. 2, Summer, 1996.

"In Defense of the Land Residual Theory and the Absence of a Business Value Component for Retail Properties" with Steve Jones and Stephen Roulac, <u>Journal of Real Estate Research</u>, Vol. 10, No. 2, 1995. Reprinted in a "Business Enterprise Value Anthology" Edited by David C. Lennhoff**,** published by the Appraisal Institute, Sept. 1, 2001.

"We Need a Fourth Asset Class: HEITs" with David Geltner and Jean Snavely,  Real Estate Finance, Vol. 12, No. 2, Summer, 1995

"Residential Mortgage Choice: Does the Supply Side Matter?" with Tim Riddiough and Steve Jones,  Journal of Housing Economics, Vol. 4, pp 71-90, 1995.

"A Note on the Integration of the Global Capital Markets" with Maura Skill, Real Estate Finance, Vol. 11, No. 4, Winter, 1995.

"The Parking Lot as a Unique Investment Class: An Option That Pays Dividends" with David Geltner and Bob Brown for Real Estate Finance, Vol. 11, No. 3, Fall, 1994.

"Incentive Commissions in Residential Real Estate Brokerage" with D. Geltner and B. Kluger, The Journal of Housing Economics, Vol. 2, No. 2. June, 1992.

"Optimal Price and Selling Effort from the Perspectives of the Broker and Seller," with B. Kluger and D. Geltner, The AREUEA Journal (now Real Estate Economics), Vol. 19, No. 1, Spring, 1991.

"On Improving the Measurement of Residential Real Estate Liquidity," The AREUEA Journal (now Real Estate Economics), Vol. 18, No. 2 (Summer 1990), with Brian D. Kluger.

"Leading Indicators of Real Estate Price Trends," with M. Sklarz, Spring, 1989 Special Proceedings Series on "Forecasting Market Determinants Affecting Cash Flows and Reversions," Report No. 4, American Institute of Real Estate Appraisers.

"Tax Rates and Implicit Rates of Return on Owner-Occupied Single-Family Housing: Comment," The Journal of Real Estate Research, Vol. 4, No. 1, Spring 1989.

"Exchange Rates and Speculation in Real Estate Markets" with M. Sklarz and N. Ordway, Journal of Real Estate Research, Vol. 3, No. 3, Fall 1988.

"The Value of a Real Estate Brokerage Firm," monograph for with John Keaton and Glenn Crellin, Economics and Research Division, 1989, NAR, Wash. D.C.

"It's Time for Some Options in Real Estate," Real Estate Securities Journal, Vol. 9, November 1, Fall, 1988 with Michael Sklarz.

"Housing Market Forecasting Using Autoregressive Modeling," Vol. 15, No. 4, Winter, 1987, The AREUEA Journal (now Real Estate Economics), with W. Gersch and M. Sklarz.

"Pricing Strategies and Residential Property Selling Prices," with Michael A. Sklarz, Vol. 2, No. 1, Fall, 1987, The Journal of Real Estate Research.  Voted **Best Paper of 1987** by members of ARES.

"A New Market Based Condominium Valuation Model," The Appraisal Journal, (April 1987) with Michael A. Sklarz.

"Automated Homebuilding in Japan:  Are Japanese Methods Exportable to the United States?" Urban Land, June, 1987, with Judy Kautz.

"Leading Indicators of Housing Market Price Trends," The Journal of Real Estate Research, Fall, 1986, with Michael A. Sklarz.

"Condominium Valuation Models with a Touch of Behavioral Theory," January 1987, The Appraisal Journal, with Michael Sklarz.

"Long Range Cash Flow Planning:  A Total Systems Approach," Vol. 1, No. 4, Spring, 1986, The Journal of Real Estate Development.

"Using A Real Discount Rate Model is Better Than Predicting Inflation," The Appraisal Journal, April, 1986 with Michael E. Solt.

"Managerial Incentives and the Financial Performance of Real Estate Investment Trusts," (Real Estate Economics) AREUEA Journal, Winter 1985, with Michael Solt.

"The Determination of Compensatory Damages:  A Valuation Framework," The American Business Law Journal, Spring, 1984, as lead article, co-authored with John Bagby and Michael Solt.

"Optimizing Limited Partnership Returns Through Tax Minimization Modeling:  ACRS Effects and Theoretical Reconciliations," Real Estate Research Annual, Vol. 3, l983.

"Residential Property Hedonic Pricing Models:  Limits and Extensions," Real Estate Research Annual, Vol. 2, 1982.  (Cited by 45 academic papers)

"A Note on the Differentiation of Market Participants by Search Costs," Journal of Economic Letters, Fall l98l, co-author Peter Rice.

"Real Estate Multiple Listing Services and the Sherman Act:  A Response to Malin," American Business Law Journal, Fall, l980.

"Do Antitrust Laws Apply to the Real Estate Brokerage Industry?" with Peter J. Shedd, The American Business Law Journal, Fall, l979.

"Optimizing Limited Partnership Returns," The AREUEA Journal now Real Estate Economics, Fall, 1979.

