Exhibit 34

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MYA BATTON, AARON BOLTON, MICHAEL BRACE, DO YEON IRENE KIM, ANNA JAMES, JAMES MULLIS, THEODORE BISBICOS, and DANIEL PARSONS, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) | |
| | ) | Civil Action No.: 1:21-cv-00430 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge LaShonda A. Hunt |
| | ) | |
| THE NATIONAL ASSOCIATION OF REALTORS, ANYWHERE REAL ESTATE, INC. F/K/A REALOGY HOLDINGS CORP., RE/MAX, LLC, and KELLER WILLIAMS REALTY, INC., | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

**OBJECTIONS AND RESPONSES OF DEFENDANT NATIONAL ASSOCIATION OF
REALTORS® TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rule of Civil Procedure 33, Defendant National Association of

REALTORS® ("NAR") hereby provides the following objections and responses to Plaintiffs Mya

Batton, Aaron Bolton, Michael Brace, Do Yeon Irene Kim, Anna James, James Mullis, Theodore

Bisbicos, and Daniel Parsons' (collectively, "Plaintiffs'") First Set of Interrogatories to NAR,

served on July 3, 2025.

**GENERAL OBJECTIONS**

NAR's responses to this First Set of Interrogatories incorporate and are subject to the

general objections set forth below. These general objections are incorporated into NAR's

specific responses to each Interrogatories. The failure to incorporate any one or more of the

general objections below into a specific response does not waive any general objection not specifically repeated in the response.

1.     NAR objects to the Interrogatories as premature because discovery, including witness testimony and expert discovery, has not yet been completed and because NAR is continuing to develop evidence in response to Plaintiffs' allegations.  NAR has not completed its investigation and discovery in this matter, nor has it completed its preparation for trial.  Further investigation and discovery, including expert discovery, and legal research and analysis may lead to substantial additions to, changes in, and variations from NAR's responses.  The following responses are given without prejudice to NAR's right to provide additional responses or produce evidence of subsequently discovered information, and NAR reserves the right to supplement and/or change any responses in accordance with its obligations under Federal Rules of Civil Procedure 26, 33, and 34.

2.     NAR objects to the extent that these Interrogatories, including the definitions and instructions therein, are overly broad, vague, ambiguous, not relevant to the parties' claims or defenses, not proportional to the needs of the case, unduly burdensome, or unreasonably cumulative or duplicative.

3.     NAR objects to the extent these Interrogatories call for information, knowledge, or understanding outside the scope of NAR's knowledge, and to the extent that these Interrogatories purport to require NAR to search for and provide information that is not in its possession, custody, or control.  NAR further objects to the Interrogatories to the extent that they would require NAR to search for and provide information that is publicly available, is already in the possession of Plaintiffs, or is equally obtainable from third parties or from some source other than NAR that is more convenient, less burdensome, or less expensive.  NAR will provide information only to the

2

extent that such information is in the possession, custody, or control of NAR and not publicly available or otherwise already in the possession of Plaintiffs.

4.      NAR objects to the Interrogatories to the extent they seek identification of documents or information relating to third parties or anticipate NAR will collect information from third parties, including, without limitation, MLSs or other associations.  Such Interrogatories seek information outside of NAR's control, impose an undue burden on NAR, and are inconsistent with the obligations imposed by the Federal Rules.  NAR will respond to the Interrogatories solely on its own behalf.

5.      NAR objects to the Interrogatories to the extent that they purport to require disclosure of information that is protected from discovery by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, doctrine, or immunity.  Nothing contained in the following responses is intended to be or may be construed as a waiver of the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, doctrine, or immunity.  Any disclosure or production of attorney work product, confidential material, or attorney-client privileged material is not intended to be a waiver of any applicable privilege or protection and shall be deemed inadvertent.  NAR reserves the right to request the return of any such information.

6.      NAR objects to the Interrogatories to the extent they seek confidential: (a) business or other proprietary information; or (b) information submitted to NAR under contractual promise of non-disclosure.

7.      NAR objects to the Interrogatories to the extent that they seek to elicit legal conclusions.

8.      By agreeing to provide information in response to any particular Interrogatory, NAR does not accept or concede any assertions, definitions, technical descriptions, express or implied characterizations, or assumptions contained therein.

9.      NAR objects to the Interrogatories insofar as they seek to impose obligations on NAR beyond those imposed by the Federal Rules.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      NAR objects to each and every paragraph of the section labeled "Definitions" to the extent the definitions set forth therein would (a) expand the definition of a term beyond its ordinary use in the English language; (b) create an undue burden for NAR; (c) impose an obligation on NAR that exceeds, or is inconsistent with, the obligations imposed by the Federal Rules of Civil Procedure; and/or (d) impose obligations on NAR that exceed, or are inconsistent with, the Agreed Order for the Production of Documents entered by the Court on October 9, 2024.  NAR will respond to the Interrogatories consistent with the ordinary English meaning of words and its obligations under the Federal Rules of Civil Procedure.

2.      NAR objects to the definition of "You" and "Your" to include a wide variety of entities other than NAR as overly broad and unduly burdensome.  NAR will not collect, review, and/or produce documents from its members or any other separate entity.  NAR will construe these terms to mean Defendant NAR, including any persons acting on its behalf.

3.      NAR does not accept or concede the express or implied characterizations of the definitions of "NAR Rules," "Buyer Broker Commission Rules," "Restraints on Negotiation Rules," "Commission Filtering and Disclosure Rules," "Advertising Buyer-Brokers as Free Rules," and "Clear Cooperation Rules."  NAR does not accept or concede any presumption of relevance of each of the identified provisions and sections to this case, nor the presumption that the definitions contain a comprehensive list of the relevant provisions to this case.  NAR's practices and policies

cannot be considered in isolation as they work together holistically to create a procompetitive environment in which real estate professionals can compete to best serve home buyers and sellers.

4. NAR objects to the Interrogatories to the extent they seek information from long before the filing of the Complaint on January 25, 2021. Documents and information dating from well prior to that date are neither relevant nor proportionate to the needs of the case. Investigation, collection, and review of such information would be unduly burdensome and expensive relative to the value of such information to determination of the facts and legal questions at issue in this litigation. Therefore, except as explicitly indicated, NAR will answer these interrogatories only for the period commencing January 25, 2016.

### SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify all NAR-affiliated MLSs and the years during the Relevant Time Period in which they were NAR-affiliated.

**<u>ANSWER:</u>**

NAR incorporates its General Objections and further objects to this Interrogatory to the extent it seeks information from long before the filing of the Complaint on January 25, 2021. Documents and information dating from well prior to that date are neither relevant nor proportionate to the needs of the case.

NAR objects to the extent the Interrogatory seeks information: (a) outside its possession, custody, and control; or (b) publicly available, already in the possession of Plaintiffs, or equally obtainable from third parties or from some source other than NAR that is more convenient, less burdensome, or less expensive.

Subject to and without waiving any of the foregoing General or Specific Objections, NAR exercises its option under Federal Rule of Civil Procedure 33(d) to produce a business record in response to this Interrogatory. The spreadsheet Bates-stamped NAR_Battonl01176862 is a NAR

business record within the meaning of Rule 33(d) and reflects all NAR-affiliated MLSs as of July 29, 2025. NAR does not maintain a centralized record of the period during which these MLSs were affiliated with NAR.

**INTERROGATORY NO. 2:** Identify all members of the Relevant NAR Groups, including the periods during which they were a member and any Broker or MLS the individual was affiliated with.

**ANSWER:**

NAR incorporates its General Objections and further objects to this Interrogatory to the extent it seeks information from long before the filing of the Complaint on January 25, 2021. Documents and information dating from well prior to that date are neither relevant nor proportionate to the needs of the case.

Subject to and without waiving any of the foregoing General or Specific Objections, NAR exercises its option under Federal Rule of Civil Procedure 33(d) to produce business records in response to this Interrogatory. The documents Bates-stamped NARSITZER0000870517-NARSITZER0000870526; NARSITZER0000051160-NARSITZER0000051162; NAR_Battonl01176863; NAR_Battonl01176865; NAR_Battonl01176866; NAR_Battonl01176867; NAR_Battonl01176868; NAR_Battonl01176869; NAR_Battonl01176870; NAR_Battonl01176871; NAR_Battonl01176872; NAR_Battonl01176873; and NAR_Battonl01176889 are NAR business records within the meaning of Rule 33(d) and reflect the membership of its Leadership Team, Board of Directors, Executive Committee, RES Advisory Group, Top 75 Large Residential Firms Directors Forum, Multiple Listing Issues and Policies Committee, MLS Technology and Emerging Issues Subcommittee, Professional Standards Committee, Interpretations and Procedures Subcommittee, and Presidential Advisory Groups.

6

For clarity, the Top 75 Large Residential Firms Directors Forum is now the "50 Large Firm Directors Forum." Members from both before and after the change are identified within the Board of Directors membership list as "Large Firm Representatives."

**INTERROGATORY NO. 3:** For each of the NAR Rules, Identify (i) when the policy or practice was adopted; (ii) which individuals, group(s), committee(s) within NAR reviewed or played any role in drafting, approving, or revising the policy or practice; and (iii) each subsequent revision in the policy or practice, including but not limited to: any change in language, when the revision was adopted, and which group(s) or committee(s) within NAR reviewed or played any role in approving the revision.

**<u>ANSWER:</u>**

NAR incorporates its General Objections and further objects to this Interrogatory to the extent it seeks information from long before the filing of the Complaint on January 25, 2021. Documents and information dating from well prior to that date are neither relevant nor proportionate to the needs of the case.

Subject to and without waiving any of the foregoing General or Specific Objections, NAR responds as follows. Throughout this Answer, additions to policy language are indicated by underlined text, and deletions are indicated by stricken text.

**<u>Former MLS Policy Statement 7.23, Paragraph 1</u>**

With respect to the former MLS Policy Statement 7.23, Paragraph 1, which states, "In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants. This is necessary because cooperating participants have the right to know what their compensation will be prior to commencing their efforts to sell":

- In May 1979, at the recommendation of the Multiple Listing Policy Committee, the Board of Directors approved a proposed policy concerning Information Specifying

the Compensation on Each Listing Filed with a Multiple Listing Service of a Board of REALTORS® at the Executive Committee's recommendation. The original text stated in relevant part:

> "In filing a property with the Multiple Listing Service of a Board of REALTORS®, the Participant in a Board Multiple Listing Service is making a blanket unilateral offer of subagency to the other MLS Participants, and shall therefore specify on each listing filed with the Service the compensation being offered by the listing broker to the other MLS Participants. Specifying the compensation on each listing is necessary because the cooperating broker has a right to know what his compensation shall be prior to his endeavor to sell."

- In November 1988, the Multiple Listing Committee recommended that Section 5 of the Handbook on Multiple Listing Policy be amended as follows:

> "In filing a property with the Multiple Listing Service of a Board of REALTORS®, the Participant ~~in a Board Multiple Listing Service is making~~ makes a blanket unilateral offer of subagency to the other MLS Participants, and shall therefore specify on each listing filed with the Service the subagency compensation being offered by the listing broker to the other MLS Participants. This ~~Specifying the compensation on each listing~~ is necessary because the ~~cooperating broker~~ subagent has a right to know what his compensation shall be prior to his endeavor to sell."

- In April 1992, at the recommendation of the Multiple Listing Policy Committee, the Board of Directors approved amendments to the Suggested Rules and Regulations for an MLS Operated as a Committee of a Board of REALTORS®.  The revised text stated in relevant part:

   "In filing a property with the Multiple Listing Service of a Board of REALTORS®, the Participant ~~of the Service is making~~ makes a blanket unilateral offer of ~~subagency~~ cooperation to the other MLS Participants, and shall therefore specify on each listing filed with the Service the compensation being offered by the listing broker to the other MLS Participants. ~~Specifying the compensation on each listing~~ This is necessary because the cooperating Participant has a right to know what his compensation shall be prior to commencing his endeavor to sell."

- In November 1996, at the recommendation of the Multiple Listing Policy Committee, the Board of Directors approved amendments to this clause of the Suggested Rules and Regulations for an MLS Operated as a Committee of a Board of REALTORS®.  The revised text stated in relevant part:

   "In filing a property with the Multiple Listing Service of a Board of REALTORS®, the Participant makes a blanket unilateral offer of ~~cooperation~~ compensation to the other MLS Participants, and shall therefore specify on each listing filed with the Service the compensation being offered by the listing broker to the other MLS Participants. This is necessary because the cooperating Participant has a right to know what his compensation shall be prior to commencing his endeavor to sell."

9

- In November 2004, the Board of Directors approved amendments to this clause of the Suggested Rules and Regulations for an MLS Operated as a Committee of a Board of REALTORS®. The revised text stated in relevant part:

  > "In filing a property with the multiple listing service of ~~a Board~~ an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants. This is necessary because cooperating participants have the right to know what their compensation will be prior to commencing their efforts to sell."

**Former MLS Policy Statement 7.23, Paragraph 7**

With respect to the former MLS Policy Statement 7.23, Paragraph 7, which states, "Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships":

- The Board of Directors adopted this clause of MLS Policy Statement 7.23 in February 1993. The policy was drafted by the Multiple Listing Policy Committee. The original text stated in relevant part:

  > "Multiple Listing Services shall not include offers of cooperation that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount nor shall they include general

invitations by listing brokers to other Participants to discuss terms and conditions of possible cooperative relationships."

- The Board of Directors amended MLS Policy Statement 7.23 in November 1996. The amendments were recommended by the Multiple Listing Policy Committee. The revised text stated in relevant part:

  "Multiple Listing Services shall not ~~include offers of cooperation~~ <u>publish listings</u> that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other Participants to discuss terms and conditions of possible cooperative relationships."

### MLS Policy Statement 7.23, Note 1

With respect to the MLS Policy Statement 7.23, Note 1, which states in relevant part, "…the essential and appropriate requirement by a multiple listing service is that the information to be published shall clearly inform the participants as to the compensation they will receive in cooperative transactions unless advised otherwise by the listing broker in writing in advance of their submitting an offer to purchase":

- Upon the recommendation of the Executive Committee, the Board of Directors in May 1979 adopted a proposed policy concerning Information Specifying the Compensation on Each Listing Filed with a Multiple Listing Service of a Board of REALTORS®. The original text stated in relevant part:

  "*NOTE: The compensation specified on listings filed with the Multiple Listing Service by the Participants of the Service may appear in one of several forms. The essential and appropriate requirement by a Board

11

Multiple Listing Service is that the information to be published shall clearly inform the Participants as to the compensation they will receive as subagents in cooperative transactions unless advised otherwise by the listing broker in writing in advance."