"Time on the Market and Selling Price," The AREUEA Journal, now Real Estate Economics, Summer, l978.  (Cited by 82 other academic papers)

9

TRADE JOURNALS and Blogs: Many other publications in minor journals such as Real Estate Issues, Valuation, Development Magazine, Mortgage Bankers, The Assessors Journal, The Journal of Property Management, Real Estate Review, Institutional Real Estate Newsletter, the Property Chronicle, Institutional Real Estate Investor and more.

PROFESSIONAL ACTIVITIES AND MEMBERSHIPS

Emeritus Editor, The Journal of Sustainable Real Estate. Funded, founded and launched this new journal starting in 2009. International submissions have been vigorous and the first issue was published November of 2009.
Hoyt Land Use Institute Vice-President, Faculty and Board Member (A School for Academic Post Doc Research and Industry Leader Discussions, based in North Palm Beach, Florida) See www.hoytgroup.org
Advisory Board member of the Energy Efficient Buildings Hub, Wharton, U. Penn. 2013-2018.
President- HIRE, Hoyt Institute for Real Estate (since 2005) with a mission to enhance real estate educational resources and assist with career advice and mentoring.
Member of the NAIOP Sustainable Research Forum (2008-2013)
Member of the NAIOP Property Trends Task Force (2003-2008 and 2013)
Member of the Research Affinity Group for PREA (Pension Real Estate Association) (2010-2012)
Member of the Research Council for ICSC (2009-2013)
Member of the Research Committee for ULI (2009-2012)
American Real Estate Society Past President and Board member (2000-2017)
Approved Fulbright Sr. Specialists (for 3 to 6 weeks visiting scholar activities) on the topic of Sustainability. Approved March 26, 2009.
Co-Managing Editor, Real Estate Finance, 1991-2001.
Editorial Board, The Journal of Real Estate Research (1992-2018)
Editorial Board, Journal of Property Finance, Henry Stewart Publications, London (since 1993)
Editorial Board, The Journal of Real Estate Literature (since 1994)
Editorial Board, Real Estate Information Technology JREL since 1997.
Editorial Board, The Journal of Real Estate Education and Practice, JREEP (since 1998)
Ad hoc reviewer and prior Editorial Board member of several other journals.
USD Intellectual Property Policy Task Force (2018-2020)

COMMUNITY SERVICE
Frequent speaker to numerous groups at regional and national meetings including the Appraisal Institute, Real Estate Investors Association, American Property Tax Counselors, Building Owners Managers Association, International Council of Shopping Centers, NAA, NAR, NMHC, NAIOP (Commercial Real Estate Developers), CCIM, CREW, USGBC, CoreNet, and others. Ad hoc committees for the San Diego Unified School District on real estate utilization issues. 2017 to 2020.

## Prior Testimony of Norman G. Miller

1. *FHLB Seattle v. Bear Stearns & Co., Inc., et al.,* Superior Court of Washington for King County, No. 09-2-46298-4 SEA; *FHLB Seattle v. Banc of America Securities LLC, et al.,* Superior Court of Washington for King County, No. 09-2-46319-1 SEA; *FHLB Seattle v. Barclays Capital Inc., et al.,* Superior Court of Washington for King County, No. 09-2-46320-4 SEA; *FHLB Seattle v. Countrywide Securities Corp., et al.,* Superior Court of Washington for King County, No. 09-2-46321-2 SEA; *FHLB Seattle v. RBS Securities Inc., et al.,* Superior Court of Washington for King County, No. 09-2-46347-6 SEA; *FHLB Seattle v. Morgan Stanley & Co., Inc., et al.,* Superior Court of Washington for King County, No. 09-2-46348-4 SEA; *FHLB Seattle v. Goldman Sachs & Co., et al.,* Superior Court of Washington for King County, No. 09-2-46349-2 SEA; *FHLB Seattle v. UBS Securities, LLC, et al.,* Superior Court of Washington for King County, No. 09-2-46350-6 SEA; *FHLB Seattle v. Deutsche Bank Securities, Inc., et al.,* Superior Court of Washington for King County, No. 09-2-46351-4 SEA; *FHLB Seattle v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al.,* Superior Court of Washington for King County, No. 09-2-46352-2 SEA; *FHLB Seattle v. Credit Suisse Securities (USA) LLC, et al.,* Superior Court of Washington for King County, No. 09-2-46353-1 SEA.

2. *Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc., et al.*, Superior Court of the State of California, City and County of San Francisco, No. CGC-10-497839; *Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA) LLC, et al*, Superior Court of the State of California, City and County of San Francisco, No. CGC-10-497840.

3. *Federal Deposit Insurance Corp. as Receiver for Colonial Bank v. Countrywide Financial Corp., et al.*, United States District Court for the Central District of California, MDL No. 11-ML-02265-MRP (MANx), Case No. 12-CV-08317-MRP (MANx).