- In November 1988, the Multiple Listing Policy Committee moved and carried a motion to amend the relevant text of the Suggested MLS Rules and Regulations, under then-Section 5, to read as follows:

    "*NOTE: The compensation specified on listings filed with the Multiple Listing Service ~~may~~ shall appear in one of ~~various~~ two forms. The essential and appropriate requirement by a Board Multiple Listing Service is that the information to be published shall clearly inform the Participants as to the compensation they will receive as subagents in cooperative transactions unless advised otherwise by the listing broker in writing in advance."

- In November 1989, the Board of Trustees approved amendments to Section 7.23, Information Specifying the Compensation on Each Listing Filed with The MLS in the *Handbook on Multiple Listing Policy*. The revised text stated in relevant part:

    "NOTE: The <u>subagency</u> compensation specified on listings filed with the Multiple Listing Service by the Participants of the Service shall appear in one of two forms. The essential and appropriate requirement by a Board Multiple Listing Service is that the information to be published shall clearly inform the Participants as to the compensation they will receive as subagents in cooperative transactions unless advised otherwise by the listing broker in writing in advance."

12

- In November 1995, the Multiple Listing Policy Committee and, later that month, the Board of Directors approved amendments to Section 7.23, Information Specifying the Compensation on Each Listing Filed with a Multiple Listing Service of a Board of REALTORS®. The revised text stated in relevant part:

    "NOTE: The compensation specified on listings filed with the Multiple Listing Service by the Participants of the Service shall appear in one of two forms. The essential and appropriate requirement by a Board Multiple Listing Service is that the information to be published shall clearly inform the Participants as to the compensation they will receive in cooperative transactions unless advised otherwise by the listing broker in writing in advance of their producing an offer to purchase."

- In November 1996, the Multiple Listing Policy Committee, and later that month the Board of Directors, approved amendments to Multiple Listing Policy Statement 7.23, Information Specifying Compensation of Each Listing Filed with a Multiple Listing Service of a Board of REALTORS®. The revised text stated in relevant part:

    "NOTE: The compensation specified on listings filed with the Multiple Listing Service by the ~~Participants~~ participants of the Service shall appear in one of two forms. The essential and appropriate requirement by a Board Multiple Listing Service is that the information to be published shall clearly inform the Participants as to the compensation they will receive in cooperative transactions unless advised otherwise by the listing broker in writing in advance of their producing an offer to purchase."

13

- In November 1995, the Board of Directors approved amendments to MLS Policy Statement 7.23.  The revised text stated in relevant part:

  "Note: The compensation specified on listings filed with the Multiple Listing Service by the Participants of the Service shall appear in one of two forms.  The essential and appropriate requirement by the Board Multiple Listing Service is that the information to be published shall clearly inform the Participants as to the compensation they will receive in cooperative transactions unless advised otherwise by the listing broker in writing in advance of their producing an offer to purchase."

- In November 2008, the Board of Directors approved amendments to MLS Policy Statement 7.23.  The revised text stated in relevant part:

  "Note: The compensation specified on listings filed with the Multiple Listing Service by the Participants of the Service shall ~~appear in one of two forms~~ be expressed as a percentage of the gross sales price or as a definite dollar amount.  Multiple Listing services may, as a matter of local discretion, allow participants to offer cooperative compensation as a percentage of the net sales price, with net sales price defined as the gross sales price minus buyer upgrades (new construction) and seller concessions (as defined by the MLS unless otherwise defined by state law or regulation).  The essential and appropriate requirement by a Board Multiple Listing Service is that the information to be published shall clearly inform the Participants as to the compensation they will receive in cooperative transactions unless advised

14

otherwise by the listing broker in writing in advance of their producing an offer to purchase."

- In May 2010, the Board of Directors adopted amendments recommended by the Multiple Listing Issues and Policies Committee to MLS Policy Statement 7.23, Information Specifying the Compensation on Each Listing Filed with a Multiple Listing Service of an Association of REALTORS®. The revised text stated in relevant part:

"Note 1: The compensation specified on listings filed with the multiple listing service by the participants of the service shall be expressed as a percentage of the gross sales price or as a definite dollar amount. Multiple ~~Listing~~ listing services may, as a matter of local discretion, allow participants to offer cooperative compensation as a percentage of the net sales price, with net sales price defined as the gross sales price minus buyer upgrades (new construction) and seller concessions (as defined by the MLS unless otherwise defined by state law or regulation). The essential and appropriate requirement by a ~~Board Multiple Listing Service~~ multiple listing service is that the information to be published shall clearly inform the ~~Participants~~ participants as to the compensation they will receive in cooperative transactions unless advised otherwise by the listing broker in writing in advance of their ~~producing~~ submitting an offer to purchase. (Amended 5/08)."

**Former Standard of Practice 3-2**

With respect to the section of the former Standard of Practice 3-2 that states, "Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction":

- The Board of Directors adopted Standard of Practice 3-2 (originally Standard of Practice 9-5) in April 1980. The standard was recommended by the Professional Standards Committee. The original text stated in relevant part:

  "The REALTOR® shall, with respect to the subagency of another REALTOR®, timely communicate any change of compensation for subagency services to the other REALTOR® prior to the time such REALTOR® produces a prospective buyer who has signed an offer to purchase the property for which the subagency has been offered through MLS or otherwise by the listing agency."

- The Board of Directors approved amendments to Standard of Practice 9-5 in November 1989. The amendments were recommended by the Professional Standards Committee. The revised text stated:

  "~~The~~ REALTOR<u>S</u>® shall, with respect to the subagency of another REALTOR®, timely communicate any change of compensation for subagency services to the other REALTOR® prior to the time such REALTOR® produces a prospective buyer who has signed an offer to

purchase the property for which the subagency has been offered through MLS or otherwise by the listing agency."

- The Board of Directors approved amendments to Standard of Practice 9-5 in November 1993. Standard of Practice 9-5 was also renumbered as Standard of Practice 9-5(a). The amendments were recommended by the Professional Standards Committee. The revised text stated in relevant part:

  "REALTORS® shall, with respect to ~~the subagency of~~ offers of compensation to another REALTOR®, timely communicate any change of compensation for ~~subagency~~ cooperative services to the other REALTOR® prior to the time such REALTOR® produces an ~~prospective buyer who has signed an~~ offer to purchase/lease the property ~~for which the subagency has been offered through MLS or otherwise by the listing agency~~."

- In November 1994, at the recommendation of the Professional Standards Committee, the Board of Directors approved an amendment to renumber and reorder the Code of Ethics and Standards of Practice. As a result, Standard of Practice 9-5(a) was renumbered to Standard of Practice 3-2. The text remained unchanged.

- The Board of Directors approved amendments to Standard of Practice 3-2 in May 2009. The amendments were recommended by the Professional Standards Committee. The revised text stated in relevant part:

  "~~REALTORS® shall, with respect to offers of compensation to another REALTOR®, timely communicate~~ To be effective, any change ~~of~~ in compensation offered for cooperative services must be communicated to the

17

other REALTOR® prior to the time ~~such~~ <u>that</u> REALTOR® ~~produces~~ <u>submits</u> an offer to purchase/lease the property."

- The Board of Directors approved amendments to Standard of Practice 3-2 in May 2013. The amendments were recommended by the Professional Standards Committee. The revised text stated in relevant part:

    "~~To be effective, a~~<u>A</u>ny change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. <u>After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction.</u>"

**<u>Former Standard of Practice 16-16</u>**

With respect to the section of the former Standard of Practice 16-16 (originally Standard of Practice 21-16) that states, "REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation":

- The Board of Directors adopted Standard of Practice 21-16 in February 1989. The standard was recommended by the Professional Standards Committee. The original text stated in relevant part:

    "The REALTOR®, acting as subagent or buyer's agent, shall not use the terms of an offer to purchase to attempt to modify the listing broker's offer

18

of compensation to subagents or buyer's agents nor make the submission of an executed offer to purchase contingent on the listing broker's agreement to modify the offer of compensation."

- The Board of Directors approved amendments to Standard of Practice 21-16 in November 1992. The amendments were recommended by the Professional Standards Committee. The revised text stated in relevant part:

    "REALTORS®, acting as subagents or buyer's/tenant agents, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer's agents nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation."

- In November 1994, at the recommendation of the Professional Standards Committee, the Board of Directors approved an amendment to renumber and reorder the Code of Ethics and Standards of Practice. As a result, Standard of Practice 21-16 was renumbered to Standard of Practice 16-16. The text remained unchanged.

- The Board of Directors approved amendments to Standard of Practice 16-16 in May 1997. The amendments were recommended by the Professional Standards Committee. The revised text stated in relevant part:

    "REALTORS®, acting as subagents or buyer/tenant agents or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer's agents or brokers nor

make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation."

- The Board of Directors approved amendments to Standard of Practice 16-16 in November 2003 at the recommendation of the Professional Standards Committee. The revised text stated in relevant part:

> "REALTORS®, acting as subagents or buyer/tenant ~~agents~~ <u>representatives</u> or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer~~'s~~ ~~agents~~ /tenant <u>representatives</u> or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation."

## Former Standard of Practice 3-1

With respect to the section of the former Standard of Practice 3-1 (originally Standard of Practice 22-4) that states, "Terms of compensation, if any, shall be ascertained by cooperating brokers before beginning efforts to accept the offer of cooperation":

- The Board of Directors adopted a new Standard of Practice under Article 22 in November 1988. The provisions were recommended by the Professional Standards Committee. The original text stated in relevant part:

> "The REALTOR®, acting as exclusive agent of the seller, establishes the terms and conditions of offers to cooperate. Unless expressly indicated in offers to cooperate made through MLS or otherwise, a cooperating broker may not assume that the offer of cooperation includes an offer of compensation. Entitlement to compensation in a cooperative transaction

20

must be agreed upon between a listing and cooperating broker prior to the time an offer to purchase the property is produced."

- In April 1993, the Board of Directors adopted amendments to Standard of Practice 22-4. The amendments were recommended by the Professional Standards Committee. The revised text stated in relevant part:

  > "REALTORS® acting as exclusive agents of sellers/<u>landlords</u>, establish the terms and conditions of offers to cooperate. Unless expressly indicated in offers to cooperate ~~made through the MLS or otherwise~~, cooperating broker<u>s</u> may not assume that the offer of cooperation includes an offer of compensation. ~~Entitlement to compensation in a cooperative transaction must be agreed upon between a listing and cooperating broker prior to the time an offer to purchase the property is produced."~~ <u>Terms of compensation, if any, shall be ascertained by cooperating brokers before beginning efforts to accept the offer of cooperation.</u>"

- In April 1994, at the recommendation of the Professional Standards Committee, the Board of Directors approved an amendment to renumber and reorder the Articles of the Standards of Practice. As a result, Standard of Practice 22-4 was placed under the heading "Duties to Clients and Customers" and was renumbered to Standard of Practice 3-1." The relevant text remained unchanged.

- In November 1998, the Board of Directors approved amendments to Standard of Practice 3-1. The Professional Standards Committee recommended the amendments. The revised text stated in relevant part:

"REALTORS®, acting as exclusive agents <u>or brokers</u> of sellers/landlords, establish the terms and conditions of offers to cooperate. Unless expressly indicated in offers to cooperate, cooperating brokers may not assume that the offer of cooperation includes an offer of compensation. Terms of compensation, if any, shall be ascertained by cooperating brokers before beginning efforts to accept the offer of cooperation."

**<u>Former Standard of Practice 16-11</u>**

With respect to the section of the former Standard of Practice 16-11 that states, "REALTORS® shall make any request for anticipated compensation from the seller/landlord at first contact":

- The Board of Directors adopted a new Standard of Practice related to Article 21 of the Code of Ethics in May 1988 at the recommendation of the Professional Standards Committee. The original text stated in relevant part:

  "On unlisted property, the REALTOR®, acting as the agent of a buyer, shall disclose that relationship to the seller at first contact."

- In May 1997, the Board of Directors approved amendments to Standard of Practice 16-11. The revised text stated in relevant part:

  "On unlisted property, REALTORS® acting as buyer/tenant agents <u>or brokers</u> shall disclose that relationship to the seller/landlord at first contact for that client and shall provide written confirmation of such disclosure to the seller/landlord not later than execution of any purchase or lease agreement. REALTORS® shall make any request for anticipated compensation from the seller/landlord at first contact."

- In November 2003, the Board of Directors approved amendments to Standard of Practice 16-11. The revised text stated:

  "On unlisted property, REALTORS® acting as buyer/tenant ~~agents~~ <u>representatives</u> or brokers shall disclose that relationship to the seller/landlord at first contact for that ~~client~~ <u>buyer/tenant</u> and shall provide written confirmation of such disclosure to the seller/landlord not later than execution of any purchase or lease agreement. REALTORS® shall make any request for anticipated compensation from the seller/landlord at first contact. (Amended 1/98)."

**Former MLS Standard of Conduct 16.18**

With respect to the section of the former MLS Standard of Conduct 16.18 that states, "MLS participants, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers, or make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation":

- In November 1994, the Board of Directors approved a new provision to the Standard of Conduct for MLS Participants 16.18. The text of the provision stated:

  "MLS Participants, acting as subagents or buyer/tenant agents, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer's agents nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation."