4. *Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. Banc of America Funding Corp., et al.*, Circuit Court of Montgomery County, Alabama, Case No. 03-CV-2012-901035; *Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. Citigroup Mortgage Loan Trust Inc., et al.*, Circuit Court of Montgomery County, Alabama, Case No. 03-CV-2012-901036.

5. *Federal Deposit Insurance Corp. as Receiver for Franklin Bank v. Countrywide Financial Corp., et al.*, United States District Court for the Central District of California, MDL No. 11-ML-02265-MRP (MANx), Case No. 12-CV-03279-MRP (MANx).

6. *Federal Deposit Insurance Corporation as Receiver for Franklin Bank, S.S.B. v. Morgan Stanley & Company LLC f/k/a Morgan Stanley & Co. Inc.*, District Court of Harris County, Texas, 151st Judicial Court, Case No. 2011-67305.

7. *Federal Deposit Insurance Corporation as Receiver for Guaranty Bank v. RBS Securities Inc.*, United States District Court for the Western District of Texas, Civ. No. 1:14-CV-00126-SS; *Federal Deposit Insurance Corporation as Receiver for Guaranty Bank v. Deutsche Bank Securities Inc. et al.*, United States District Court for the Western District of Texas, Civ. No. 1:14-CV-00129-SS.

8. *Federal Deposit Insurance Corp. as Receiver for United Western Bank v. Countrywide Financial Corp., et al.*, United States District Court for the Central District of California, MDL No. 11-ML-02265-MRP (MANx), Case No 2:11-cv-10400 MRP (MAN).

9. *Federal Deposit Insurance Corporation as Receiver for United Western Bank v. RBS Acceptance Inc., et al.*, United States District Court for the District of Colorado, Case No. 1:14-cv-00418-PAB-MJW.

10. *The Charles Schwab Corporation v. J.P. Morgan Securities, Inc., f/k/a Bear, Stearns & Co. Inc., et al.,* Superior Court of the State of California for the City and County of San Francisco, Case No. CGC-10-503207.

11. *The Charles Schwab Corporation v. BNP Paribas Securities Corp., et al.,* Superior Court of the State of California for the City and County of San Francisco, Case No. CGC-10-501610.

12. *The Charles Schwab Corporation v. Banc of America Securities LLC, et al.,* Superior Court of the State of California for the City and County of San Francisco, Case No. CGC-10-501151.

## Summary Table of Results from Dr. Miller's 2021 Study on Commissions

REAL ESTATE ISSUES[*]

Revisiting Residential Brokerage Fees in a More Technologically Advanced World

### Figure 1: Typical Residential Commissions Around the World

| Country | Total Commission as % Price | Seller Com rate | Buyer Com Rate | Avg Home Price In U.S. Dollars Midyear 2020 | Comment or Notes |
|---|---|---|---|---|---|
| Denmark | 0.5-3% | 2 | 0 | $330,000 | **2002:** 2%-4% commission. Buyer pays 25% of sale price transfer tax; advertising provided by real-estate agent. |
| | | | | | **2015:** 1%-3% paid by the seller |
| Netherlands | 1-3.5% | 2 | 1.5 | $385,280 | Buyers do not always have agents. |
| Hong Kong | 2% | 1 | 1 | $1,200,000 | **2002:** One agent may deal with both the buyer and seller. Commission increased since 2002. |
| | | | | | **2015:** After introduction of buyer's agent, 1% paid by seller and 1% paid by the buyer |
| UK | 1.5-2.5% | 1.5 | 1 | $292,140 | Usually paid by Seller and split between Agents |
| Sweden | 1.5 -5% | 2.7 | 0 | $340,000 | **2002:** 5% paid by seller. Higher commission charged for lower-priced units |
| | | | | | **2015:** 1%-2% paid by the seller. 1.5% till 3% in Stockholm and 4-5% in the countryside. |
| Singapore | 2% | 1 | 1 | $874,372 | Usually Buyer's Agent will co-broker and share commission with Seller's Agent |
| Australia | 2-4% | 2 | 1.5 | $558,450 | Buyers commission depends on option of the agency agreement, can start from $300 fixed up to 2% of the total price |
| Belgium | 2.5-3.5% | 3 | 0 | $293,659 | No buyer commission |
| Finland | 3-4% | 3.5 | 0 | $280,000 | In **2002:** Fees ran to about 5% of the sale price on condos, and 3%-4% on single-family homes. More expensive homes have lower commission fees. The government collects a value added tax (22% of the selling price). |
| | | | | | **2015 to present:** 2% paid by the seller, up to 3% in some regions |
| Russia | 4% | 2 | 2 | $149,000 | 2-4% or fixed $500 to $2,500 depending on services. The average home price is only based on two largest cities |
| Norway | 1.5-2% | 1.8 | 0 | $412,900 | **2002:** 2%-3%. Broker represents both parties in the transaction, 2015 - 1.5%-2% paid by the seller. |
| USA | 4-6% | 3 | 3 | $288,000 | Typical seller commission is 1% to 3%, but the buyer's commission is uniformly 3%. Most typical sum is 6% of the price of the home. |