23

**Former Case Interpretation #3-7**

With respect to former Case Interpretation #3-7 which first appeared in the revised manual *Interpretations of the Code of Ethics*, 1985 (Eighth Edition Fourth Printing).  It was originally published as Case #9-26.  The original text stated:

> **"Case #9-26, Time at Which Modification to Offer of Subagency is Communicated is a Determining Factor**:
>
> REALTOR® A listed the home of Seller X and filed the listing with the Board MLS in which he was a Participant.  The property data sheet that was published by the MLS indicated, among other things, the compensation that REALTOR® A was offering to the other Participants if they were successful in finding a buyer for Seller X's home.
>
> During the next few weeks REALTOR® A authorized several Participants of the Multiple Listing Service, including REALTOR® C, to show Seller X's home to potential buyers.  Although several showings were made, no offers to purchase were forthcoming.  REALTOR® A and Seller X, in discussing possible means of making the property more salable, agreed to reduce the listed price.  REALTOR® A also agreed to lower the sales commission by one percent.  REALTOR® A then proceeded to call the other MLS Participants to advise them that he was modifying the blanket unilateral offer of subagency that he had made with regard to the listing of Seller X's home by reducing it by one half of a percent.  Upon receiving the call, REALTOR® C responded that he was working with Prospect Z who appeared to be very interested in purchasing the property and who would

probably be making an offer to purchase it within the next day or two. REALTOR® C indicated that he would expect to receive the amount of subagency compensation that had been published originally in the MLS listing book, rather than the reduced amount of compensation now being offered to him, since he had already shown the property to Prospect Z and expected to have an offer to purchase shortly. REALTOR® A responded that since Prospect Z had not as yet signed an offer of purchase, the modified offer of compensation for subagency services was applicable. The conversation between REALTOR® A and REALTOR® C was terminated at that point. Subsequently, REALTOR® A advised the other MLS Participants of the modified offer of subagency and notified the MLS in writing of the change as was required by the MLS Rules and Regulations. The following day REALTOR® C obtained an offer to purchase from Prospect Z. The offer was submitted to the Seller by REALTOR® A and was accepted. At the closing, REALTOR® A provided REALTOR® C with a check for subagency services in an amount reflecting the modified offer that had been communicated to REALTOR® C by phone. REALTOR® C refused to accept the check and indicated that he felt that REALTOR® A's actions were in violation of Article 9 of the Code of Ethics. REALTOR® C filed a complaint with the Board's Grievance Committee alleging violation of Article 9 on the part of REALTOR® A and cited Standard of Practice 9-5 in particular. REALTOR® C also requested arbitration with REALTOR® A.

Upon receipt of REALTOR® C's request for arbitration, and complaint of unethical conduct, the Board's Grievance Committee, in accordance with the procedures outlined in the Board's Code of Ethics and Arbitration Manual, separated the request for arbitration from the complaint alleging unethical conduct and referred the matters to the appropriate Hearing Panels of the Board's Professional Standards Committee with recommendation that the arbitration matter be resolved first and that a Panel be appointed to hear the charge of unethical conduct following successful completion of the arbitration hearing.

Following the arbitration hearing, a Hearing Panel comprised of Board Members other than those participating in the arbitration hearing was appointed to determine whether or not REALTOR® A's actions had been in violation of Article 9. During the hearing REALTOR® C stated that REALTOR® A's modification of the amount of compensation that he was offering for subagency services constituted a misrepresentation through concealment of pertinent facts by not providing REALTOR® C with specific written notification of such modification prior to the time that REALTOR® C had begun his efforts to interest the purchaser in the listed property. REALTOR® A defended his actions by indicating that timely notice of the modification of the amount of compensation that he was offering for subagency services had been provided to REALTOR® C by telephone prior to the time that REALTOR® C had a signed offer to purchase. REALTOR® A also indicated that his modified offer of

26

compensation for subagency services had been bulletined to all participants through the MLS "hot sheet." REALTOR® A indicated that in accordance with the obligations expressed in Standard of Practice 9-5, his modification of compensation offered for subagency services had been communicated to REALTOR® C prior to the time a prospective purchaser had signed an offer to purchase.

Based on the evidence presented to it, the Hearing Panel concluded that REALTOR® A had acted in accordance with the obligation expressed in Standard of Practice 9-5 and consequently was not in violation of Article 9."

- In May 1988, the Board of Directors approved amendments to Case #9-26. The revised text stated:

"Case #9-26, Time at Which Modification to Offer of Subagency is Communicated is a Determining Factor (Cross-reference #22- _____):

REALTOR® A listed the home of Seller X and filed the listing with the Board MLS. in which he was a Participant. The property data sheet that was published by the MLS indicated, among other things, the compensation that REALTOR® A was offering to the other Participants if they were successful in finding a buyer for Seller X's home.

During the next few weeks, REALTOR® A authorized several Participants of the Multiple Listing Service, including REALTOR® C, to show Seller X's home to potential buyers. Although several showings were made, no offer to purchase were forthcoming. REALTOR® A and Seller X, in discussing possible means of making the property more salable, agreed to

27

reduce the listed price. REALTOR® A also agreed to lower the sales commission by one percent. REALTOR® A then proceeded to call the other MLS Participants to advise them that he was modifying the blanket unilateral offer of subagency that he had made with regard to ~~the listing of~~ Seller X's home by reducing it by one half of a percent. Upon receiving the call, REALTOR ® C responded that he was working with Prospect Z who appeared to be very interested in purchasing the property and who would probably ~~be making~~ make an offer to purchase it within the next day or two. REALTOR® C indicated that he would expect to receive the amount of subagency compensation that had been published originally in the MLS ~~listing book~~ rather than the reduced amount of compensation now being offered to him, since he had already shown the property to Prospect Z and expected to have an offer to purchase shortly. REALTOR® A responded that since Prospect Z had not yet signed an offer to purchase, the modified offer of compensation for subagency services was applicable. ~~The conversation between REALTOR® A and REALTOR® was terminated at that point. Subsequently, REALTOR® A advised the other MLS Participants of the modified offer of subagency and notified the MLS in writing of the change as was required by the MLS Rules and Regulations~~. The following day REALTOR® C obtained an offer to purchase from Prospect Z. The offer was submitted to the seller by REALTOR® A and was accepted. At the closing REALTOR® A provided REALTOR® C with a check for subagency services in an amount reflecting the modified offer

28

that had been communicated to REALTOR® C by phone. REALTOR® C refused to accept the check and indicated that he felt that REALTOR® A's actions were in violation of ~~Article 9 of~~ the Code of Ethics. REALTOR® C filed a complaint with the Board's Grievance Committee alleging violation of Articles 9 <u>and 22</u> on the part of REALTOR® A and cited Standard of Practice 9-5 in particular. ~~REALTOR® C also requested arbitration with REALTOR® A.~~

~~Upon receipt of REALTOR® C's request for arbitration and complaint of unethical conduct, the Board's Grievance Committee, in accordance with the procedures outlined in the Board's Code of Ethics and Arbitration Manual, separated the request for arbitration from the complaint alleging unethical conduct and referred the matters to the appropriate hearing panels of the Board's Professional Standards Committee with recommendation that the arbitration matter be resolved first and that a panel be appointed to hear the charge of unethical conduct following successful completion of the arbitration hearing.~~

~~Following the arbitration hearing, a hearing panel comprised of Board Members other than those participating in the arbitration hearing was appointed to determine whether or not REALTOR® A's action had been in violation of Article 9.~~

During the hearing, REALTOR® C stated that REALTOR® A's modification of the amount of compensation that he was offering for subagency services constituted a misrepresentation through concealment of

pertinent facts by not providing REALTOR® C with specific written notification of such modification prior to the time that REALTOR® C had begun his efforts to interest the purchaser in the listed property. REALTOR® A defended his actions by indicating that timely notice of the modification of the amount of compensation that he was offering for subagency services had been provided to REALTOR® C by telephone prior to the time that REALTOR® C had obtained a signed offer to purchase. REALTOR® A also indicated that his modified offer of compensation for subagency services had been bulletined to all participants through the MLS "hot sheet." REALTOR® A indicated that in accordance with the obligation expressed in Standard of Practice 9-5, ~~his~~ the modification of compensation offered for subagency services had been communicated to REALTOR® C prior to the time a prospective purchaser had signed an offer to purchase. REALTOR® Also commented that had REALTOR® C produced the signed offer to purchase prior to the time REALTOR® A had communicated the modified offer of subagency compensation, then REALTOR® A would have willingly paid the amount originally offered.

Based on the evidence presented to it, the Hearing Panel concluded that REALTOR® A had acted in accordance with the obligation expressed in Standard of Practice 9-5 and consequently was not in violation of Articles 9 or 22."

- In November 1994, at the recommendation of the Professional Standards Committee, the Board of Directors approved an amendment to renumber and

reorder the Code of Ethics and Standards of Practice. As a result, Case #9-26 was renumbered to Case #3-7. The text remained unchanged.

- In November 2001, the Professional Standards Committee amended Case Interpretation #3-7. The revised text stated:

  **"Case #3-7: Time at Which Modification to Offer of ~~Subagency~~ <u>Compensation</u> is Communicated is a Determining Factor**

  (Revised Case #22-7 May, 1988. Transferred to Article 3 November, 1994. Cross-reference Case #2-14. Revised November, 2001.)

  REALTOR® A listed ~~the home of~~ Seller X<u>'s</u> ~~home and~~ filed the listing with the ~~Board's~~ MLS. The property data sheet indicated~~, among other things,~~ the compensation ~~that~~ REALTOR® A was offering to the other Participants if they were successful in finding a buyer for Seller X's home.

  During the next few weeks, REALTOR® A authorized several Participants of the Multiple Listing Service, including REALTOR® C, to show Seller X's home to potential buyers. Although several showings were made, no offers to purchase were forthcoming. REALTOR® A and Seller X, in discussing possible means of making the property more ~~sellable~~ <u>salable</u>, agreed to reduce the listed price. REALTOR® A also agreed to lower ~~the sales~~ <u>his</u> commission ~~by one percent~~. REALTOR® A <u>changed his compensation offer in the MLS and</u> then ~~proceeded to call~~ <u>called</u> the ~~other~~ MLS Participants <u>who had shown Seller X's property</u> to advise them that he was modifying ~~the~~ <u>his</u> ~~blanket unilateral~~ offer of ~~subagency~~ <u>compensation</u> <u>to cooperating brokers</u> ~~that he had made with regard to Seller X's home by~~

~~reducing it by one half of a percent~~.  Upon receiving the call, REALTOR® C responded that he was working with Prospect Z who appeared to be very interested in purchasing the property and who would probably make an offer to purchase ~~it within~~ in the next day or two.

REALTOR® C indicated that he would expect to receive the ~~amount of subagency~~ compensation that had been published originally in the MLS ~~rather than~~ and not the reduced amount ~~of compensation~~ now being offered to him, since he had already shown the property to Prospect Z and expected ~~to have~~ an offer to purchase would be made shortly.  REALTOR® A responded that, since Prospect Z had not ~~as yet~~ signed an offer to purchase, the modified offer of compensation ~~for subagency services was~~ would be applicable.

The following day, REALTOR® C ~~obtained~~ wrote an offer to purchase ~~from~~ for Prospect Z.  The offer was submitted to the Seller by REALTOR® A and was accepted. At the closing, REALTOR® A ~~provided~~ gave REALTOR® C ~~with~~ a check for ~~subagency~~ services in an amount reflecting the modified offer ~~that had been~~ communicated to REALTOR® C by phone. REALTOR® C refused to accept the check ~~and indicated that~~ indicating he felt ~~that~~ REALTOR® A's actions were in violation of the Code of Ethics. REALTOR® C filed a complaint with the Board's Grievance Committee alleging violation of Articles 2 and 3 on the part of REALTOR® A ~~and cited~~ citing Standard of Practice 3-2 in support of the charge.

During the hearing, REALTOR® C stated that REALTOR® A's modification of the ~~amount of~~ compensation ~~that he was offering for subagency services~~ constituted a misrepresentation through concealment of pertinent facts by ~~not providing~~ since he had not provided REALTOR® C with specific written notification of ~~such~~ the modification prior to the time ~~that~~ REALTOR® C ~~had begun~~ began his efforts to interest the purchaser in the listed property.

REALTOR® A defended his actions by indicating that timely notice of the modification ~~of the amount~~ of compensation ~~that he was offering for subagency services~~ offered had been provided to REALTOR® C by telephone prior ~~to the time that~~ REALTOR® C ~~had obtained~~ obtaining a signed offer to purchase. REALTOR® A also indicated that his modified offer of compensation ~~for subagency services~~ had been bulletined to all Participants through the MLS ~~"hot sheets"~~. REALTOR® A ~~indicated~~ also noted that in accordance with ~~the obligations expressed in~~ Standard of Practice 3-2, the ~~modification of~~ modified compensation offer~~ed for subagency services~~ had been communicated to REALTOR® C prior to the time ~~a prospective~~ the purchaser had signed an offer to purchase. REALTOR® A also commented that had REALTOR® C produced the signed offer to purchase prior to ~~the time~~ REALTOR® A ~~had communicated~~ communicating the modified offer ~~of subagency compensation~~, then REALTOR® A would have willingly paid the amount originally offered. Based on the evidence presented to it, the Hearing Panel concluded that

REALTOR® A had acted in accordance with the obligation expressed in Standard of Practice 3-2 and consequently was not in violation of Articles 2 or 3."

- In May 2017, the Professional Standards Committee amended Case Interpretation #3-7. The revised text stated:

**"Case #3-7: Time at Which Modification to Offer of Compensation is Communicated is a Determining Factor** (Revised Case #22-7 May, 1988. Transferred to Article 3 November, 1994. Cross-reference Case #2-14. Revised November, 2001.)

Realtor® A listed Seller X's home and ~~filed~~ entered the listing ~~with~~ into the MLS. The ~~property data sheet~~ relevant MLS data field indicated the compensation Realtor® A was offering to the other Participants if they were successful in finding a buyer for Seller X's home.

During the next few weeks, Realtor® A authorized several Participants of the ~~Multiple Listing Service~~ MLS, including Realtor® C, to show Seller X's home to potential buyers. Although several showings were made, no offers to purchase were forthcoming. Realtor® A and Seller X, in discussing possible means of making the property more salable, agreed to reduce the listed price. Realtor® A also agreed to lower his commission. Realtor® A changed his compensation offer in the field in the MLS and then called the MLS Participants who had shown Seller X's property to advise them that he was modifying his offer of compensation to cooperating brokers. Upon receiving the call, Realtor® C responded that he was working with Prospect

Z who appeared to be very interested in purchasing the property and who would probably make an offer to purchase in the next day or two. Realtor® C indicated that he would expect to receive the compensation that had been published originally in the MLS and not the reduced amount now being offered to him, since he had already shown the property to Prospect Z and expected an offer to purchase would be made shortly. Realtor® A responded that since Prospect Z had not signed an offer to purchase and no offer had been submitted the modified offer of compensation would be applicable.

The following day, Realtor® C wrote an offer to purchase for Prospect Z. The offer was submitted to the Seller by Realtor® A and was accepted. At the closing, Realtor® A gave Realtor® C a check for services in an amount reflecting the modified offer communicated to Realtor® C by phone. Realtor® C refused to accept the check indicating that he felt Realtor® A's actions were in violation of the Code of Ethics. Realtor® C filed a complaint with the ~~Board's~~ Association's Grievance Committee alleging violation of Articles 2 and 3 on the part of Realtor® A citing Standard of Practice 3-2 in support of the charge.

During the hearing, Realtor® C stated that Realtor® A's modification of the compensation constituted a misrepresentation through concealment of pertinent facts since he had not provided Realtor® C with specific written notification of the modification prior to the time Realtor® C began his efforts to interest the purchaser in the listed property. Realtor® A defended his actions by indicating that timely notice of the modification of

35

compensation offered had been provided to Realtor® C by telephone prior to Realtor® C submitting a signed offer to purchase. Realtor® A also indicated that his modified offer of compensation had been bulletined to all Participants, including Realtor® C, through the MLS in accordance with Standard of Practice 3-2 prior to the time that Realtor® C had submitted the signed offer to purchase. Realtor® A also commented that had Realtor® C submitted the signed offer to purchase prior to Realtor® A communicating the modified offer, then Realtor® A would have willingly paid the amount originally offered.

Based on the evidence presented to it, the Hearing Panel concluded that Realtor® A had acted in accordance with the obligation expressed in Standard of Practice 3-2 based on changing the offer of cooperative compensation in the MLS alone, even without the courtesy phone calls, and consequently was not in violation of Articles 2 or 3."

- In June 2025, the Professional Standards Committee approved amendments to the Case Interpretations to the Code of Ethics and Arbitration Manual that struck all text of Case Interpretation #3-7.

**<u>Former Case Interpretation #16-16</u>**

With respect to former Case Interpretation #16-16:

- In April 1990, The Professional Standards Committee approved two new Case Interpretations related to Article 21 of the Code of Ethics. Case Interpretation #16-16 was originally published as Case #21-17.

- In November 1994, at the recommendation of the Professional Standards Committee, the Board of Directors approved an amendment to renumber and reorder the Code of Ethics and Standards of Practice. As a result, Case #21-17 was renumbered to Case #16-11. The text remained unchanged.

- In November 2001, the Professional Standards Committee approved amendments to Case Interpretation #16-11. The Interpretations and Procedures Subcommittee recommended the amendments. The revised text stated:

  "**Case #16-11 16 (Formerly Case #16-11): Buyer Agent's Demand that Listing Agent Reduce Commission** (Adopted as Case #21-17 April, 1990. Transferred to Article 16 November, 1994. Renumbered November, 2001)

  REALTOR® B contacted REALTOR® A, the listing broker, and notified her that he was a buyer's agent and was interested in showing one of her listings to his client, a prospective purchaser. REALTOR® A made an appointment for REALTOR® B and his client to view the property. Shortly thereafter, REALTOR® B presented REALTOR® A with a signed offer to purchase from his client which was contingent on REALTOR® A's willingness to reduce her commission by the amount she had offered through the MLS to subagents and on the seller's willingness to compensate the buyer for the commission the buyer owed to REALTOR® B, his agent. REALTOR® A presented the offer to her client, the seller, explaining that she would not agree to reduce the previously agreed commission as specified in their listing contract.

REALTOR® A then filed a complaint with the local Board charging REALTOR® B with violating Article 16 as interpreted by Standard of Practice 16-16.  In her complaint, REALTOR® A stated that REALTOR® B had interfered in her agency relationship with the seller by encouraging the buyer to condition acceptance of his offer on the renegotiation of REALTOR® A's commission arrangement with her client, the seller. REALTOR® B defended his action arguing that REALTOR® A's refusal to reduce her commission by an amount equal to what she had offered other brokers for subagency services would have placed the seller in the position of having to pay an excessive amount of commission if he had accepted the offer agreeing to contribute to the buyer broker's compensation.  In addition, REALTOR® B felt that it was his duty to his client to get the best price for the property by encouraging the buyer to reduce the costs of sale wherever practical.  The Hearing Panel concluded that REALTOR® B's actions to encourage his buyer-client to pressure the seller to try to modify the listing agreement with REALTOR® A was an unwarranted interference in their contractual relationship.  The Hearing Panel noted that Article 16, as interpreted by Standard of Practice 16-16, required REALTOR® B to determine, prior to presenting an offer to REALTOR® A and her seller-client, whether REALTOR® A was willing to contribute to REALTOR® B's commission, either directly or by reducing the commission as agreed to in the listing contract and, if so, the terms and amount of such contributions.

It was the decision of the Hearing Panel that REALTOR® B had violated Article 16."

- In June 2025, the Board of Directors approved amendments to the Case Interpretations to the Code of Ethics and Arbitration Manual that struck all text of Case Interpretation #16-16. The Professional Standards Committee recommended the amendments.

**Former Case Interpretation #16-17**

With respect to former Case Interpretation #16-17:

- In April 1990, The Professional Standards Committee approved two new Case Interpretations related to Article 21 of the Code of Ethics. Case Interpretation 16-17 was originally published as Case #21-18.

- In November 1994, at the recommendation of the Professional Standards Committee, the Board of Directors approved an amendment to renumber and reorder the Code of Ethics and Standards of Practice. As a result, Case #21-18 was renumbered to Case #16-17. The text remained unchanged.

- In November 2001, the Professional Standards Committee approved amendments to Case Interpretation 16-17. The Interpretations and Procedures Subcommittee recommended the amendments. The revised text stated:

  "**Case #16-~~12~~ 17 (Formerly Case #16-12): Buyer Conditions Purchase Offer on Seller's Agreement to Pay Buyer Agent's Fee** (Adopted as Case #21-18 April, 1990. Transferred to Article 16 November, 1994. <u>Renumbered November, 2001</u>)

39

REALTOR® A filed a listed property with his local MLS offering to pay a fee for subagency services. REALTOR® B called REALTOR® A, identified himself as a buyer's agent, and asked if REALTOR® A would arrange a showing of the property to his client and himself. REALTOR® A agreed. The following day, REALTOR® B presented REALTOR® A with an offer to purchase that was contingent on the seller's agreement to pay REALTOR® B's commission. The seller accepted the offer and the sale closed shortly afterward. REALTOR® A then filed a complaint against REALTOR® B citing Article 16 of the Code of Ethics as interpreted by Standard of Practice 16-16. He stated that REALTOR® B had interfered in REALTOR® A's relationship with his seller-client by attempting to negotiate a separate commission agreement with the seller. REALTOR® B responded that since the request that the seller pay his commission was made by REALTOR® B's client, the buyer, directly of the seller and not of the listing broker, no violation of the Code of Ethics had occurred. In their decision, the Hearing Panel noted that if REALTOR® B; or if his client at REALTOR® B's urging, had demanded that a portion of REALTOR® A's commission be paid to REALTOR® B, there would have been a valid basis for REALTOR® A's position. Since the request for payment of REALTOR® B's fee was made directly to the seller, REALTOR® B was not in violation of Article 16."

- In June 2025, The Board of Directors approved amendments to the Case Interpretations to the Code of Ethics and Arbitration Manual that struck all text of

Case Interpretation #16-17. The Professional Standards Committee recommended the amendments.

**Former Case Interpretation #16-15**

With respect to former Case Interpretation #16-15:

- In September 1978, the Professional Standards Committee drafted and approved the adoption of Case Interpretation #16-15. This Case Interpretation first appeared in the manual *Interpretations of the Code of Ethics*, Eighth Edition, May 1982. It was originally published as Case Interpretation #21-12. The original text stated:

  "Case #21-12, Cooperating Broker's Compensation Specified On Deposit Receipt: REALTOR® A filed written complaint with the Executive Officer of the Board against REALTOR® B alleging violation of Article 21 of the Code of Ethics. The Executive Officer referred it to the Grievance Committee and after preliminary investigation the Grievance Committee referred it back to the Executive Officer with instructions to arrange for a hearing before a Hearing Panel of the Professional Standards Committee. After following required procedures including timely notices to all parties, a Hearing Panel was convened.

  REALTOR® A stated to the Hearing Panel that he and REALTOR® B were both members of the Board MLS and that as an MLS participant, he had specified on the particular listings relating to his complaint the respective amounts of compensation applicable to each such listing. However, REALTOR® B had ignored this information provided on the listing and had, on two (2) separate occasions, brought to REALTOR® A agreements for

41

sale of real property with copies of deposit receipts provided to the purchaser that stated on said deposit receipts that in consideration for REALTOR® B's service a certain amount of compensation would be due and payable to REALTOR® B. In following this practice, REALTOR® B was, in effect, presenting a demand for a subagency commission greater than that which REALTOR® A as the listing broker had specified on the listing filed with the Board's Multiple Listing Service. REALTOR® A also complained that the language of the deposit receipt was so phrased as to make presentation of the offer conditioned upon REALTOR® A's agreement to pay a larger commission than he had specified on the listing. REALTOR® A said this practice by REALTOR® B created a dilemma for him as the listing broker of either not submitting the offer to the client or alternatively paying a subagent commission higher than he had offered on the listing. Moreover REALTOR® A said he was by this practice forced to discriminate against other brokers who had been invited to cooperate. REALTOR® B responded that he had a right to negotiate with REALTOR® A as to the subagent's compensation he desired to receive for his work, and the amount that he had put on the deposit receipt was the compensation for which he was willing to work. REALTOR® B said that REALTOR® A would have to make his own decision as to whether he would present the offer or not.

The Hearing Panel advised REALTOR® B that he was indeed entitled to negotiate with REALTOR® A concerning the compensation to be paid as a subagent, but that such negotiation should be completed prior to the showing

of the property by REALTOR® B. The Hearing Panel stressed that REALTOR® B was legally entitled to show property listed by REALTOR® A only if there existed a subagency agreement between them and so long as there was no agreement on the essential terms and conditions of such subagency, e.g., compensation, there was no authorization for REALTOR® B to show the property or to invite an offer to purchase the property.

The Hearing Panel advised REALTOR® B that it was improper for him to follow the procedure of inserting on any document provided to seller or buyer the amount of compensation to be paid by the listing broker to the cooperating broker since this is properly a matter between the listing broker and the cooperating broker. The Hearing Panel concluded such a practice was inconsistent with the agency of the listing broker, and was in violation of Article 21 of the Code of Ethics."

- In May 1988, the Professional Standards Committee revised Case Interpretation #21-12. The revised text stated:

    "**Case #21-12, Cooperating Broker's Compensation Specified On Deposit Receipt:**

    REALTOR® A filed a written complaint with the Executive Officer of the Board against REALTOR® B alleging violation of Article 21 of the Code of Ethics. The Executive Officer referred it to the Grievance Committee and after preliminary investigation the Grievance Committee referred it back to the Executive Officer with instructions to arrange for a hearing before a Hearing Panel of the Professional Standards Committee. After following

43

required procedures including timely notices to all parties, a Hearing Panel was convened.

REALTOR® A stated to the Hearing Panel that he and REALTOR® B were both members of the Board MLS and that as an MLS participant, he ~~had~~ was required to ~~specified~~ specify ~~on the particular listings relating to his complaint the respective amounts of compensation applicable to each such listing~~ the amount of subagency compensation he was offering on listings filed with the MLS. However, REALTOR® B had ignored this information ~~provided on the listing~~ as published by the MLS and had, on two ~~(2)~~ separate occasions, brought ~~to~~ REALTOR® A purchase agreements ~~for sale of real property~~ with copies of deposit receipts that provided ~~to the purchaser that stated on said deposit receipts that in consideration for REALTOR® B's service a certain~~ different amount of subagency compensation ~~would~~ ~~to~~ be due and payable to REALTOR® B. In following this practice, REALTOR® B was, in effect, presenting a demand for a subagency ~~commission~~ compensation greater than that which REALTOR® A as the listing broker had specified ~~on~~ in the ~~listing~~ information filed with the Board's Multiple Listing Service.

REALTOR® A also complained that the language of the deposit receipt was so phrased as to make presentation of the offer conditioned upon REALTOR® A's agreement to pay a larger subagency commission than he had ~~specified on the listing~~ offered through the MLS. REALTOR® A said this practice by REALTOR® B created a dilemma for him as the listing

broker of either not submitting the offer to the client or alternatively paying a subagent commission higher than he had ~~offered on the listing.  Moreover REALTOR® A said he was by this practice forced to discriminate against other brokers who had been invited to cooperate~~ through the MLS.

REALTOR® B responded that he had a right to negotiate with REALTOR® A as to the ~~subagent's~~ subagency compensation he desired to receive for his work, and the amount that he had put on the deposit receipt was the compensation for which he was willing to work.  REALTOR® B said that REALTOR® A would have to make his own decision as to whether he would present the offer or not.

The Hearing Panel's decision advised REALTOR® B that he was indeed entitled to negotiate with REALTOR® A concerning the subagency compensation ~~to be paid as a subagent~~, but that such negotiation should be completed prior to the showing of the property by REALTOR® B.  The ~~Hearing Panel stressed~~ decision indicated that REALTOR® B was legally entitled to show property listed by REALTOR® A only if there existed a subagency agreement between them.  ~~And so long as~~ If there was no agreement on the essential terms and conditions of such subagency, e.g., compensation, there was no authorization for REALTOR® B to show the property or to ~~invite~~ procure an offer to purchase. ~~the property.~~

~~The Hearing Panel advised REALTOR® B that it was improper for him to follow the procedure of inserting on any document provided to seller or buyer the amount of compensation to be paid by the listing broker to the~~

~~cooperating broker since this is properly a matter between the listing broker~~
~~and the cooperating broker.   The Hearing Panel concluded such a practice~~
~~was inconsistent with the agency of the listing broker, and was in violation~~
~~of Article 21 of the Code of Ethics.~~

<u>The Panel's decision further advised that it was improper for REALTOR®</u>
<u>B to follow a procedure of inserting the amount of subagency compensation</u>
<u>to be paid by the listing broker on any document provided to a buyer or a</u>
<u>seller, since this is properly a matter to be decided by the listing and</u>
<u>cooperating brokers at the time the offer of subagency is accepted; and that</u>
<u>preconditioning an offer to purchase on the listing broker's acceptance of a</u>
<u>subagency commission greater than he had offered was a practice</u>
<u>inconsistent with respect for the agency of the listing broker.</u>

<u>REALTOR® B was found in violation of Article 21.</u>"

- In November 1994, at the recommendation of the Professional Standards Committee, the Board of Directors approved an amendment to renumber and reorder the Code of Ethics and Standards of Practice.  As a result, Case #21-12 was renumbered to Case #16-6.  The text remained unchanged.

- Case interpretation #16-6 was renumbered 16-15 in November 2001.   The renumbering was approved by the Professional Standards Committee.  The relevant text remained unchanged.

- The Professional Standards Committee revised Case Interpretation #16-15 in November 2015.  The revised text stated:

46

"**Case #16-15, Cooperating Broker's Compensation Specified On Deposit Receipt:**

REALTOR® A filed written complaint ~~with the Executive Officer of the Board~~ against REALTOR® B alleging violation of Article 16 of the Code of Ethics. ~~The Executive Officer~~ <u>It</u> <u>was</u> referred it to the Grievance Committee and after preliminary investigation the Grievance Committee referred it ~~back~~ to the Executive Officer <u>Professional Standards Administrator</u> with instructions to arrange for a hearing before a Hearing Panel of the Professional Standards Committee. After following required procedures, including timely notices to all parties, a Hearing Panel was convened.

REALTOR® A stated to the Hearing Panel that he and REALTOR® B were both members of the Board MLS and that as an MLS participant, he was required to specify the amount of subagency compensation he was offering on listings filed with the MLS. However, REALTOR® B had ignored this information as published by the MLS and had, on two separate occasions, brought REALTOR® A purchase agreements with copies of deposit receipts that provided for a different amount of subagency compensation to be due and payable to REALTOR® B. In following this practice, REALTOR® B was, in effect, presenting a demand for subagency compensation greater than that which REALTOR® A as the listing broker had specified in the information filed with the Board's Multiple Listing Service.

47

REALTOR® A also complained that the language of the deposit receipt was so phrased as to make presentation of the offer conditioned upon REALTOR® A's agreement to pay a larger subagency commission than he had offered through the MLS. REALTOR® A said this practice by REALTOR® B created a dilemma for him as the listing broker of either not submitting the offer to the client or alternatively paying a subagent commission higher than he had offered through the MLS. REALTOR® B responded that he had a right to negotiate with REALTOR® A as to the subagency compensation he desired to receive for his work, and the amount that he had put on the deposit receipt was the compensation for which he was willing to work. REALTOR® B said that REALTOR® A would have to make his own decision as to whether he would present the offer or not. The Hearing Panel's decision advised REALTOR® B that he was indeed entitled to negotiate with REALTOR® A concerning subagency compensation but that such negotiation should be completed prior to the showing of the property by REALTOR® B. The decision indicated that REALTOR® B was legally entitled to show property listed by REALTOR® A only if there existed a subagency agreement between them. If there was no agreement on the essential terms and conditions of such subagency, e.g., compensation, there was no authorization for REALTOR® B to show the property or to procure an offer to purchase.

The panel's decision further advised that it was improper for REALTOR® B to follow a procedure of inserting the amount of subagency compensation

to be paid by the listing broker on any document provided to a buyer or a seller, since this is properly a matter to be decided by the listing and cooperating brokers at the time the offer of subagency is accepted; and that preconditioning an offer to purchase on the listing broker's acceptance of a subagency commission greater than he had offered was a practice inconsistent with respect for the agency of the listing broker.

REALTOR® B was found in violation of ~~Article 21~~ Article 16."

- The Professional Standards Committee revised Case Interpretation #16-15 in November 2018. The revised text stated:

   "**Case #16-15, Cooperating Broker's Compensation Specified on Deposit Receipt:**

   REALTOR® A filed written complaint against REALTOR® B alleging violation of Article 16 of the Code of Ethics. It was referred it to the Grievance Committee and after preliminary investigation the Grievance Committee referred it to the Professional Standards Administrator with instructions to arrange for a hearing before a Hearing Panel of the Professional Standards Committee. After following required procedures, including timely notices to all parties, a Hearing Panel was convened.

   REALTOR® A stated to the Hearing Panel that he and REALTOR® B were both members of the Board MLS and that as an MLS participant, he was required to specify the amount of subagency compensation he was offering on listings filed with the MLS. However, REALTOR® B had ignored this information as published by the MLS and had, on two separate occasions,

49

brought REALTOR® A purchase agreements with copies of deposit receipts that provided for a different amount of ~~subagency~~ cooperating broker compensation to be ~~due and~~ payable to REALTOR® B.  In following this practice, REALTOR® B was, in effect, presenting a demand for ~~subagency~~ a cooperating broker compensation greater than that which REALTOR® A as the listing broker had specified in the information filed with the Board's Multiple Listing Service.

REALTOR® A also complained that the language of the deposit receipt was so phrased as to make presentation of the offer conditioned upon REALTOR® A's agreement to pay a larger ~~subagency~~ cooperating broker commission than he had offered through the MLS. REALTOR® A said this practice by REALTOR® B created a dilemma for him as the listing broker of either not submitting the offer to the client or, alternatively, paying ~~a~~ ~~subagent commission higher~~ an amount of cooperating broker compensation greater than he had offered through the MLS.

REALTOR® B responded that he had a right to negotiate with REALTOR® A as to the ~~subagency~~ cooperating broker compensation he desired to receive for his work, and the amount that he had put on the deposit receipt was the compensation for which he was willing to work.  REALTOR® B said that REALTOR® A would have to make his own decision as to whether he would present the offer or not.

The Hearing Panel's decision advised REALTOR® B that he was indeed entitled to negotiate with REALTOR® A concerning ~~subagency~~ cooperating

broker compensation but that such negotiation should be completed prior to the showing of the property by REALTOR® B.  The decision indicated that REALTOR® B was legally entitled to show property listed by REALTOR® A ~~only if there existed a subagency agreement between them. If there was no agreement on the essential terms and conditions of such subagency, e.g., compensation, there was no authorization for REALTOR® B to show the property or to procure an offer to purchase~~ on the terms offered by the listing broker in the MLS.

The panel's decision further advised that it was improper for REALTOR® B to ~~follow a procedure of inserting~~ insert the amount of ~~subagency~~ cooperating broker compensation to be paid by the listing broker ~~on any document provided to a~~ into the contract between the buyer ~~or a~~ and seller, ~~since this is properly a matter to be decided by the listing and cooperating brokers at the time the offer of subagency is accepted;~~ as the brokers are not the parties to the buyer-seller contract. Compensation between the cooperating broker and the listing broker is properly a matter of contract between the listing and cooperating brokers; and that preconditioning an offer to purchase between the buyer and seller on the listing broker's acceptance of a ~~subagency~~ cooperating broker commission greater than he had offered was ~~a practice inconsistent with respect for the agency of the listing broker~~ inappropriate as a non-party to the buyer-seller contract.

REALTOR® B was found in violation of Article 16."

- In June 2025, the Board of Directors approved amendments to the Case Interpretations to the Code of Ethics and Arbitration Manual that struck all text of Case Interpretation #16-15. The Professional Standards Committee recommended the amendments.

### Former MLS Policy Statement 7.58 (re IDX listings)

With respect to the section of the former MLS Policy Statement 7.58 that states in relevant part, "Participants may select the IDX listings they choose to display based . . . on . . . cooperative compensation offered by listing brokers":

- In November 2006, the Board of Directors, at the recommendation of the Multiple Listing Issues and Policies Committee, approved amendments to the Internet Display (IDX) Policy. The revised text stated in relevant part:

  > "Participants may ~~exclude~~ <u>select the</u> listings ~~from~~ <u>they choose to</u> display on their IDX sites based only on objective criteria including, but not limited to, factors such as geography, <u>or location ("uptown", "downtown", etc.)</u> list price, type of property~~,~~ <u>(e.g., condominiums, cooperatives, single family detached, multi-family)</u> ~~or~~ cooperative compensation offered by listing brokers<u>, type of listing (e.g. exclusive right to sell or exclusive agency), or the level of service provided by the listing firm. Selection of listings to be displayed on an IDX site much be independently made by each Participant</u>."

- In November 2010, the Multiple Listing Issues and Policies Committee approved amendments to Multiple Listing Policy Statement 7.58, to be approved by the Board of Directors. In May 2012, the Board of Directors adopted those amendments to

Multiple Listing Policy Statement 7.58, Internet Data Exchange Policy. The revised text stated in relevant part:

> "Participants may select the <u>IDX</u> listings they choose to display ~~on their IDX sites~~ based only on objective criteria including, but not limited to, factors such as geography or location ("uptown", "downtown", etc.), list price, type of property (e.g., condominiums, cooperatives, single family detached, multi-family), cooperative compensation offered by listing brokers, type of listing (e.g., exclusive right-to-sell or exclusive agency), or the level of service provided by the listing firm. Selection of <u>IDX</u> listings to be displayed ~~on an IDX site~~ must be independently made by each participant."

- In November 2021, the Multiple Listing Issues and Policies Committee recommended revisions to the IDX and VOW policies and Model MLS Rules and Regulations. The revised text stated in relevant part:

> "Participants may select the IDX listings they choose to display based only on objective criteria including, but not limited to, factors such as geography or location ("uptown", "downtown", etc.), list price, type of property (e.g., condominiums, cooperatives, single family detached, multi-family), ~~cooperative compensation offered by listing brokers,~~ <u>or</u> type of listing (e.g., exclusive right-to-sell or exclusive agency~~), or the level of service provided by the listing firm~~. Selection of IDX listings to be displayed must be independently made by each participant."

**Former MLS Rules Section 18.2.4**

With respect the section of the former MLS Rules Section 18.2.4 that states, "Participants may select the listings they choose to display through IDX based . . . on . . . cooperative compensation offered by listing brokers":

- In May 2005, the Board of Directors adopted MLS Rule Section 18.2.4. The original text stated in relevant part:

  "Participants may exclude listings from display on their IDX sites based only on objective criteria including, but not limited to, factors such as geography, list price, type of property, or cooperative compensation offered by listing brokers."

- In November 2006, the Board of Directors adopted amendments to the model Internet Data Display (IDX) rules, recommended by the Multiple Listing Issues and Policies Committee. The revised text stated in relevant part:

  "**Section 18.2.4**

  Participants may ~~excludes~~ select the listings ~~from~~ they choose to display on their IDK sites based only on objective criteria including, but not limited to, factors such as geography or location ("uptown", "downtown", etc.), list price, type of property, (e.g. condominiums, cooperatives, single-family detached, multi-family, ~~or~~ cooperative compensation offered by listing brokers, type of listing (e.g. exclusive right to sell or exclusive agency), or the level of service being provided by the listing firm. Selection of listings displayed on any IDX site must be independently made by each Participant. ~~Examples include property type ("condos", "single family detached", "multi family", etc.), price, or location ("downtown").~~"

54

- In November 2021, the Board of Directors adopted amendments to Section 18 of NAR's Model MLS Rules and Regulations recommended by the Multiple Listing Issues and Policies Committee. The revised text stated:

  > "Section 18. IDX Defined
  >
  > 18.2.4 Participants may select the listings they choose to display through IDX based only on objective criteria including, but not limited to, factors such as geography or location "uptown", "downtown", etc.), list price, type of property (e.g., condominiums, cooperatives, single-family detached, multi-family), ~~cooperative compensation offered by listing brokers~~, or type of listing (e.g., exclusive right-to-sell or exclusive agency),~~or the level of service being provided by the listing firm~~. Selection of listings displayed through IDX must be independently made by each participant."

**Former Model MLS Rules Section 19.12**

With respect to the section of former Model MLS Rules Section 19.12 that states in relevant part, "A participant's VOW may exclude listings from display based . . . cooperative compensation offered by listing broker":

- In May 2003, the Board of Directors approved a motion to supplement the model MLS Rules and Regulations in the *Handbook on Multiple Listing Policy* with additional rules related to VOWs. Section 19.12 (originally Section 19.2.15) stated in relevant part:

  > "Listings from the MLS may only be excluded from display on Participants' VOWs based on objective criteria, e.g., type of property, listed price,

geographic location, or cooperative compensation offered by the listing brokers."

- In August 2008, the Leadership Team approved a motion to and adopt a revised VOW Policy. Section 5(h) stated:

    "A VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, type of property, cooperative compensation offered by listing broker, or whether the listing broker is a REALTOR®."

- In November 2021, the Board of Directors approved amendments to Section 19.12 of the Model MLS Rules and Regulations recommended by Multiple Listing Issues and Policies Committee. The revised text stated:

    "A Participant's VOW may exclude listings from display based only on objective criteria including, but not limited to, factors such as geography, list price, <u>or</u> type of property ~~or cooperative compensation offered by listing broker and whether the listing broker is a REALTOR®~~."

**<u>Former Model MLS Rule Section 19.15</u>**

With respect to the section of the former Model MLS Rule Section 19.15 that states in relevant part, "A participant's VOW may not make available for search by or display to Registrants . . . the compensation offered to other MLS participants":

- In May 2003, at the recommendation of Multiple Listing Issues and Policies Committee, the Boad of Directors approved a motion to supplement the Model MLS Rules and Regulations in the *Handbook on Multiple Listing Policy* with rules related to VOW. Section 19.15 (originally Section 19.2.18) stated in relevant part:

56

> "Section 19.2.18 A Participant's VOW may not make available for search by or display to Registrants the following data intended exclusively for other MLS Participants and their affiliated licensees: . . . 2) The compensation offered to other MLS Participants."

- In May 2021, the Board of Directors adopted amendments to Model MLS Rule Section 19.15 recommended by the Multiple Listing Issues and Policies Committee. The revised text stated in relevant part:

  > **"Section 19.15**
  >
  > A participant's VOW may not make available for search by or display to Registrants ~~the following data intended exclusively for other MLS Participants and their affiliated licensees~~ any of the following information . . ."

**Former MLS Policy Statement 7.91**

With respect to the section of the former MLS Policy Statement 7.91 that states in relevant part, "A participant's VOW may not make available for search by or display to Registrants the following data, intended exclusively for other MLS participants and their affiliated licensees: . . . the compensation offered to other MLS participants":

- The 2003 Virtual Office Website ("VOW") Work Group sent a report to the NAR Leadership in March 2003, proposing policy governing use of MLS data in connection with Internet brokerage services offered by MLS Participants. Section II.4.b of the proposed policy stated:

  > "A Participant's VOW may not make available for search by or display to Registrants the following data intended exclusively for other MLS

57

participants and their affiliated licensees: . . . The compensation offered to other MLS Participants."

- The Multiple Listing Issues and Policies Committee adopted the proposed policy in May 2003. Section II.4.b was changed to Section IV.1.a.ii, but the relevant text remained the same.

- In August 2008, the Leadership Team adopted the Revised VOW Policy, subject to approval by the court of the Final Judgment in *US v. NAR*. Section IV.1.a.ii was changed to Section IV.1.a.iii, but the relevant text remained the same.

**Former MLS Policy Statement 7.58 (re confidential information fields)**

With respect to the section of the former MLS Policy Statement 7.58 that states in relevant part, "MLSs may: . . . prohibit display of confidential information fields intended for cooperating brokers rather than consumers including compensation offered to other MLS participants":

- In May 2000, the Board of Directors, at the recommendation of the Multiple Listing Issues and Policies Committee, adopted a Statement of Multiple Listing Policy, which stated in relevant part:

  "In addition, the following guidelines are recommended but not required to conform to NAR policy. Pursuant to these guidelines, MLSs may: . . . prohibit display of confidential information fields intended for cooperating brokers rather than consumers."

- In November 2006, the Board of Directors, at the recommendation of the Multiple Listing Issues and Policies Committee, adopted amendments to the Internet Display (IDX) Policy. The revised text stated in relevant part:

58

"~~In addition, t~~ Uhe following guidelines are recommended but not required to conform to ~~NAR~~ <u>National Association</u> policy. Pursuant to these guidelines, MLSs may: . . . prohibit display of confidential information fields intended for cooperating brokers rather than consumers <u>including compensation offered to other MLS participants, showing instructions, property security information, etc.</u>"

- In May 2009, the Multiple Listing Issues and Policies Committee adopted a motion for proposed amendments to the Internet Display (IDX) Policy (Multiple Listing Policy Statement 7.58) to "be referred to a work group of the Committee for review and comment, with any resulting recommendations reported to the Committee at the next meeting." The proposed amendments, in relevant part, were:

    "The following guidelines are recommended but not required to conform to National Association policy. ~~Pursuant to these guidelines,~~ MLSs may: . . . prohibit display of confidential information fields intended for cooperating brokers rather than consumers including compensation offered to other MLS ~~participants~~ <u>Participants</u>, showing instructions, property security information, etc."

- In November 2009, the Board of Directors, at the recommendation of the Multiple Listing Issues and Policies Committee, adopted amendments to the Internet Display (IDX) Policy (Multiple Listing Policy Statement 7.58). The relevant text of the revised policy remained the same as what was proposed by the Multiple Listing Issues and Policies Committee in May 2009.

59

- In November 2014, the Board of Directors, at the recommendation of the Multiple Listing Issues and Policies Committee, adopted amendments to the Internet Display (IDX) Policy (Multiple Listing Policy Statement 7.58). The revised text stated in relevant part:

  > "The following guidelines are recommended but not required to conform to National Association ~~policy~~ Policy. MLSs may: . . . prohibit display of confidential information fields intended for cooperating brokers rather than consumers including compensation offered to other MLS ~~Participants~~ participants, showing instructions, property security information, etc."

- In May 2017, the Board of Directors, at the recommendation of the Multiple Listing Issues and Policies Committee, adopted amendments to the Internet Display (IDX) Policy (Multiple Listing Policy Statement 7.58). The revised text stated in relevant part:

  > "The following guidelines are recommended but not required to conform to National Association ~~Policy~~ policy. MLSs may: . . . prohibit display of confidential information fields intended for cooperating brokers rather than consumers including compensation offered to other MLS participants, showing instructions, property security information, etc."

**Former MLS Policy Statement 18.3.1**

With respect to the section of the former MLS Policy Statement 18.3.1 that states in relevant part, "Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields

intended only for other MLS participants and users (e.g., cooperative compensation offers . . . ) may not be displayed":

- In November 2001, the Multiple Listing Issues and Policies Committee adopted "Optional Provisions for establishing Internet Data Exchange ("IDX")" to "be added to the model MLS rules and regulations (all types) in the *Handbook on Multiple Listing Policy*." Because "[t]hese rules implement existing policy," they "did not require approval by the Board of Directors." The Optional Provisions stated in relevant part:

  > "Section 18.3.1- Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited."

- In May 2012, the Multiple Listing Issues and Policies Committee adopted amendments to Section 18 of the model MLS rules, which stated in relevant part:

  > **"Section 18.3.1**
  >
  > Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. <u>Confidential fields intended only for other MLS participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed."</u>

- Later that month, the Board of Directors adopted the amendments, with the following change to the relevant text:

  > **"Section 18.3.1**

Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed on IDX sites."

**Model MLS Rule Section 10**

With respect to the section of Model MLS Rule Section 10 that states, "Any information provided by the multiple listing service to the participants shall be considered official information of the service. Such information shall be considered confidential and exclusively for the use of participants and real estate licensees affiliated with such participants and those participants who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property and licensed or certified appraisers affiliated with such participants":

- In May 1979, at the report of the Ad Hoc Committee on Multiple Listing Policy, the Multiple Listing Policy Committee adopted the "Suggested Model Bylaws for a Multiple Listing Service separately incorporated, but wholly owned by a Board of REALTORS®." The Suggested Model Bylaws stated in relevant part:

  "Section 10.1. Confidentiality of Multiple Listing Service Information. Any publications or information provided by the Multiple Listing Service to the Participants thereof shall be considered as official publications and information of the Service and shall provide such information as deemed desirable. Information contained therein shall be considered confidential and restricted to the use of qualified real estate personnel affiliated with

62

Participants to discuss possible real estate transactions to bona fide prospects or customers. It shall be the duty and responsibility of Participants to disclose or to disseminate such information only to qualified personnel."

- In November 1979, at the recommendation of the Executive Committee, the Board of Directors adopted the Rules and Regulations for a Multiple Listing Service operated as a Committee of a Board of REALTORS®, to be included in the next revision of the *Handbook on Multiple Listing Policy*. The relevant text contained the following changes from the Suggested Model Bylaws:

  "Section ~~10.1~~ 10. Confidentiality of ~~Multiple Listing Service~~ MLS Information~~.~~ : Any publications or information provided by the Multiple Listing Service to the Participants ~~thereof~~ shall be considered official publications and information of the Service and shall provide such information as deemed desirable. Information contained therein shall be considered confidential and restricted to the use of real estate personnel affiliated with Participants ~~to discuss~~ in presenting possible real estate transactions to bona fide prospects or customers. It shall be the duty and responsibility of Participants to disclose or to disseminate such information only to ~~qualified personnel~~ sales personnel qualified to act as subagents."

- In February 1981, the Board of Directors adopted amendments to the Suggested MLS Rules and Regulations in the *Handbook on Multiple Listing Policy*. The revised text stated in relevant part:

  "Section 10. Confidentiality of MLS Information: Any ~~publications or~~ information provided by the Multiple Listing Service to the Participants

63

shall be considered official ~~publications and~~ information of the Service ~~and shall provide such information as deemed desirable~~. <u>Such</u> ~~I~~<u>i</u>nformation ~~contained therein~~ shall be considered confidential and ~~restricted to~~ <u>exclusively for</u> the use of ~~real estate personnel affiliated with~~ Participants ~~in presenting possible real estate transactions to bona fide prospects or customers~~ <u>authorized and qualified to act as subagents of the listing broker in the sale of property filed with the Service, and real estate licensees affiliated with such Participants</u>. ~~It shall be the duty and responsibility of Participants to disclose or to disseminate such information only to sales personnel qualified to act as subagents.~~"

- In November 1991, at the recommendation of the Multiple Listing Policy Committee, the Board of Directors adopted amendments to Section 10, Confidentiality of MLS Information, of the Suggested MLS Rules and Regulations in the *Handbook on Multiple Listing Policy*. The revised text stated in relevant part:

  "Any information provided by the Multiple Listing Service to the Participants shall be considered official information of the Service. Such information shall be considered confidential and exclusively for the use of Participants authorized and qualified to act as subagents of the listing broker in the sale of property filed with the Service and real estate licensees affiliated with such Participants <u>and those Participants who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property and licensed or certified appraisers affiliated with such Participants</u>."

- In April 1992, the Board of Directors approved the recommendation of the Presidential Advisory Group on Agency that "NAR's multiple listing policy shall be modified to delete mandatory offer of subagency and make offers of subagency optional. Participants submitting listing to the MLS must, however, offer cooperation to other MLS participants in the form of subagency or cooperation with buyer agents or both. All offers of subagency or cooperation made through an MLS must include an offer of compensation."

- In June 1992, the Multiple Listing Policy Committee Chairman Nancy Pomerleau issued a memorandum to all Boards and Associations and Members of the Multiple Listing Policy Committee providing for their consideration "legislative style changes to the model MLS Rules and Regulations" for "Boards and Associations wishing to eliminate mandatory subagency prior to year end." The recommended changes were in relevant part:

  > **"Section 10. Confidentiality of MLS Information:** Any information provided by the Multiple Listing Service to the Participants shall be considered official information of the Service. Such information shall be considered confidential and exclusively for the use of Participants ~~authorized and qualified to act as subagents of the listing broker in the sale of property filed with the Service~~ and real estate licensees affiliated with such Participants and those Participants who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property and licensed or certified appraisers affiliated with such Participants."

65

- In November 1992, the Multiple Listing Policy Committee approved the changes in Chairman Pomerleau's June 1992 memorandum.

**Former MLS Policy Statement 7.3**

With respect to the section of the former MLS Policy Statement 7.3 that states in relevant part, "It is strongly recommended that any irrelevant information such as . . . the sales commission or the compensation offered or paid to cooperating brokers be deleted":

- In February 1978, at the recommendation of the Executive Committee, the Board of Directors approved the Multiple Listing Policy Committee's recommendation that:

    "statistical reports of information concerning listings which have been sold produced by the Board of REALTORS® are not a part of the Multiple Listing Service even though the source of some or all of such information is derived from the Multiple Listing Service or committee, and, therefore, need not be supplied to non-member participants. It is the recommendation that such reports and other reports of statistical information be reserved as a Board service."

- In February 1981, the Board of Directors approved a footnote to be added to Section 7.3, Statistical Reports in the *Handbook on Multiple Listing Policy*:

    "NOTE: This does not preclude the Board MLS from publishing, as an integral part of its current information concerning properties filed with the MLS, "SOLD" information concerning these properties. This is current and necessary information provided to the Participants concerning the continued availability of all properties filed with the Service and as to the price for

66

which they were sold subject to any contingencies of sale. However, Section 7.3 describes the proper ownership and vested interest of the Board in the statistical information concerning property listings which have been sold. This information even though derived wholly or in part from the operation of the Board MLS, is properly the property of the Board and should be provided as a service of the Board in a separate publication from that furnished MLS Participants."

- In November 2004, the Multiple Listing Issues and Policies Committee amended Section 7.3, in relevant part to include this language, previously housed under Section 7.28:

  "It is strongly recommended that any irrelevant information such as the names of current or former owners, or information concerning the sales commission or the compensation offered or paid to cooperating brokers be deleted."

**Former Standard of Practice 12-1**

With respect to the section of the former Standard of Practice 12-1 that states, "REALTORS® may use the term 'free' and similar terms in their advertising and in other representations provided that all terms governing availability of the offered product or service are clearly disclosed at the same time":

- In February 1975, the Professional Standards Committee adopted Standard of Practice 12-1 (originally 9-4). The original text stated in relevant part:

  "The REALTOR® shall not offer a service described as free when there is an expectation of obtaining a benefit such as a listing or a commission."

- In November 1994, at the recommendation of the Professional Standards Committee, the Board of Directors approved an amendment to renumber and reorder the Code of Ethics and Standards of Practice. As a result, Standard of Practice 9-4 was renumbered to Standard of Practice 12-1. The text remained unchanged.

- In April 1996, at the recommendation of the Professional Standards Committee, the Board of Directors amended Standard of Practice 12-1. The revised text stated in relevant part:

    "~~REALTORS® shall not offer a service described as 'free of charge' when the rendering of a service is contingent on the obtaining of a benefit such as a listing or commission~~".

    REALTORS® <u>may use the term 'free' and similar terms in their advertising and in other representations provided that all terms governing availability of the offered product or service are clearly disclosed at the same time.</u>"

- In November 2019, at the recommendation of the Professional Standards Committee, the Board of Directors amended Standard of Practice 12-1. The revised text stated in relevant part:

    "<u>Unless they are receiving no compensation from any source for their time and services,</u> REALTORS® may use the term "free" and similar terms in their advertising and in other representations ~~provided that all terms governing availability of the offered product or service are clearly disclosed at the same time~~ <u>only if they clearly and conspicuously disclose: a) by whom they are being, or expect to be paid; b) the amount of the payment or</u>

anticipated payment; c) any conditions associated with the payment, offered product or service, and d) any other terms relating to their compensation."

- In November 2021, at the recommendation of the Professional Standards Committee, the Board of Directors adopted amendments to Standard of Practice 12-1. The revised text stated in relevant part:

> "~~Unless they are receiving no compensation from any source for their time and services, REALTORS® may use the term "free" and similar terms in their advertising and in other representations only if they clearly and conspicuously disclose: 1) by whom they are being, or expect to be paid; 2) the amount of the payment or anticipated payment; 3) any conditions associated with the payment, offered product or service, and 4) any other terms relating to their compensation.(Amended 1/20)~~
>
> REALTORS® must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the REALTOR® will receive no financial compensation form any source for those services."

### Former Standard of Practice 12-2

With respect to the section of the former Standard of Practice 12-2 that states, "REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR® to obtain a benefit from a third party is clearly disclosed at the same time":

- In November 1994, at the recommendation of the Professional Standards Committee, the Board of Directors adopted Standard of Practice 12-2 (originally Standard of Practice 19-6). The original text stated in relevant part:

  > "REALTORS® shall not represent that their services are free or without cost if they expect to receive compensation from any source other than their client."

- In November 1996, at the recommendation of the Professional Standards Committee, the Board of Directors approved amendments to Standard of Practice 12-2. The revised text stated in relevant part:

  > "~~REALTORS® shall not represent that their services are free or without cost if they expect to receive compensation from any source other than their client.~~

  > REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR® to obtain a benefit from a third party is clearly disclosed at the same time."

- In November 2019, at the recommendation of the Professional Standards Committee, the Board of Directors approved a motion to delete Standard of Practice 12-2.

## MLS Policy Statement 8 and Model MLS Rules and Regulation Section 1.01

With respect to the section of MLS Policy Statement 8 that states, "Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers

displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public":

- In November 2019, at the recommendation of the Multiple Listing Issues and Policies Committee, the Board of Directors approved Section 17 of the Participants' Rights Policies, Statement 8.0.  The original text stated in relevant part:

> "MLS Statement 8.0.  Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants.  Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public."

**INTERROGATORY NO. 4:**   For each of the NAR Rules, Identify and describe each procompetitive justification or benefit to consumers that you contend applies and all facts and evidence that you contend support each procompetitive justification.

**ANSWER:**

NAR incorporates its General Objections and further objects to this Interrogatory as a premature contention interrogatory.  NAR has not completed its investigation and discovery in this matter, nor has it completed its expert discovery, research, and analysis that could impact any potential answers to contention interrogatories.  Moreover, NAR construes this as a request to identify the evidence that NAR intends to proffer at trial or in future motion practice, and therefore further objects to this Interrogatory as a premature request for identification of documents to be used at trial, which will be disclosed in accordance with Federal Rule 26(a)(3), the Local Rules, the case schedule, and any related Court orders.

NAR further objects on that the grounds that the Interrogatory to identify "each procompetitive justification" is vague and ambiguous. NAR further objects that the Interrogatory to identify "all facts or evidence" is overly broad and unduly burdensome, requiring NAR to conduct burdensome and unreasonable searches to identify all documents relating to a particular topic over multiple years.

NAR objects to the extent the Interrogatory seeks information: (a) outside its possession, custody, and control; or (b) publicly available, already in the possession of Plaintiffs, or equally obtainable from third parties or from some source other than NAR that is more convenient, less burdensome, or less expensive.

NAR objects to the extent this Interrogatory calls for legal arguments or conclusions. NAR also objects to this Interrogatory to the extent it seeks identification of documents containing information protected by the attorney-client privilege, the attorney work-product doctrine, and other applicable legal protections.

NAR objects on the grounds that procompetitive justifications are only required once a plaintiff has demonstrated an anticompetitive theory of harm. Until an anticompetitive restraint has been identified, there is no need for a procompetitive justification. NAR is not conceding that an anticompetitive restraint has been identified, pled, or proved.

NAR objects on the grounds that the Interrogatory requires NAR to consider each policy in isolation. NAR's practices and policies work together holistically to create a procompetitive environment in which real estate professionals can compete to best serve home buyers and sellers. NAR's policies and practices cannot be considered in isolation.

NAR will not be providing an answer to this Interrogatory at this time.

**INTERROGATORY NO. 5:** Identify and describe all facts and evidence that you contend demonstrate that any procompetitive justification or benefit to consumers identified in

response to Interrogatory No. 4 could not be reasonably achieved through less anticompetitive means.

**<u>ANSWER</u>:**

NAR incorporates its General Objections and further objects to this Interrogatory as a premature contention interrogatory. NAR has not completed its investigation and discovery in this matter, nor has it completed its expert discovery, research, and analysis that could impact any potential answers to contention interrogatories. Moreover, NAR construes this as a request to identify the evidence that NAR intends to proffer at trial or in future motion practice, and therefore further objects to this Interrogatory as a premature request for identification of documents to be used at trial, which will be disclosed in accordance with Federal Rule 26(a)(3), the Local Rules, the case schedule, and any related Court orders.

NAR objects on that the grounds that the Interrogatory to identify "any such procompetitive justification" is vague and ambiguous. NAR further objects that the Interrogatory to identify "all facts and evidence" is overly broad, and unduly burdensome, requiring NAR to conduct burdensome and unreasonable searches to identify all documents relating to a particular topic over multiple years.

NAR objects to the extent the Interrogatory seeks information: (a) outside its possession, custody and control; or (b) publicly available, already in the possession of Plaintiffs, or equally obtainable from third parties or from some source other than NAR that is more convenient, less burdensome, or less expensive.

NAR objects to the extent this Interrogatory calls for legal arguments or conclusions. NAR also objects to this Interrogatory to the extent it seeks identification of documents containing information protected by the attorney-client privilege, the attorney work-product doctrine, and other applicable legal protections.

NAR objects on the grounds that procompetitive justifications are only required once a plaintiff has demonstrated an anticompetitive theory of harm. Until an anticompetitive restraint has been identified, there is no need for a procompetitive justification. NAR is not conceding that an anticompetitive restraint has been identified, pled, or proved.

NAR objects on the grounds that the Interrogatory requires NAR to consider each policy in isolation when identifying procompetitive benefits. NAR's practices and policies work together holistically to create a procompetitive environment in which real estate professionals can compete to best serve home buyers and sellers. NAR's policies and practices cannot be considered in isolation.

NAR will not be providing an answer to this Interrogatory at this time.

**INTERROGATORY NO. 6:** To the extent You contend that Corporate Defendants do not collectively possess market power, Identify and describe all facts and evidence that you contend support that position, including what you contend to be relevant geographic and product markets.

**<u>ANSWER</u>:**

NAR incorporates its General Objections and further objects to this Interrogatory as a premature contention interrogatory. NAR has not completed its investigation and discovery in this matter, nor has it completed its expert discovery, research, and analysis that could impact any potential answers to contention interrogatories. Moreover, NAR construes this as a request to identify the evidence that NAR intends to proffer at trial or in future motion practice, and therefore further objects to this Interrogatory as a premature request for identification of documents to be used at trial, which will be disclosed in accordance with Federal Rule 26(a)(3), the Local Rules, the case schedule, and any related Court orders.

NAR further objects on that the grounds that the Interrogatory requires NAR to address whether the "Corporate Defendants do not collectively possess market power" and such demand is vague and ambiguous. NAR further objects that the Interrogatory to identify "all facts and

74

evidence" is overly broad, and unduly burdensome, requiring NAR to conduct burdensome and unreasonable searches to identify all documents relating to a particular topic over multiple years.

NAR objects to the extent this Interrogatory calls for legal arguments or conclusions. NAR also objects to this Interrogatory to the extent it seeks identification of documents containing information protected by the attorney-client privilege, the attorney work-product doctrine, and other applicable legal protections.

NAR objects on the grounds that this Interrogatory impermissibly shifts Plaintiffs' burden of proof to NAR by requiring NAR to define the applicable markets in Plaintiffs' claim.

NAR objects on the grounds that this Interrogatory seeks information regarding the Corporate Defendants that may be more accessible through interrogatories addressed to those entities.

Subject to the foregoing General and Specific Objections, NAR responds as follows:

Because this Interrogatory requests information that will be the subject of merits expert discovery, NAR will respond to this Interrogatory following production of merits expert reports pursuant to the Court's scheduling order. NAR further reserves the right to update and supplement its response to this Interrogatory pursuant to Federal Rule of Civil Procedure 26(e).

**INTERROGATORY NO. 7:** Identify and describe each affirmative defense that you contend applies to any cause of action against You in the Complaint and all facts and evidence that you contend support each affirmative defense.

**ANSWER:**

NAR incorporates its General Objections and further objects to this Interrogatory as a premature contention interrogatory. NAR has not completed its investigation and discovery in this matter, nor has it completed its expert discovery, research, and analysis that could impact any potential answers to contention interrogatories. Moreover, NAR construes this as a request to identify the evidence that NAR intends to proffer at trial or in future motion practice, and therefore

further objects to this Interrogatory as a premature request for identification of documents to be used at trial, which will be disclosed in accordance with Federal Rule 26(a)(3), the Local Rules, the case schedule, and any related Court orders.

NAR objects that the Interrogatory to identify "all facts and evidence" is overly broad, and unduly burdensome, requiring NAR to conduct burdensome and unreasonable searches to identify all documents relating to a particular topic over multiple years.

NAR objects to the extent the Interrogatory seeks information: (a) outside its possession, custody and control; or (b) publicly available, already in the possession of Plaintiffs, or equally obtainable from third parties or from some source other than NAR that is more convenient, less burdensome, or less expensive.

NAR objects to the extent this Interrogatory calls for legal arguments or conclusions. NAR also objects to this Interrogatory to the extent it seeks identification of documents containing information protected by the attorney-client privilege, the attorney work-product doctrine, and other applicable legal protections.

Subject to and without waiving any of the foregoing General and Specific Objections, NAR continues to assert the affirmative defenses it raised in its Answer to the Complaint. NAR reserves the right to update and supplement its response to this Interrogatory pursuant to Federal Rule of Civil Procedure 26(e).

**INTERROGATORY NO. 8:** Identify and describe each relevant antitrust geographic and product market and all facts and evidence that you contend support each such relevant market.

**ANSWER:**

NAR incorporates its General Objections and further objects to this Interrogatory as a premature contention interrogatory. NAR has not completed its investigation and discovery in this matter, nor has it completed its expert discovery, research, and analysis that could impact any

potential answers to contention interrogatories. Moreover, NAR construes this as a request to identify the evidence that NAR intends to proffer at trial or in future motion practice, and therefore further objects to this Interrogatory as a premature request for identification of documents to be used at trial, which will be disclosed in accordance with Federal Rule 26(a)(3), the Local Rules, the case schedule, and any related Court orders.

NAR further objects on that the grounds that the Interrogatory requires NAR to identify "each relevant antitrust geographic and product market" and facts that "support each such relevant market," which are both vague and ambiguous. NAR further objects that the Interrogatory to identify "all facts and evidence" is overly broad, and unduly burdensome, requiring NAR to conduct burdensome and unreasonable searches to identify all documents relating to a particular topic over multiple years.

NAR objects to the extent the Interrogatory seeks information: (a) outside its possession, custody and control; or (b) publicly available, already in the possession of Plaintiffs, or equally obtainable from third parties or from some source other than NAR that is more convenient, less burdensome, or less expensive.

NAR objects to the extent this Interrogatory calls for legal arguments or conclusions. NAR also objects to this Interrogatory to the extent it seeks identification of documents containing information protected by the attorney-client privilege, the attorney work-product doctrine, and other applicable legal protections.

NAR objects on the grounds that this Interrogatory impermissibly shifts Plaintiffs' burden of proof to NAR by requiring NAR to define the applicable markets in Plaintiffs' claim.

Subject to the foregoing General and Specific Objections, NAR responds as follows:

Because this Interrogatory requests information that will be the subject of merits expert discovery, NAR will respond to this Interrogatory following production of merits expert reports pursuant to the Court's scheduling order, or as the Court may otherwise order in response to the currently pending motions. NAR further reserves the right to update and supplement its response to this Interrogatory pursuant to Federal Rule of Civil Procedure 26(e).

**INTERROGATORY NO. 9:** For the Relevant Time Period, Identify all individuals or entities that You have been informed, or otherwise have reason to believe, have or may have received Civil Investigative Demands ("CIDs") from the Department of Justice relating to real estate commissions and, for any such CID, indicate when the CID was sent or received and whether documents have been provided to the Justice Department, NAR, or to any Corporate Defendant that are related to that CID. If Your answer relies on Documents or testimony, Identify the evidence by Bates number, testimony/affidavit page, and specify the identity of the witness.

**ANSWER:**

NAR designates its Answer to Interrogatory No. 9 as "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY – SUBJECT TO PROTECTIVE ORDER" in its entirety, pursuant to the Agreed Protective Order entered by the Court on June 13, 2024.

NAR incorporates its General Objections and further objects to the extent the Interrogatory seeks information: (a) outside its possession, custody and control; or (b) publicly available, already in the possession of Plaintiffs, or equally obtainable from third parties or from some source other than NAR that is more convenient, less burdensome or less expensive.

Subject to and without waiving any of the foregoing General or Specific Objections, NAR responds as follows:



███████████████████████████████████████████████

███████████████████████████████████████.

**INTERROGATORY NO. 10:** For the period between 1992 and the Present, Identify and Describe each attempt (whether successful or not) by any board member, executive, employee, or agent of the Corporate Defendants or their Subsidiaries to rescind or modify the NAR Rules. For purposes of this interrogatory, "Describe" includes: (i) the content of any proposal, including the rule to be modified and any proposed replacement language; (ii) the timing of any attempt and subsequent Communications regarding that attempt; (iii) the name(s) of any individuals making or receiving communications regarding the attempt; (iv) any efforts taken by the Corporate Defendants or their Subsidiaries in support of each attempt; (v) the substance of any communications regarding the proposal; and (vi) the current status of any attempt.

**ANSWER:**

NAR incorporates its General Objections and further objects to this Interrogatory to the extent it seeks information from long before the filing of the Complaint on January 25, 2021. Documents and information dating from well prior to that date are neither relevant nor proportionate to the needs of the case.

NAR objects to this Interrogatory as unreasonably cumulative or duplicative of Interrogatory No. 3.

NAR objects to this Interrogatory because it presumes NAR's knowledge of subsidiaries of any Corporate Defendants and of any individual's status as a board member, executive, employee, or agent of the Corporate Defendants or their subsidiaries. NAR does not have a practice of recording or documenting the identity or corporate affiliation of any individual who may make proposals or requests concerning NAR rules. NAR further objects to this Interrogatory because this information is more readily available to Plaintiffs from Corporate Defendants.

Subject to and without waiving any of the foregoing General and Specific Objections, NAR responds as follows:

NAR incorporates its objections and responses to Interrogatory No. 3.

NAR is not aware of any attempts by the Corporate Defendants or their Subsidiaries to rescind or modify NAR's rules other than the March 7, 2022 proposal from Caitlin McCrory to the MLS Technology and Emerging Issues Advisory Board to modify MLS Policy Statement 7.23 ("the Realogy Proposal"). *See* NARSITZER0000866931 (MLS Technology and Emerging Issues Advisory Board Minutes); NARSITZER0000866957 (MLS Technology and Emerging Issues Advisory Board Agenda); NARSITZER0000867005 (Appendix 6 to the March 7, 2022 MLS Technology and Emerging Issues Advisory Board Agenda); NARSITZER0000867008 (MLS Technology and Emerging Issues Advisory Board PowerPoint).

As explained by NAR's 30(b)(6) witness in *Sitzer et al v. National Association of Realtors et al*, the MLS Technology and Emerging Issues Advisory Board did not receive support for the Realogy Proposal. Accordingly, it never advanced to a vote and MLS Policy Statement 7.23 was not amended. *See* NAR 30(b)(6) 8/3/2022 Dep. Tr. 96:9-99:10.

**INTERROGATORY NO. 11:** Identify and describe all research You have conducted concerning the impact of the NAR Rules on consumers, including homebuyers and home prices, or Brokers, including changes to the NAR Rules, and the individuals responsible for such research.

**ANSWER:**

NAR incorporates its General Objections and further objects that terms "research" and "impact" are vague and ambiguous and that the request for "all" such research is overly broad and unduly burdensome, requiring NAR to conduct burdensome and unreasonable searches.

Subject to the foregoing General and Specific Objections, NAR responds as follows:

NAR is not aware of any NAR research concerning the impact of the NAR Rules on consumers, including homebuyers and home prices, or Brokers, including changes to the NAR Rules.

**INTERROGATORY NO. 12:** Identify and fully describe all databases or sources that track, maintain, compile, or otherwise set forth transactional data or summaries of commissions offered or paid to listing agents or brokers and buyer agents or brokers.

**ANSWER:**

NAR incorporates its General Objections and further objects that the terms "sources," "set forth," and "summaries of commissions" are vague and ambiguous and that the request for all databases or sources that "set forth" transactional data or summaries of commissions is overly broad and unduly burdensome.

Subject to and without waiving any of the foregoing General and Specific Objections, NAR responds as follows:

NAR does not track, maintain, or compile transactional data or summaries of commissions offered or paid to listing agents or brokers and buyer agents or brokers.

**INTERROGATORY NO. 13:** Identify Your five current or former Employees who are the most knowledgeable about the following topics, and describe their terms of employment, current and former titles, the basis for their knowledge, and the time period and volume of associated ESI available:

a.  The Buyer Broker Commission Rules;

b.  The Commission Filtering and Disclosure Rules;

c.  Advertising Buyer-Brokers as Free Rules;

d.  Clear Cooperation Rules;

e.  Restraints on Negotiation Rules;

f.  Relevant NAR Groups;

g.  MLSs and compliance with NAR Rules;

h.  Your collection and retention of data relating to commissions;

i.  Training or guidance You provide regarding the NAR Rules;

j.  Your compliance policies and/or efforts to comply with federal, state, or international antitrust laws; and

k.  Any practice of Brokers steering, encouraging, or discouraging potential buyers toward or away from a home based on the amount or type of compensation offered in that home's listing, including by: (i) filtering or sorting listings by amount or type of compensation; (ii) declining to disclose to a potential buyer that a home has been

81

listed; (iii) refusing to show a home to a buyer; (iv) discouraging a buyer from submitting an offer on a listing; and (v) encouraging a buyer to view or purchase a home based on the amount or type of compensation.

l.     Any practice of Brokers encouraging a home seller to offer a commission to a buyer's agent based, in part or in whole, on the belief that a higher offered commission will entice more showings, offers, or a higher home price.

m.    Your guidelines, policies, rules, recommendations, and training regarding Brokers' compensation amount or type.

n.    Complaints received from any customer of Real Estate Services or any Broker or agent regarding NAR Rules.

**<u>ANSWER</u>:**

NAR incorporates its General Objections and further objects to the request for "terms of employment" as vague, ambiguous, and not relevant to the parties' claims or defenses. NAR objects to the use of the undefined term "Real Estate Services" as likewise vague and ambiguous.

NAR objects to the request for "the time period and volume of associated ESI available" as violating Plaintiffs' prior agreement with NAR regarding their document requests, as memorialized in the parties' email thread with the subject line, "Batton plaintiffs' discovery proposal to NAR."

Subject to and without waiving any of the foregoing General and Specific Objections, NAR identifies the following five individuals and their current and former titles with NAR:

Rodney Gansho has been NAR's Senior Director of Engagement since 2025. He served as NAR's Director of Engagement from 2018 to 2025, Managing Director of Member Policy from 2014 to 2018, Director of the Member Policy from 2013 to 2014, Manager of Policy Information from 2002 to 2013, Board Policy Communications Specialist in 2001, Policy Consultant from 1993 to 2001, and Policy Analyst from 1991 to 1993.

Rene Galicia was NAR's MLS Director for the Member Experience, Engagement and Legal Group from 2018 to 2021.

Kate Moore (Lawton) has been NAR's Vice President of Member Experience since 2018. She served as NAR's Director of Professional Standards and Financial Administration from 2016 to 2018, Manager of Professional Standards and Administration from 2014 to 2016, Policy Consultant from 2009 to 2014, and GREEN Designation agent from 2008 to 2009.

Sharon Millett was the NAR President in 1999 and served as a member of the 2024 Leadership Team. Millett has been a member of NAR's Board of Directors since 1985 and in 2016 was awarded Emeritus Member for life on the NAR Executive Committee. In 1995, she served as NAR's Vice President and Liaison to Committees and as a member of the association's Member Services Presidential Advisory Group. In 1994, Millett was NAR's Committee Liaison for the Internal Policy and External Communications Group. In 1993, she chaired the Strategic Planning Committee and served as Vice Chair of NAR's Presidential Advisory Group on the Facilitator Concept. Between July 1991 and April 1992, Millett chaired NAR's Presidential Advisory Group on Agency. In 1988, she was an NAR Regional Vice President for Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont.

Diane Mosley has been NAR's Director of Training and Policy Resources since 2014. She served as NAR's Director of Policy Resources from 2013 to 2014, Manager of Policy Resources from 2002 to 2013, and Assistant Director of Professional Standards and Multiple Listing from 1990 to 2001.

The basis for Mr. Gansho, Mr. Galicia, Ms. Millet, Ms. Moore (Lawton), and Ms. Mosley's knowledge of the above-listed topics is their experience in their respective roles at NAR.

**INTERROGATORY NO. 14:** Identify by name, employer, title, and address all current and former employees and all third parties you are aware of who objected in some fashion to the NAR Rules.

**ANSWER:**

NAR incorporates its General Objections and further objects to the phrase "third parties" as vague and ambiguous. NAR objects to the request for information about those who "objected in some fashion" as vague, ambiguous, overly broad, and unduly burdensome.

NAR objects to the request for third parties' employers, titles, and addresses as seeking information: (a) outside its possession, custody and control; or (b) publicly available, already in the possession of Plaintiffs, or equally obtainable from third parties or from some source other than NAR that is more convenient, less burdensome or less expensive.

Subject to and without waiving any of the foregoing General and Specific Objections, NAR responds pursuant to Federal Rule of Civil Procedure 33(d) and refers Plaintiffs to the following produced documents: NARSITZER0000866964; NARSITZER0000866966; NAR_Battonl01168306; NAR_Battonl00999092; NAR_Battonl01154317; NAR_Battonl00976189; NARSITZER0000741583; NARSITZER0000741583; NARSITZER0000813692; NARSITZER0000819977.

**INTERROGATORY NO. 15:** Identify all training materials, guidance, or reference materials made available to NAR members concerning the NAR Rules.

**ANSWER:**

NAR incorporates its General Objections and further objects to this Interrogatory as requiring NAR to search for and provide information that is publicly available or is already in the possession of Plaintiffs. NAR also objects to the terms "guidance" and "reference materials" as vague and ambiguous.

Subject to and without waiving any of the foregoing General and Specific Objections, NAR directs Plaintiffs to NAR's MLS Policy Statements, Code of Ethics and Standards of Practice, Case Interpretations, Model MLS Rules and Regulations, Handbook on Multiple Listing Policy, https://www.nar.realtor/the-facts/nar-settlement-faqs, and https://www.nar.realtor/the-facts.

**INTERROGATORY NO. 16:** Identify all training materials, guidance, or reference materials made available to NAR members concerning regarding listing prices, making or considering an offer or counteroffer, or the negotiation of home prices.

**ANSWER:**

NAR incorporates its objections and responses to Interrogatory No. 15.

**INTERROGATORY NO. 17:** Identify all Meetings involving You concerning the FTC, DOJ, and CFPB, including, but not limited to, Meetings with officials or representatives of the FTC, DOJ, and CFPB. If Your answer relies on Documents or testimony, Identify the evidence by Bates number or testimony/affidavit page, and specify the identity of the witness if applicable.

**ANSWER:**

NAR designates its Answer to Interrogatory No. 17 as "HIGHLY CONFIDENTIAL –

OUTSIDE COUNSEL EYES ONLY – SUBJECT TO PROTECTIVE ORDER" in its entirety,

pursuant to the Agreed Protective Order entered by the Court on June 13, 2024.

NAR incorporates its General Objections and further objects to this Interrogatory as overly

broad to the extent it seeks information not related to subject matter of this litigation.

Subject to and without waiving any of the foregoing Specific and General Objections, NAR

responds as follows:

██████████████████████████████████████████████████████

████████████████

**INTERROGATORY NO. 18:** Identify all Meetings of the Relevant NAR Groups in which the NAR Rules or broker commissions were discussed, including the participants of each meeting and the identity of any Broker, Corporate Defendant, or MLS they are associated with.

**ANSWER:**

NAR incorporates its General Objections and further objects to this Interrogatory as

unreasonably cumulative or duplicative of Interrogatory No. 3, overly broad and unduly

burdensome to the extent it requests identification of "discuss[ions]" of the NAR Rules or broker

commissions, and vague and ambiguous in its use of the undefined term "Meetings."

Subject to and without waiving any of the foregoing Specific and General objections, NAR incorporates its objections and responses to Interrogatory No. 3.

**INTERROGATORY NO. 19:** Identify all changes to your training materials, guidance, or materials disseminated to NAR members made in response to litigation concerning the NAR Rules, such as *Moehrl*, *Sitzer*, *Nosalek*, or this litigation, or other changes from 2019 to the present related to the NAR Rules.

**<u>ANSWER:</u>**

NAR incorporates its General Objections and further objects to this Interrogatory as unreasonably cumulative or duplicative of Interrogatory Nos. 15 and 16. NAR also objects to the terms "guidance" and "materials" as vague and ambiguous.

Subject to and without waiving any of the foregoing Specific and General objections, NAR incorporates its objections and responses to Interrogatory No. 15.

Dated: August 4, 2025

Respectfully submitted,

/s/ Kylie Chiseul Kim

Leonard A. Gail
Suyash Agrawal
Brigid M. Carmichael
MASSEY & GAIL LLP
50 East Washington Street, Suite 400
Chicago, IL 60602
Tel: (312) 283-1590
lgail@masseygail.com
sagrawal@masseygail.com
bcarmichael@masseygail.com

Matthew M. Collette
Kylie Chiseul Kim
MASSEY & GAIL LLP
The Wharf
1000 Main Avenue SW, Suite 450
Washington, D.C. 20024
Tel: (202) 652-4511
mcollette@masseygail.com
kkim@masseygail.com

86

*Counsel for Defendant National*
*Association of REALTORS®*

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2025, I served the Objections and Responses of

National Association of Realtors® to Plaintiffs' First Set of Interrogatories to NAR on the

following counsel of record via email:

George A. Zelcs (Ill. Bar No. 3123738)
Randall P. Ewing, Jr. (Ill. Bar No. 6294238)
Ryan Z. Cortazar (Ill. Bar No. 6323766)
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Tel: 312.641.9750
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Steven M. Berezney (N.D. Ill. Bar
No. 56091)
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Tel: 314.241.4844
sberezney@koreintillery.com

Vincent Briganti (*pro hac vice*)
Christian Levis (*pro hac vice*)
Noelle Forde (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: 914.997.0500
vbriganti@lowey.com
clevis@lowey.com
nforde@lowey.com

***Counsel for Plaintiffs and the Proposed
Class***

Jeffrey A. LeVee (*pro hac vice*)
**JONES DAY**
555 Flower Street, 50th Floor
Los Angeles, CA 90071
Tel: 213.489.3939
Fax: 213.243.2539
jlevee@jonesday.com

Eddie Hasdoo (ARDC #6317518)
**JONES DAY**
110 N. Wacker Drive,
Suite 4800
Chicago, IL 60606
Tel: 312.782.3939
Fax: 312.782.8585
ehasdoo@jonesday.com

***Counsel for Defendant RE/MAX, LLC***

Kenneth M. Kliebard (ARDC #6201479)
Jason L. Chrestionson (ARDC #6326714)
**MORGAN, LEWIS & BOCKIUS LLP**
110 N. Wacker Drive, Suite 2800
Chicago, IL 60606
Tel: 312.324.1000
Fax: 312.324.1001
kenneth.kliebard@morganlewis.com
jason.chrestionson@morganlewis.com

Stacey Anne Mahoney (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Tel: 212.309.6000
Fax: 212.309.6001
stacey.mahoney@morganlewis.com

William T. McEnroe (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103
Tel: 215.963.5000
Fax: 215.963.5001
William.mcenroe@morganlewis.com

William S.D. Cravens (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: 202.373.6083
Fax: 202.739.3001
William.cravens@morganlewis.com

*Counsel for Defendant Anywhere Real Estate Inc.*

Timothy Ray (ARDC #6230099)
**HOLLAND & KNIGHT LLP**
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60603
Tel: 312.263.3600
timothy.ray@hklaw.com

David C. Kully (*pro hac vice*)
Anna P. Hayes (*pro hac vice*)
**HOLLAND & KNIGHT LLP**
800 17th Street NW, Suite 1100
Washington, DC 20530
Tel: 202.469.5415
david.kully@hklaw.com
anna.hayes@hklaw.com

Boris Bershteyn
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
One Manhattan West
New York, NY 10001
Tel: 212.735.3834
Fax: 917.777.3834
boris.bershteyn@skadden.com

*Counsel for Defendant Keller Williams Realty, Inc.*

*/s/       Brigid M. Carmichael*

## VERIFICATION OF INTERROGATORY ANSWERS

I, __Charlie Lee__ , state that I am the Associate General Counsel and Vice President, Association Legal Affairs at the National Association of REALTORS® ("NAR") and an authorized agent for the purpose of executing this document on behalf of NAR. While I do not have personal knowledge of all facts recited in the foregoing NAR's Answers to Plaintiffs' First Set of Interrogatories, the factual statements therein have been made after my review of information relating to the subject. Based on my review of the aforementioned records, the factual information contained in the foregoing document is true and correct to the best of my knowledge and belief. The document is, therefore, verified on behalf of NAR. As for the objections asserted in the foregoing document, they were prepared by counsel, and this verification does not pertain to them.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 4th day of August, 2025.